person who was in possession of the alleged controlled substance that Mr. Green was charged with, would have answered that question, rebutting the inference that Mr. Green must have possessed the drugs, because no one else was in a position to do so. In addition, Mr. Green's attorney failed to argue to the jury that the prosecution's evidence didn't prove that Mr. Green had been in possession of an alleged controlled substance, this is also significant because there was so little direct evidence of what actually happened, and this was far from an admission of guilt.

Because Mr. Green's counsel, Mr. Keith was unfamiliar with the case and/or case law, he was barred from introducing the evidence that someone else was in possession of the drugs, nor could he fully argue the police sloppy investigation theory. Because of counsel's being unfamiliar with the case and case law, Mr. Keith could not point out what the police hadn't done, nor could he suggest any exculpatory evidence that the police might have found had they conducted a more thorough investigation. The excluded evidence would have lent support to Mr. Green's theory that someone else had possession of the drugs and under mined the prosecutor's claim that a more thorough investigation would have turned up nothing of value. Rather than being limited to trying to poke holes in the prosecutions case, counsel could have plausibly argued that a more thorough investigation would have produced evidence incriminating only Mr. Brown as having possession of the drugs of which he sold to an undercover officer.

Finally, in light that the prosecution had no other eyewitnesses or evidence and the rest of their case consisted of weak circumstantial proof, the people failed to present legally sufficient evidence to convict Mr. Green of the charge of Criminal Possession of a Controlled Substance, in the First and Third Degree, in violation of Penal Law §§220.21(1); 220.16(1).

Therefore, Mr. Green should not have been found guilty of the crime of Criminal

Possession of a Controlled Substance in the First and Third Degree, in violation of Penal Law §§220.21(1); 220.16(1).

## DEFENSE COUNSEL FAILURE TO PREPARE A DEFENSE CONSTITUTED INEFFECTIVE ASSISTANCE OF COUNSEL

The failure of Mr. Green's defense Counsel to prepare a defense constituted Ineffective Assistance of Counsel. First, Mr. Arnold Keith decided not to prepare a proper defense for Mr. Green solely because he was confident that at the close of the prosecution's presentation of its evidence, the trial judge would have granted the defense motion to dismiss or the jury would have found Mr. Green not guilty. Counsel opted not to prepare a defense based entirely on this rational militates strongly in favor of the conclusion that his representation of Mr. Green was constitutionally deficient. See, Harris v. Reed, 894 F2d 871, 878-879.

[S]trategic choices made after thorough investigation of law and fact relevant to plausible options are virtually unchallengeable, and strategic choices make after less than a complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitation on investigations. Defense counsel had a duty to make a reasonable investigation or to make a reasonable decision that makes particular investigations unnecessary. Where ineffective assistance counsel is all alleged, a particular investigation must be directly assessed for reasonableness in all circumstances. As to a "conscious" decision, see Bean v. Calderon , 163 F3d 1073, 1079 (noting that a decision cannot be characterized as "strategic" where it was a resulted only from confusion); United States v. Gray, 878 F.2d 702, 712 ("counsel's behavior was not colorably based on tactical considerations but merely upon a lack of diligence").

As to "reasonably informed" decisions: see, Williams v. Taylor, 529 U.S. 362, 120 S.Ct.

1495 (2000) (noting that a decision based on a legal misunderstanding was not animated by "strategic" calculation); Kimmelman, 477 U.S. at 368, 106 S.Ct. 2574 (noting that a decision based on ignorance of relevant facts and mistaken beliefs was not based on "strategic considerations); Smith v. Stewart, 189 F.3d 1004, 1010 (holding that an attorney's decision not to pursue certain evidence was not "strategic" where, it was based on a lack of understanding of what constituted such evidence) and Williams, 59 F.3d at 680 (because of his ignorance, counsel was unable to make any strategic decision"); and compare Crisp v. Duckworth, 743 F.2d 580, 587("contrasting an attorney's general polic[y]" of how to defend a case with "strategic decisions," which are "decisions based on the specific facts of a given case").  The Supreme Court has explained that "[s]trategic choices made after a thorough investigation of law and facts relevant to plausible options are virtually unchallengeable."  Strickland, 466 U.S. at 690-691, 104 S.Ct. 2052.  But "virtually unchallengeable" does not mean wholly unchallengeable, see, Phoenix v. Matesanz, 233 F.3d 77, 82, n.2 (1st Cir. 2000), and decisions that are not reasonably informed have emphatically not been "made after a thorough investigation of law and facts."

Mr. Green's trial counsel failure to call any witnesses and to rely entirely on the people's evidence in exonerating the defendants was thus "strategic" in the sense that it related to a question of trial strategy which witnesses to call and it was trial "strategy" also in that it was made by counsel to advance a particular goal.  That goal, was mainly avoiding not-work, as it should have been, serving Mr. Green's interests by providing him with reasonably effective representation.

Mr. Keith's decision was "strategic" in some senses of the word, it was not the sort of conscious, reasonably informed decision made by an attorney with an eye to benefiting his client that the Federal Courts have denominated "strategic" and especially reluctant to disturb.

17

Accordingly, the hesitation to disturb "strategic" decisions described above has no bearing on this case. There are many ways to properly assist a client, but making important decisions with no regard for a client's interests is not one of them.

Mr. Keith's representation of Mr. Green was unprofessional to the point of being constitutionally "deficient" and "flawed". The cumulative weight of these flaws deprived Mr. Green of his constitutionally protected Sixth Amendment Right to Effective Assistance of Counsel.

## CONCLUSIONS

WHEREFORE, based upon these and a multitude of other failures, Mr. Green was deprived of meaningful representation by his attorney, Mr. Arnold Keith. Accordingly, the Mr. Green's conviction should be reversed.

Dated: March 2010

                                    Respectfully Submitted

                                    Edward Green, Pro-se

# VERIFICATION

I, Edward Green, being duly sworn according to the law of the State of New York, deposes and says that I am the plaintiff in the within action and that the facts set forth in the foregoing answer are true and correct to the best of my knowledge, information and belief, except as to matters therein to be alleged upon information and belief and as to those matters I believe it to be true.

The grounds of my belief as to all matters not stated upon my own knowledge are based upon my review of defendant's petitions in the within matter.

Dated:
April 2010

Respectfully Submitted
*Edward Green*
Edward Green, Pro-se 08A5510
Clinton Correctional Facility, Annex
Dannemora, New York 12929

Sworn to before me this
day of April 2010

# AFFIDAVIT OF SERVICE

I Edward Green, being duly sworn, depose and says:

I Edward Green` make and serve A true copy of the following papers: Petitioner's Affidavit in Support of Motion for Petitioner's Pro se Supplemental Brief to the Appellate Division-First Department, by mailing the same in a sealed envelope on the__day of March Two Thousand Ten, with postage prepaid thereon in a post office or official depository of the U.S. Postal Service within the State of New York, addressed to the last-known address of the addressee as indicated below:

cc:   **Office of the District Attorney**
      Appeals Unit
      One Hogan Place
      New York, New York 10013

     **STEVEN BANKS**             **NATALIE REA**
     Attorney for Defendant-Appellant    of Counsel
     THE LEGAL AID SOCIETY
     Criminal Appeals Bureau
     199 Water Street – 5th Floor
     New York, New York 10038

**Dated:**
**April 2010**

                                    Respectfully Submitted

                                      *Edward Green*
                                      Edward Green 08A5510
                                      Clinton Correctional facility Annex
                                      P.O. Box 2002

## PRINTING SPECIFICATIONS STATEMENT

The word count for this brief is 5,127 excluding the table of Contents, the Table of Authorities, and the Rule 5531. The word processing system used to prepare the brief and calculate the word count was Microsoft Word 2003. The brief is printed in Times New Roman, a verified, proportionally spaced typeface. The type size is 12 points in the text and headings, and 12 points in the footnotes. The line spacing is two.

*To be argued by*

BRITTA GILMORE

# 𝕹𝖊𝖜 𝖄𝖔𝖗𝖐 𝕾𝖚𝖕𝖗𝖊𝖒𝖊 𝕮𝖔𝖚𝖗𝖙

## Appellate Division - First Department

———

**THE PEOPLE OF THE STATE OF NEW YORK,**

*Respondent,*

- *against* -

**EDWARD GREEN,**

*Defendant-Appellant.*

## BRIEF FOR RESPONDENT

CYRUS R. VANCE, JR.
District Attorney
New York County
Attorney for Respondent
One Hogan Place
New York, New York 10013
(212) 335-9000
danyappeals@dany.nyc.gov

FRANK GLASER
BRITTA GILMORE
ASSISTANT DISTRICT ATTORNEYS
*Of Counsel*

# **TABLE OF CONTENTS**

Page

TABLE OF AUTHORITIES ........................................................................ iii

INTRODUCTION ........................................................................................ 1

      THE EVIDENCE AT TRIAL ............................................................. 5

      The People's Case .......................................................................... 5

POINT I

                DEFENDANT'S GUILT OF CRIMINAL
                POSSESSION OF A CONTROLLED
                SUBSTANCE IN THE FIRST AND
                THIRD DEGREES, AND OF TWO
                COUNTS OF CRIMINALLY USING
                DRUG PARAPHERNALIA IN THE
                SECOND DEGREE, WAS PROVED BY
                OVERWHELMING EVIDENCE. ................................... 11

POINT II

                THE RECORD DOES NOT SUPPORT
                DEFENDANT'S CLAIM THAT THE
                COURT IMPROPERLY RESPONDED TO
                A NOTE FROM THE DELIBERATING
                JURY. ................................................................................ 19

POINT III

                DEFENDANT WAS NOT DEPRIVED OF
                HIS RIGHT TO COUNSEL OR TO BE
                PRESENT FOR THE SUPPRESSION
                PROCEEDINGS. ............................................................. 28

POINT IV

                      DEFENSE COUNSEL'S MISLEADING
                      STATEMENTS IN OPENING
                      STATEMENT OPENED THE DOOR TO
                      THE ADMISSION OF THE PREVIOUSLY
                      SUPPRESSED KEYS. ........................................................ 40

POINT V

                      DEFENDANT WAS AFFORDED
                      EFFECTIVE ASSISTANCE  OF
                      COUNSEL ......................................................... 51

CONCLUSION .............................................................................. 60

**SR 104**

# TABLE OF AUTHORITIES

## FEDERAL CASES

Harrington v. Richter, 2011 U.S. Lexis 912 (January 19, 2011)...................................... 53

Jackson v. Virginia, 443 U.S. 307 (1979) .......................................................... 12

James v. Illinois, 493 U.S. 307 (1990) ......................................................... 46, 49

Walder v. United States, 347 U.S. 62 (1954) ................................................... 46

## STATE CASES

People v. Andrew, 1 N.Y.3d 546 (2003).......................................................... 23

People v. Baldi, 54 N.Y.2d 137 (1981)......................................................... 53

People v. Benevento, 91 N.Y.2d 708 (1998)................................................... 53

People v. Betts, 70 N.Y.2d 289 (1987).......................................................... 26

People v. Blakeney, 219 A.D.2d 10,
    aff'd, 88 N.Y.2d 1011 (1996).......................................................... 47

People v. Blythe, 262 A.D.2d 199 (1st Dept. 1999)....................................... 45

People v. Brown, 45 N.Y.2d 852 (1978)........................................................ 52

People v. Bundy, 90 N.Y.2d 918 (1997) ....................................................... 15

People v. Caban, 5 N.Y.3d 143 (2005)......................................................... 53

People v. Caraballo, 176 A.D.2d 669 (1st Dept. 1991)................................... 13

People v. Carter, 63 N.Y.2d 530 (1984)....................................................... 12

People v. Cintron, 95 N.Y.2d 329 (2000)...................................................... 14

People v. Contes, 60 N.Y.2d 620 (1983) ..................................................... 12

People v. Crimmins, 36 N.Y.2d 230 (1975) ................................................. 50

People v. Danielson, 9 N.Y.3d 342 (2007)................................................... 12

People v. Darden, 34 N.Y.2d 177 (1974) ...........................................17, 29, 31-32, 37, 54

People v. Degondea, 3 A.D.3d 148 (1st Dept. 2003) ...................................................... 37

People v. DeRosario, 81 N.Y.2d 801 (1993) ................................................................. 22

People v. Dominique, 90 N.Y.2d 880 (1997) ................................................................. 23

People v. Drain, 73 N.Y.2d 107 (1989) .....................................................................46-47

People v. Echevarria, 233 A.D.2d 200 (1st Dept. 1996) ................................................. 12

People v. Esajerre, 35 N.Y.2d 463 (1974) ..................................................................... 36

People v. Feldman, 296 N.Y. 127 (1947)....................................................................... 14

People v. Fernandez, 81 N.Y.2d 1023 (1993) ................................................................ 23

People v. Garrett, 13 A.D.3d 131 (1st Dept. 2004) ....................................................... 13

People v. Gole, 228 A.D.2d 696 (2d Dept. 1996) .......................................................... 47

People v. Gomez, 273 A.D.2d 160 (1st Dept.),
    lv. denied 95 N.Y.2d 890 (2000) .......................................................................... 27

People v. Hansen, 95 N.Y.2d 227 (2000) ...................................................................... 36

People v. Henry, 95 N.Y.2d 563 (2000).......................................................................... 53

People v. Jackson, 283 A.D.2d 201 (1st Dept. 2001)....................................................... 13

People v. Jervis, 12 A.D.3d 163 (1st Dept. 2004)............................................................ 23

People v. Johnson, 46 A.D.3d 415 (1st Dept. 2007),
    lv. denied 10 N.Y.3d 812 (2008) .......................................................................... 22

People v. Jones, 55 N.Y.2d 771 (1981)........................................................................... 52

People v. Kelly, 11 A.D.3d 133 (1st Dept. 2004) .......................................................25-26

People v. Kelly, 14 A.D.3d 390 (1st Dept. 2005) ....................................................... 22, 25

People v. Kinchen, 60 N.Y.2d 772 (1983)....................................................................... 23

People v. Kisoon, 8 N.Y.3d 129 (2007)........................................................................... 21

**SR 106**

People v. Littlejohn, 72 A.D.2d 515 (1st Dept. 1979) ............................................. 37

People v. Lopez, 6 N.Y.3d 248 (2006)...................................................................... 36

People v. Love, 57 N.Y.2d 998 (1982)...................................................................... 52

People v. Lugo, 61 A.D.3d 612 (1st Dept.),
    lv. denied 13 N.Y.3d 798 (2009) ...................................................................... 16

People v. Manini, 79 N.Y.2d 561 (1992) ................................................................ 12

People v. Marte, 14 A.D.3d 408 (1st Dept 2005) ................................................... 13

People v. Massie, 2 N.Y.3d 179 (2004)............................................................. 45, 47-48

People v. McGrath, 46 N.Y.2d 12 (1978),
    cert. denied, 440 U.S. 972 (1979) .................................................................... 46

People v. McPhatter, 235 A.D.2d 233 (1st Dept.),
    lv. denied 89 N.Y.2d 1038 (1997) .................................................................... 22

People v. Melendez, 55 N.Y.2d 445 (1982)......................................................... 45, 47

People v. Morales, 246 A.D.2d 396 (1st Dept. 1998) ............................................ 37

People v. Mullins, 179 A.D.2d 48 (3d Dept. 1992)............................................. 48-50

People v. Norman, 85 N.Y.2d 609 (1995)............................................................... 12

People v. O'Rama, 78 N.Y.2d 270 (1991); .............................................................. 21

People v. Ramirez, 60 A.D.3d 560 (1st Dept. 2009),
    aff'd 15 N.Y.3d 824 (2010) .............................................................................. 15

People v. Randolph, 294 A.D.2d 158 (1st Dept. 2002) .......................................... 13

People v. Reed, 84 N.Y.2d 945 (1994) .................................................................... 45

People v. Robinson, 41 A.D.3d 317 (1st Dept. 2007) ............................................ 16

People v. Rodriguez, 11 A.D.3d 350 (1st Dept. 2004) ........................................... 23

People v. Rogers, 52 N.Y.2d 527,
    cert. denied, 454 U.S. 898 (1981) .................................................................... 46

**SR 107**

People v. <u>Rojas</u>, 97 N.Y.2d 32 (2001) ................................................................. 45

People v. <u>Sandobar</u>, 191 A.D.2d 375 (1st Dept. 1993).................................. 13

People v. <u>Shack</u>, 86 N.Y.2d 529 (1995) ............................................................. 45

People v. <u>Starling</u>, 85 N.Y.2d 509 (1995) ....................................................... 22

People v. <u>Stewart</u>, 81 N.Y.2d 877 (1993)........................................................ 22

People v. <u>Tabb</u>, 13 N.Y.3d 852 (2009) ............................................................. 27

People v. <u>Tirado</u>, 38 N.Y.2d 955 (1976) ......................................................... 13

People v. <u>Vega</u>, 277 A.D.2d 18 (1st Dept. 2000)........................................... 45

People v. <u>Velasquez</u>, 1 N.Y.3d 44 (2003) ....................................................... 23

People v. <u>Waters</u>, 90 N.Y.2d 826 (1997) ........................................................ 45

People v. <u>Williams</u>, 38 A.D.3d 429 (1st Dept. 2007) .................................. 22

## STATE STATUTES

CPL 210.30(6) ......................................................................................................... 19

CPL 310.30......................................................................................................... 21, 27

CPL 440.10 ...................................................................................................25, 52, 60

CPL 440.10(1)(h) .................................................................................................. 52

CPL 470.05 ............................................................................................................. 39

CPL 470.05(2) ........................................................................................................ 45

Penal Law § 10.00(8) ........................................................................................... 12

Penal Law § 15.95(1) ........................................................................................... 12

Penal Law § 70.25(2) .............................................................................................. 2

Penal Law § 220.16(1) ............................................................................................ 1

Penal Law § 220.21(1) ........................................................................... 1

Penal Law §§ 220.50(2), (3) ................................................................. 1

Public Health Law §3306, Schedule II(b)(4) .................................... 19

### OTHER AUTHORITIES

Kamins, New York Search and Seizure § 8.04, pg. 8-32 ................. 47

Wigmore, Vol. II, [3d ed.], § 273 [1] .............................................. 14

SUPREME COURT OF THE STATE OF NEW YORK
APPELLATE DIVISION: FIRST DEPARTMENT

THE PEOPLE OF THE STATE OF NEW YORK,

Respondent,

-against-

EDWARD GREEN,

Defendant-Appellant.

BRIEF FOR RESPONDENT
INTRODUCTION

Defendant Edward Green appeals from an October 8, 2008 judgment of the Supreme Court, New York County (Edward McLaughlin, J.) convicting him, after a jury trial, of Criminal Possession of a Controlled Substance in the First Degree (Penal Law § 220.21[1]), Criminal Possession of a Controlled Substance in the Third Degree (Penal Law § 220.16[1]), and two counts of Criminally Using Drug Paraphernalia in the Second Degree (Penal Law §§ 220.50[2], [3]). Defendant was sentenced, as a second felony drug offender, to an aggregate prison term of 15 years, to be followed by 5 years of post-release supervision.[1] He is currently incarcerated pursuant to that judgment.

---

[1] Specifically, defendant received a fifteen-year sentence on the first-degree possession count, to be followed by 5 years of post-release supervision. That term was to
(Continued…)

On the evening of November 1, 2007, officers from the New York City Police Department's ("NYPD") Major Case Unit executed search warrants for the second- and third-floor apartments of an apartment building at 451 Lenox Avenue in Harlem. In the second-floor apartment, officers discovered a makeshift "office"; inside, officers apprehended co-defendant Steven Brown. A search incident to Brown's arrest revealed more than $900 on his person and a set of keys in his jacket pocket. The apartment itself contained 18 half-gram bags of cocaine packaged for sale, significant quantities of drug packaging materials, a gun holster, and a bag of marijuana. The main room was also equipped with a closed-circuit television ("CCTV") monitor whose split screen displayed real-time images of the building's front door as well as the entrance to the apartment. Officers stationed at the rear of the building reported that the CCTV wiring extended from the second-floor apartment to the rear southwest apartment on the fourth floor.

Officers went to the fourth floor, where they located the rear southwest apartment and used one of the keys seized from Brown to open the door. Inside, officers found defendant alone, sitting in the dark, unresponsive to their verbal commands. The apartment itself bore no signs of residential use: it contained no

---

(...Continued)

run concurrently with a twelve-year sentence on the third-degree possession count, to be followed by 3 years of post-release supervision. On the misdemeanor counts of criminally using drug paraphernalia, defendant received two 1-year prison terms, which merged with his felony sentences. Penal Law § 70.25(2).

-2-

clothing, personal effects, or typical furniture, and the outside windows had been covered with black garbage bags. The apartment's main room was littered with drug paraphernalia, including playing cards coated with cocaine residue, common mixing agents, a digital scale and two heat sealers, and hundreds of plastic baggies. The officers immediately arrested defendant, and seized more than $300 and a large set of keys from his person.

After securing defendant, the officers opened a nearby closet in order to confirm that no one was inside. Inside they discovered two combination-lock safes, assorted drug packaging materials, an additional heat sealer, and numerous digital scales. After obtaining a supplemental search warrant, the officers pried open the two locked safes. Inside one was a white "baby gift bag" containing three large chunks of cocaine which together weighed more than 17 ounces. The smaller safe contained two cigar boxes which contained approximately $1,100 in cash and additional cocaine, packaged and ready for sale.

By New York County Indictment No. 5643/07, filed on November 11, 2007, defendant and Brown were jointly charged with first- and third-degree criminal possession of a controlled substance, and two counts of second-degree criminally using drug paraphernalia. On April 9, 2008, the Honorable Edward J. McLaughlin held an ex parte hearing at which a confidential informant and a police officer testified. On June 30, 2008, after reviewing the parties' written submissions, the court denied defendant's motion to suppress a set of keys seized from his person and the

-3-

**SR 112**

contraband recovered from the fourth floor apartment, finding defendant lacked standing. Defendant moved to reargue the motion, and on August 11, 2008, Justice McLaughlin modified his initial ruling by suppressing the keys seized from defendant. On September 8, 2008, defendant proceeded to trial before Justice McLaughlin and a jury.[2]   On September 15, 2008, the jury convicted defendant as charged, and on October 8, 2008, defendant was sentenced as set forth above.

On appeal, defendant raises several claims through counsel and in a pro se supplemental brief. Through counsel, defendant argues that the trial court deprived him of his right to counsel and his right to be present during the police testimony at the pretrial hearing. Additionally, he contends that the trial court committed a mode-of-proceedings error by addressing a jury note off the record. Next, defendant argues that the trial court erred in ruling that remarks in counsel's opening statement opened the door to admission of the keys that had been suppressed. Finally, defendant argues that he was denied effective assistance of trial counsel when his attorney's closing statement opened the door to evidence regarding defendant's criminal history.

Defendant, pro se, contends that the trial evidence was legally insufficient to support his convictions for first- and third-degree criminal possession of a controlled substance, and that he received ineffective assistance from trial counsel.

---

[2] On September 9, 2008, co-defendant Brown pled guilty to a single count of Criminal Possession of a Controlled Substance in the Third Degree. He was sentenced, on October 7, 2008, to a determinate prison term of five years.

## THE EVIDENCE AT TRIAL

### The People's Case

On November 1, 2007, Detectives ANTHONY ROMERO and ALFRED HERNANDEZ executed two search warrants at 451 Lenox Avenue (Hernandez: 267, 270; Romero: 409, 411). The warrants, which Romero had obtained several days previously, were for two separate apartments at the address: one on the building's second floor, and one on the third floor (Hernandez: 268-269; Romero: 411-413). The team had information that drugs were being sold from the second floor of the building, and that there was a "stash apartment" on an upper floor (Hernandez: 354, 403-404).

The approximately 15 officers participating in the raid were divided into two teams, one assigned to each target apartment (Hernandez: 270, 348; Romero: 414). The teams arrived at 451 Lenox Avenue around 5:15 p.m. (Hernandez: 271). The four-story building housed a laundry on the ground floor, to the right of which was a separate door for the upper floors (Hernandez: 272-273, 366; Romero: 414). That door was locked, so an officer was instructed to wait outside until a resident entered or exited, and then to hold the door open for the teams (Hernandez: 272-273; Romero: 414). Once the door was secured, the third-floor team entered, followed immediately by the second-floor team, which included both Hernandez and Romero (Hernandez: 273-274).

-5-

**SR 114**

On the second floor, the team discovered a single door, on which there was a sign that read "Office Browns" (Hernandez: 274-275; Romero: 415; People's Exhibit 15 [photograph of door]). Hernandez and Romero entered. Inside they found an apartment that was "basically [ ] made up almost like an office," with several tables (Hernandez: 275, 336-337; People's Exhibit 12, 13, 16, [photographs of apartment]). A man later identified as co-defendant Steven Brown was seated at a table immediately to the right of the apartment's entrance (Hernandez: 275-276, 287; Romero: 415; People's Exhibit 1 [photograph of Brown]). Brown was immediately placed under arrest, and in a subsequent search officers recovered approximately $900 from his person, along with a set of keys (Hernandez: 277, 284, 296, 357; Romero: 415, 419; People's Exhibit 4 [keys, lock]).

The officers seized numerous items from the second-floor apartment. In a shelving unit in the living area, officers discovered a wooden box that contained 18 half-gram plastic baggies of cocaine, as well as empty plastic baggies and a gun holster (Hernandez: 276-277, 288-289; Romero: 416; People's Exhibits 2 [wooden box, baggies, holster]). Nearby on the same shelves were several pink cigar boxes labeled "Philly Blunts," all of which contained empty plastic bags typically used to package cocaine for sale (Hernandez: 279-280, 293; Romero: 416; People's Exhibit 3 [cocaine]). Several of the plastic bags bore the "Red Apple" stamp, a label commonly used in local cocaine trade (Hernandez: 279-281, 367). The shelving unit where Hernandez had recovered the packaged cocaine was covered in a white cocaine or

-6-

**SR 115**

cutting-agent residue, and a bag of marihuana was found on the table where Brown had been sitting (Hernandez: 281-283, 284, 367-369; Romero: 416).  A split-screen CCTV monitor mounted on the wall in the "living area" showed views of the door through which the teams had entered and the stairwell leading to the second floor apartment (Hernandez: 285; Romero: 417).  During the search, the monitor displayed a live video of the team members at the building's front entrance, as well as several officers in the stairwell (Hernandez: 285).  Soon after arresting Brown, the officers disconnected the CCTV cables and monitors (Hernandez: 323).

In the meantime, as the third-floor team approached the third-floor landing, officers heard the sound of running steps above them, and a door slamming (Hernandez: 301, 358; Romero 420).  At the landing, where the officers expected to see the single apartment that was the subject of the warrant, they instead discovered "multiple doors to multiple rooms," and an additional stairway leading to the fourth floor — not the single apartment that was the subject of the warrant (Hernandez: 298-299).  As the third-floor team weighed the situation, other officers reported that wires from the surveillance cameras that were trained on the front entrance and stairwell led not only to the second floor apartment, but also to an apartment at the

rear southwest corner of the fourth floor (Hernandez: 301, 358, 360; Romero: 417, 420).[3]

On the basis of that information, Romero and Hernandez went up to the fourth floor to find the rear southwest corner apartment (Hernandez: 302, 359; Romero: 420). When they reached the door, Romero inserted into the lock one of the keys seized from Brown on the second floor; the key turned, and Romero prepared to enter (Hernandez: 303; Romero: 420). Hernandez instructed Romero to wait for other officers to bring a "ballistic bunker" — a plastic shield — and a flashlight (Hernandez: 303, 371-372; Romero: 420-421). Once equipped with the shield and flashlight, Romero knocked on the door of the darkened apartment "numerous times," announcing the officers' presence and commanding anyone inside to come out. There was no response from inside (Romero: 421-422).

Romero then opened the door and shined a flashlight into the dark room (Hernandez: 303-304; Romero: 422). Taking a step in, Romero could see defendant sitting on a couch in a small, narrow room, staring silently at the wall (Hernandez: 304; Romero: 422-423). Hernandez turned on the lights; black garbage bags had been taped over the windows (Hernandez: 304; Romero: 423). Defendant remained on the

---

[3] At trial, defense counsel presented both detectives with an undated photograph of the façade of 451 Lenox Avenue, in which cable wires appeared to be strung across the entire front of the building (Hernandez: 362-363; Romero: 445-446; Defense Exhibit 1 [photograph]). Both officers stated that they did not see such wiring on the front of the building on November 1, 2007 (Hernandez: 362-363, 407; Romero: 445-446).

-8-

couch, and despite Romero's orders to "get to the ground," defendant did not move or speak, or even turn his head to look at the officers (Hernandez: 303, 373; Romero: 424; People's Exhibit 28 [photograph of defendant]).  The officers placed defendant under arrest and recovered $330 in cash and a large set of keys from his person (Hernandez: 305, 314-315, 351; Romero: 427, 485; People's Exhibit 29 [keys]).  Keys from that set opened the doors locks to both the second floor apartment where Steven Brown was arrested and the fourth floor apartment where defendant was arrested (Romero: 487-488).

After securing defendant, Hernandez and Romero went directly to the one other door in the room.  The door opened to a small closet containing two combination-lock safes, assorted drug packaging materials, and several digital scales (Hernandez: 305-306, 311, 370; Romero: 426).  Romero left the building in order to secure a supplemental search warrant covering the fourth floor apartment and its contents (Hernandez: 313; Romero: 426).  Once the new warrant was ready, Romero called Hernandez and directed him to pry open the safes (Hernandez: 314; Romero: 426).  In the larger of the two safes was a white "baby gift bag," inside of which Hernandez found three "large chunk[s]" of cocaine, each wrapped in a plastic baggie (Hernandez: 314, 328-329, 338-339; People's Exhibits 8, 9 [items seized from closet], 23-26 [photographs]).  The smaller of the two safes contained two cigar boxes, one labeled "Dutch Master," the other "Philly Blunt," like those recovered from the second-floor apartment (Hernandez: 314, 324-329; People's Exhibits 8, 9).  One box

-9-

contained approximately $1,100 and some pre-packaged cocaine; the other contained packages of cocaine "sealed up and ready for sale" (Hernandez: 314, 324-329, 338-339; People's Exhibits 8, 9, 18 [photograph]).  The apartment contained no personal items or clothing (Romero: 502).

In the main room, officers discovered "paraphernalia all over" (Romero: 425). A small glass table, covered in cocaine residue, stood immediately to the left of the apartment door.  Underneath that table was one of three heat sealers that were seized from the apartment (Hernandez: 306-308, 315, 338-339, 375-376; Romero: 425; People's Exhibits 5 [heat sealers], 27 [photograph]).  Several boxes of plastic baggies, as well as a bottle of peroxide and a box of baking soda — items commonly used to "cut," or dilute, pure cocaine — were on the mantel above the fireplace (Hernandez: 306, 308, 309, 324-328, 338-339; Romero: 425; People's Exhibits 8, 9, 21-22 [photographs]).  Also recovered from the main room were ten digital scales, two "kilo wrappers" typically used to package bricks of cocaine, and "thousands of small Ziploc bags" bearing the Red Apple logo, like those discovered on the second floor (Hernandez: 307, 318, 376; Romero: 425; People's Exhibit 6 [scales]).  Above the fireplace mantel was a television stand, and above that, a small television monitor (Hernandez: 306).  When Hernandez turned on the monitor, after the security cameras outside the building had already been torn down by other officers, the monitor showed only static (Hernandez: 320-321, 323; People's Exhibit 7 [cameras]).

-10-

**SR 119**

At trial, the parties entered into a stipulation concerning the results of the laboratory testing of the substances seized from the second and fourth floor apartments (Proceedings: 464). It was stipulated that a police civilian chemist received two separately vouched substances in two sealed envelopes, that laboratory analysis confirmed that the substances contained cocaine, and that the substances weighed 17.87 ounces and .16 ounces (Proceedings: 464).

During their deliberations, the jurors sent out several notes. The penultimate note inquired, in part, "if you have dominion + control of a space (i.e. apartment), do you automatically have control over everything in the room (locked and unlocked)" (Court Exhibit VI [note]). After conferring with the parties, the court responded, "no" (Proceedings: 626).

<u>POINT I</u>

DEFENDANT'S GUILT OF CRIMINAL POSSESSION OF A CONTROLLED SUBSTANCE IN THE FIRST AND THIRD DEGREES, AND OF TWO COUNTS OF CRIMINALLY USING DRUG PARAPHERNALIA IN THE SECOND DEGREE, WAS PROVED BY OVERWHELMING EVIDENCE (Answering Defendant's Pro Se Brief, Point I).

The jury found defendant guilty of first- and third-degree criminal possession of a controlled substance, and two counts of second-degree criminally using drug paraphernalia for his possession of the cocaine and packaging material seized from the second and fourth floor apartments at 451 Lenox Avenue. On appeal, defendant challenges the legal sufficiency of the evidence (Pro se Brief: 2-3) and contends it was

-11-

"weak" (Defense Brief: 38, 44). In fact, there was overwhelming proof that defendant and Brown knowingly exercised dominion and control over more than 17 ounces of cocaine (see Penal Law § 10.00[8]), and that their conscious objective was to sell the 18 pre-packaged baggies seized on the second floor. See Penal Law § 15.95(1). Furthermore, defendant and Brown exercised dominion and control over drug packaging materials and digital scales under circumstances demonstrating knowledge that those items would be used to package and distribute cocaine.

Evidence is legally sufficient when, "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); People v. Contes, 60 N.Y.2d 620, 621 (1983); see also People v. Carter, 63 N.Y.2d 530, 537 fn. 1 (1984). Thus, the proper inquiry is, simply, whether "viewing the facts in a light most favorable to the People," there is "a valid line of reasoning and permissible inferences from which a rational jury could have found the elements of the crime proved beyond a reasonable doubt." People v. Danielson, 9 N.Y.3d 342, 349 (2007); see also People v. Norman, 85 N.Y.2d 609, 620 (1995); People v. Echevarria, 233 A.D.2d 200, 202 (1st Dept. 1996).

A defendant may constructively possess contraband by exerting "a sufficient level of control over the area in which the contraband is found." People v. Manini, 79 N.Y.2d 561, 573 (1992). Indeed, this Court has held that a defendant is in

constructive possession of drugs when the evidence demonstrates that he was a participant in a drug dealing operation based in the apartment where the contraband is found. See, e.g., People v. Marte, 14 A.D.3d 408, 409 (1st Dept. 2005); People v. Garrett, 13 A.D.3d 131 (1st Dept. 2004); People v. Jackson, 283 A.D.2d 201 (1st Dept. 2001); People v. Sandobar, 191 A.D.2d 375 (1st Dept. 1993); People v. Caraballo, 176 A.D.2d 669 (1st Dept. 1991). That a defendant neither owns nor leases the area where contraband is found does not preclude a finding of constructive possession. Moreover, more than one person can exercise dominion and control over the same drugs; "[p]ossession if joint is no less possession." See People v. Tirado, 38 N.Y.2d 955, 956 (1976); People v. Randolph, 294 A.D.2d 158 (1st Dept. 2002).

Judged by these standards, the People's evidence amply proved defendant's guilt. Indeed, the jury reached the only reasonable conclusion based on the evidence: that defendant was a participant in the drug-selling operation being run out of the second- and fourth-floor apartments at 451 Lenox Avenue, and thus, that he constructively possessed the cocaine and paraphernalia recovered from both apartments.

Here, the only rational inference was that defendant was participating in a retail drug enterprise headquartered in the noted second and fourth floor apartments. The evidence unequivocally demonstrated that defendant was aware of the drugs and drug-packaging supplies in the apartments. Defendant demonstrated that awareness when the police rushed into the building. The officers testified that as they

-13-

approached the building's third floor, they heard the sound of someone running to the fourth floor, followed by a door slamming. Upon reaching the door to the target apartment on the fourth floor, the officers banged loudly on the door and identified themselves as police officers; there was no response, but when the officers entered the apartment they discovered defendant, sitting alone and silent in the darkened room. Even when instructed to "get down" on the ground, defendant remained motionless and non-responsive. That was not the behavior of an innocent bystander or invitee caught in the wrong place at the wrong time, as defense counsel suggested in voir dire. Rather, the jury was entitled to infer that defendant's remarkably detached manner was that of a man who, when caught red-handed with contraband, tried to affect the nonchalance of an innocent, but overplayed the part so badly that his guilty knowledge was plain for all to see. See generally People v. Cintron, 95 N.Y.2d 329, 333 (2000) (defendant's behavior when confronted by police was "sufficient to support the reasonable inference" of guilty knowledge); People v. Feldman, 296 N.Y. 127, 142 (1947) ("The kinds of conduct properly suggesting consciousness of guilt are beyond enumeration") (quoting in part Wigmore, Vol. II, [3d ed.], § 273 [1] ).

The character and contents of the fourth-floor apartment likewise offered compelling evidence of defendant's knowledge of the contraband inside it. After all, the apartment contained no signs of actual residential occupation, such as clothing, personal items, or typical furnishings. Black plastic garbage bags had been taped over the windows to conceal illegal activity. Drug paraphernalia was on display throughout

-14-

**SR 123**

the apartment.  On the fireplace mantel in the main room, officers recovered boxes of plastic baggies and two kilo wrappers, as well as bottles of peroxide and baking soda, mixing agents commonly used in drug manufacturing.  A digital scale and heat sealer sat underneath a glass table coated in cocaine residue.  That the apartment was a fully-equipped a drug packaging station was obvious.   Under these circumstances, defendant's feigned indifference to his surroundings merely underscored that he was well aware of the apartment's contents.

The People also proved that defendant constructively possessed the drugs and paraphernalia seized from the fourth floor apartment.  After all, when defendant was arrested inside the fourth-floor apartment, officers seized $333 dollars in cash and a large set of keys, including one that opened the lock on the apartment's door. Defendant's capacity to lock and unlock the apartment from the outside, with the key, proved that he exercised dominion and control over the apartment's contents. Further, only a member of the illegal enterprise being run in the apartment would have had a key to the door.  Put differently, the jury had every reason to conclude that defendant would not have been permitted to enter and remain in the apartment unless he was a working member of the operation.  See People v. Bundy, 90 N.Y.2d 918, 920 (1997) (under the specific facts presented, "a reasonable jury could conclude that only trusted members of the operation would be permitted to enter [the] apartment").  See also People v. Ramirez, 60 A.D.3d 560, 560-561 (1st Dept. 2009) ("Although nothing was in  open view, this was the type of premises where . . . the presence of casual

visitors or social guests would be unlikely"), aff'd 15 N.Y.3d 824 (2010); People v. Lugo, 61 A.D.3d 612, 613 (1st Dept.) (facts permitted jury to conclude defendant was "at least[ ] a participant in the drug operation being conducted out of the apartment and at least a joint possessor of the contraband at issue"), lv. denied 13 N.Y.3d 798 (2009); People v. Robinson, 41 A.D.3d 317, 317 (1st Dept. 2007) (defendant's possession of a key, as well as his entry and re-entry to apartment containing narcotics, drug paraphernalia, and cash permitted jury to conclude defendant was "one of the possessors of the apartment's unlawful contents by virtue of his involvement in the operation"). Thus, defendant had full knowledge and control over the fourth-floor apartment and its contents.

The evidence of defendant's knowledge of and control over the drugs and paraphernalia in the second floor apartment was similarly compelling. The evidence showed that the second and fourth-floor apartments comprised a single drug operation, run by defendant and Steven Brown. Indeed, like the fourth-floor apartment, the second-floor apartment was plainly not a personal residence. Like the fourth-floor apartment, the second-floor apartment was equipped with a CCTV monitor, and the two monitors were wired together, indicating that the fourth-floor monitor, like that on the second floor, provided surveillance of key areas both inside and outside the building. Like the fourth-floor apartment, the second-floor apartment was stocked with drug packaging materials for selling "Red Apple"-branded cocaine. And, of course, defendant and Brown each possessed keys to both apartments. Thus,

-16-

defendant and Brown ran a drug-trafficking operation conveniently located on the second- and fourth-floors of the same building. Therefore, defendant constructively possessed the drugs and drug paraphernalia in both apartments.

Nevertheless, defendant contends that the evidence of his guilt was "far from overwhelming," because the "the case rested on the testimony of two officers whose credibility the court seriously questioned" (Defense Brief: 38). But defendant's claim adverts to comments the court made at the pretrial <u>Darden</u> hearing, not the evidence before the jury (4/9/08 Transcript: 56-58, 60-63). At trial, Hernandez and Romero offered straightforward, consistent, and mutually corroborating testimony which, together with the physical evidence, overwhelmingly proved that defendant participated in the drug-selling operation at 451 Lenox Avenue.

Defendant also suggests that the purportedly erroneous admission of the keys seized from him at the time of his arrest could not have been harmless. In support of that claim, defendant asserts that the keys were "the main evidence connecting defendant to the second floor" and "the only evidence suggesting [he] was in the fourth floor apartment more than in passing" (Defense Brief: 44). But the keys alone did not definitively establish defendant's control over the contraband in the safes in the fourth floor apartment. In that regard, the jurors are presumed to have followed the court's supplemental instruction that any conclusion that defendant had control over the apartment did <u>not</u> compel the conclusion that he had control over all everything in the apartment. (Court Exhibit VI; Proceedings: 627, 629-630). In fact,

-17-

**SR 126**

as discussed above, the crucial evidence of dominion and control was, as to all counts, a combination of circumstances, namely, the markedly similar drug packaging and vending materials, and the countermeasures taken against detection with which each apartment had been equipped and to which any occupant of either apartment had ready access. This was the crucial evidence proving that defendant was a working participant in a single, dual-apartment drug enterprise. As such a participant, defendant had dominion and control. Defendant's possession of the keys confirmed this fact, but was not the sine qua non of the proof of his possession.

Finally, defendant argues in his pro se brief that, because the People failed to establish a proper chain of custody for the drugs seized from 451 Lenox Avenue, the drug evidence admitted at trial was "never satisfactorily authenticated" (Pro se Brief: 4). Defendant also complains that the trial court "had no evidence before it that [defendant] had committed the crime charged by possessing a control[led] substance, to wit, cocaine" in "a specified weight" (Pro se Brief: 3, 4). But defendant overlooks entirely the stipulation agreed upon by the parties, and read into evidence at trial (Proceedings: 464). By that stipulation, the parties agreed that the narcotics seized from 451 Lenox Avenue were delivered to the laboratory, sealed, and that chemical analysis revealed that each of the substances contained cocaine, and, combined,

weighed in excess of 17 ounces (Stipulation; Proceedings: 464).[4]   Accordingly, there

was no question at trial that the substances recovered from both the second and

fourth floor apartments contained cocaine, a controlled substance, or that the chunks

seized on the fourth floor and the packaged powder seized on the second floor had an

aggregate weight of more than 8 ounces.   See Stipulation; Proceedings: 464; Public

Health Law §3306, Schedule II(b)(4).

In sum, the jury's verdict was supported by ample proof, and should not be

disturbed on appeal.

<u>POINT II</u>

THE   RECORD   DOES   NOT   SUPPORT
DEFENDANT'S   CLAIM   THAT   THE   COURT
IMPROPERLY RESPONDED TO A NOTE FROM
THE DELIBERATING JURY (Answering Defense Brief:
Point I).

Defendant, on appeal, claims that the trial court committed a "mode of

proceedings" error by omitting to respond on the record to a note from the

deliberating jury (Defense Brief: 25-26).   This claim lacks merit.

The relevant facts are as follows.   Following the court's main charge and before

sending the jury out to deliberate, the court suggested that the parties "have a chat [ ]

with respect to the evidence" (Proceedings: 624).   Defense counsel immediately

---

[4] In his <u>pro se</u> brief, defendant also argues that the indictment was "invalid" because
the police lab report "did not charge and the trial court did not find specified amounts of
drugs" (Pro se Brief: 2-3).   To the extent that defendant challenges the sufficiency of the
grand jury evidence, his claim is unreviewable because the trial proof was legally sufficient.
CPL 210.30(6).

-19-

responded that he had "[n]o objection to the jury examining the evidence" (Proceedings: 624).    The parties then left the courtroom for a lunch break (Proceedings: 625).

During their deliberations, the jurors sent out four notes (Court Exhibits IV-VII [notes]).[5]  The first note requested the "polaroids, keys, locks, defense's pictures, scale(s)" (Court Exhibit IV).  The second note indicated that the jurors wanted "to try the key in the lock," and asked, "[c]an we open [the] bag?" (Court Exhibit V). Although the first and second notes were marked as court exhibits and placed in the court file, there is no mention of either note in the trial transcript.  The third note requested "clarification of [the] 3 elements per charge," and inquired, "if you have dominion + control of a space (i.e. apartment), do you automatically have control over everything in the room (locked and unlocked)" (Court Exhibit VI [note]).  The judge read the third note aloud to the parties and proposed a supplemental instruction that both parties found acceptable: the court would re-read the elements of each charge, and answer "no" to the jury's second question (Proceedings: 625-626).  The judge then called the jury into the courtroom, read the note aloud, and delivered the agreed-upon supplemental charge (Proceedings: 626-630).  The fourth and final note announced that a verdict had been reached (Court Exhibit VII [note]).

---

[5] None of the jury's notes bears a time designation (Court Exhibits IV-VII).

Criminal Procedure Law § 310.30 provides, in pertinent part, that if the jury requests further instruction during deliberations, the court must "after notice to both the people and counsel for the defendant," give such requested information as the court deems proper.  In interpreting this statute, the Court of Appeals made clear in People v. O'Rama, 78 N.Y.2d 270 (1991), and in People v. Kisoon, 8 N.Y.3d 129 (2007), that the court's "core responsibility" under this statute is (1) to give "meaningful notice" of the content of the jurors' requests, thereby giving the parties an opportunity to "frame intelligent suggestions" for the court's response, and (2) to provide a "meaningful response" to the jury.

O'Rama and Kisoon outlined the procedure for answering "a substantive written jury communication."  See Kisoon, 8 N.Y.3d at 134 (emphasis added). Specifically, the Court of Appeals indicated that a court in receipt of such a jury note should mark it as a court exhibit, read it into the record in the presence of counsel, without the jury, allow counsel an opportunity to suggest appropriate responses, apprise counsel the response and, finally, read the note and the response to the jury in open court.  O'Rama, 78 N.Y.2d 270, 277 (1991); see also Kisoon, 8 N.Y.3d at 134. The Court stressed that responding to a "deliberating jury's request for clarification of the law or further guidance on the process of deliberations" is a "critical" moment in a criminal trial.  Kisoon, 8 N.Y.3d at 134-35 (internal quotations omitted).  Thus, if counsel is denied access to the contents of a substantive jury note or denied input into

-21-

**SR 130**

how such a note will be answered, the resulting error presents a question of law even if the defendant fails to protest. O'Rama, 78 N.Y.2d at 279.

However, when defense counsel is given notice of the contents of the jury note and has knowledge of the substance of the court's intended response, "counsel's silence at a time when any error by the court could have been obviated by timely objection renders the claim unpreserved." People v. Starling, 85 N.Y.2d 509, 516 (1995); see also People v. Stewart, 81 N.Y.2d 877, 878-79 (1993); People v. DeRosario, 81 N.Y.2d 801, 803 (1993); People v. Kelly, 14 A.D.3d 390, 391 (1st Dept. 2005). Here, defense counsel expressly consented to allowing the deliberating jury to "examine" the evidence (Proceedings: 624). Because defendant specifically agreed, in advance, to permit the jury to examine the physical evidence, his O'Rama claim is not preserved for this Court's review.

Even if this Court were to treat the present claim as preserved, defendant cannot prevail, for two additional reasons. First, the parties' prior agreement that the jurors should be permitted to examine the evidence rendered the court's response to the note a purely ministerial function, the performance of which required no further input or discussion. See, e.g., People v. Johnson, 46 A.D.3d 415, 417 (1st Dept. 2007) ("jury's request for the "evidence" was in fact a ministerial request for the exhibits"), lv. denied 10 N.Y.3d 812 (2008); People v. Williams, 38 A.D.3d 429, 431 (1st Dept. 2007) (court's response to jury note was "essentially [a] ministerial act"); People v. McPhatter, 235 A.D.2d 233, 234 (1st Dept.) (where parties had previously agreed on

the matter, it was a "ministerial task" for court officer to deliver to the jury a gun that was in evidence, as well as to "assist" the jurors in opening the evidence bag if necessary), <u>lv.</u> denied 89 N.Y.2d 1038 (1997).

Moreover, defendant's claim should be rejected for a more fundamental reason. A party who seeks appellate relief must have made a record in the trial court sufficient to show that an error occurred. <u>People</u> v. <u>Fernandez</u>, 81 N.Y.2d 1023, 1024 (1993); <u>People</u> v. <u>Kinchen</u>, 60 N.Y.2d 772, 773-74 (1983).    That is because official proceedings are invested with a presumption of regularity, which may be overcome only by "substantial evidence." <u>People</u> v. <u>Andrew</u>, 1 N.Y.3d 546, 547 (2003); <u>People</u> v. <u>Velasquez</u>, 1 N.Y.3d 44, 48 (2003); <u>People</u> v. <u>Dominique</u>, 90 N.Y.2d 880, 881 (1997).    This rule applies even when "fundamental" rights are at issue.    <u>Velasquez</u>, 1 N.Y.3d at 47-48 (right to be present); <u>Kinchen</u>, 60 N.Y.2d at 773-74 (right to counsel).    Unsurprisingly, in response to defense claims that <u>O'Rama</u> was not followed, this Court has not hesitated to enforce against the defense the requirement that a proper record be made. <u>People</u> v. <u>Jervis</u>, 12 A.D.3d 163, 163 (1st Dept. 2004); <u>People</u> v. <u>Rodriguez</u>, 11 A.D.3d 350 (1st Dept. 2004) (as a "presumption of regularity attaches to judicial proceedings," and may be "overcome only by substantial evidence," defendant's claim that the court's response to the jury notes violated the principles of <u>O'Rama</u> rests on "pure speculation").

Under this principle, defendant's <u>O'Rama</u> claim is untenable.    There is no record evidence at all, much less "substantial evidence," that defense counsel lacked

-23-

**SR 132**

notice of or disagreed with any action taken in response to the jury note. And even if the parties did not discuss the note upon its receipt, the record makes clear that they had already agreed how such a request should be addressed. Thus, while defendant contends that there is "no record that the note was discussed or answered" (Defense Brief: 26), that is not a completely accurate characterization. The relevant record was made in <u>anticipation</u> of the note's delivery, rather than at the time of its receipt.

Importantly, too, the jury notes were marked sequentially as successive court exhibits. The note at issue here was Court Exhibit V, and was followed by Court Exhibit VI, which the parties discussed, and which the court answered on the record, without mentioning the first or second note. This convincingly demonstrates that the parties had all the information they wanted about the first two notes and agreed with any action taken in response. If that were not so, the parties received and resolved the third note without questioning what would have been perceived either as an obvious gap in the exhibit numbers or the conspicuous absence of the two preceding exhibits. That is absurd. The only reasonable interpretation of the record is that the parties were fully aware of the jury's two notes regarding the physical evidence, but saw no reason to re-hash their discussion of the issue or place it on the record a second time. Of course, the court's proper handling of the jury's third note, which articulated a substantive request for legal instruction, likewise weighs against defendant's claim of error as to the first two notes. Thus, the court understood the procedures for handling jury notes, and properly implemented them.

-24-

**SR 133**

Defendant, while acknowledging an "exception" to the <u>O'Rama</u> procedure where the jury's request concerns a "ministerial" matter in which "counsel would have no meaningful input," nonetheless suggests that the note here was substantive (Defense Brief: 27). But defendant offers no hint of what meaningful input his trial counsel — who had already agreed that the jury could "examine" the evidence — could have provided. Instead, defendant points to <u>People</u> v. <u>Kelly</u>, 11 A.D.3d 133 (1st Dept. 2004), arguing that the jury request here was "similar and equally substantive" because it amounted to a request "to introduc[e] extra-record information into jury deliberations" (Defense Brief: 28). But <u>Kelly</u> cannot help defendant's cause.

In <u>Kelly</u>, before the jury was sent out to deliberate, the parties agreed that the trial exhibits, including a bayonet used to commit the charged murder, should be provided to the jurors upon request. 11 A.D.3d at 138. When the court officer later delivered the bayonet and its sheath to the jury room, the jurors asked to handle the weapon. <u>Id</u>. Concerned for the jurors' safety, the court officer instead agreed to remove the bayonet from its sheath as the jury watched; he then answered questions about the demonstration. <u>Id</u>.[6] Once informed of the demonstration, the trial judge

---

[6] It was revealed, in a subsequent motion pursuant to CPL 440.10, that the jurors wanted to know how easy it was to remove the bayonet from its sheath. <u>Kelly</u>, 11 A.D.3d at 139-140. At least one juror considered the officer's demonstration and answers to questions relevant to the issues at trial. <u>Id</u>.

-25-

immediately returned the jurors to the courtroom and instructed them to disregard the demonstration.  Id.

On direct appeal, this Court did not, as defendant suggests, determine that the jury's request for a demonstration was "substantive and not ministerial" (Defense Brief: 28).  Nor did the court conclude that the court officer's demonstration violated defendant's right to be present during a material stage of the proceedings.  To the contrary, this Court concluded that the court officer's refusal to relinquish the bayonet was "ministerial," and that his failure to direct the jury to put submit their questions in written form was also a "failure to perform a ministerial duty," and was thus subject to preservation rules and harmless error analysis.  Kelly, 11 A.D.3d at 143-144.  Perhaps most critically, the court further observed that "the court officer's jury room demonstration . . . was the kind of experiment that a jury could conduct itself in the jury room," and that neither constituted a mode-of-proceedings error nor escaped traditional preservation rules.[7]  The same is true here.  After all, turning a key in a lock

_____

[7] In a related argument, defendant suggests that the jury's request to try the key in the lock was also akin to the jury "asking about unexplained characteristics of an item of evidence," pointing for support to People v. Betts, 70 N.Y.2d 289, 295 (1987) (Defense Brief: 28).  Of course, the connection between the lock and key was not an "unexplained characteristic" of the evidence: Romero testified that the fourth floor lock was opened by keys seized from both defendant and Brown (Romero: 419-420, 487-488).  In any event, Betts in no way stands for the proposition that a jury's curiosity about "unexplained characteristics" of admitted evidence constitutes a substantive inquiry triggering O'Rama protections.  In Betts, the court merely held that it was error for the court to refuse, after a specific request, an instruction that the jury not "speculat[e] on the meaning" of a stain on a pair of jeans in evidence.  70 N.Y.2d at 295.

is an act a juror likely performs several times a day, and thus was a task involving nothing more than the "application of everyday experiences, perceptions, and common sense." People v. Gomez, 273 A.D.2d 160, 161 (1st Dept.) ("appropriate" experiment for jury to "drop" a gun to the floor to hear the resulting sound), lv. denied 95 N.Y.2d 890 (2000).

Defendant's reliance on People v. Tabb, 13 N.Y.3d 852 (2009), is misplaced. It is of course true, as defendant notes (Defense Brief: 27), that in Tabb the court held that "in the absence of record proof that the trial court complied with its core responsibilities under CPL 310.30, a mode of proceedings error occurred requiring reversal." 13 N.Y.3d at 853. But the note at issue in Tabb requested "direction on, or an explanation of, 'the legal definition of self defense.'" Id. In a case in which defendant raised a justification defense against charges that he assaulted on a peace officer, that request was substantive, as it concerned potentially dispositive legal concepts well beyond the layperson's ken. Thus, the note in Tabb was subject to CPL 310.30, unlike the note at issue here. Moreover, there is no indication that in Tabb the record was as telling as the one here, where the parties anticipated a request for exhibits and expressly agreed that the jurors should be permitted to examine them. Put differently, defendant can find no support for his current arguments in a case where, unlike his own, there was no record at all.

Finally, if the jury in fact tried the keys in the locks and if the court improperly acquiesced, any consequent error would be harmless. As noted above, Detective

-27-

**SR 136**

Romero testified at trial that keys seized from both defendant and Steven Brown opened the fourth floor door. Thus, the jury's turning of the key in the lock would have interjected nothing into their deliberations that was not already part of the trial evidence, and there would have been no prejudice to defendant.

In sum, the parties agreed in advance that the jurors should be permitted, should they so request, to examine the trial exhibits. It was unnecessary for the parties to reconvene when the jurors sent out a note asking to inspect the exhibits and confirm that a key opened the lock. Thus, there was no irregularity entitling defendant to a reversal.

POINT III

> DEFENDANT WAS NOT DEPRIVED OF HIS RIGHT TO COUNSEL OR TO BE PRESENT FOR THE SUPPRESSION PROCEEDINGS (Answering Defense Brief, Point II).

On appeal, defendant claims that he was deprived of his right to counsel and his right to be present at a material stage of the proceedings when the court "excluded" him from a "hearing on the motion to suppress physical evidence" (Defense Brief: 29). For those reasons, defendant contends that he is entitled to reversal of his conviction, or, in the alternative, to have his appeal held in abeyance while a suppression hearing is conducted (Defense Brief: 33). In fact, defendant affirmatively waived the right to the hearing he now demands. Accordingly, he is not entitled to the relief he seeks.

-28-

**SR 137**

A.

On January 18, 2008, defendant filed an Omnibus Motion seeking, among other things, to suppress any "physical evidence seized from him" (Omnibus Motion: 6-7). At the same time, defendant moved to controvert the search warrants pursuant to which the police had entered and searched 451 Lenox Avenue, and further requested a hearing, pursuant to People v. Darden, 34 N.Y.2d 177 (1974), to confirm the existence of the confidential informant who supplied information in support of the warrant (Omnibus Motion: 9-12). Specifically, defendant asserted that the court should, after in camera questioning of the informant, make an attempt to "communicate the substance of the information's information without betraying his or her identity" (Omnibus Motion: 11-12). In a February 6, 2008 response, the People argued that defendant did not have standing to seek suppression of the evidence seized in the searches of 451 Lenox Avenue (Omnibus Response: 5). Specifically, the prosecutor pointed out that defendant's claims to be a manager of the Laundromat at 451 Lenox or the superintendant of the building were insufficient to confer standing (Omnibus Response: 6). Further, the prosecutor argued, because defendant had failed to allege standing, he was not entitled to a suppression hearing (Omnibus Response: 7).

In his February 19, 2008 decision on the Omnibus Motion, the Honorable Charles H. Solomon granted a hearing

-29-

> with regard to the legality of the detectives' initial entry
> [into] the fourth floor apartment, as well as their actions
> once inside.   The warrant was premised, in part, on
> observations made by them while inside the apartment
> prior to obtaining the warrant.   Whether the information
> contained in the affidavit stemmed from unlawful police
> conduct and tainted the warrant application will be
> determined at the hearing

(Solomon Decision: 1).   The court additionally directed the People to provide

defendant with "the search warrant application for 451 Lenox Avenue, fourth floor

southwest apartment" (Solomon Decision: 1).   Finally, Justice Solomon specifically

found that defendant had failed to demonstrate standing to challenge the search of

the apartments on the second and third floors of the building (Solomon Decision: 1).

On March 31, 2008, the People moved for a Protective Order limiting discovery of

the search warrants and supporting affidavits.

On April 9, 2008, the Honorable Edward McLaughlin conducted a hearing

outside defendant's presence, at which the confidential informant and Detective

Romero testified (4/10/2008 Letter: 1).   Romero was the applicant for the search

warrants for 451 Lenox Avenue, and had submitted an affidavit in connection with

each application.   At the conclusion of Romero's testimony, the trial judge pointed

out that the confidential informant "didn't say anything about the fourth floor" at 451

Lenox Avenue.   Thus, Romero's affidavit was the sole basis for the fourth floor

warrant (4/9/08 Transcript: 56-57).   Accordingly, the court observed, "[t]his strikes

-30-

**SR 139**

me [as] a hearing to decide whether there was probable cause to get the warrant"
(4/9/08 Transcript: 59).

In response, the prosecutor proposed that the hearing be treated solely as a
"Darden/Castillo hearing," and that the court issue findings concerning the
confidential informant (4/9/08 Transcript: 59-60). Then, the prosecutor suggested,
the "issues on the scope of the execution of the warrant" could be "litigated fully [ ] in
an adversary hearing" (4/9/08 Transcript: 60). After further discussion, the trial
judge concluded that he would "let the two lawyers litigate" the probable cause issues
that had arisen (4/9/08 Transcript: 63).

The following day, April 10, 2008, Justice McLaughlin informed the defense by
letter that the Darden hearing was complete, and set forth general findings regarding
the existence of the confidential informant (4/10/2008 Letter: 1). The judge then
explained that, following the confidential informant's testimony, Detective Romero
had offered testimony about the police team's entry into the fourth floor (4/10/2008
Letter: 1). The court explained that "the prosecutor requested and I ultimately agreed
to permit you to litigate any legal issues presented by the police entry into the fourth
floor" (4/10/2008 Letter: 1). To that end, the court announced that it would provide
Romero's redacted testimony to the defense (4/10/2008 Letter: 2). The letter
continued:

> Once you have read the minutes, you either can ask to
> resume the hearing with a further appearance by Det.
> Romero or you may choose to brief the issues which Judge

> Solomon asked to be resolved or you may submit papers
> regarding them.   While I made some preliminary
> assessments about the matters the People might want to
> address, it was done before they convinced me that the
> preferred method would be to do what this letter states.
> Consequently, I am not bound by my preliminary remarks
> made at the end of the hearing.  I can be convinced to alter
> both the factual assessments and preliminary identification
> of the issues I mentioned.

(4/10/2008 Letter: 2).

On April 25, 2008, defense counsel, via email, declined the court's offer to

reopen the hearing for additional testimony from Detective Romero (People's

Suppression Response at ¶ 4).  On April 30, 2008 the court issued "Supplemental

Darden Hearing Findings" which provided additional information about the identity

of the confidential informant, as well as the information he provided in support of the

warrant (Supplemental Findings: 1).[8]  In the same letter, the court set forth a briefing

schedule according to which the parties would address the legality of the police action

on the fourth floor of 451 Lenox Avenue (Supplemental Findings: 2).  In accordance

with that schedule, defendant submitted a memorandum on May 20, 2008, and the

prosecutor submitted a response on June 17, 2008 (Defense Memo; People's

Suppression Response).

In his memorandum, defendant advanced several arguments for suppression of

the evidence seized on the fourth floor.  First, defense counsel asserted standing to

---

[8] None of the Darden findings are at issue on appeal.

challenge the searches of 451 Lenox Avenue on three grounds: that defendant was the "superintendant" of the building; that he acted as "manager" of the ground floor Laundromat, and that he was an "invited guest" of the lessee of the fourth floor apartment (Defense Memo: 13). Defendant additionally argued that the police had based the warrant applications on inaccurate information as to the second and third floor of the building, and no information whatsoever as to the fourth floor (Defense Memo: 17, 20). In particular, defense counsel argued that because the informant's information about the drug operation "stopped at the third floor," the slamming of an unidentified door above them did not provide "founded suspicion that criminality was afoot" (Defense Memo: 19-20). Accordingly, because the officers were acting on nothing more than a "hunch" when they began trying Brown's keys in the fourth floor locks, the information supporting the issuance of a search warrant for the fourth floor had been illegally obtained (Defense Memo: 19-20).

Finally, defendant contrasted Romero's redacted testimony from the April 9, 2008 hearing with the search warrant affidavits, and asked the hearing court to refuse to credit Romero's "patently tailored" testimony at the hearing (Defense Memo: 24-25). Specifically, defense counsel pointed out that Romero "had difficult[y]" answering even the most "basic questions." For example, Romero testified that, while on the third floor, he was unable to hear the team using a battering ram on the third floor, but nonetheless maintained that he could hear a door slamming on the fourth floor (Defense Memo: 25). So, too, although Romero's warrant affidavit claimed that

-33-

the apartments on the third floor were searched before the entry on the fourth floor, Romero maintained the opposite in his hearing testimony (Defense Memo: 25).

Furthermore, in his "Statement of the Case," defense counsel pointed out that Justice McLaughlin, at the conclusion of the hearing, took note of the discrepancies between Romero's hearing testimony and his warrant applications (Defense Memo: 8-11). The court stated that, while he did not know if the police testimony about the fourth floor was "exaggeration or puffery or sloppiness," it was plain that "the informant [ ] didn't say anything about the fourth floor" (Defense Memo: 8; 4/9/08 Transcript: 56-57). Further, counsel noted, the hearing court at least provisionally concluded that "there wasn't probable cause to start with on the fourth floor" (Defense Memo: 9; 4/9/08 Transcript: 60). In the end, defense counsel argued, the "totality of the circumstances" required that the evidence seized from the fourth floor of 451 Lenox Avenue be suppressed (Defense Memo: 26).

In their response, the People pointed out that none of defendant's claims —to being the building's superintendant, the manager of the Laundromat, or an invitee — was sufficient to establish defendant's standing to contest the search of the fourth floor apartment (People's Response: 2-4). The People also maintained that the police entry into the fourth floor was supported by probable cause, as the information available to the officers suggested that cocaine was sold from the second floor of 451 Lenox, but was packaged and stored above the second floor (People's Response: 5-6). But even if that information was insufficient to establish probable cause, the People

-34-

pointed out, the entry into the fourth floor apartment was justified by exigent circumstances (People's Response: 6). Specifically, the CCTV wires connecting the apartments, the sound of footsteps running to the third or fourth floor, and the slam of a door on an upper floor gave the officers reason to believe that their presence had been detected, and that there was reason to believe someone might destroy evidence or contraband on the upper floors of the building (People's Response: 7). Finally, the People contended that the unfolding circumstances justified a "security sweep" of 451 Lenox Avenue (People's Response: 7).

On June 30, 2008, the trial court issued a "Decision on the Motion to Controvert the Search Warrant" (6/30/2008 Decision: 1). In that decision and order, the court concluded that, although the search of the fourth floor apartment at 451 Lenox Avenue was unlawful, defendant lacked standing to challenge the search (6/30/2008 Decision: 11-13, 13-18). Specifically, the court held that none of defendant's primary claims — that he possessed a key to the apartment, that he was an invited guest, or that he was a building superintendent — established a legitimate expectation of privacy in the fourth floor apartment (6/30/2008 Decision: 11). The court additionally rejected defendant's claim that he could rely on the doctrine of "automatic standing" in challenging the search (6/30/2008 Decision: 12).

By papers dated July 22, 2008, defendant moved to reargue his motion to suppress (Notice of Motion to Reargue; Motion to Reargue: 2-3). In an August 11, 2008 decision on the motion, the trial court granted defendant's motion to reargue to

the extent of suppressing the keys seized from defendant's person, but again rejected defendant's standing arguments as to the search of the fourth floor apartment (8/11/2008 Decision: 1-2).

### B.

On appeal, defendant contends that the trial court violated both his right to counsel and his right to be present at a material stage of the proceedings by "excluding" defendant and counsel "from the hearing on the motion to suppress" (Defense Brief: 29). Indeed, defendant contends that "the People asked for an adversary proceeding," but "[t]he court refused" (Defense Brief: 29-30). Defendant is simply wrong.

To be sure, the Court and the prosecutor perceived issues in Romero's account of the execution of the search warrants that could properly be the subject of a conventional suppression hearing in the presence of both parties. Therefore, the court properly offered defendant the opportunity to litigate those issues at such a hearing, or, alternatively, to brief the issues presented by the police action on the fourth floor. There is no dispute that defendant specifically elected to brief the suppression issues rather than resume the hearing. Thus, defendant both failed to preserve his current demand for a suppression hearing and affirmatively waived any right to such a hearing. See People v. Lopez, 6 N.Y.3d 248, 256-257 (2006) ("Waiver [ ] occurs when a defendant intentionally and voluntarily relinquishes or abandons a known right"); People v. Hansen, 95 N.Y.2d 227, 231 (2000) (same); People v.

-36-

Esajerre, 35 N.Y.2d 463, 466 (1974) (reasoning that if a defendant may waive a suppression motion by failing to act, he may affirmatively waive the judicial determination of a previously filed suppression motion).   Accordingly, defendant should not now be heard to demand a hearing that he expressly refused below.  See People v. Littlejohn, 72 A.D.2d 515, 515 (1ˢᵗ Dept. 1979) (concluding that defendant's failure to object was "strategy," and that "having tacked, thus, and failed," defendant was not entitled to review in the interest of justice); see also People v. Degondea, 3 A.D.3d 148, 159 (1st Dept. 2003); People v. Morales, 246 A.D.2d 396, 397 (1ˢᵗ Dept. 1998).

Importantly, defendant's waiver was not only intentional, knowing, and voluntary, but tactically sound.  At the Darden hearing, Justice McLaughlin noted that components of Romero's testimony about what had transpired prior to his application for the fourth-floor warrant — the seizure of a gun holster on the second floor, the sound of footsteps running to the fourth floor, followed by a door slamming — had not been included in the warrant affidavits before Judge Whiten (4/9/08 Transcript: 56-57).  Those omissions led Justice McLaughlin to observe, preliminarily, that the People had "probable cause problems" with the fourth floor warrant (Darden Hearing: 59).  In view of the court's seeming inclination to rule in defendant's favor on the probable cause question, defendant sensibly chose to forgo further testimony from Romero; metaphorically, defendant simply elected not to "stir the pot."

As defendant took pains to point out in his memorandum, Romero's hearing testimony was at times directly contradictory to the information supplied in his warrant affidavits. With those potentially damaging discrepancies in hand, defendant had no reason to seek further testimony or an opportunity for cross-examination, which would only afford Romero an opportunity to resolve the contradictions and repair the fissures in his hearing testimony. In other words, defendant reached the conclusion that he had more to gain by waiving the hearing and proceeding on the extant record than by reopening the hearing for further testimony. And defendant's strategy worked, to some extent. Although the hearing court found after both sides had briefed the issues that defendant lacked standing to contest the search of the fourth floor, it expressly concluded that the warrant applications contained "insufficient information" to support a police search of the fourth floor (6./30/2008 Decision: 13).

To be sure, defendant, at least theoretically, could have presented evidence at a suppression hearing to support his claim of standing. But at no point in the ongoing discussion and briefing of the suppression issues did defendant suggest that he had such evidence to present, nor does he claim so now.[9] Instead, defense counsel argued, without stating the basis of his information or belief, that defendant possessed

---

[9] Notably, the hearing court's April 10, 2008 letter invited the parties to "submit papers" on any issue relating to the legality of the fourth floor search (4/10/2008 Letter). Thus, defendant could have submitted affidavits to substantiate his standing arguments. He did not.

a key to the fourth floor apartment, was an "invited guest" of the apartment's lessee, and was employed as a "superintendent" for the building and manager of the ground-floor Laundromat (Defense Memo: 13).   The court properly rejected those unsubstantiated assertions (6/30/2008 Decision: 10-13).[10]

Faced with the inconvenient fact that trial counsel waived the hearing he demands, defendant characterizes the court's April 10, 2008 offer of a further hearing as a Hobson's choice, complaining that he was forced to forgo the hearing and had "no choice but to brief[ ] the issues" of standing and probable cause (Defense Brief: 33).   However, defendant made no such protest in the court below. Accordingly, he has not preserved that complaint for this Court's review.   See CPL 470.05.

In any event, the choice presented in the court's April 10th letter was clear: defendant was invited to resume the hearing or to brief the issues noted in Justice Solomon's Omnibus Decision.   There is absolutely nothing in the record suggesting that the court's offer was disingenuous, or somehow offered to reopen the hearing without an opportunity for cross-examination of Romero, as defendant now implies (Defense Brief: 32).   Defendant inexplicably reads the court's offer to "resume the hearing" as a refusal to do so (Defense Brief: 32).   In fact, defendant's assertion that — the court's offer to reopen the hearing notwithstanding — "there was no other

---

[10] Defendant also argues that, in response to defendant's motion to reargue, the trial court refused to reopen for a hearing on standing (Defense Brief: 32).   But defense counsel did not request such a hearing in either his initial memorandum or his re-argument motion. Moreover, by electing to brief the issues, defendant 0waived any right to a hearing.

issue [to explore] and Romero's testimony would not have added anything" (Defendant's Brief: 33) is baseless speculation.   There is no record support for defendant's assumption that the court would not have allowed proper cross-examination or the introduction of relevant defense evidence.   In the end, trial counsel understood his options, and pursued the one he viewed as the most advantageous.

In sum, defendant affirmatively waived a conventional suppression hearing. Consequently, his appellate claims are nonsensical, and the relief he seeks is unavailable.[11]

### POINT IV

DEFENSE          COUNSEL'S          MISLEADING
STATEMENTS     IN     OPENING     STATEMENT
OPENED THE DOOR TO THE ADMISSION OF
THE PREVIOUSLY SUPPRESSED KEYS (Answering
Defense Brief, Point II).

As noted above, the court granted defendant's Mapp/Dunaway motion to the extent of suppressing the keys seized from his person at the time of his arrest.  One of those keys opened the door to the fourth floor apartment where he was found.  In his opening statement, defense counsel argued that defendant neither owned nor leased the fourth floor apartment, which was "a place where clearly others had access," and which the police were able to enter only after recovering a set of keys from the second

---

[11] Nor should this Court hold defendant's direct appeal in abeyance in order to remand for a hearing defendant in fact refused.  See Defense Brief: 33.

-40-

**SR 149**

floor.  Following the defense opening, the prosecutor argued that counsel's remarks had opened the door to admission of the suppressed keys.  The court agreed, and the keys were received in evidence.

On appeal, defendant claims that the trial court erred in admitting the keys, because only "extreme" defense tactics, unlike those here, can justify the admission of evidence suppressed con constitutional grounds (Defense Brief: 40-41).  This claim is unpreserved and lacks merit.

A.

During voir dire, defense counsel remarked that the case was "real simple": "[b]asically, wrong place, wrong time" (Voir Dire: 111).  In his opening statement, defense counsel addressed what would become the central issue at trial: defendant's dominion and control over the drugs and drug paraphernalia (Defense Opening: 256). Counsel emphasized that the jurors would be asked "to consider whether the drugs were in a place or thing that [defendant] had control [over]" (Defense Opening: 256). Counsel continued:

> Was it his Home?  No.  Was it his apartment?  Was it his hotel room?  No.  Was it his business establishment?  Is it? No?  Obviously not his automobile.  Did he have the power to do with it as he pleased?  How would he know the stuff was in a closet and a locked safe?
>
> The judge will instruct you along the lines with regards [sic] to whether or not the People can prove possession beyond a reasonable doubt . . . Are the drugs in a trunk, a bag of clothing, or some other item that belongs to and is exclusively used by [defendant]?  There will be no proof of

-41-

**SR 150**

> that. What we will learn is that this apartment is not owned
> or leased by [defendant] . . . We will learn that this is a place
> where clearly other had access [ ]. As the police, when they
> went in the second floor apartment, they found a set of
> keys which gave them access to this apartment.

(Defense Opening: 257). As a final comment, defense counsel offered the following:

> I want to leave you with this thought, ladies and gentlemen.
> You may recall during the jury selection process, I asked
> two jurors, both maintenance men in residential buildings, I
> asked them both whether they've ever been alone in a
> residential apartment . . . Both gentlemen answered yes. I
> ask you ladies and gentlemen, just to think about that.
> Thank you.

(Defense Opening: 258).

On September 11, 2008, during a break in Detective Hernandez's cross-examination, the prosecutor argued that defense counsel's opening statement had opened the door to admission of the keys (Proceedings: 378). The trial judge pointed out that, although it did not have a "printed transcript" of counsel's opening statement, he recalled that

> what [counsel] said was that they found keys, I believe he
> said they found keys on Mr. Brown and so thereby got
> access to the apartment. [I] think the way to hear it is you
> are a juror [is] that the police got into the apartment by
> virtue of the keys from Brown, and since [defendant] had
> no keys, he must have been let in by somebody with the
> real control over the apartment. So it is more than just
> arguable that the jury should understand about the keys[.]

(Proceedings: 380). In response, counsel argued that "the fact[ ] that the officers got into that apartment with keys they got from somewhere else, I don't believe that opens the door" (Proceedings: 383). The court reserved decision (Proceedings: 384).

-42-

**SR 151**

Later that day, outside the presence of the jury, the court reporter read back defense counsel's opening statement (Proceedings: 460). The court again observed that counsels' accumulated comments left the jurors with the impression that "clearly others had access to the apartment, [and] that means [defendant] had no access" (Proceedings: 461).

After hearing from both parties the next day, September 12, 2008, the court ruled that the keys were admissible (Proceedings: 475-477). The court explained that the defense opening "presented a series of statements regarding defendant's lack of connection with the fourth floor apartment," and additionally referenced his exchanges during voir dire "with two separate prospective jurors who were residential superintendents, that they frequently were alone inside [others'] apartment[s] as part of their responsibilities" (Proceedings: 475). The court continued:

> [Defense counsel] then said, clearly others had access to [the apartment], such a police who entered with keys they took from down on the second floor. That statement was tantamount to saying that defendant had no more access to the apartment than anyone else without keys, that, as with the police, he had no keys of his own and would have to have been given access[.]

(Proceedings: 476).

The court observed that the defense could have disclaimed defendant's access without relying on others' access to or possession of keys (Proceedings: 476). The court concluded that defendant had "twisted the suppression ruling by arguing that the defendant had no connection to the apartment and had no means of getting into it

-43-

other than by someone else's keys" (Proceedings: 476). The court said that "[t]he fact that the defendant had keys to the fourth floor still leaves the jury the issues of whether he knew about the existence or contents of the arguably hidden safes, and whether he exercised dominion and control of the drugs found" (Proceedings: 477). Accordingly, the court concluded that although admission of the keys was "adverse" to defendant, it was not "overwhelmingly" so (Proceedings: 477).[12]

The prosecutor re-called Detective Romero (Romero: 485). On re-direct examination, Romero testified that a large set of keys was recovered from defendant's belt when he was arrested (Romero: 485; People's Exhibit 29 [keys]). Keys from the set opened several doors in the building, including the doors to the second- and fourth-floor apartments (Romero: 487, 491-492).

B.

On appeal, defendant argues that because the remarks in counsel's opening statement were "neither incorrect nor misleading," they did not open the door to "precluded evidence." Further, he contends that merely "incorrect" or "misleading" remarks cannot open the door to evidence suppressed on constitutional grounds.

---

[12] Immediately after the court's decision, defendant moved for a mistrial on the grounds that the trial had "evolved into [ ] a travesty of justice" (Proceedings: 477). Although counsel pointed to several of the court's interlocutory decisions as support for his mistrial motion, he made no specific arguments with regard to the admission of the keys (Proceedings: 479).

-44-

**SR 153**

Defendant asserts that "more is required" to open the door to such evidence (Defense Brief: 40-41).

However, defendant failed to preserve this claim for this Court's review. CPL 470.05(2) Although defendant protested that the noted remarks did not open the door, he never argued that, in the door-opening context, a more restrictive rule applied to evidence that had been suppressed on constitutional grounds than for evidence "precluded" on other grounds. Simply opposing the trial court's ruling did not alert the court to the theory of inadmissibility urged on appeal. See, e.g., People v. Waters, 90 N.Y.2d 826 (1997); People v. Reed, 84 N.Y.2d 945 (1994). Preservation aside, however, defendant's current claim must still fail.

It is well-settled that a defendant's trial tactics may "open the door" to evidence that might otherwise not be admissible. See People v. Massie, 2 N.Y.3d 179, 183-185 (2004); People v. Melendez, 55 N.Y.2d 445, 451-52 (1982); People v. Vega, 277 A.D.2d 18 (1st Dept. 2000); People v. Blythe, 262 A.D.2d 199 (1st Dept. 1999). Such tactics include the presentation of "incomplete or misleading" "evidence or argument." When such tactics are used, the admission of previously precluded evidence may become "reasonably necessary to correct the misleading impression." Massie, 2 N.Y.3d at 184. See also People v. Rojas, 97 N.Y.2d 32, 39 (2001) (court properly admitted previously precluded evidence in order to permit the People to rebut "defendant's misleading assertion[s]" in opening and cross-examination); People v. Shack, 86 N.Y.2d 529, 541-542 (1995) (defense counsel opened the door to

-45-

**SR 154**

otherwise privileged testimony when she "affirmatively injected the issue of defendant's mental illness into the trial during her opening statement").

Even evidence that was previously suppressed on constitutional grounds may be admitted to correct such a misleading impression. After all,

> [i]t is one thing to say that the Government cannot make an affirmative use of evidence unlawfully obtained. It is quite another to say that the defendant can turn the illegal method by which evidence in the Government's possession was obtained to his own advantage, and provide himself with a shield against contradiction of his untruths.

Walder v. United States, 347 U.S. 62, 65 (1954). Accordingly, where the admission of previously suppressed evidence will "further the truth-seeking function of a criminal trial," and where it is "but a speculative possibility" that admission would encourage future police misconduct, the evidence may be properly received to rectify defense door-opening. James v. Illinois, 493 U.S. 307, 311 (1990). See, e.g., People v. Rogers, 52 N.Y.2d 527, cert. denied, 454 U.S. 898 (1981) (custodial statements made subsequent to illegal arrest admitted at trial because, since the statements were prompted by independently acquired evidence, "there would be no deterrence"); People v. McGrath, 46 N.Y.2d 12, 21 (1978), cert. denied, 440 U.S. 972 (1979) (defendant's grand jury testimony, otherwise inadmissible as fruit of an illegal wiretap, nonetheless admissible in later perjury proceedings due to "insubstantial" deterrent effect of exclusion); People v. Drain, 73 N.Y.2d 107, 110 (1989) (illegally seized evidence admissible in subsequent perjury prosecution); People v. Gole, 228 A.D.2d

696 (2d Dept. 1996) (cross-examination of police witness opened door to testimony about suppressed drugs).  See also Kamins, New York Search and Seizure § 8.04, pg. 8-32 ("If defense counsel seeks to gain unfair advantage from the fact of suppression, counsel may open the door").  In other words, the admissibility at trial of previously suppressed evidence "is ascertained by balancing the foreseeable deterrent effect against the adverse impact of suppression upon the truth-finding process." Drain, 73 N.Y.2d at 110.

Ultimately, the question of "whether, and to what extent" evidence or argument has opened the door is committed to the sound discretion of the trial court. See Massie, 2 N.Y.3d at 184; Melendez, 55 N.Y.2d at 451; People v. Blakeney, 219 A.D.2d 10, 14 (1st Dep't), aff'd, 88 N.Y.2d 1011 (1996).  Thus, subject to the noted balancing test, the court may admit evidence that is "reasonably necessary" to correct a misimpression created by the defense, provided the evidence is not "remote" or "tangential." Massie, 2 N.Y.3d at 184-185. See also Melendez, 55 N.Y.2d at 452.

Here, the trial court properly found that defense counsel's opening justified the admission of the suppressed keys.  While defendant was undoubtedly free, as the court recognized (Proceedings: 476), to argue that the People would not be able to meet their burden of proving that he had dominion and control over the drugs, he had no right to exploit the court's suppression decision, figuratively using it as a "sword" instead of a "shield."  Here, defendant effectively argued that to gain access to the fourth floor apartment, defendant — like the police — would need access

-47-

**SR 156**

either to someone with keys or to the keys themselves. Further still, defense counsel both insisted that defendant had no connection to the apartment, and urged the jury to "think about" the fact that maintenance men were likely to be invited into another's apartment — obviously, without knowing what was in the closets — and left alone there. Those arguments flatly implied that defendant had neither the right to access the apartment without invitation, nor the keys necessary to do so.

But the very opposite was true: keys that opened the door to the fourth floor apartment were in fact seized from defendant at the time of his arrest. And the misimpression created by the defense went directly to a central question before the jury: whether defendant had dominion or control over the apartment. Further, proving that defendant had the key on his person could correct the misimpression without being remote or tangential to it. Such proof could, with geometric precision, show that defendant was perfectly capable of accessing the apartment, unlike a person without a key. Accordingly, the keys were admissible as a result of the defense's opening statement. See Massie, 2 N.Y.3d at 184-185.

Nor does the Third Department's decision in People v. Mullins, 179 A.D.2d 48 (3d Dept. 1992), on which defendant relies (Defense Brief: 40-41), suggest a contrary result. The crime in Mullins was a murder "consistent with" blows inflicted by an axe. 179 A.D.2d at 49. On the first appeal, the Third Department held that the axe recovered from the defendant's residence was the product of an unlawful search. Id. at 49-50. At the retrial, the defendant sought to introduce testimony about a second

-48-

axe that had been found during the search of a car of another man who, like the defendant, had been in a bar with the victim on the night of the murder. Id. at 50. The trial court ruled that, if the defense did so, the door would be opened to the otherwise-suppressed evidence of the axe found at the defendant's residence. Id. On appeal, the People agreed with the defendant's claim that he had been deprived of the "use of this exculpatory evidence." Id. at 51. In deciding the sole issue before it, whether the evidence had, nonetheless, been properly excluded as "incompetent, immaterial, and irrelevant." Mullins, 179 A.D.2d at 51. The Third Department relied on cases like James v. Illinois, 493 U.S. 307 (1990), where the defendant testified at the trial, to create a general "impeachment" exception applicable to all exclusionary cases, and found that the direct evidence that the People had been seeking to introduce in rebuttal did not fall into this category. Mullins, 179 A.D.2d at 51-52. It also separately rejected the admission of the People's proposed rebuttal evidence on an opening-the-door theory, finding that the introduction of rebuttal evidence was not appropriate because the defendant had not "sought additional benefit from the fact of suppression itself." Id. at 52. The Third Department noted that "it is one thing to establish the existence of an axe as defendant sought to do; it is quite another to offer evidence that it was the only axe found. This defendant did not seek to do." Id.

Putting aside the so-called "impeachment" exception that the Third Department suggested was applicable to all cases, it is nonetheless clear that the evidence at issue here was readily admissible under the "opening-the-door" exception

as enunciated in Mullins. Notably, in Mullins, the proffered defense evidence would not necessarily have led the jury to incorrectly conclude that the axe found in the other man's car was the only axe relevant to the case that had ever existed. Instead, the jury in Mullins could reasonably have believed as a factual matter that the defendant had used a second axe to kill the victim but had discarded it after the crime under circumstances such that it never was found. For that reason, evidence about the axe in the other man's car would not have been affirmatively misleading. Here, by contrast, the only reasonable explanation the jury could have come to as a factual matter if it heard only about the keys seized from Brown was that defendant, like the police, needed another person's keys to gain access to the fourth floor apartment where he was arrested. Thus, unlike in Mullins, the evidence that defendant wished to introduce here was inherently misleading, and unquestionably opened the door.

Finally, even if the court's well-reasoned decision to admit the keys could be considered error, such error would have been harmless. Given the cumulative evidence of defendant's guilt (see Point I, supra), there is no reasonable possibility that defendant would have been acquitted had the supposed error not occurred. See People v. Crimmins, 36 N.Y.2d 230, 241 (1975).

*     *     *     *

In sum, the court properly determined that defense counsel's opening statement left the jurors with a misleading impression that could be corrected only by

the admission of the previously suppressed keys.  Defendant's contrary assertions do not withstand scrutiny.

<u>POINT V</u>
DEFENDANT   WAS   AFFORDED   EFFECTIVE ASSISTANCE  OF COUNSEL (Answering Defense Brief, Point III and Pro se Brief, Point II).

On appeal, defendant claims that he was deprived of the effective assistance of counsel by his attorney's summation.  <u>See</u> Defense Brief: 34, 43 fn. 6.  Defendant, <u>pro se</u>, also asserts an ineffective assistance claim in a supplemental brief (<u>see generally Pro se</u> Brief).  To be sure, counsel's closing argument had undesirable consequences. But those consequences had no impact on the outcome at trial because there was such overwhelming evidence of defendant's guilt that even a brilliant summation delivered by a perfect defense lawyer could not possibly have persuaded the jury to acquit.  The misstep about which defendant now complains therefore did not deprive defendant of the meaningful representation to which he was entitled or undermine that overall fairness of the trial.

In summation, defense counsel argued that the People's case was "very weak" and "built on reasonable doubt" (Defense Summation: 520).  Counsel urged the jurors that it was pure "speculation" to suggest that, because defendant was in the fourth floor apartment and had "keys to just about everything in the building," he knowingly possessed the drugs locked in safes in the closet (Defense Summation: 521).  Defense

-51-

counsel likewise downplayed the significance of the paraphernalia in open view in the apartment, asking the jury "How are we to assume [defendant], even if he were sitting right next to a digital scale, would know what it is?" (Defense Summation: 523). While "a person involved in drug trafficking" might recognize such paraphernalia and know that they "could possibly be used" in drug trade (Defense Summation: 538), the People had not proved that <u>defendant</u> knew. When the prosecutor objected to counsel's statements, the court ruled that counsel had opened the door to defendant's prior drug-related convictions (Proceedings: 547-560). Thus, the court informed the jury that defendant had "two convictions related to drug felony charges": one for "possessing a shotgun in connection with armed narcotics trafficking" and one for "an attempt to commit a drug sale" (Proceedings: 560-561).

At the outset, the record on appeal does not present sufficient facts to properly dispose of any of defendant's ineffective assistance complaints. Where, as here, an ineffective assistance claim concerns defense counsel's trial strategy or other facts outside the record, the appropriate way for a defendant to raise his grievance is to file a post-judgment motion pursuant to CPL 440.10(1)(h). Thus, defendant should have proceeded by way of CPL 440.10 to expand the record, either by filing an affirmation of counsel or by requesting an evidentiary hearing at which the attorney would have an opportunity to explain her overall strategy and to respond to the complaints raised by appellate counsel and defendant <u>pro se</u>. See People v. <u>Love</u>, 57 N.Y.2d 998, 1000 (1982); <u>People</u> v. <u>Jones</u>, 55 N.Y.2d 771, 773 (1981); <u>People</u> v. <u>Brown</u>, 45 N.Y.2d 852,

-52-

853-854 (1978). Because defendant failed to file the appropriate motion below, his claims are not properly before this court. In any event, on the existing record, defendant's complaints are manifestly unfounded.

A defendant complaining of ineffective assistance must show that he did not receive "meaningful representation" in light of the evidence, the law, and the circumstances of the particular case. See People v. Baldi, 54 N.Y.2d 137, 147 (1981); see also People v. Caban, 5 N.Y.3d 143 (2005). In that regard, New York courts have recognized that "[i]solated errors in counsel's representation generally will not rise to the level of ineffectiveness." People v. Henry, 95 N.Y.2d 563, 566-567 (2000). Instead, courts must determine whether an attorney's conduct "constituted 'egregious and prejudicial' error such that defendant did not receive a fair trial." People v. Benevento, 91 N.Y.2d 708 (1998). It is "difficult" for a defendant to establish that such an error occurred especially where, as here, the "overall performance" of his lawyer was that of an "active and capable" advocate. See Harrington v. Richter, 2011 U.S. Lexis 912, *43 (January 19, 2011) (Kennedy, J.).

Under the noted standards, defendant received effective assistance of counsel. As noted above, there was a cornucopia of incriminating evidence at the People's disposal. The second- and fourth-floor apartments were dedicated to the sale and packaging of narcotics. Defendant was arrested in the fourth floor apartment, surrounded by drug-packing materials and tools, and the surfaces around him were covered with cocaine residue. Additionally, defendant had keys to both apartments.

-53-

**SR 162**

Plainly, defendant was a trusted participant in the drug enterprise and, along with Brown, jointly possessed over 17 ounces of cocaine with the intent to sell it. Thus, from the outset of the case, mounting a viable defense seemed extremely improbable.

Even so, defense counsel vigorously litigated his client's case. Counsel filed a comprehensive omnibus motion supported by his own affirmation, and succeeded in obtaining a <u>Darden</u> hearing and an opportunity to challenge the police activity on the fourth floor of the building (Omnibus Decision). In support of his Motion to Controvert the Search Warrant, counsel submitted a 27-page memo raising three legal points (<u>see</u> Defense Memo). When Justice McLaughlin denied that motion, counsel promptly moved to reargue, and won suppression of the keys seized from defendant. Defense counsel also adamantly opposed the People's <u>Sandoval</u> application, and secured another favorable ruling. These preliminary efforts conclusively demonstrate that defense counsel was engaged in measured decision-making from the case's earliest stages, and had diligently conducted all preparation necessary to mount an effective defense.

Of course, counsel pursued a reasoned strategy at trial despite the People's strong case. Counsel mounted a comprehensive attack on the People's evidence, engaging in extensive cross-examination of the police witnesses. At the close of the People's case, defense counsel timely moved for a trial order of dismissal, which he later renewed (Proceedings: 514-515). Counsel likewise made four mistrial motions, each time vigorously arguing his position (Proceedings: 477-484; 499-500; 549-560;

623-624). And, of course, counsel presented a summation that was persuasive, if not flawless, and which vigorously attacked the police investigation of the case. Taken as a whole, these efforts show that defendant's representation at trial was capable and meaningful.

Defendant nevertheless argues that trial counsel's closing argument, which opened the door to the introduction of two of defendant's prior convictions, deprived him of effective assistance of counsel. More specifically, defendant contends that counsel could not have properly researched "the law or facts" of his case, because, had he done so, he "would have known that his [summation] comments would open the door" to defendant's criminal history (Defense Brief: 36). Of course, nothing in the record suggests that counsel believed that he could advance any argument in summation, however misleading, without opening the door to remedial evidence. Indeed, counsel argued not that his comments <u>could</u> not open the door, but that they <u>did</u> not do so (Proceedings: 548-549). And contrary to defendant's contention on appeal that counsel "admitted his mistake" (Defense Brief: 35), counsel in fact argued to the court that he had <u>not</u> made a mistake (Proceedings: 549). Instead, counsel explained, he had simply argued that there was "no evidence to suggest that [defendant] had any knowledge what [the paraphernalia was] used for" (Proceedings: 549). In the end, counsel's mistake in summation, of course, must be evaluated in context. Here, given the mountain of damning evidence that defendant faced, and his potentially severe sentencing exposure, counsel reasonably chose to test the bounds

-55-

**SR 164**

of proper argument, a strategy that was not without risk. When he inadvertently overstepped those bounds, he did so in a game attempt to win a complete acquittal.

Importantly, contrary to defendant's appellate contentions, the introduction of his prior convictions was not "devastating" (Defense Brief: 38). Although, in defendant's estimation, his criminal record "provided the connection between the paraphernalia and the drugs recovered" (Defense Brief: 39), that connection had been well established by the time counsel began his closing argument. The evidence left no doubt that defendant and Brown were participants in the same drug-selling business, and thus both had knowledge of and control over the drugs and paraphernalia. In the face of that conclusive evidence, it is simply untenable to suggest that the jury would have reached a different conclusion had it not learned of defendant's decades-old drug convictions (Defense Brief: 39).

### B.

In his pro se brief, defendant raises a litany of additional complaints about trial counsel's performance, and on those grounds alleges that he received ineffective assistance of counsel (Pro se Brief: 8). Defendant's pro se claims of ineffective assistance, like those raised through counsel, should be rejected.

First, defendant states that, because his attorney "pursued no defense at trial," he must have "failed to prepare a proper defense," and even "affirmatively aided the prosecution" (Pro se Brief: 11). Nothing could be further from the truth. Indeed, counsel exhaustively litigated the case in its early stages, actively pursuing numerous

pretrial motions, and setting the stage for a viable defense in jury selection. Likewise, in an effort to unveil reasonable doubt, counsel vigorously cross-examined the People's witnesses and deftly summoned weaknesses in their testimony in his arguments to the jury. Thus, the record does not support defendant's allegations that counsel "abandoned his client" and was unprepared to defend him (Pro se Brief: 11).

Nevertheless, defendant argues that counsel did not recognize that the People purportedly had failed to prove "intent to sell" under the count charging third-degree criminal possession (Pro se Brief: 12). Defendant's challenge, however, overlooks the fact that the People presented overwhelming evidence of intent to sell: the possession of more cocaine than would be consistent with mere recreational use; possession of cocaine packaged for sale; the presence throughout the apartments of materials used to mix, portion, and package drugs for sale; and, finally, the large amounts of cash recovered from both defendant and Brown. Of course, one cannot intend to sell drugs about which he lacks knowledge, or over which he lacks dominion and control. Therefore, it was perfectly sensible for defense counsel to assert that knowing possession had not been satisfactorily proved, as that defense subsumed a claim of no intent to sell.

Similarly, defendant contends that counsel, purportedly having conducted insufficient legal research, failed to recognize that "control over an area will not in and of itself give [rise] to a conclusive presumption that a defendant also knew contraband was present," and, further, would not necessarily establish constructive possession

-57-

**SR 166**

(Pro se Brief: 12). But nothing in the record suggests counsel erroneously believed that proof of defendant's control of the apartment established either knowledge or possession of the seized drugs. Counsel never argued as much, and acquiesced when the court in colloquy stated plainly that "the fact that defendant had keys to the fourth floor still leaves for the jury the issues of whether he knew about the existence or contents of the arguably hidden safe and whether he exercised dominion or control of the drugs" (Proceedings: 477). And, of course, the court expressly instructed the jury that if they concluded that defendant had dominion and control over the apartment, that did not lead to the inexorable conclusion that he exercised dominion and control over the apartment's contents (Proceedings: 626-627, 629). Thus, even had defense counsel been ignorant of the law, as defendant alleges, the court's instructions would have prevented any prejudice in this regard.

Defendant next complains that counsel was ineffective for failing to understand and present "other suspect" evidence — namely, that co-defendant Steven Brown was the guilty party, not defendant (Pro se Brief: 13). But defense counsel prudently refrained from pressing such a defense. After all, as explained supra, Point I, there was plenty of evidence connecting defendant with Brown in a shared drug-dealing enterprise, and establishing the two apartments as the locales of that enterprise.

-58-

**SR 167**

Under those circumstances, attempts to cast blame exclusively on Brown would have been futile.[13]

Finally, defendant asserts that his attorney failed to conduct a thorough investigation and was unable to "point out what the police hadn't done" or suggest "any exculpatory evidence that the police might have found had they conducted a more thorough investigation" (Pro se Brief: 14).   Defendant's claim is patently speculative, both in its unsupported assertion that defense counsel did not investigate the case and in its suggestion that there was somehow "more" for the police to discover.   Moreover, defense counsel relentlessly attacked the police investigation in the pretrial motion practice, and continued that assault in his extensive cross-examination of both police witnesses.   Thus, counsel's efforts reveal that, contrary to defendant's contention, counsel was familiar with the details of the police action in this case, and had formulated a cogent plan to attack the evidence provided by the police witnesses.

*      *      *      *

---

[13] Defendant also alleges that Brown, at his own sentencing proceeding, exonerated defendant by wholly disclaiming his involvement in the drug business (Pro se Brief: 13).  But Brown had already pleaded guilty in exchange for a negotiated sentence.  He had nothing to lose, and potentially could have benefitted from taking full responsibility for the drugs.  In this sense, Brown's statements were self-serving and accordingly suspect.  Nor would Brown's statements unsettle the compelling evidence of defendant's guilt.

In sum, defendant's failure to file a post-judgment motion pursuant to CPL 440.10 leaves this Court with a record legally insufficient to permit review of many of defendant's current claims. In any event, the existing record makes it abundantly clear that defendant was provided with capable and meaningful representation.

<u>CONCLUSION</u>

The judgment of conviction should be affirmed.

Respectfully submitted,

CYRUS R. VANCE, JR.
District Attorney
New York County

FRANK GLASER
BRITTA GILMORE
  Assistant District Attorneys
    Of Counsel

February 2011

-60-

**SR 169**

<u>PRINTING SPECIFICATIONS STATEMENT</u>

The word count for this brief is 14282, excluding the Table of Contents and Table of Authorities. The word processing system used to prepare this brief and to calculate the word count was Microsoft Word 2007. The brief is printed in Garamond, a serifed, proportionally spaced typeface. The type size is 14 points in the text and headings, and 13 points in the footnotes.

*To be argued by*
**NATALIE REA**

# NEW YORK SUPREME COURT

## APPELLATE DIVISION — FIRST DEPARTMENT

THE PEOPLE OF THE STATE OF NEW YORK,

Respondent,

-against-

**EDWARD GREEN,**

Defendant-Appellant.

## REPLY BRIEF FOR DEFENDANT-APPELLANT

**STEVEN BANKS**
Attorney for Defendant-Appellant
THE LEGAL AID SOCIETY
Criminal Appeals Bureau
199 Water Street - 5th Floor
New York, New York 10038
(212) 577-3403

NATALIE REA
*Of Counsel*
February, 2011
NRea@legal-aid.org

## TABLE OF CONTENTS

TABLE OF AUTHORITIES........................................................................ iii

PRELIMINARY STATEMENT ................................................................1

ARGUMENT

      POINT I

      CONTRARY TO THE PEOPLE'S
      CONTENTIONS, THE COMPLETE ABSENCE
      OF ANY RECORD EVIDENCE OF THE
      JURY'S SECOND NOTE ASKING TO OPEN
      AN EVIDENCE BAG AND TEST THE KEY IN
      THE LOCK WAS A MODE-OF-PROCEEDINGS
      ERROR MANDATING REVERSAL UNDER
      PEOPLE V. TABB, 13 N.Y.2d 852 (2009) (Reply
      to Point II in Respondent's Brief 19 to 39). ..............................2

      POINT II

      IN THE ABSENCE OF ANY EVIDENCE
      SHOWING THAT APPELLANT WAS
      INFORMED ABOUT HIS RIGHT TO BE
      PRESENT AT THE SUPPRESSION HEARING
      AND THE CONSEQUENCES OF ABSENTING
      HIMSELF, THE PEOPLE'S ARGUMENT THAT
      HE WAIVED HIS RIGHT MUST BE
      REJECTED. (Reply to Point III in RB 28 to 40). ......................6

      POINT III

      IRONICALLY AND DESPITE THEIR CLAIM
      THAT COUNSEL FAILED TO PRESERVE
      ANY OF THE ISSUES RAISED ON APPEAL,
      THE PEOPLE ARGUE THAT APPELLANT
      RECEIVED MEANINGFUL REPRE-
      SENTATION. (Reply to Point V in RB 51 to 60)....................8

i

CONCLUSION...............................................................................10

ii

## TABLE OF AUTHORITIES

### STATE CASES

People v. Caban, 78 A.D. 3d 403 (1st Dept. 2010) ..................................... 1-2

People v. Kadarko, 14 N.Y. 2d 426 (2010) ...................................................4

People v. Kelly, 11 A.D. 3d 133 (1st Dept. 2004) .........................................4

People v. Lewis, 77 A.D. 3d 579 (1st Dept. 2010) ..................................... 1-2

People v. Mullins, 179 A.D. 2d 48 (3rd Dept. 1992) ....................................8

People v. Parker, 57 N.Y. 2d 136 (1982) ......................................................7

People v. Tabb, 13 N.Y. 3d 852 (2009)................................................... 1-2, 4

People v. Vargas, 88 N.Y. 2d 363 (1996) .....................................................7

### STATUTES

C.P.L. §310.30 .........................................................................................2, 4

C.P.L. §440.10 .............................................................................................9

iii

**SR 174**

SUPREME COURT OF THE STATE OF NEW YORK
APPELLATE DIVISION:   FIRST DEPARTMENT

-------------------------------------------------------------------X

THE PEOPLE OF THE STATE OF NEW YORK,           :

                     Respondent,           :

               -against-           :

EDWARD GREEN,           :

              Defendant-Appellant.           :

-------------------------------------------------------------------X

## PRELIMINARY STATEMENT

This reply is submitted in response to the brief filed by the People and received by appellate counsel on February 2, 2011.  The facts and procedural history of the case are fully discussed in appellant's opening brief (herein after "AB").   The purpose of this reply is to respond to the People's contentions that: (1) the absence of any record evidence of the jury's second note is not reversible error -- even after People v. Tabb, 13 N.Y. 3d 852 (2009), People v. Caban 78 A.D. 3d 403 (1st Dept. 2010) and People v. Lewis, 77 A.D. 3d 579 (1st Dept. 2010) – because counsel must have known about the note and therefore, waived any future objection; (2) counsel's failure to move to reopen the Darden hearing somehow amounted to

1

appellant's implicit waiver of his right to be present at his suppression hearing; and (3) counsel's comment in summation that opened the door to appellant's drug-related prior convictions did not amount to ineffective assistance of counsel since overall counsel provided meaningful representation.

ARGUMENT

POINT I

CONTRARY TO THE PEOPLE'S CONTENTIONS, THE COMPLETE ABSENCE OF ANY RECORD EVIDENCE OF THE JURY'S SECOND NOTE ASKING TO OPEN AN EVIDENCE BAG AND TEST THE KEY IN THE LOCK WAS A MODE-OF-PROCEEDINGS ERROR MANDATING REVERSAL UNDER PEOPLE V. TABB, 13 N.Y.2d 852 (2009) (Reply to Point II in Respondent's Brief 19 to 39).

The Court of Appeals has made it clear that in the absence of record proof that the trial court complied with its core responsibilities under C.P.L. §310.30, to give meaningful notice to counsel of a substantive juror inquiry, a mode-of-proceedings error has occurred requiring reversal. People v. Tabb, 13 N.Y. 3d 852 (2009). Following Tabb, this Court reversed the judgments in People v. Caban 78 A.D. 3d 403 (1st Dept. 2010) and People

2

v. Lewis, 77 A.D. 3d 579 (1st Dept. 2010), where there was no evidence that a jury note had been read verbatim or otherwise before the court answered.

The same conclusion must be reached in this case. Indeed, the People concede that "there is no mention" of the second note in the trial transcript (Respondent's Brief "RB" 20). After a first note requesting that the exhibits be sent into the jury room, the jury sent a second note asking to open an evidence bag, remove a set of keys from one bag and a lock from another, and then test the keys in the lock.

Conveniently refusing to distinguish the second note from the first note merely requesting exhibits, the People argue that: (1) counsel waived any challenge to the two notes when he agreed in advance to have the exhibits sent into the jury room; (2) the issue is unpreserved since despite the lack of record, counsel must have known about the notes since the Court exhibit numbers discussed on the record when directly from Exhibit II to V making it clear that there had been Exhibits III and IV; and (3) the note was ministerial and not substantive (RB 22-23, 25). These arguments are without merit.

First, the two notes cannot be collapsed into one. The parties had agreed before jury deliberations that the exhibits, if requested, could be sent

3

into the jury room.  The parties never agreed beforehand that the jury could remove the exhibits from their bags, separate them, and test them.  Second, the issue need not be preserved and, in fact, could not be preserved since there is no evidence that counsel was aware of the note or its content. People v. Tabb, 13 N.Y. 3d 852 (2009); People v. Kadarko, 14 N.Y. 2d 426 (2010). To assume that the parties were all aware of the notes because of the number on the court exhibits is unreasonable.  Indeed, the jury could have sent notes to ask for lunch or to make a phone call.  The numbers on the court exhibits said absolutely nothing about the two unmentioned notes.

Finally, the People's argument that the second note was ministerial is without merit.  Respondent rely on People v. Kelly, 11 A.D. 3d 133 (1st Dept. 2004), but reads the case incorrectly.  In that case, a bayonet in its sheath was introduced into evidence.  When the jury wanted to remove the bayonet from the sheath, the officer refused and "fulfilling his ministerial duty of safeguarding the jury," removed it himself in front of the jury.  The court found that the failure to put the request in writing was also ministerial. In Kelly, this Court never held that the experiment itself was ministerial. Protecting the safety of the jury was ministerial and asking the jury to put its

4

request in writing is ministerial.   The experiment itself was not and a curative instruction was given.

Even if the experiment in <u>Kelly</u> could be considered ministerial, the experiment requested in this case was not.   In <u>Kelly</u>, there was no question that the sheath was the sheath to that particular bayonet.   They were apparently submitted as one exhibit and there was no evidence that they had been in a sealed plastic bag.   Here, there were two items, a key and a lock in different evidence bags that had to be opened to conduct the experiment. The key was not in the lock. There was no clear link between the two. Establishing a clear link between the two  provided a link between appellant and the fourth-floor apartment.

Finally, to be ministerial, a note must request no meaningful input from counsel (AB at 27-28).   In this case, there is no evidence as to whether or not the note was answered and the experiment permitted on denied. Appellant had to be given an opportunity to discuss the matter with counsel. He may have known something about that lock and that door that would have helped counsel assist the court formulate a meaningful response. Here, appellant could have asked the court to disallow the experiment.   Absent

5

record proof that the court complied with its core responsibilities under C.P.L. §310.30, the judgment must be reversed.

### POINT II

IN THE ABSENCE OF ANY EVIDENCE SHOWING THAT APPELLANT WAS INFORMED ABOUT HIS RIGHT TO BE PRESENT AT THE SUPPRESSION HEARING AND THE CONSEQUENCES OF ABSENTING HIMSELF, THE PEOPLE'S ARGUMENT THAT HE WAIVED HIS RIGHT MUST BE REJECTED. (Reply to Point III in RB 28 to 40).

The People do not claim that appellant was present at the suppression part of the hearing.  They take the position that the suppression hearing was simply an extension of the Darden hearing to which appellant has no right to be present.  In their view, since counsel was given many opportunities to reopen the Darden hearing, appellant waived his right to be present at the suppression hearing.  He never did. Counsel could not waive appellant's right to be present, only appellant could.

A defendant has the right to be present at all material stages of the proceedings.  The right can be waived.  To be valid, however, the waiver must be made by the defendant in person, knowingly, voluntarily, and intelligently.  Defendant must be informed of his right to be present, as well

6

**SR 180**

as the consequences of not being present including a warning that the proceedings may proceed in his or her absence.  People v. Parker, 57 N.Y. 2d 136, 141 (1982). A court cannot infer a valid waiver, where as here, there is nothing in the record to support any inference that the defendant was advised of his right and waived it.  People v. Vargas, 88 N.Y. 2d 363 (1996).

The People do not, and cannot, point to anything in the record from which to infer that appellant was advised that he had a right to be present at the suppression part of the hearing.  They conveniently collapse the suppression hearing into the Darden hearing.  In doing so, they mistakenly extend the limited Darden exception to the right to be present  to suppression hearings.  There is no such exception.  Appellant had the right to be present at the suppression hearing and was denied that right.

The People timidly argue that appellant's presence would have been superfluous.  This is total speculation. Appellant was in the fourth-floor apartment when the police came in without probable cause and without a warrant.  Appellant was the only person who could assist counsel in examining the officers. To suggest otherwise is absurd.  Since appellant was not present at a material stage of the proceeding, the judgment must be reversed.

7

## POINT III

IRONICALLY AND DESPITE THEIR CLAIM
THAT COUNSEL FAILED TO PRESERVE
ANY OF THE ISSUES RAISED ON APPEAL,
THE PEOPLE ARGUE THAT APPELLANT
RECEIVED       MEANINGFUL       REPRE-
SENTATION. (Reply to Point V in RB  51 to 60).

The court found that counsel, in summation, opened the door to

evidence of appellant's prior drug-related convictions.  The result was

devastating and appellant now argues that as a result, he was denied the

effective assistance of counsel.  The People concede that the closing

argument "had undesirable consequences"  (RB at 51). Nevertheless, in their

view, counsel provided meaningful representation.  He "vigorously litigated

his client's case."  He filed a "comprehensive omnibus motion," obtained a

Darden hearing, submitted a 27-page memorandum raising three issues after

the hearing, won a suppression motion, effectively opposed the People's

Sandoval application, cross-examined witnesses, moved for a trial order of

dismissal, and made four mistrial motions.

While counsel obtained a Darden hearing, he allowed that hearing to

include an in camera suppression hearing where neither he nor appellant

8

**SR 182**

were present.  While he filed a 27-page memorandum following the hearing,

he never argued that the in camera suppression hearing violated his client's

right to be present.   While he opposed the People's Sandoval application, he

also opened the door to appellant's prior drug-related convictions.

Contrary to the People's contention, the admissible evidence was far

from overwhelming.  At the end of the People's case, counsel argued that

the credibility of the People's key witness, Detective Anthony Romero,  was

questionable at best.  Counsel reminded the court of its own hesitation about

the witness after the pretrial hearing.  The court commented:

> Perhaps your assessment of my instinct and my
> reaction is relatively if not largely accurate. I was
> afraid after the Darden hearing of saying that the
> entire thing had to be dismissed since I don't get to
> act, however, on my own personal feelings now or
> whenever on whim or caprice . . . but I am required
> to figure out as best I can with my humble
> mentality what the law is and having been
> implored and impleaded not to toss the case out of
> pique or perhaps an assessment of credibility, I
> didn't think and researched and that's why I had to
> invoke in my opinion the rule regarding standing.

(517). While the court was commenting on the officer's hearing testimony,

his trial testimony was the same.  Counsel's ineffectiveness strengthened the

People case significantly.  It allowed the People to introduce the suppressed

9

keys to make a connection between appellant and the fourth- and second-floor apartments.  It also allowed the People to argue over and over again in summation that appellant was a convicted drug dealer.  In addition, should the court find that any of the errors raised on appeal were unpreserved, counsel's ineffectiveness would be undeniable.

## CONCLUSION

FOR THE REASONS STATED HEREIN AND APPELLANT'S OPENING BRIEF, THE JUDGMENT SHOULD BE REVERSED AND A NEW TRIAL ORDERED.

Respectfully submitted,
Steven Banks
Attorney for Defendant-Appellant

Natalie Rea
  Of Counsel
February 2011

10

**SR 184**

## PRINTING SPECIFICATION STATEMENT

The word count for this brief is 2324, excluding the Table of Contents, the Table of Authorities, and the Rule 5531 Statement. The word processing system used to prepare the brief and calculate the word count was Microsoft Word 2003. The brief is printed in Times New Roman, a serifed, proportionally spaced typeface. The type size is 14 points in the text and headings, and 12 points in the footnotes. The line spacing is two.

11

Gonzalez, P.J., Catterson, Richter, Abdus-Salaam, Román, JJ.

4603        The People of the State of New York,        Ind. 5643/07
                                Respondent,

                        -against-

            Edward Green,
                Defendant-Appellant.
            ─────────────────────────────

Steven Banks, The Legal Aid Society, New York (Natalie Rea of
counsel), for appellant.

Cyrus R. Vance, Jr., District Attorney, New York (Britta Gilmore
of counsel), for respondent.
            ─────────────────────────────

    Judgment, Supreme Court, New York County (Edward J.

McLaughlin, J.), rendered October 8, 2008, convicting defendant,

after a jury trial, of criminal possession of a controlled

substance in the first and third degrees and two counts of

criminally using drug paraphernalia in the second degree, and

sentencing him, as a second felony drug offender, to an aggregate

term of 15 years, unanimously affirmed.

    The verdict was based on legally sufficient evidence and was

not against the weight of the evidence.  Moreover, the evidence

overwhelmingly established that defendant was a participant in a

drug-selling operation and a possessor of contraband found in two

apartments being used as drug factories.

    Defendant has not established a violation of the principles

of *People v O'Rama* (78 NY2d 270 [1991]) in connection with a note

                                10

from the deliberating jury.  Before deliberations began, defense counsel expressly agreed to permit the jury to examine the exhibits in evidence.  In the note in question on appeal, the jury requested permission to open an evidence bag and try a key in a lock.  Under the circumstances of the case, this was not a request to perform an experiment or demonstration, but was essentially a request to apply "everyday experiences, perceptions, and common sense" (*People v Gomez*, 273 AD2d 160, 161 [2000], *lv denied* 95 NY2d 890 [2000]) in handling the exhibit. Accordingly, the request was ministerial rather than substantive (*cf. People v Kelly*, 5 NY3d 116, 120 [2005]), and there was no need for input from counsel.

The court properly conducted an in camera, ex parte hearing concerning an informant's existence and his communications to the police, in accordance with *People v Darden* (34 NY2d 177 [1974]). Defendant incorrectly asserts that this hearing also constituted a general suppression hearing at which he had a right to be present.  After the hearing, the court informed the parties that the hearing testimony raised issues that might warrant an adversarial suppression hearing, and released pertinent portions of that testimony.  The court made no determinations regarding those issues at that time, and offered defendant the opportunity to litigate them at a conventional hearing.  Defense counsel

11

**SR 187**

declined the offer of a hearing, and chose to rely on written
submissions and the *Darden* hearing minutes.  Accordingly,
defendant waived any objection to the procedure by which the
court resolved the suppression issues (*cf. People v Jenkins*, 38
AD3d 230 [2007], *lv denied* 8 NY3d 986 [2007]).

Defendant received effective assistance of counsel under the
state and federal standards (*see People v Benevento*, 91 NY2d 708,
713-714 [1998]; *see also Strickland v Washington*, 466 US 668
[1984]).  Defendant has not shown a reasonable probability that
counsel's isolated error in opening the door to the introduction
of two of defendant's prior convictions affected the outcome of
the trial, given the overwhelming evidence of guilt.  The
additional ineffective assistance arguments raised in defendant's
pro se supplemental brief are unreviewable on direct appeal
because they involve matters outside the record (*see People v
Rivera*, 71 NY2d 705, 709 [1988]; *People v Love*, 57 NY2d 998
[1982]).

The court properly exercised its discretion in determining
that defense counsel's opening statement opened the door to
admission of an item of physical evidence that the court had
suppressed (*see People v Massie*, 2 NY3d 179, 183-185 [2004]).  In

12

**SR 188**

any event, any error in admitting this evidence was harmless (*see*

*People v Crimmins*, 36 NY2d 230 [1975]).

          THIS CONSTITUTES THE DECISION AND ORDER
OF THE SUPREME COURT, APPELLATE DIVISION, FIRST DEPARTMENT.

          ENTERED:  MARCH 24, 2011

CLERK

13

**SR 189**