

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK - CRIMINAL TERM - PART 93
------------------------------------------------x
THE PEOPLE OF THE STATE OF NEW YORK,

                                           Ind.
                                           5643/07

        -against-


EDWARD GREEN,                       **4603**

                 Defendant

------------------------------------------------x
                              JURY TRIAL

         100 Centre Street          GONZALEZ   , P.J.
         New York, New York 10013    CATTERSON
         September 8, 2008
                               RICHTER
**B E F O R E:**   HONORABLE E. MCLAUGHLIN, JSC
                            ABDUS-SALAAM

**A P P E A R A N C E S:**         ROMAN     J.J.


*For the People:*

        ROBERT MORGENTHAU ESQ.,
        District Attorney, County of New York
        BY: JASON BERLAND, ESQ.
        Assistant District Attorney


*For the Defendant:*

        18-B Assigned Counsel Panel
        BY: ARNOLD KEITH, ESQ.

=========YVETTE PACHECO   SENIOR COURT REPORTER=========

1          THE CLERK:   Calendar number two,

2    Edward Green.

3          Appearances.

4          MR. KEITH:   Arnold Keith; Hornstein,

5    Palumbo & Keith.

6          MR. BERLAND:   Jason Berland for the

7    People.

8          THE COURT:   All right, let's do

9    Antommarchie, Sandoval, and any evidentiary

10   things.  Let's get on with it.

11         MR. BERLAND:   The People provided Counsel

12   with Rosario material.  I do have the Rosario list

13   for the Court.  Would you like me to begin with

14   Sandoval?

15         MR. KEITH:   Before we do that, with

16   regard to the evidentiary ruling, there has been

17   quite a bit of discussion between myself and

18   Mr. Berland with regard to a possible disposition.

19         One of the arguments that's been raised

20   by the People or a part of our discussion was the

21   fact that upon entry to the apartment in question,

22   Mr. Green basically didn't do anything --

23         THE COURT:   When you say "in question,"

24   meaning the fourth floor?

25         MR. KEITH:   The fourth floor apartment.

SANDOVAL

1          THE COURT:  Fine.  Go ahead.

2          MR. KEITH:  I believe during the Darden

3    hearing, there was some testimony to the effect

4    when the police were trying the keys in the

5    different apartments, when they got up to the

6    apartment that Mr. Green was in, they put the key

7    in, and I believe they indicated that they

8    announced police or words to that effect and

9    indicated they were coming in.

10          During the process, Mr. Green, in the

11   apartment, did not respond, just sat there, and

12   when they entered, he was just sitting there on

13   the couch.

14          Your Honor, I believe and I think it's

15   clear that it was perfectly within his right to do

16   that, and that there should be no inference of

17   guilt or consciousness of guilt because of his

18   non-response to the police activity.

19          THE COURT:  What legally do you think I

20   would do or what instruction do you think I would

21   give to the jury?  What are you seeking to

22   prevent?

23          MR. KEITH:  I just want it clear to the

24   jury that they should not infer a consciousness of

25   guilt or any guilty behavior because he exercises

═ SANDOVAL ═

1    his right to do nothing.

2            THE COURT:  Well, I would not be making

3    any comment at all unless and until we get to the

4    charge conference and somebody asks me to give a

5    consciousness of guilt charge.  If there's a

6    request, almost certainly it would be granted,

7    but --

8            MR. KEITH:  I would also --

9            THE COURT:  I would never interrupt the

10   testimony to say, for example, when a police

11   officer would be testifying about a statement, I

12   would never interrupt to say anything about the

13   defendant's right to speak or not to speak.  You

14   let the thing go.

15           My recollection of the testimony, I'm not

16   going to testify and I don't remember, my

17   recollection was your client was supposedly

18   sitting in the dark, not having said anything.

19           The jury can hear all of that and make

20   their own decision about what, if anything, it

21   means.  There's nothing I would say other than to

22   give them a general consciousness of guilt charge,

23   if requested.

24           MR. KEITH:  Well, then I would hope that

25   Your Honor would direct the People to not argue

1    that because if he did that, that's some indicia

2    of guilt.

3          THE COURT:  They can argue that.  Why

4    wouldn't they be allowed to argue that?

5          MR. KEITH:  Because I believe he has a

6    constitutional right to not respond to police

7    officers.

8          THE COURT:  You can argue that, but it's

9    in conjunction with everything else the jury will

10    be hearing.

11          MR. KEITH:  I don't believe that legally

12    he was obligated to get up and open the door.

13          THE COURT:  Nobody is suggesting that he

14    is. I might even, if you ask me, say he is not

15    required to get up and open the door.

16          MR. KEITH:  I want the jury to know that.

17    If that's the law, I want the jury to know that.

18          THE COURT:  Okay, but don't misunderstand

19    that the jury may still decide something adverse

20    to them.  He's sitting in the dark during the day.

21    I don't know that.

22          MR. KEITH:  That defeats the whole thing.

23          THE COURT:  It doesn't defeat it. You

24    want 12 jurors -- whether he, Mr. Berland, can

25    prove the case, part of it is, I see a defendant

SANDOVAL

1   with a bloody knife standing over a dead body.

2           Part of it in some situations is, I saw

3   the defendant standing over the body before it

4   died.   Other situations are rather, I saw a person

5   running down the stairs with a bloody knife in

6   their hand and when I ran upstairs, there is a

7   deceased body with a gaping hole in their throat.

8           All the varieties of factual testimony

9   that a jury has to analyze is just it.   It's their

10  analysis.   They're supposed to put common human

11  experience together as part of their factfinding

12  function.   It's not for a judge to say what

13  they're supposed to think.

14          There are certain categories of things

15  where there is a law that says something.   That

16  doesn't mean having heard what the law is the jury

17  isn't going to find adverse to whatever either

18  side is hoping that they'll find, but they

19  certainly can hear.

20          And, again, my recollection is a little

21  bit hazy.   Let's assume, as I sort of remember it,

22  some time during the day that Mr. Green was

23  arrested --

24          Was it during the day?

25          MR. BERLAND:   Late afternoon, early

SANDOVAL

1    evening.

2          MR. KEITH:  November 1, 2007,

3    at 5:20 p.m.

4          THE COURT:  So that can be analyzed both

5    ways, from both side's standpoint.  He's tired.

6    He's had a hard day at work.  He wants to sit in

7    the quiet room and close his eyes.  That's fine.

8    The jury can decide that.

9          The jury can decide he walked into the

10   room in the dark, didn't know what, if anything,

11   was there, and sat down.  That's fine, too.

12         For you to ask me to say that they can't

13   find something, the 600 or 825 years of law

14   doesn't enable me to do that.

15         MR. KEITH:  I respectfully disagree.  I

16   think that if the police officers come banging on

17   your door and you decide to sit there and not do

18   anything, that you are perfectly within your right

19   to do that and there is no consciousness of guilt

20   that should be attached to that. That's the

21   explanation of the law.

22         THE COURT:  You used the word "your."

23   Was it his apartment?

24         MR. KEITH:  I don't think that changes

25   the analysis, the fact that it wasn't his

SANDOVAL

1    apartment.

2                   THE COURT:  As they say in Latin, res

3    ipsa loquitur, the thing speaks for itself.  The

4    jury then will get to hear the circumstances under

5    which the people think he got in the apartment,

6    whether it's valid or not and that will be in the

7    mix of what the jury is to factually decide.

8                   What other evidentiary thing would you

9    like to discuss?

10                  MR. KEITH:  I want to make sure we're

11   clear.  The People can argue that that action is a

12   consciousness of guilt?

13                  THE COURT:  Sure.  If you think that's an

14   appeal issue --

15                  MR. KEITH:  I am not thinking about an

16   appeal.  I am thinking about Mr. Green getting a

17   fair trial.

18                  THE COURT:  He'll get a fair trial.

19                  MR. KEITH:  I will have to argue to the

20   jury that he had a right not to do or say

21   anything.

22                  THE COURT:  I guess. I'm not the defense

23   lawyer.  Let me see if I understand the facts.

24                  MR. KEITH:  Okay.

25                  THE COURT:  The police find contraband in

SANDOVAL

1   the room in which he's sitting.  Yes or no?

2          MR. BERLAND:  Correct.

3          MR. KEITH:  Yes.

4          THE COURT:  I am not suggesting that you

5   or I were there.  They find drugs in the room in

6   which he was sitting?

7          MR. KEITH:  In a safe in the room -- in a

8   closet in the room.

9          THE COURT:  So the safe is locked, and

10  the jury will then get to decide if the door was

11  locked to the room in which one or two safes with

12  drugs in them are found.  Then they get to decide

13  whether or not the lights, I guess, were on or off

14  when the police come through.  Then, I guess, they

15  decide whether the police actually said police or

16  said anything, and then, I guess, they decide

17  whether there is an audible sign to an older man

18  across the door as a lock and door are being

19  fiddled with, and then they get to decide whether

20  the police detected any movement or Mr. Green

21  simply was sitting in the dark, literally and

22  figuratively, when they came in.

23          All of these things are part and parcel,

24  the whole makeup of this case and they vary

25  somewhat, the factual considerations that a jury

SANDOVAL

1    has to make from literally top to bottom in any

2    case that the jury is asked to decide.

3         No judge says anything more than that. If

4    you want me to, I will say he's got an absolute

5    right.  I'm saying it not knowing what the proof

6    is going to be regarding the word "your."

7         When you said to me would I tell them

8    that he has an absolute right not to answer a

9    knock or a summons or direction or inquiry by the

10   police, it didn't dawn on me that there was an

11   issue about whose room it was.

12        If we're going to get to the point where

13   we're talking about an instruction to the jury

14   about the legal effects under certain different

15   factual predicates, his non-response, we need to

16   be understanding that it could be that if he has

17   no right to be there, and that's a factual

18   scenario I have to present to them, that might

19   affect what the law is about his right or

20   non-right to say anything.

21        If he has a right to be there, I'll

22   incorporate that in my instruction I have to give,

23   but we're beating this one to death.  You are on

24   notice that it's not exactly the way you hoped it

25   to be and I'm certain that it's not a surprise.

YVETTE PACHECO  SENIOR COURT REPORTER

══════════════ SANDOVAL ══════════════

1    MR. KEITH:  Well, actually it is.

2    THE COURT:  I know, but you get paid,

3    basically, to say it's a surprise, and it may be

4    and if it is, I'm wrong.  Let's keep going.

5    MR. KEITH:  Again, Your Honor, I'm sorry,

6    but I want to make sure we're clear on this.

7    THE COURT:  I'm clear. I don't know about

8    you.

9    MR. KEITH:  I know from the prosecutor's

10   perspective that that's basically the position

11   that they're taking, some indicia of guilt by

12   Mr. Green sitting there and doing nothing in this

13   dark room --

14   THE COURT:  How did they start on this

15   discussion?  You started.  You wanted something

16   about no consciousness of guilt because he's

17   sitting there.

18   MR. KEITH:  Your Honor, I strongly

19   believe that legally that is an erroneous

20   position.  I believe this man has a right not do

21   anything.

22   THE COURT:  We will flesh out the factual

23   circumstances in accordance with everything I've

24   said for the last 22 minutes now.  Whatever it is,

25   it will be good news for you or bad news for you.

══════════ YVETTE PACHECO  SENIOR COURT REPORTER ══════════

1    If it's good news, he'll be grateful. If it's bad

2    news, nothing you haven't experienced before in

3    your many, many decades of trial work, and you've

4    navigated all of the pitfalls within the trial

5    practice.

6         What's his position on Antommarchie,

7    unless there's some other evidentiary issue that,

8    pardon the expression, we can clear up easily?

9         MR. KEITH:  Your Honor, I guess we can

10    provide you with the Sandoval/Antommarchie.

11         THE COURT:  Then you get to ask him his

12    position on Antommarchie, since that appears to be

13    the simplest of the next things to do.

14         MR. KEITH:  With regard to the

15    Antommarchie rights, I believe I sufficiently

16    explained them to Mr. Green, and he will waive his

17    rights in that regard.

18         THE COURT:  Okay, fine.

19         Mr. Berland, why don't you do the

20    Sandoval with respect to criminal history if the

21    defendant testifies.

22         MR. KEITH:  Is it possible that Mr. Green

23    could be uncuffed?

24         THE COURT:  Yes, it is.  Would you like

25    us to do that?

SANDOVAL

1          MR. KEITH:  Yes, Your Honor.

2          THE COURT:  They are physically capable

3    of doing that and we will now ask them to do it.

4          MR. KEITH:  I will not be that difficult.

5          THE COURT:  It's all right.  That is in

6    keeping with my persnicketiness.  With keeping

7    with the ADA script, when they say, did you have

8    an opportunity to interview the witness, you will

9    likely hear me say, did you take the opportunity.

10   Having it and using it are two distinct things.

11         MR. KEITH:  I understand.

12         THE COURT:  They apparently don't. I've

13   made that point for no purpose for a long time.

14   What about Sandoval?

15         MR. BERLAND:  Your Honor, the defendant,

16   Mr. Green, has a lengthy, lengthy criminal record

17   dating back to the Nixon administration.  The

18   first felony was in 1969.

19         THE COURT:  Not a Federal felony.

20         MR. BERLAND:  Not a Federal felony.

21         THE COURT:  Nor California.

22         MR. BERLAND:  Just New York.

23         THE COURT:  Tell me about that.

24         MR. BERLAND:  I think for the sake of

25   fairness I want to focus on three felony

1    convictions.  The last one, October 8, 1996

2    conviction here in New York County when the

3    defendant was convicted of Attempted Criminal Sale

4    of a Controlled Substance in the Third Degree, a

5    class A felony, where along with the co-defendant

6    he sold Ziploc bags of cocaine to an undercover at

7    160 West 133rd Street.  He plead guilty and

8    received three to six years.

9         The second conviction is a Federal case.

10   March 24, 1994 was the date of the crime.  He did

11   not plead guilty until July 1, 1996, to 18 U.S.

12   Code 924(c)(2), and that's Possession of a Firearm

13   During Drug Trafficking.  In that case, and this

14   occurred in South Carolina, the defendant was

15   found in possession of a 12-gauge --

16        THE COURT:  A 12 what?

17        MR. BERLAND:  Shotgun.  I do not know.

18   However, based on the information --

19        THE COURT:  You cannot gauge its

20   accuracy.

21        MR. BERLAND:  I cannot gauge how long the

22   barrel was.  It was -- we have to assume it was

23   not a violent crime; however, it's still a felony.

24        The oldest case is an Attempted

25   Kidnapping in the First Degree from August 30,

1   1982.  It's a Class B violent felony, where the

2   defendant abducted an individual by the name of

3   Woodrow Sulton (phonetic) with intent to compel

4   Anne Sulton to pay money for the release of

5   Woodrow Sulton.

6        Because the case was some time ago, not

7   sure of the relationship between the Woodrow

8   Sulton and Anne Sulton.  I know the defendant fled

9   to South Carolina after the crime was committed

10   and was arrested seven months later.

11        MR. BERLAND:  Based on these three felony

12   convictions, I believe it goes to the veracity and

13   honesty of the defendant.  I think they are

14   substantive, and the jury should hear about them

15   and the underlying facts.

16        Regarding the attempted kidnapping, when

17   prior convictions are for crimes of dishonesty,

18   usually we think of theft or fraud, the Courts

19   often allow cross-examination of underlying facts.

20        The kidnapping is of a person. I think

21   that is clearly a crime of dishonesty.  Although

22   it is an old case, I think the jury should hear

23   about the crime and some of the facts.  That

24   pretty much wraps it up.

25        THE COURT:  That's wrapping up your

1      discussion of his rap sheet?

2              MR. BERLAND:  Correct, in under seven

3      minutes.

4              THE COURT:   Fine.  Mr. Keith.

5              MR. KEITH:  Your Honor, I guess I should

6      go to the oldest case first. The kidnapping case

7      is 26 years ago.  He received a sentence of two to

8      six on that accusation.

9              Your Honor, I don't think there's any

10     probative value into going into that crime at all.

11     I ask Your Honor to not mention the fact that

12     there is a felony conviction from 26 years ago.

13             Mr. Green is now 58 years old.  That was

14     a different person and a different lifetime. I

15     don't think that conviction or any reference to

16     that conviction will have any probative value in

17     this case. Clearly, there will be some prejudicial

18     effect if it comes into play.

19             When you balance the scales, Your Honor

20     should consider not adding any reference to it at

21     all or at the very least to mention the fact that

22     there was a felony conviction from 26 years ago.

23             THE COURT:  What else?

24             MR. KEITH:  With regard to the Federal

25     conviction, Your Honor, he did plead to a Federal

SANDOVAL

1    weapons charge.  I don't believe that charge says

2    possession of a weapon involved with narcotics.  I

3    believe it simply says possession of a weapon.

4          It's fairly routine in Federal Court

5    whether the gun is in the home or place of

6    business, shotgun, rifle, a sentence of seven

7    months is usually the sentence that is imposed in

8    Federal Court.

9          It's my understanding that this was a

10   shotgun in a home. I don't believe that would be a

11   New York felony. It is what it is. It's a Federal

12   conviction that he received a five-year sentence

13   for.

14         I would ask Your Honor to just indicate

15   that he had a prior conviction in Federal Court.

16   I don't believe that's the equivalent of a New

17   York felony because of the factual nature of the

18   charge.

19         Lastly, with regard to the October 8,

20   1996 conviction for Attempted Criminal Sale of a

21   Controlled Substance in the Third Degree, in that

22   case, Mr. Green received a sentence of three to

23   six years that ran concurrent with the sentence he

24   received in Federal Court.

25         Because this case involves narcotics,

SANDOVAL

1     cocaine in particular, I would ask you to minimize

2     the prejudicial effect of hearing about another

3     cocaine conviction.  Although it was from 12 years

4     ago, I just ask Your Honor to indicate that he had

5     a prior felony conviction.

6           THE COURT:  Were there crimes that you

7     are alluding to asking about?

8           MR. BERLAND:  Your Honor, although he

9     does have a lengthy record, I don't think it's

10    proper to go into crimes that occurred before

11    1982, and those were the other crimes on his

12    record.

13          If I can clear one thing up.  Count two

14    of the Federal indictment which the defendant

15    plead guilty under the possession of that shotgun

16    was during and in relation to a drug trafficking

17    crime.

18          THE COURT:  I accept what you read. Show

19    it to Mr. Keith and then I'll go ahead and make

20    the ruling.

21          MR. KEITH:  I don't have the United

22    States Code with me.  I believe the Code simply

23    says, with regard to Section 924, I believe it

24    just talks about weapons.  It's my understanding

25    that in that case there was some underlying

═══════════════════════════DECISION═══════════════════════════

1   allegations with regard to narcotics. Mr. Green

2   did not plead to any narcotics charge, he just

3   pled to the weapons charge?

4          THE COURT:  When the Court has to rule on

5   a Sandoval application, it has to answer two

6   questions.  Will the testimony elicited on

7   cross-examination have a disproportionate and

8   improper impact on the triers of fact?  And

9   whether apprehension of the introduction

10  undesirably deter a defendant from testifying and

11  denying the jury significant material evidence?

12         The Court of Appeals has taken pity by

13  providing guidelines and rules that we can employ

14  to use in the analysis of the proper balance to be

15  struck between a defendant being questioned about

16  the entirety of his or her criminal history versus

17  the defendant's being able, in a somewhat

18  unfettered status, to present a version of events

19  favorable to him or her.  Oftentimes, as the Court

20  of Appeals has observed, oftentimes the only

21  source of information favorable to them.

22         The Court of Appeals has said that there

23  are basically three categories of cases analyzed.

24  One is the catch-all, the crimes that indicate a

25  person has a desire to place his or her interest

=====DECISION=====

1    ahead of society. The Ali Ramin (phonetic) choice

2    of crime where you repeatedly commit over a

3    demonstrable period of time the same kind of

4    criminal conduct. Finally, those crimes which are

5    more specifically directed towards honesty, such

6    as robberies and burglaries, larcenies and

7    perjuries.

8         The idea is to give both the defendant

9    some ability to testify, not completely encumbered

10   by their record, and giving the jury a realistic

11   basis to take credibility into account of the

12   ongoing evidence being inveighed to it by the

13   testifying defendant.

14        It's unfortunate that oftentimes in the

15   news over the last several years we have heard

16   about one or another form of kidnapping and it

17   strikes fear in everybody's heart.  Whether a

18   defenseless child or somebody older, kidnapping is

19   one of those things that is difficult for somebody

20   to deal rationally with the idea of removing a

21   person from their normally anticipated life

22   routine.

23        Be it encumbered with criminality or

24   innocence, kidnapping is not something that the

25   judicial institution can overcome. So it seems to

=====YVETTE PACHECO   SENIOR COURT REPORTER=====

1   me were the jury to glean any fact regarding the

2   defendant's participating and being convicted and

3   fleeing from an allegation about kidnapping, there

4   would be no further effort to listen to what

5   Mr. Green had to say.

6        That doesn't mean that the fact of the

7   felony conviction is obscured or eradicated, but

8   certainly a reference to it can't be elicited

9   during the course of any cross-examination.

10       The difficulty with the Green situation

11  as it relates to Sandoval is the difficulty that

12  relates to many repeat offenders in the drug

13  realm.  They are in a position of both saying I

14  haven't been convicted of drug cases to all in the

15  Ali Ramin regimen, and the ones convicted, you

16  shouldn't be allowed to use them because, after

17  all, what I'm on trial for is a drug case as well.

18       If we all remember, or at least I do,

19  before the Sandoval case under Schwartzman,

20  anything you ever did was properly the subject of

21  cross-examination under the old rules which,

22  obviously, produced significant unexpected

23  fairness most of the time, but the Sandoval rule

24  was not designed to shield entirely and recuse

25  from the responsibility of their past crime. It's

COLLOQUY

1    re-writing of history, but only to a certain

2    extent.

3        If Mr. Green were to testify, he can be

4    asked whether he has two felony convictions with

5    regard to the event as described in 1994.  He can

6    be asked whether or not he possessed a shotgun.

7    And with regard to the 1996 case, he can be asked

8    whether he sold controlled substances to a person

9    who turned out to be an undercover officer in

10   Manhattan.  I think that would be sufficient.

11       I do have a couple of cases on tomorrow,

12   but not enough that we can't do jury selection

13   tomorrow and finish jury selection on Wednesday

14   and then begin the testimony or part of the trial.

15   Do we work on Fridays or not?

16       MR. KEITH:  No, Your Honor.

17       THE COURT:  Don't think I'm signaling him

18   out.  I ask this of virtually everybody who gives

19   me the response.  I assume the only reason you are

20   going to trial is you expect to be acquitted.  I

21   can't imagine any other reason other than you will

22   be acquitted.

23       I ask you to consider two things.

24   Whatever your answer, it's fine.  If you are going

25   to be acquitted, you will get acquitted just that

COLLOQUY

1      much quicker if we work five days a week.  The

2      other thing I'd like you to consider is the effect

3      of your not working on Friday on all of the other

4      people who want a trial who are presently

5      incarcerated in Riker's Island.

6            Not signaling you out again, but as

7      somebody who has been through the system, you may

8      remember the New York State Supreme Court criminal

9      term in Manhattan as having 53 judges.  Right now,

10     we have got something like 32, some of whom their

11     courtroom assignments don't allow them to do any

12     trials at all, ever.

13           A certain percentage of judges do trials

14     only four days a week, if there is a five-day

15     week.  Of course, those people don't have trials

16     if they have religiously-observing people on

17     Friday.  And so, the point here is, as you can

18     undoubtedly glean, is the trial capacity is --

19           MR. KEITH:  Your Honor, we'll work on

20     Fridays.

21           THE COURT:  All right, fine.  So there

22     you have it.

23           Anything else to discuss or do we take

24     the rest of the day off?  Come in at ten after

25     ten; that way, I might be able to get a couple of

1    my calendar cases out of the way.  We will start

2    with jury selection at about 10:00, 10:15.

3              MR. KEITH:  Very well, Your Honor.

4    ------------------------------------------------------

5    SUPREME COURT OF THE STATE OF NEW YORK.
6    COUNTY OF NEW YORK                PART-93

7    THE PEOPLE OF THE STATE OF NEW YORK

8                      -against-

9                                     HEARING

10

11   EDWARD GREEN,
                      Defendant

12                    September 9, 2008

13   B E F O R E:  HONORABLE E. MCLAUGHLIN, JSC

14

15             (Appearances as previously mentioned.)
16   ------------------------------------------------------

17             THE CLERK:  Recalling case on trial,

18   Edward Green.

19             THE COURT:  This thing has to be tried.

20   There is the right to appeal, but is the sticking

21   point.  Does that ring any bells or not anywhere

22   near what you're talking about?

23             MR. KEITH:  It rings some bells.  I think

24   the actual time numbers could be adjusted

25   slightly.

                    ═══YVETTE PACHECO  SENIOR COURT REPORTER═══

1   THE COURT:  What about the right to

2   appeal thing?  This is what struck me, struck

3   me --

4   MR. KEITH:  It's my understanding that

5   the People's position is a recommended sentence of

6   eight years incarceration with no right to appeal;

7   is that correct?

8   MR. BERLAND:  That is correct.  The

9   defendant I'm sure is aware if convicted of the

10   A-1 faces a maximum of 24 years as a nonviolent

11   predicate felon.

12   THE COURT:  Let's put that aside just for

13   a moment.  I think I see the easy and obvious

14   solution to this.  Since clearly the right to

15   appeal is the thing that Mr. Green is interested

16   in, and, indeed, I gather that's where he thinks

17   his hope lies, just an observation, what number

18   past two and a half years could possibly cause him

19   to worry?  The final appeal would be over in two

20   and a half years.

21   What does he care whether it's 11 and a

22   half or 12 and 3 quarters?  His hope is after two

23   and a half years in jail, the final appeal is

24   resolved in his favor and he'll walk out the door.

25   It doesn't matter to him whether the bottom line,

PROCEEDINGS

1  ultimate far out left to the number is 15, 22, 24,

2  11, he's going to get out from, his standpoint, as

3  soon as the appeal is decided.

4          My suggestion is the People want

5  something, he wants something, why don't we

6  say 11 years and the right to appeal?

7          MR. KEITH:  Eleven years and no right to

8  appeal?

9          THE COURT:  And the right to appeal.

10          MR. KEITH:  I don't believe --

11          THE COURT:  If that doesn't satisfy him,

12  then I don't follow his logic.

13          MR. KEITH:  He knows he may have a chance

14  in appeal with regard to the standing issue, but

15  may also be denied in the appeal.  Certainly, he

16  would like to resolve the case and minimize the

17  exposure and exercise the right to appeal.

18          In my discussions with Mr. Green, I don't

19  think he will agree to 11 years. We're thinking

20  more in the lines of 6 years or something like

21  that.

22          THE COURT:  Well, the People, from their

23  standpoint, have to have something. They think

24  they're going to win.

25          MR. KEITH:  Right.  They're think they're

PROCEEDINGS

1    going to win and run the table and then he will
2    wind up in the twenties. He doesn't want to expose
3    himself to the twenties. He wants to do something
4    smart.  I thought his thinking was he's going to
5    win on the appeal?
6             MR. KEITH:  Of course.
7             THE COURT:  Now, he might win on appeal
8    with regard to the suppression.  It seemed to me
9    that 11 and a right to appeal would be something
10   that everybody gets.  I'm interested in doing
11   Manning and Mcnair later on today, which is
12   another trial, I will do this one.  We're going to
13   start in seven minutes.  If you cannot work it
14   out, we'll have ourselves a trial in seven
15   minutes.
16             (Pause in proceedings.)
17             THE COURT:  Ready for the jury?
18             MR. KEITH:  Yes, Your Honor.
19             THE COURT:  Bring the jury down, please.
20             MR. KEITH:  Your Honor, another thing.  I
21   haven't tried one with you in a while. I know you
22   fill up the box.
23             THE COURT:  Twenty people.
24             MR. KEITH:  In the box, though?
25             THE COURT:  After I do my schmoozing and

=PROCEEDINGS=

1      my introductory legal recitation, yes. It will

2      take me about 21 minutes to inculcate them, and

3      then we call a panel and you get 15 minutes first

4      round, 10 minutes second round. Don't feel

5      compelled to use all the time.

6              With regard to the expert, you will be

7      picking up 14 smart people. I don't know that

8      they need an expert.

9              MR. KEITH:  Thank you, Your Honor.

10             THE COURT:  We haven't resolved this.

11     I'm leaning.  I usually lean left and I am leaning

12     that way now.  Assuming we got 14 intelligent

13     people, the witnesses who will be called have some

14     familiarity with narcotics and consequently

15     they're able to talk somewhat, other than being

16     denominated an expert, they are able to say the

17     hand-held digital scales or something else.

18             MR. BERLAND:  Yes.

19             THE COURT:  So the average Manhattan

20     dweller doesn't have one in the apartment, let

21     alone three or five.  I bet that the average

22     citizen in Manhattan doesn't have any heat sealing

23     plastic devices, and you contend there are lots,

24     several?

25             MR. BERLAND:  I believe eight.

PROCEEDINGS

1    THE COURT:  And this isn't a restaurant.
2    And then thousands of plastic bags?
3    MR. BERLAND:  Correct.
4    THE COURT:  Immediately packaged
5    somewhere?
6    MR. BERLAND:  Some neat, some loose, some
7    in garbage bags.
8    THE COURT:  You do not need an expert.
9    MR. BERLAND:  Can they discuss the
10   pricing of the narcotics recovered?
11   THE COURT:  Yes, that's usual. It's
12   having somebody else come in to talk about things
13   that are not required to be contributed by an
14   expert, but left within the common sense of the
15   jury having been told something about the nature,
16   because paraphernalia requires some description of
17   what would ordinarily be a household item, so to
18   speak, which takes on that various purpose under
19   some circumstances.
20       You have a right to have a witness or the
21   two witnesses you intended to call describe what
22   converts a plastic bag, such as the one with my
23   peanut butter and jelly sandwich down in my
24   office, what converts a peanut butter and jelly
25   sandwich package into something that would be a

1    misdemeanor where you subject a person to a year

2    in jail.

3           MR. KEITH:  Your Honor, another thing,

4    count two of the indictment as to my client --

5           THE COURT:  What is count two?

6           MR. KEITH:  The charge that Mr. Brown

7    plead guilty to.

8           THE COURT:  Yes, this was the bench

9    discussion about whether there's a connection

10   between Mr. Green and the contents of count two.

11          MR. KEITH:  Yes, Your Honor.  The keys

12   have been suppressed.

13          THE COURT:  Who did that?  In the learned

14   times and the fair courts always sometimes

15   suppress lots of stuff.

16          MR. KEITH:  Yes, Your Honor.  Thank you

17   very much.  I take what I can get.

18          THE COURT:  That sometimes is a good

19   advice to other people involved in a court

20   process.  Take what you can get.  Anyway, you were

21   saying?

22          MR. KEITH:  I hear you loud and clear.

23          THE COURT:  Well, we go back a while.

24   Your client and I don't, but anyway, go ahead.

25          MR. KEITH:  Your Honor, the second count

1    of the indictment, referring to the drugs that

2    were recovered from the second floor apartment,

3    those drugs D felony possession with intent to

4    sell, the connection between Mr. Green and that

5    apartment was primarily the keys recovered from

6    him.  I believe a detective would have testified

7    that one or two of the keys that he had were keys

8    for that second floor apartment.

9         The other connection to the apartment I

10   think is somewhat tenuous and certainly to prove

11   constructive possession of the stuff recovered in

12   the second floor apartment, to prove dominion and

13   control beyond a reasonable doubt would be

14   impossible for the People. That charge should be

15   dismissed.

16        THE COURT:  Your prediction may be

17   accurate, but I don't think there's any conviction

18   by which I can do that, other than by reserving to

19   see what a jury does because of the Brown case

20   which doesn't even address a motion at this

21   juncture but rather a motion at the end of the

22   case where the People would have no opportunity to

23   appeal if I were to say you're right, dismissed by

24   not giving them a way to see what a jury does.

25        What is the second connection other than

1   keys or do you have two, three or four

2   connections?

3         MR. BERLAND:  I believe I have two, three

4   or four connections.  There are two issues, with

5   all due respect, to Mr. Keith.  Count two of the

6   indictment is possession with intent to sell, in

7   the A weight possession as to the drugs recovered

8   in the second floor apartment.

9         This defendant was in an apartment with

10  half a kilo of cocaine.  We contend he possessed

11  with intent to sell.  Count two applies to the

12  drugs in both apartments.  It shouldn't be

13  dismissed for the grounds that Mr. Keith argues.

14        As far as the connection --

15        THE COURT:  Suppose there were other

16  drugs under somebody else's control within the

17  building.  Obviously, you cannot say because

18  somebody else had drugs in the building, somehow

19  that's drugs that he, Green, possessed also intent

20  to sell some or all of it.  I don't think what you

21  said is compelling persuasion. Do you have some

22  other -- it is the connection.

23        MR. BERLAND:  I am moving on to the

24  connection.

25        THE COURT:  I was dismissing your first

1    effort.

2            MR. BERLAND:  All I am saying count two

3    doesn't apply to the second apartment.  It applies

4    to the drugs in the apartment where the defendant

5    was located.

6            As far as the connection --

7            THE COURT:  Let's be clear about that.

8    You say, and at this juncture, they're not having

9    been litigation in the motion stage and a Bill of

10   Particulars specifying, et cetera, et cetera, you

11   say that he, Green, is charged with possession --

12   with intent to sell of what was found in the

13   second floor apartment?

14           MR. BERLAND:  Yes, Your Honor, that's

15   what he's charged with among other drugs within

16   the building.  Charged with possession with intent

17   to sell the half a kilo recovered in the fourth

18   apartment, not the second apartment.

19           THE COURT:  What is he accused of doing

20   with respect to the second floor apartment?

21           MR. BERLAND:  I will get to the

22   connection.  I, obviously, am aware that the keys

23   were suppressed which allowed him into the second

24   floor; however, we do have the issue of the video

25   monitors.

1      A detective will testify that the

2  monitors went solely to the second floor apartment

3  where defendant Brown was located and the fourth

4  floor apartment where Mr. Green was located.

5      Additionally, there was numerous

6  paraphernalia, Ziploc bags to be exact, in cigar

7  boxes, red cigar Philly blunt boxes.  Same boxes

8  recovered in the second floor apartment as were

9  recovered in the fourth floor apartment.  There

10 were loose Ziploc bags stamped Red Apple found in

11 the second floor apartment and fourth floor

12 apartment.

13      THE COURT:  With no residue in it?

14      MR. BERLAND:  With no residue in it.  The

15 bags packaged ready to be sold, the Ziploc bags in

16 the second floor apartment were sealed in the same

17 manner, cut the same size as the bags found in the

18 fourth floor apartment, which were packaged for

19 sale. In the safe, there were --

20      THE COURT:  I don't need to hear any

21 more. There is no way in the world that a judge is

22 allowed to take that factual decision away from a

23 jury.  So the application to dismiss at this

24 juncture is denied.

25      With regard to scheduling, we'll pick a

=PROCEEDINGS=

1    jury as much as we can and finish tomorrow.  Some

2    point in the morning, you will start calling your

3    cases. You need Thursday morning or afternoon off?

4              MR. KEITH:  Morning.

5              THE COURT:  Just remind me.  That's the

6    sort of thing that not only goes against my

7    nature, but will slip through my conscious and I

8    don't want to be responsible for baby-sitting 14

9    jurors on Thursday morning.

10             MR. BERLAND:  Can he speak to his client

11   about the issue of the chemist?

12             THE COURT:  Oh, yes.  Are the

13   sandwich-type bag coin-type bags or Zips?

14             MR. BERLAND:  Variety. Some small Zips,

15   some loose plastic bags which contain wraps, some

16   are kilo wrappers.

17             MR. KEITH:  The kilo wrappers were in the

18   garbage.

19             MR. BERLAND:  In the garbage but out in

20   the open.

21             MR. KEITH:  What do you mean?

22             MR. BERLAND:  A plastic bag hanging on

23   the wall open with tons of kilo wrappers inside.

24             THE COURT:  Tons?

25             MR. BERLAND:  Numerous.  I apologize.

=YVETTE PACHECO  SENIOR COURT REPORTER=

VOIR DIRE

1        MR. KEITH:  From the review of the Grand

2   Jury minutes, there were two bags of garbage in

3   the closet.

4        THE COURT:  In Sesame Street, from trash

5   to treasures. One person's trash is another

6   person's treasure. It depends on your perspective.

7   Whether garbage or unused packaging for drugs.

8        MR. KEITH:  That's how it's characterized

9   in the Grand Jury minutes.

10       THE COURT:  Well, Grand Jury

11   presentations are what they're.  Whoever possessed

12   the things, I'm sure they didn't possess

13   non-narcotic items.

14       With regard to the stipulation regarding

15   the chemist.

16       MR. KEITH:  We'll stipulate that the

17   white powdery substance is cocaine.

18       MR. BERLAND:  I anticipate you will

19   mention to the jury that only one defendant is at

20   the table, although two men were arrested.

21       THE COURT:  Summon the citizens, please.

22       COURT OFFICER:  Jury entering.

23       MR. KEITH:  Your Honor, may we approach

24   briefly?

25       THE COURT:  Yes.

============= VOIR DIRE =============

 1            (A discussion was held off the record.)

 2            THE COURT:  You are all here as possible

 3    jurors.  This is a Supreme Court criminal term. We

 4    are about to begin selection that will decide a

 5    criminal charge.

 6            If you were on the jury before, listening

 7    to the orientation, we do jury selection on

 8    question and answer form.  The lawyers and I have

 9    questions for you, and for your participation in

10    that, we need to administer to you now either an

11    oath or affirmation.

12            Anybody prefer to affirm as opposed to

13    swear?  Anybody have any idea what I am talking

14    about?  Nobody is affirming.  Please stand up and

15    take the oath.

16            THE CLERK:  Raise your right hand.

17            (Prospective jurors comply.)

18            THE CLERK:  Do you solemnly swear or

19    affirm that you will truthfully answer all

20    questions put to you relative to your

21    qualifications to serve as jurors in the case of

22    the People of the State of New York versus Edward

23    Green.  Answer please.

24            PROSPECTIVE JURORS:  Yes.

25            THE CLERK:  Please be seated.

================= YVETTE PACHECO  SENIOR COURT REPORTER =================

=VOIR DIRE=

1    THE COURT:  Did anybody say no?  Good

2    start.  In order to intelligently and honestly

3    answer questions, I need to tell you something in

4    outline form about the law that controls a

5    criminal case anywhere in the U.S.

6         You have to accept that the only person

7    in a criminal courtroom in the United States who

8    has to do anything or prove anything is the person

9    who represents the government, the prosecution.

10   Whether it's in a Federal Court in Maine or state

11   court in Hawaii, the only person who has to prove

12   anything is the person who represents the

13   government.

14        In some places, that's the state of Iowa,

15   refers to itself as the State, Pennsylvania, the

16   Commonwealth, of New York, Illinois and California

17   refer to the government as the People.  The

18   government, the State, the People bring the

19   charge.

20        Under the system created, it is the

21   State, prosecution's obligation to prove the

22   charge. They have to meet a certain standard of

23   proof which you know is something called proof

24   beyond a reasonable doubt.

25        The accused who does not want to be in

1    the courtroom or in any other defendant doesn't

2    want to be a courtroom, they're presumed innocent.

3    If you are presumed innocent, what left is there

4    for to you do?  You're presumed innocent.  That's

5    the starting point.  So you do not have to prove

6    anything.

7         To demonstrate that, put some flesh on

8    it, to particularize it, an accused in his or her

9    own trial, does not have to testify, the lawyer

10   doesn't have to ask questions of the witness, they

11   do not have to call witnesses. They can literally

12   look over at the prosecution's table and say, You

13   brought the charges prove them if you can.

14        For there to be a resolution, a decision,

15   the jury has to agree as to the charge as you go

16   through the verdict sheet.  If there is more than

17   one charge, the jury doesn't make a decision about

18   a charge until all the voting jurors are in

19   agreement that the charge has or has not been

20   established, proven.

21        I have nothing to do with that. You've

22   created a jury system.  Some relatively

23   sophisticated places around the globe don't have

24   jury trials. They have a judge or three judges or

25   judge surrounded by military officers.  I guess to

1  make sure the judge gets it right, some places,

2  they just shoot you.

3        We have a jury trial system which brings

4  you here because you have said and I'm in full

5  agreement with it that I can't decide this.

6        I'm here every working day and many

7  non-working days, happily, competently, but we all

8  have said better to have, let's try that without

9  the word people, but better to have the

10  rig-of-the-mill citizens decide the cases rather

11  than somebody with a black robe who got it, who

12  knows how, who has seen it all being done.  So

13  that's why you're here and that is, of course, why

14  you cannot leave.

15        Once there is a charge, and a request for

16  a trial, you just heard me say it doesn't go away

17  until you folks decide it.  Once there is an

18  indictment and a request for a trial, no judge,

19  even one who has been here for over 25 years, if

20  you believe that, no judge can look at the

21  prosecution and say, You know, I'm fed up with

22  this, dismiss it.  No judge can look at the

23  accused and say, I'm fed up, plead guilty.

24        As we all know, once an indictment and

25  request for a trial, there has to be a trial.

═══════════════════VOIR DIRE═══════════════════

1   Everything stays as it was on the day of the

2   arrest.

3        Understand, there probably isn't one

4   prospective juror here who doesn't think your time

5   can be better used someplace else doing anything

6   else. I also don't think any one of you upon any

7   amount of reflection would want this decision or

8   other decisions made down in the courthouse made

9   by people who had nowhere better to be.  I can't

10  go to institutions and get jurors.  You are it.

11  You're it.

12        This is the user-friendly New York State

13  court system.  You folks have a benefit that

14  virtually no state accords, gives to its citizen

15  jurors and that is a one-time

16  get-out-of-jury-service free.  You've either taken

17  it or you haven't.  So you are here to serve in

18  this case.

19        Longest trial I did as a judge was four

20  and a half months. Four and a half months.  The

21  longest trial you know about took 13 months. There

22  is no special list of losers to serve on cases

23  that take more than a couple days.  Imagine that

24  you signed up for National Guard unit to get

25  commodity, extra pay, instead you get your arms

=VOIR DIRE=

blown off, eat sand, don't get a shower for weeks.
You want to talk about a hardship.  Tens of
thousands of people lying dead in military
cemeteries who would like to serve on the case,
but they can't.

Anybody have religious, moral or ethical
beliefs in judging another human being; anybody
think only God can do that and we cannot judge a
humankind?

My job is to explain what the law is.
Your function is to decide the case. The way you
do that is to make accuracy and credibility
judgments about witnesses.  You will decide who to
believe, if anybody, what extent to believe them,
then decide what facts you are going to use to
make your decision.  My job is to explain the law.
Put your assessment of the facts, of the
testimony, together with the law, and you decide
whether it's proven or not proven.

In making these assessments, judgments on
the accuracy and credibility of witnesses, you do
that in the same way you do in your own lives.
You've survived in New York whether for seven
months or 70 years.

Every week, month, somebody whom you do

=YVETTE  PACHECO   SENIOR  COURT  REPORTER=

VOIR DIRE

not know under a variety of circumstances starts
to talk to you. When you realize they want you to
do something, this stranger with whom you have no
history, you do two things, automatically as New
Yorkers, without my standing around saying let me
tell you how to figure this out, you judge, you
assess both the person talking to you and the
content of what they're saying without my having
to be there.  You decide whether or not what the
person is saying makes sense.

Does it fit in with life in New York as
you know it exists?

Does what the person says to you here
from the witness stand, does it sound like that
person actually lived through an event or does it
sound like the person is trying desperately to say
what they were told to say?

Does it have a naturalness or artificial
sense about it?  Is it fantasy, is it fact?  Your
decision.

Is it fact or contradicted by something
else?

What's your comfort level with the
witness as he or she is talking to you?

What's in it for them?

═VOIR DIRE═

1    The stranger talking to you what do they

2    want from you or what do they get out of it if

3    they convince to you do it?  Those are the

4    judgments you make, and those are the same

5    judgments you make here.

6         In this case you will see and hear police

7    testimony. It's difficult to have a criminal trial

8    without police officers testifying.  Sure you can

9    have a little lady bopped on the head, bleed a lot

10   and have a trial with just a little old lady and

11   the doctor and may be a Good Samaritan or two.

12   Usually, you have New York City police officers

13   testify or state troopers.

14        This is a case where the New York City

15   Police Department will be the witnesses. What does

16   that mean?  I have to tell you.  Well, not much,

17   except what the law is.  The law says you can't

18   believe or disbelieve somebody because of their

19   occupation.  If you have had a bad experience with

20   a plumber, you can't discount every plumber's

21   testimony.  The law says you can't believe or

22   disbelieve a person because of their occupation,

23   that applies to police officers.

24        You know that some police officers get

25   up, go to work, shot, killed and go directly to

═YVETTE PACHECO  SENIOR COURT REPORTER═

1    heaven. Some go to work, commit crimes and wind up

2    in state prison.  There are about 39,200 people

3    somewhere had the middle. Are they heroes here or

4    normal civilians, just folks.

5         We have this rule on your behalf because

6    you are responsible for the law that says

7    essentially the Eleventh Commandment, thou shall

8    not stereotype. If you do not like being judged

9    before anybody evaluates you, do not do it in the

10    courtroom, for heaven's sake. We are looking for

11    people who will listen and make up their mind. Not

12    make up their mind as soon as they see a person or

13    listen to a situation.

14         If you didn't get the apartment, didn't

15    get a loan, get a promotion, this or that and you

16    realize the reason you didn't get it was because

17    the decision was made before merits were

18    evaluated, you were stereotyped. Think about how

19    sick you were when you discovered that happened.

20    That's the reason why New York says thou shall not

21    stereotype.

22         I generally don't care. I get paid the

23    same salary since 1999, I get the same salary,

24    whether you find guilt or non-guilt, whether you

25    believe or disbelieve a police officer, I don't

═══ VOIR DIRE ═══

1   care.  My job is to make sure you follow the law,

2   which is judge after, not before.

3        Sentencing.  Somebody out there could be

4   saying, sentencing, oh my heavens, start sweating

5   perspiring, having cramps.  In order to remove

6   that consideration from you, you and your wisdom

7   have said with regard to what might happen in the

8   future, you cannot be concerned with that.  You

9   can't, because it's both legally and logically

10  irrelevant what might happen if there is a

11  conviction.  You can't worry about what might

12  happen.  You're here to decide whether a past

13  event happened, whether the prosecution in this

14  present trial can prove it to have happened.

15       If there is a sentence to be imposed, you

16  have nothing whatever to do with it. That's the

17  law you have created.  I would be the one to do

18  sentencing.  I probably am the only one, apart

19  from your children, if you have children or had

20  them.  I'm the only one in the room who has ever

21  imposed a sentence.  If I have to impose a

22  sentence here, I will know more about the person

23  to be sentenced than any other human being on the

24  globe.  You can't worry about sentencing. It is

25  not your job.  You look back rather than forward.

VOIR DIRE

1     Mr. Garber, hello.

2     Who knows Robert Morgenthau, personal

3  friends, personal acquaintance, hangs or chills

4  with Bob, brunches with Bob, picks apples with

5  Bob?

6     I expected as much. For 25 years, 25

7  to 27 times a year, I've asked the question and

8  the answer is virtually identical repetition of

9  what just happened, stunned silence, that anybody

10  would have an interpersonal relationship with the

11  elected district attorney of Manhattan who appears

12  to be a recluse and social failure.

13     As Hal Brenner used to say, wonder

14  amount.  Continual confabulation.  I cannot

15  understand it, especially since it is routinely

16  since the 1800 he's elected every four years.

17  He's never been here in the 25 plus years I have

18  been here. He is, however, represented by an

19  assistant DA named Jason Berland.

20     Stand up and see if anybody knows you.

21     MR. BERLAND:  Good morning.

22     THE COURT:  Must be one of the job's

23  criteria.

24     Next thing might strike you as odd, too.

25  I hope it will because it's memorable.  You can't

================ VOIR DIRE ================

1    be a defendant in a New York State Supreme Court

2    by volunteering. We don't take volunteers.   Two

3    things have to happen before you can get to be a

4    defendant in a New York State Supreme Court and be

5    on trial. You have to be indicted and arrested.

6          So everybody, those found not guilty by

7    the jury, as well as those found guilty by the

8    jury started the process by an arrest and an

9    indictment, and so intelligent folks like

10   yourselves and I can perceive intelligence among

11   all of you.

12          Intelligent people trying to figure out

13   the correct result here will not pause a

14   nanosecond trying to figure out what the effect of

15   the arrest and indictment are on the verdict

16   because you just heard me say whether you will be

17   acquitted or found guilty, you started off the

18   same way.  Your focus is not what happened with

19   the arrest and indictment, it's what happens from

20   the witness stand.

21          I will introduce the person accused here.

22   The person's name is Edward Green.  This is the

23   plexiwheel you heard about since children.

24          Mr. Green, stand up and see if anybody

25   knows you.  This is Edward Green.  Anybody think

================ YVETTE PACHECO  SENIOR COURT REPORTER ================

VOIR DIRE

1     they know or have seen or heard of Edward Green?

2              THE DEFENDANT:  Good morning.

3              THE COURT:  Have a seat.  He's

4     represented by Arnold Keith.  Does anybody know

5     Mr. Keith?

6              MR. KEITH:  Good morning, everyone.

7              THE COURT:  We're about to call 20

8     people, put you in the box and ask you questions.

9     There is a trait found among some New Yorkers that

10    I need to address.  First thing I want to say is

11    how many people here are in favor of crime?  You

12    are under oath.  Nobody here is in favor of crime?

13    All right.

14             Let's say, now that I probably have your

15    attention, right now in the United States there

16    are 30,000 criminal trials.  Let's say there are

17    12 jurors per trial, 360,000 jurors right now in

18    Hawaii and Maine, and how many of them do you

19    think are in favor of crime?  None.

20             So pendulumly speaking, what does that

21    mean about the relationship about not liking crime

22    and being a fair juror?  They blend together

23    easily.  They're not mutually exclusive. You can

24    be opposed to crime, indeed you can be violently

25    opposed to crime and serve fairly on a jury where

VOIR DIRE

1   a crime is charged provided you meet the common

2   sense U.S. standard, which is what?  As best as is

3   humanly possible, given the nature of the charge,

4   you set aside the emotional components, the

5   emotional reaction that tend to that crime and

6   trial.

7        So in a rape of a four-year old girl, I

8   don't have to find 12 people in favor of raping

9   children.  I just have to find 12 people who, when

10  they get agitated, will recognize the agitation

11  for what it is.  Not being proof, they will say,

12  all right, I am a human being, that's affecting

13  me, so I'm, as best as is humanly possible,

14  discounting that, setting it aside and refocusing

15  on my original evaluation of what the proof is or

16  absence of proof.

17       So here we have a drug charge.  Mr. Green

18  is accused of possessing what you will hear is

19  over half a kilogram of drugs and we're having a

20  trial.  New York has a definition of possession,

21  which I'll explain at the appropriate time, and

22  you need to decide whether the prosecution can

23  prove the elements of the crimes with which

24  Mr. Green is charged.  That's it. The republic,

25  the government, your standard of living will not

1   be affected whether you find him guilty or not

2   guilty.  I can't do it.

3        I don't know what kinds of lengthy or

4   short trials are happening on this floor and the

5   floors above and below us or 60 Centre or 111

6   Centre Street or down at 49 Thomas Street.  I

7   can't tell you where you will go if you are

8   excused at this trial. I don't know and I will

9   purposely remain ignorant.  If there is a trial

10   across the street down the corridor that will take

11   two weeks, four weeks, four months, I don't know.

12   I purposely remain ignorant.

13        I will put you folks in a position to

14   decide the case, either next Monday or next

15   Tuesday.  However long you decide your

16   deliberations take is up to you. I expect, having

17   consulted with the lawyers, to put you in a

18   position to decide the case next Monday or

19   Tuesday, and I emphasize I don't know what's

20   happening in other buildings where you will be

21   sent if not selected here.

22        Now, some people say, Judge, you just

23   said that you will put us in a position to decide

24   the case next Monday or Tuesday, yet asking us

25   today and perhaps some of tomorrow morning, can we

═══VOIR DIRE═══

1    be fair.  Can't you ask us next Monday or next

2    Tuesday?  The answer is no.  Today is the day

3    we're picking the jury. So you need to say it.

4    This is something I'm fair about or not fair about

5    it.

6          We'll call 20 people. This doesn't

7    guarantee you will be selected.  Do not panic if

8    your name is among the first 20.  Many, many

9    people will be called. As I said, not everybody

10   called will be chosen.  Gather your gear, take the

11   questionnaire and prepare your answers.

12         Go ahead.

13         THE CLERK:  Seat number one,

14   Wendy Shrijver.  Seat number two, Phyllis Wein.

15   Shanera Stuart, seat number three.

16   Timothy Carvin, seat number four.  Robert Cole,

17   seat number five.  Kathleen Mitchell, seat number

18   six.  Megan Stubbendeck, seat number seven.

19   Manuel Salgado, Seat number eight. Melissa Pinker,

20   seat number nine.  Caroline Wicker, seat number

21   ten.  Stacy Sullivan, seat number 11.  David

22   Riley, seat number 12.  Michael Wagner, seat

23   number 13.  Gerforne Johnson, seat number 14.

24   Qubell Haile, seat number 15. Omar Perez, seat

25   number 16. David Daniels, seat number 17.

═══YVETTE PACHECO  SENIOR COURT REPORTER═══

═══VOIR DIRE═══

1    Bienvenido Caba, seat number 18.  James Wysock,

2    seat number 19. Rafael Taveras, seat number 20.

3         Those who names are yet to be called,

4    don't have the questionnaire, and the last

5    question says, Given what you heard so far, can

6    you be fair and follow the law?

7         I made reference to 30,000 trials and

8    probably a lot more than that going on and then

9    30,000 plus ways of doing jury selection.  The

10   point of any judge's jury selection is to find

11   people who can answer that question.  Yes, I can

12   be fair.

13        We tell you a little bit about what

14   supposedly occurred.  I forgot the address of the

15   building.

16        MR. BERLAND:  451 Lenox Avenue.

17        THE COURT:  451 Lenox Avenue. Do you

18   remember what the cross streets are?

19        MR. BERLAND:  Between 132nd and 133rd

20   Streets.

21        THE COURT:  Okay, that's the place.

22   You've heard what the allegation is.  We have this

23   questionnaire.  I'm going to tell you how  you

24   would answer the questions.

25        Questions two and three make a reference

═══YVETTE PACHECO  SENIOR COURT REPORTER═══

1    to New York City. What I'd like, if you can do it

2    is give me one answer.  What I mean by that, if

3    you have a relative in the five boroughs, I don't

4    want you to go borough by borough, just say

5    about 15 relatives in the City of New York that

6    includes all five boroughs or here by myself or

7    whatever it is.  I have over hundred people, I

8    lost count at 55.

9         Question five asks are you working.

10    Don't just say no or yes. The lawyers and

11    Mr. Green need to know something about you.  I do

12    not want to know where you work, but for example

13    if you work in a store, say retail store, manager,

14    cashier. I work in a bank, loan officer, computer

15    person.  You do not have to say I'm a geek. Just

16    what kind of work do you do.

17         If you are in school, what is it that you

18    are studying.  Do you have a major. If you are

19    retired, what did you do before you retired.  If,

20    unfortunately, you recently were laid off, quit or

21    fired, I need to know what your job experience

22    was.

23         I need to know your neighborhood, Battery

24    Park City, Harlem, Murray Hill. With regard to

25    132nd Street, I'm going to ask you whether you

═══════════════ VOIR DIRE ═══════════════

1    live within three blocks in a circle, below blocks

2    around Lenox and 132nd.  If you do it, it doesn't

3    disqualify you, just something Mr. Green and the

4    lawyers and I need to know.

5         There is a last question I ask, which is

6    not on the questionnaire and it is the following.

7    Essentially, anything that is not on the

8    questionnaire or about which we have not asked you

9    with affects your ability to decide the case. You

10   need to answer that question.

11        We start with Ms. Shrijver, start with

12   you and go down the road to Mr. Salgado, back to

13   Mr. Perez, move down to Ms. Pinker and the two

14   folks on the side and two folks in the front.

15   There it is, the hand-held microphone.

16        Go ahead.

17        PROSPECTIVE JUROR:  My name is Wendy

18   Shrijver. I live on the Upper East Side in

19   Yorkville.  I live there for two years.  I'm not a

20   New Yorker.

21        MR. KEITH:  We lost the sign.

22        THE COURT:  You were or were not born in

23   New York.

24        PROSPECTIVE JUROR:  I was not born in New

25   York.  I was born in Connecticut.

═════════ YVETTE PACHECO  SENIOR COURT REPORTER ═════════

======VOIR DIRE======

 1          THE COURT:  Maybe if you hit it against

 2    your head?  No, that's not good.  Could somebody

 3    help her?

 4          PROSPECTIVE JUROR:  I work as a portrait

 5    painter.  That involves painting every day.  It's

 6    a free-lance job.  I have a graduate degree.  I

 7    have been married.  I have two children.

 8          THE COURT:  Do either live at home with

 9    you?

10          PROSPECTIVE JUROR:  Part of the time.

11          THE COURT:  When they were younger, did

12    you speak with either or both about drugs?

13          PROSPECTIVE JUROR:  Yes.

14          THE COURT:  Continue.

15          PROSPECTIVE JUROR:  I served on a

16    criminal case that was settled.

17          THE COURT:  You did not have to decide

18    it?

19          PROSPECTIVE JUROR:  No.

20          THE COURT:  Were there any criminal or

21    civil cases that you made a verdict?

22          PROSPECTIVE JUROR:  No.

23          THE COURT:  Continue.

24          PROSPECTIVE JUROR:  I have had a close

25    friend who was the victim of a crime.

========================================VOIR DIRE========================================

1          THE COURT:  What happened to that person?

2          PROSPECTIVE JUROR:  She was raped.

3          THE COURT:  By somebody whom she knew or

4     did not know?

5          PROSPECTIVE JUROR:  Did not know.

6          THE COURT:  Did she report it?

7          PROSPECTIVE JUROR:  Yes.

8          THE COURT:  Was it in New York State?

9          PROSPECTIVE JUROR:  No.

10          THE COURT:  Continue.

11          PROSPECTIVE JUROR:  I don't have any

12     relatives who are A or B.

13          THE COURT:  In law enforcement?

14          PROSPECTIVE JUROR:  No.

15          THE COURT:  Continue.

16          PROSPECTIVE JUROR:  No.

17          THE COURT:  No to what?

18          PROSPECTIVE JUROR:  Number ten.

19          THE COURT:  They want to know what number

20     ten is.

21          PROSPECTIVE JUROR:  Family members or

22     close friends in conflict with the law.  No.

23          THE COURT:  Actually, I think that's the

24     victim of a crime.

25          PROSPECTIVE JUROR:  Oh, yes, okay.

========================YVETTE PACHECO  SENIOR COURT REPORTER========================

1     Right.  Close friend being victim of a crime.

2              THE COURT:  Twenty-five years, I should

3     know these questions.  Go ahead.

4              PROSPECTIVE JUROR:  No, I don't have any

5     moral or religious beliefs or opinions that might

6     conflict with the rules of law controlling

7     criminal cases.

8              THE COURT:  There is no reason you

9     couldn't be fair and follow the law?

10             PROSPECTIVE JUROR:  No.

11             THE COURT:  You told us the neighborhood.

12    Anything which isn't on the questionnaire or I

13    didn't ask you which affects your ability to

14    decide the case?

15             PROSPECTIVE JUROR:  No.

16             THE COURT:  Go ahead, Ms. Wein.

17             PROSPECTIVE JUROR:  My name is Phyllis

18    Wein. I live in the Upper West Side for 39 years.

19             MR. KEITH:  Upper West or East?

20             PROSPECTIVE JUROR:  Upper West.

21             THE COURT:  Does it make a difference?

22             MR. KEITH:  Yes.

23             PROSPECTIVE JUROR:  I'm retired.  Prior

24    to retiring, I helped my husband in his business,

25    a mail order business. I graduated from college. I

====VOIR DIRE====

1   have two children.

2           THE COURT:  Did you speak with them about

3   drugs?

4           PROSPECTIVE JUROR:  Yes, I did.

5           THE COURT:  Did they listen?

6           PROSPECTIVE JUROR:  Yes.

7           THE COURT:  Good.

8           PROSPECTIVE JUROR:  I have never served

9   on a criminal case.  Fortunately, I don't have a

10  close friend or relative who has been a victim of

11  a crime.  No, I do not have any relatives who are

12  attorneys or in law enforcement.  No, I don't have

13  any family who has been in conflict with the law.

14          THE COURT:  Actually, that says victim of

15  a crime.

16          PROSPECTIVE JUROR:  No conflict.

17          THE COURT:  I apologize. Periodically,

18  they do give us a vacation.  Periodically, then,

19  somebody else sneaks in here and uses the

20  courtroom.  I'm wondering whether we get a

21  different jury questionnaire. In any event, I will

22  keep my mouth shut and you will answer the

23  question.

24          MR. KEITH:  On that issue, may we

25  approach.

1      THE COURT:  Sure.

2           (A discussion was held off the record.)

3           THE COURT:  There is somebody named Louis

4    Bart Stone, but he ain't me. I don't use the word

5    "conflict."  Anyway, we'll use his.

6           MR. KEITH:  Sorry, Your Honor, one other

7    thing.

8           THE COURT:  So am I.  Mine certainly is

9    better.

10          (A discussion was held off the record.)

11          THE COURT:  Forget about the

12   questionnaire.  I want them back.  Give the

13   questionnaires back. It must be that Judge Stone

14   doesn't plan on doing any more trials in his

15   career. What are his questionnaires here for?

16          So, Ms. Wein, people who said conflict, I

17   apologize.  What neighborhood do you live in?

18          PROSPECTIVE JUROR:  Upper West Side.

19          THE COURT:  Any of the children at home

20   with you these days?

21          PROSPECTIVE JUROR:  No.  I'm a

22   grandmother.

23          THE COURT:  Anything you need to tell us

24   about your ability to decide the case that isn't

25   on that now-discarded questionnaire?

VOIR DIRE

1    PROSPECTIVE JUROR:  No.

2    THE COURT:  We'll go to Ms. Stuart.

3    Go ahead.

4    PROSPECTIVE JUROR:  I was born in Harlem,

5    Harlem Hospital.  I have lived in New York all of

6    my life.  All of my relatives --

7    THE COURT:  Since I haven't had the

8    pleasure of meeting your relatives, is that 15,

9    20?  How many, roughly?

10   PROSPECTIVE JUROR:  Roughly around 50.

11   THE COURT:  Continue.

12   PROSPECTIVE JUROR:  All of the relatives

13   that I know of live in New York City.  I am not

14   married.  I am working.

15   THE COURT:  Doing what?

16   PROSPECTIVE JUROR:  In a coffee company,

17   retail.

18   THE COURT:  How long have you been there?

19   PROSPECTIVE JUROR:  For two years.

20   THE COURT:  Continue.

21   PROSPECTIVE JUROR:  I do not have any

22   children. I am in my last year of School for

23   Culinary Arts.  I have never served on a criminal

24   or civil jury.  I have never served on a Grand

25   Jury.  I've never served in the military.  None of

═══════════VOIR DIRE═══════════

1   my relatives or close friends have been employed

2   by any law enforcement. I've had two relatives

3   convicted of a crime.

4           THE COURT:  I'm going to ask everybody

5   when I'm finished whether relatives or yourselves

6   accused, victim of a crime. It happens. I will put

7   that off until I finish the questions.

8           Go ahead, please.

9           PROSPECTIVE JUROR:  I have never been a

10  party to a civil lawsuit, but I have been in court

11  for other reasons.

12          THE COURT:  What sort of things brought

13  you to court?  Family Court?

14          PROSPECTIVE JUROR:  For the relatives.

15          THE COURT:  You went to their trials.

16          PROSPECTIVE JUROR:  Yes.

17          THE COURT:  I will ask you about that

18  later. Continue, please.

19          PROSPECTIVE JUROR:  Yes, I will follow

20  the laws as the Court instructs.  I will be fair.

21          THE COURT:  Your neighborhood is what?  I

22  don't want your address.  I'm not coming over or

23  sending you a card.  I want the general area in

24  which you live.

25          PROSPECTIVE JUROR:  Harlem.

═══════YVETTE PACHECO  SENIOR COURT REPORTER═══════

═══════════════════════ VOIR DIRE ═══════════════════════

1      THE COURT:  Within three blocks of Lenox
2   and 132nd?
3      PROSPECTIVE JUROR:  Yes.
4      THE COURT:  Does that bother you?
5      PROSPECTIVE JUROR:  No.
6      THE COURT:  Anything else I need to know?
7      PROSPECTIVE JUROR:  No.
8      THE COURT:  Mr. Carvin.
9      PROSPECTIVE JUROR:  I was born in
10   Massachusetts.  I've lived in New York City for
11   eight years.  I have relatives in New York City.
12   I'm not married, but I've lived with a girl for
13   five years.
14      THE COURT:  How is it working out?
15      PROSPECTIVE JUROR:  I am working, an
16   insurance broker. I don't have any children.  I
17   have a college education.  I have never served on
18   a criminal or civil jury, nor a Grand Jury.  I've
19   never served in the military.  I have no close
20   friends or relatives employed by law enforcement
21   agency.  Neither myself or close friend a victim
22   of a crime. I've never been a party to a civil
23   lawsuit or been in court for any reason.  I could
24   certainly be fair and impartial and follow the
25   law.  I live in Gramercy.

─────────── YVETTE PACHECO  SENIOR COURT REPORTER ───────────

═══════VOIR DIRE═══════

1    THE COURT:  You sound unsure about that?

2  Are you sure you live in Gramercy?

3    PROSPECTIVE JUROR:  I am certain.

4    THE COURT:  Say it, I live in Gramercy.

5    PROSPECTIVE JUROR:  I live in Gramercy.

6    THE COURT:  Anything else I should know?

7    PROSPECTIVE JUROR:  No.

8    THE COURT:  Mr. Cole.

9    PROSPECTIVE JUROR:  Robert Cole. I was

10  born in New York.  I've lived in New York City for

11  five years.  I have no other relatives that live

12  in New York City.  I'm married.  I'm a consultant.

13    THE COURT:  What kind of business or

14  field?

15    PROSPECTIVE JUROR:  Political action

16  committee.  My spouse works for Estee Lauder.  No

17  children.  I'm college educated.  I have never

18  served on a civil or criminal jury or Grand Jury.

19  Never served in the military.  I do not have a

20  close friend or relative that have been employed

21  by the FBI or close friend or relative that's been

22  a victim of a crime.  I have no not been a party

23  to a civil lawsuit.  I can be fair and impartial.

24  I live in the Upper East Side.

25    THE COURT:  Anything else we should know?

═══════YVETTE PACHECO  SENIOR COURT REPORTER═══════

===VOIR DIRE===

1     PROSPECTIVE JUROR:  No.

2     THE COURT:  Miss Mitchell.

3     PROSPECTIVE JUROR:  Hello.

4     THE COURT:  Hi.

5     PROSPECTIVE JUROR:  I was born in

6  Worcester, New York.  I've lived in the city five

7  years.  I have about 20 relatives that live in New

8  York City.  I'm married.  I work at Discovery

9  Channel. My spouse, at CVS.  No children.  College

10  education. Never served on a criminal or civil or

11  Grand Jury or military.  I'm have close friends

12  employed by law enforcement agencies.

13     THE COURT:  What kind of --

14     PROSPECTIVE JUROR:  Police officers in

15  Worcester, New York.

16     THE COURT:  I don't mind speaking fast.

17  Keep going.

18     PROSPECTIVE JUROR:  I have close

19  relatives and friends that have been victims of a

20  crime.

21     THE COURT:  What happened to your

22  relative?

23     PROSPECTIVE JUROR:  Both were muggings in

24  Maryland.

25     THE COURT:  Any serious injury,

VOIR DIRE

1   hospitalization, stitches?

2           PROSPECTIVE JUROR:  No.

3           THE COURT:  Something serious to happen

4   to one of your friends or one of your relatives?

5           PROSPECTIVE JUROR:  Just a little shaken

6   up.  I have never been party to a civil lawsuit. I

7   believe being be fair and impartial.  I live in

8   the financial district.

9           THE COURT:  Anything else?

10          PROSPECTIVE JUROR:  No.

11          THE COURT:  Ms. Stubbendeck.

12          PROSPECTIVE JUROR:  I was born in

13  Nebraska.  I've lived in New York for one year.

14          THE COURT:  Where do you come most

15  directly, from Nebraska or someplace else?

16          PROSPECTIVE JUROR:  Recently from the

17  University of Virginia.  I am not married. I work

18  as a tutor and instructor development.

19          THE COURT:  What subject do you tutor in?

20          PROSPECTIVE JUROR:  American history and

21  SATs. I have no children.  My educational

22  background, finished my dissertation for Ph.D. in

23  American history.  My dissertation in the history

24  of urban gangs.

25          THE COURT:  You never know what might be

=VOIR DIRE=

1    interesting to the attorney.

2              PROSPECTIVE JUROR:  I assume that might

3    be interesting. I have never served on a civil or

4    criminal jury nor Grand Jury. I have never served

5    in the military.

6              THE COURT:  Did you ever join a gang?

7              PROSPECTIVE JUROR:  No, I have not been a

8    member of a gang. I have been a victim of a crime.

9              THE COURT:  What happened to you?

10             PROSPECTIVE JUROR:  I was raped.

11             THE COURT:  By somebody you knew or did

12   not know?

13             PROSPECTIVE JUROR:  Somebody I did know.

14             THE COURT:  Nebraska or somewhere else?

15             PROSPECTIVE JUROR:  Somewhere else.

16             THE COURT:  Did you report it to the

17   police?

18             PROSPECTIVE JUROR:  No.

19             THE COURT:  Continue.  I don't know

20   what's wrong with the microphone.

21             PROSPECTIVE JUROR:  I've never been a

22   party to a civil lawsuit or in court for any

23   reason. Given what I heard so far, I could be fair

24   and impartial and follow the law.  Upper West

25   Side.

═══VOIR DIRE═══

1    THE COURT:  Anything else?

2    PROSPECTIVE JUROR:  No.

3    THE COURT:  Mr. Salgado.

4    PROSPECTIVE JUROR:  Good morning.  I was

5    born in New York City.  I lived in New York

6    City 60 years.  I have 15 relatives in the city.

7    I'm not married.  I'm working respiratory in a

8    hospital.  My girlfriend's occupation is a child

9    care provider. I have three children. My education

10   is high school graduate. I've never served in a

11   civil or criminal jury or Grand Jury.  I was in

12   the military, in the army.

13        THE COURT:  What period of time?

14        PROSPECTIVE JUROR:  '67 through '70.

15        THE COURT:  Your specialty was what?

16        PROSPECTIVE JUROR:  Grunt.

17        THE COURT:  Did you serve overseas?

18        PROSPECTIVE JUROR:  Vietnam. I have a

19   nephew that just recently retired from the

20   Correction Department.

21        THE COURT:  City or state?

22        PROSPECTIVE JUROR:  City. I have no

23   friends or relatives that have been a victim to a

24   crime.  I've never been in a civil lawsuit. I can

25   be fair and impartial, but Your Honor, I think

═══YVETTE PACHECO  SENIOR COURT REPORTER═══

=====VOIR DIRE=====

1    there's something I would see you in private

2    about.

3                THE COURT:  Private has its unique

4    meaning. You me and the lawyers. Come over here.

5                (Whereupon, a sidebar conference was held

6    on the record out of the hearing of the jury.)

7                THE COURT:  What would you like to say?

8                PROSPECTIVE JUROR:  My son was convicted

9    of drug trafficking.  He did ten years in jail.

10               THE COURT:  Is he still incarcerated?

11               PROSPECTIVE JUROR:  No.  He's currently

12   out on parole or probation.

13               THE COURT:  Can you be fair here or not?

14               PROSPECTIVE JUROR:  I don't think so.  It

15   kind of created a big problem between me and him,

16   the relationship.

17               THE COURT:  I'll excuse you.

18               (Whereupon, the sidebar conference

19   concluded and the proceedings continued in open court

20   as follows:)

21               THE COURT:  We'll excuse him.  Fill seat

22   number eight, Mr. Salgado's seat.

23               THE CLERK:  Ms. Hall.

24               PROSPECTIVE JUROR:  I was born in the

25   mountains of Virginia.

=====YVETTE PACHECO  SENIOR COURT REPORTER=====

═══════VOIR DIRE═══════

1    THE COURT:  East Virginia or West

2    Virginia?

3    PROSPECTIVE JUROR:  Western Virginia.

4    I've lived in New York City for five years.  I

5    have no relatives who live in New York.  I'm not

6    married.  I'm working.  I'm self-employed.

7    THE COURT:  Doing what?

8    PROSPECTIVE JUROR:  I run a business that

9    does VIP and specialty services. I don't have a

10   spouse.  I have no children.  I graduated from the

11   University of Virginia.  Never served in a civil

12   or criminal jury, nor Grand Jury, nor the

13   military. I don't have any close friends or

14   relatives employed by law enforcement.  Never had

15   a friend or relative a victim of a crime.  Never

16   been party to a civil lawsuit or in court for any

17   other reason.  I can be fair and impartial. I live

18   in Hells Kitchen.

19        THE COURT:  Anything else?

20        PROSPECTIVE JUROR:  No, sir.

21        THE COURT:  Thank you.

22        Mr. Perez.  Thank you. Mr. Perez.

23        PROSPECTIVE JUROR:  My name is Omar

24   Perez. I was born in New York City.  I've been

25   living in New York for 41 years. I have about ten

═══════YVETTE PACHECO  SENIOR COURT REPORTER═══════

VOIR DIRE

1   relatives. I am not married.  I am working in a

2   hospital as a mechanic.  I have a daughter.

3           THE COURT:  Is she at home with you?

4           PROSPECTIVE JUROR:  No, she's not.

5           THE COURT:  Is she old enough to be

6   spoken to about drugs?

7           PROSPECTIVE JUROR:  She's only five years

8   old.  Not at that concept yet.  My educational

9   background is some engineering and some trade

10  schools. I have served on two civil cases, 60

11  Centre Street.

12          THE COURT:  Did you decide both civil

13  cases or settled?

14          PROSPECTIVE JUROR:  We came to the end.

15          THE COURT:  Please forget anything you

16  remember of what the judge said because the rules

17  in civil are different from the rules here.  I

18  will tell you anything you need to know.

19          PROSPECTIVE JUROR:  Okay. I have never

20  served in the military.  I have two friends

21  employed by the New York City Police Department.

22          THE COURT:  Blue uniforms or

23  plainclothes?

24          PROSPECTIVE JUROR:  One that wears a blue

25  uniform and another one that's a detective.

YVETTE PACHECO  SENIOR COURT REPORTER

VOIR DIRE

1      THE COURT:  What kind of detective work
2  does that fellow or woman do?
3      PROSPECTIVE JUROR:  I don't get into too
4  much detail because sometimes he is on special
5  assignments.
6      THE COURT:  Do you have any idea whether
7  it relates to organized crime, violation, sex
8  crimes?
9      PROSPECTIVE JUROR:  At the beginning of
10  his career, he had some encounters with criminals
11  and stuff like that, but I haven't gotten one into
12  details the past couple of months.
13      THE COURT:  Fine.  Continue.
14      PROSPECTIVE JUROR:  Never a party to a
15  lawsuit or in court for any other reason.
16      THE COURT:  Can you be fair and will you
17  follow the law?
18      PROSPECTIVE JUROR:  Yes. I live in Inwood
19  area.
20      THE COURT:  Anything else?
21      PROSPECTIVE JUROR:  Nothing else.
22      THE COURT:  Mr. Haile.
23      PROSPECTIVE JUROR:  I was born in New
24  York.  I have been living here for 22 years.  I
25  have four relatives that live in the city. I am

═══════════════════════VOIR DIRE═══════════════════════

1    not married.  I currently work in a hospital.

2                    THE COURT:  How long have you been there?

3                    PROSPECTIVE JUROR:  A month.

4                    THE COURT:  What do you do there?

5                    PROSPECTIVE JUROR:  A unit clerk, ICU.

6                    THE COURT:  Did you work before a month

7    ago?

8                    PROSPECTIVE JUROR:  Yeah.

9                    THE COURT:  What kind of work did you do

10   there?

11                   PROSPECTIVE JUROR:  Same thing.

12                   THE COURT:  Different hospital?

13                   PROSPECTIVE JUROR:  Yeah.  No children, I

14   have some college background.  I never served in a

15   civil or criminal jury.  Never in the Grand Jury.

16   Never was in the military. I have no close

17   relatives or friends that are in law enforcement.

18   No friends victim of crime or relative. Never a

19   party to a civil suit.  Yes, I can follow the law

20   and the Court's instruction.  I live in the Upper

21   West Side.

22                   THE COURT:  Anything else?

23                   PROSPECTIVE JUROR:  No.

24                   THE COURT:  Next is Ms. Johnson.

25                   PROSPECTIVE JUROR:  I was born in North

═══════════════YVETTE PACHECO  SENIOR COURT REPORTER═══════════════

=VOIR DIRE=

1    Carolina.  I lived in New York City for 40 years.

2           THE COURT:  No way.

3           PROSPECTIVE JUROR:  Thank you, Judge.

4           THE COURT:  I said it was the

5    user-friendly New York State Court system.

6           PROSPECTIVE JUROR:  I have about 20

7    relatives here.  I'm separated.  I'm retired.  I

8    worked from a communications company.  My husband

9    worked for a park service.  I have children.

10   They're grown.

11          THE COURT:  Did you speak with your

12   children as they were growing up about drugs?

13          PROSPECTIVE JUROR:  Yes.

14          THE COURT:  Continue, please.

15          PROSPECTIVE JUROR:  I'm currently in

16   school to complete my Bachelor's.  I never served

17   on a civil or Criminal Court, a jury, nor a Grand

18   Jury, nor military.  I did have a cousin who

19   recently retired from the police department.

20          THE COURT:  Do you know what the person's

21   last job was within the police department?

22          PROSPECTIVE JUROR:  No.

23          THE COURT:  Any idea what the person did

24   as a police officer towards the end of his or her

25   career?

═VOIR DIRE═

1    PROSPECTIVE JUROR:  I think she was

2 mainly in the office. I have friends that were

3 employed or currently employed as COs.  Thank God

4 we never had a relative or friend a victim of a

5 crime. Never been a party to a civil lawsuit.

6 Yes, I can be fair and impartial, and I live Upper

7 West Side.

8    THE COURT:  Correction officer.

9    PROSPECTIVE JUROR:  Yes.

10   THE COURT:  City or state?

11   PROSPECTIVE JUROR:  City.

12   THE COURT:  Anything else?

13   PROSPECTIVE JUROR:  No.

14   THE COURT:  Mr. Wagner.

15   PROSPECTIVE JUROR: I was born in Bayonne.

16 Lived in New York City on and off for about six or

17 seven years.  I have one aunt who lives in

18 Manhattan.  I am not married.  I have a fiance. I

19 am working, self-employed doing website design and

20 maintenance.  My fiance's occupation is graphic

21 design.  We have a six-month-old son.  I have a

22 graduate degree.  Never served on criminal or

23 civil jury, Grand Jury or military.  No close

24 friends or relatives employed by law enforcement

25 nor a victim of a crime. Never been a party to a

VOIR DIRE

civil lawsuit. I can follow law. I will be fair and impartial, and I live in midtown, Hells Kitchen.

THE COURT: Anything else?

PROSPECTIVE JUROR: No.

THE COURT: Mr. Riley.

PROSPECTIVE JUROR: Born in New York all my life. I have 20 relatives in the city. I'm married. I work for the Board of Education, custodial engineer. My wife works in a dental office. One child, she's four. I completed high school.

THE COURT: Your four-year-old is not working yet?

PROSPECTIVE JUROR: Not yet. I served on a criminal jury. They did reach a verdict.

THE COURT: Do not tell me the verdict. Tell me the charge.

PROSPECTIVE JUROR: Possession of narcotics.

THE COURT: How long did you decide that case?

PROSPECTIVE JUROR: Five days.

THE COURT: Did the lawyers or judge say anything to you after you reached the verdict?

═VOIR DIRE═

1       PROSPECTIVE JUROR:  No.

2       THE COURT:  Fine.

3       PROSPECTIVE JUROR:  Never in the

4  military. My brother is a New York City police

5  officer.

6       THE COURT:  What precinct?

7       PROSPECTIVE JUROR:  17th Precinct.

8       THE COURT:  What's the nature of his

9  assignment?

10      PROSPECTIVE JUROR:  It's two years on the

11  job, blue-and-white car.  I've never been the

12  victim of a crime.  Never a civil lawsuit. I can

13  follow the instructions. I live in Upper

14  Washington Heights.

15      THE COURT:  Anything else?

16      PROSPECTIVE JUROR:  No.

17      THE COURT:   Ms. Sullivan.

18      PROSPECTIVE JUROR:  I was born in Los

19  Angeles, California. Lived in New York 14 years.

20  No relatives here in New York. Not married.  I

21  work for a magazine publishing company. I do not

22  have any children.  I have a college degree.  I

23  have never served on any type of jury. I have not

24  been in the military.  No relatives employed by

25  law enforcement.  I was a victim of a crime.

═YVETTE PACHECO  SENIOR COURT REPORTER═

=VOIR DIRE=

```
1        THE COURT:  What happened to you?

2        PROSPECTIVE JUROR:  Thirty years ago, a

3    theft. I have never been a party to a lawsuit for

4    any reason.  I believe I can be impartial.  I live

5    in midtown, Upper West Side area.

6        THE COURT:   Tell me in two sentences

7    what you do at work.

8        PROSPECTIVE JUROR:  Human resource.

9        THE COURT:  That is a phrase.

10        PROSPECTIVE JUROR:  I handle employment

11    issues and hire people.

12        THE COURT:  So you've looked people in

13    the eye and say, you're hired, fired or not going

14    to be hired?

15        PROSPECTIVE JUROR:  Some of that, yes.

16        THE COURT:  Anything else?

17        PROSPECTIVE JUROR:  My biological father

18    was a drug addict.

19        THE COURT:  Tell me how that will affect

20    you as best you can determine now.

21        PROSPECTIVE JUROR:  I think I can remain

22    impartial.

23        THE COURT:  When you say "you think,"

24    does that mean you are satisfied to be impartial?

25        PROSPECTIVE JUROR:  I am.
```

=YVETTE PACHECO  SENIOR COURT REPORTER=

VOIR DIRE

1    THE COURT:  The word "think" causes the
2    law system to get nervous. If you are satisfied
3    you can be fair regarding the substance, that's
4    fine with us.
5        Ms. Wicker.
6        PROSPECTIVE JUROR:  I was born in Texas.
7    I've lived in New York City for three years.  I
8    have zero relatives in New York City.  I'm not
9    married.  I'm working.  I am an executive
10   recruiter. I have a college degree. No children.
11   I've never served on a jury.  Never served in the
12   military.  I have about five lawyers in the
13   family, either on --
14       THE COURT:  Sorry to hear that.  Are any
15   of them prosecutors or defense lawyers?
16       PROSPECTIVE JUROR:  Either side.
17   Virginia, Tennessee and Texas.
18       THE COURT:  Watch any of them, either
19   side, in a courtroom or trial?
20       PROSPECTIVE JUROR:  No.
21       THE COURT:  Ever talk to them what
22   happens before a trial?
23       PROSPECTIVE JUROR:  Sometimes.
24       THE COURT:  Talk about what happened
25   after the trial?

YVETTE PACHECO   SENIOR COURT REPORTER

========== VOIR DIRE ==========

1      PROSPECTIVE JUROR:  Sometimes.

2      THE COURT:  Any of that affect you?

3      PROSPECTIVE JUROR:  No.

4      THE COURT:  Continue.

5      PROSPECTIVE JUROR:  I have been a victim

6  of a crime.  I was robbed, my entire house.

7      THE COURT:  Robbed when you were in your

8  residence?

9      PROSPECTIVE JUROR:  Yes.

10     THE COURT:  Did the robber know you were

11 there when the robber was there robbing your

12 residence?

13     PROSPECTIVE JUROR:  Yes.

14     THE COURT:  Was there interaction between

15 the two of you?

16     PROSPECTIVE JUROR:  Yes.

17     THE COURT:  Were you injured?

18     PROSPECTIVE JUROR:  No.

19     THE COURT:  Did you ultimately report the

20 event to the police?

21     PROSPECTIVE JUROR:  Yes.

22     THE COURT:  Did the police capture the

23 intruder?

24     PROSPECTIVE JUROR:  No.

25     THE COURT:  How long was that event,

VOIR DIRE

1    roughly?

2          PROSPECTIVE JUROR:  Five years ago.

3          THE COURT:  It was in?

4          PROSPECTIVE JUROR:  Waco, Texas.

5          THE COURT:  West Texas.

6          PROSPECTIVE JUROR:  Right in the center

7    of Texas.

8          THE COURT:  I got something wrong.  I've

9    gotten used to that.

10         PROSPECTIVE JUROR:  I have not been a

11    party to a civil lawsuit.  I do feel that I can

12    follow the law and will be fair and impartial.  I

13    live on the Upper East Side.

14         THE COURT:  Anything else?

15         PROSPECTIVE JUROR:  No.

16         THE COURT:  Ms. Pinker.

17         PROSPECTIVE JUROR:  I was born in

18    Pittsburgh, Pennsylvania.  I lived in New York for

19    three years.  No relatives in the city.  I'm

20    married.  Currently unemployed.

21         THE COURT:  What sort of work do you do?

22         PROSPECTIVE JUROR:  Right now?

23         THE COURT:  No.  I know you're

24    unemployed.

25         PROSPECTIVE JUROR:  I did work as an

=VOIR DIRE=

1    insurance adjustor.

2             THE COURT:  If that thing doesn't work

3    we'll, do it without the microphone.  You were an

4    insurance adjustor in New York City?

5             PROSPECTIVE JUROR:  No.

6             THE COURT:  You've been unemployed

7    basically three years?

8             PROSPECTIVE JUROR:  Yes. Trying to

9    convince my husband to let me go back to school to

10   be a teacher.  My husband works for J.P. Morgan

11   Chase. No children.  We have a dog.  I have

12   college education.  I've never served on a jury

13   before.  I have never been called.  Never served

14   in the military.  No close friends in law

15   enforcement.  I guess I got my car stolen one

16   time.

17            THE COURT:  Did you report that?

18            PROSPECTIVE JUROR:  Yes, I did.

19            THE COURT:  Continue.

20            PROSPECTIVE JUROR:  I've never been a

21   party to a civil lawsuit.  I think I'm definitely

22   sure I can be fair and impartial.  Live on the

23   Upper West Side.

24            THE COURT:  What state did you come --

25            PROSPECTIVE JUROR:  Illinois.

=YVETTE PACHECO  SENIOR COURT REPORTER=

════════════════════════════ VOIR DIRE ════════════════════════════

1    THE COURT:  Ms. Wicker, what state did
2    you come from?
3        PROSPECTIVE JUROR:  Texas.
4        THE COURT:  We'll go to Mr. Caba.
5        PROSPECTIVE JUROR:  I was born in the
6    Dominican Republic. I live in New York for
7    about 17 years. I have more than 50 relatives,
8    friends in New York. I'm married.
9        THE COURT:  What's your job?
10       PROSPECTIVE JUROR:  Maintenance.
11       THE COURT:  Residence building?
12       PROSPECTIVE JUROR:  Residential building.
13   My work wife works at the salon, hairstylist.  I
14   have two children, 14 and 12.
15       THE COURT:  Speak with them about drugs?
16       PROSPECTIVE JUROR:  Always.  I took some
17   writing and reading class from the unions that I
18   belong to.  I never served in a Grand Jury before.
19   I never serve in military either, never.  I do
20   have friends been employed by any law
21   enforcements, yes, I do.
22       THE COURT:  How many police officers do
23   you know, roughly?
24       PROSPECTIVE JUROR:  Three.
25       THE COURT:   Do you see them as often as

════════════ YVETTE PACHECO  SENIOR COURT REPORTER ════════════

VOIR DIRE

1   every month or less often than that?

2           PROSPECTIVE JUROR:  No.  One of them,

3   like twice a month, and the other two, they'll be

4   here in the city.

5           THE COURT:  Continue.

6           PROSPECTIVE JUROR:  If I have any

7   relative or friends been victim?  Yes.

8           THE COURT:  Any victim of a violent

9   crime, anybody killed, anybody raped?

10           PROSPECTIVE JUROR:  No, it's about drugs.

11           THE COURT:  Some of your friends have

12   been convicted of drugs?

13           PROSPECTIVE JUROR:  Yes.

14           THE COURT:  Some of them in state prison

15   now?

16           PROSPECTIVE JUROR:  Yes.

17           THE COURT:  Does my name sound familiar.

18           PROSPECTIVE JUROR:  Say again.

19           THE COURT:   Does my name sound familiar.

20           PROSPECTIVE JUROR:  No.

21           THE COURT:  Can you be fair in a drug

22   case knowing friends or relatives are in jail?

23           PROSPECTIVE JUROR:  I can be fair.

24           THE COURT:  You can be?

25           PROSPECTIVE JUROR:  Yes.

VOIR DIRE

1          THE COURT:  Continue.

2          PROSPECTIVE JUROR:  Never been in a

3    lawsuit before, any court before.  I guess I could

4    be fair.

5          THE COURT:  When you say "I guess I can

6    be fair," what does that mean?  Are you uncertain

7    about being fair?  It's just the way you phrased

8    it.  Are you certain you can be fair?  I cannot

9    ask you to explain your statement, "I guess I can

10   be fair."

11         PROSPECTIVE JUROR:  I can be fair hundred

12   percent.

13         THE COURT:  You are satisfied you can be

14   fair?

15         PROSPECTIVE JUROR:  Yes.

16         THE COURT:   Anything else we should

17   know?

18         PROSPECTIVE JUROR:  I live in Lower East

19   Side.

20         THE COURT:  Anything else?

21         PROSPECTIVE JUROR:  That's it.

22         THE COURT:  Thank you.

23         Mr. Daniels.

24         PROSPECTIVE JUROR:  I was born in New

25   Jersey.  I've lived in New York City for 25 years.

═══VOIR DIRE═══

1    I have no relatives living in New York City.  I'm

2    not married.  I sell advertising.  I have no

3    children.  I have a college degree. I have served

4    on a criminal jury, and we did reach a verdict.

5              THE COURT:  Don't tell me the verdict,

6    but what was the charge?

7              PROSPECTIVE JUROR:  It was a drug trial.

8              THE COURT:  Did anyone speak with you

9    after you decided the case?

10             PROSPECTIVE JUROR: No.

11             THE COURT:  Roughly how long was your

12   verdict?

13             PROSPECTIVE JUROR:  Five years ago.

14   Never served in the Grand Jury.  Never served in

15   the military.  No close friends in law

16   enforcement.  No victim -- none of my relatives

17   victims of crime. Never been a party to a lawsuit.

18   I certainly can be impartial. I live in the Upper

19   East Side.

20             THE COURT:  Anything else?

21             PROSPECTIVE JUROR:  No.

22             THE COURT:  Next I believe is Mr. Wysock.

23             PROSPECTIVE JUROR:  I was in born in

24   Indiana.  Primarily from Chicago.  Lived in New

25   York for three years.  No relatives in New York

═══════════════════════ VOIR DIRE ═══════════════════════

1   City.  I am not married.  I'm a surgical resident

2   in a hospital.  I have a medical degree.

3            THE COURT:  A part of the anatomy that

4   you are better at than others --

5            PROSPECTIVE JUROR:  I'm a urologist.

6            THE COURT:  Does that mean that you are

7   good at that or better at cardiology?

8            PROSPECTIVE JUROR:  My specialty.  Never

9   served on a civil or criminal jury. Never served

10  on a Grand Jury.  Never served in the military. I

11  have an uncle who was a police officer.  He's

12  retired. I've been robbed of minor things many

13  times, but it's minor.

14           THE COURT:  Face-to-face situations or

15  something out of your car or apartment or dorm

16  room?

17           PROSPECTIVE JUROR:  Correct.  Never a

18  party to a civil lawsuit.  I can be fair and

19  impartial.  I live in the Upper East Side.

20           THE COURT:  Anything else?

21           PROSPECTIVE JUROR:  No.

22           THE COURT:  Mr. Taveras.

23           PROSPECTIVE JUROR:  Born in the Dominican

24  Republic.  Live in New York City for the

25  past 20 years.  I am married.  I work in

═════════════ YVETTE PACHECO  SENIOR COURT REPORTER ═════════════

1   commercial building as a handyman. My wife is

2   home.  I have four children from ages four to

3   fifteen.  Four girls.

4           THE COURT:  Spoke with the older ones

5   about drugs?

6           PROSPECTIVE JUROR:  Yes, I do.  I just

7   finish high school back home.  I never serve in

8   the military.  I never serve in the Grand Jury.

9   No friend or relative employed by any law

10  enforcement agency.  I've never been convicted of

11  a crime, except a relative charged of a crime.

12          THE COURT:  I will ask you about relative

13  charged with a crime in a minute.

14          PROSPECTIVE JUROR:  I never been part of

15  a lawsuit.  I believe being fair and impartial. I

16  live in Washington Heights.

17          THE COURT:  Anything else?

18          PROSPECTIVE JUROR:  No, sir.

19          THE COURT:  Now, I need to ask the

20  questions about arrests, accusations or

21  convictions.  As I said, it happens with any group

22  of New Yorkers. We heard reference that it

23  happened to yourself or relative.

24          You, yourself, ever arrested, accused of

25  by somebody, but not arrested or actually

=VOIR DIRE=

1   convicted of some crime or offense?

2          Mr. Wagner.

3          PROSPECTIVE JUROR:  I don't know if this

4   is what you mean.  I was in court for DWI.

5          THE COURT:  That's exactly what I mean.

6   Did you get a jail sentence, a program, fine,

7   suspension of license?

8          PROSPECTIVE JUROR:  Lost license for six

9   months and 2 days, driver education.

10          THE COURT:  Plead guilty or had a trial?

11          PROSPECTIVE JUROR:  Had a trial.

12          THE COURT:  A jury or judge?

13          PROSPECTIVE JUROR:  A judge.

14          THE COURT:  Somebody else?  Mr. Haile.

15          PROSPECTIVE JUROR:  I was arrested.

16          THE COURT:  For what sort of thing?

17          PROSPECTIVE JUROR:  Narcotics.

18          THE COURT:  As a misdemeanor?

19          PROSPECTIVE JUROR:  Misdemeanor.

20          THE COURT:  Did you get a jail sentence,

21   a fine, community service or go in sentence?

22          PROSPECTIVE JUROR:  Fine and community

23   service.

24          THE COURT:  Did you do all that stuff?

25          PROSPECTIVE JUROR:  Yeah.

═══VOIR DIRE═══

1    THE COURT:  Did it happen once or more

2  than once?

3    PROSPECTIVE JUROR:  More than once.

4    THE COURT:  More than five times?

5    PROSPECTIVE JUROR:  Between five and ten.

6    THE COURT:  Each time a police officer

7  accused you of something or did on more than one

8  of the occasions a civilian say you did something?

9    PROSPECTIVE JUROR:  Police officer.

10    THE COURT:  Each time?

11    PROSPECTIVE JUROR:  Yes.

12    THE COURT:  Did you have a trial in any

13  of those events?

14    PROSPECTIVE JUROR:  No.

15    THE COURT:  Plead guilty.

16    PROSPECTIVE JUROR:  No.

17    THE COURT:  Now we ask about relatives.

18  Relatives has a big meaning.  Relatives means

19  civilian, domestic partners, people with whom you

20  have a sometime, frequent, intimate relationship,

21  it also means spouses, parent, children, brothers,

22  sisters.  Any among that population arrested,

23  accused of, convicted of a crime?

24    Ms. Sullivan.

25    PROSPECTIVE JUROR:  My father.

═══YVETTE PACHECO  SENIOR COURT REPORTER═══

VOIR DIRE

1    THE COURT:  You were an infant or not

2    born?

3    PROSPECTIVE JUROR:  Small child.

4    THE COURT:  Somebody else?

5    Mr. Perez.

6    PROSPECTIVE JUROR:  My father was

7    convicted of a narcotics charge.

8    THE COURT:  In New York?

9    PROSPECTIVE JUROR:  No.

10    THE COURT:  State prison sentence?

11    PROSPECTIVE JUROR:  No.  He was acquitted

12    that case.

13    THE COURT:  Now, he was accused by police

14    officers or do you know the circumstances?

15    PROSPECTIVE JUROR:  He was accused by

16    police officers.

17    THE COURT:  The jury said not guilty?

18    PROSPECTIVE JUROR:  There was no jury.

19    THE COURT:  The judge said not guilty?

20    PROSPECTIVE JUROR:  Yes.

21    THE COURT:  Mrs. Stuart, what's your

22    situation?

23    PROSPECTIVE JUROR:  My father, he still

24    has a warrant out.

25    THE COURT:  So one of my colleagues would

YVETTE PACHECO  SENIOR COURT REPORTER

VOIR DIRE

1    like to see your father.   For what would my

2    colleague like to see your father; drugs, robbery?

3              PROSPECTIVE JUROR:   Drugs, robbery,

4    abuse.

5              THE COURT:   How long did the warrant come

6    into existence?

7              PROSPECTIVE JUROR:   It's been out for a

8    while, but I just recently found out it's still

9    existing.

10             THE COURT:   Anything else?

11             Mr. Taveras, you started to say

12   something.   What's the relationship between you

13   and whoever was arrested or accused or convicted?

14             PROSPECTIVE JUROR:   My mother's cousin,

15   he was charged drug dealing in New York City and

16   he be sentenced, but it's someone I see back home

17   when I was a teenager.

18             THE COURT:   So he got a drug sentence in

19   New York?

20             PROSPECTIVE JUROR:   Yes.

21             THE COURT:   Did you ever visit him in

22   jail?

23             PROSPECTIVE JUROR:   No, sir.

24             THE COURT:   Do you know whether he plead

25   guilty or the judge said guilty?

VOIR DIRE

1     PROSPECTIVE JUROR:  I believe the jury.

2     THE COURT:  Anybody else?

3     Last two questions.  Anybody know anybody

4  who is or in the past was prosecuted by the

5  Manhattan District Attorney's office the entity

6  for which Mr. Berland works?

7     All right, you by the law have a chance

8  to ask questions. There is an actual specific

9  amount of time. They know, you need not. By law

10  the prosecution asks questions first.  We'll hear

11  Mr. Berland's excellent questions.

12     MR. BERLAND:  My name is Jason Berland.

13  I represent the People of the State of New York

14  against Edward Green.  My time is extremely

15  limited.  I will ask some you questions

16  specifically and others I will skip over entirely.

17  Do not be offended.  The purposes of the jury

18  selection is to ensure that all sides have a fair

19  and impartial jury.

20     Ms. Shrijver, you said that your friend

21  was raped by a stranger and this was reported?

22     PROSPECTIVE JUROR:  Yes.

23     MR. BERLAND:  Was the culprit ever

24  arrested?

25     PROSPECTIVE JUROR:  Yes, he was.

YVETTE PACHECO  SENIOR COURT REPORTER

1    MR. BERLAND:  Ms. Wein, I think there was

2  some confusion when the questionnaires were being

3  turned over.

4    PROSPECTIVE JUROR:  I wanted to say

5  something else. I did serve on Civil Court.  I

6  said no to criminal and Grand Jury, but I did

7  serve on civil.

8    MR. BERLAND:  You understand that the

9  principles of law that's for the judge to tell you

10  are different in a criminal case?

11    PROSPECTIVE JUROR:  Yes.

12    MR. BERLAND:  Were you ever the victim of

13  a crime?  I don't think you had an opportunity to

14  answer that question.

15    PROSPECTIVE JUROR:  Not really a victim.

16  My pocketbook had been taken, but I think it was

17  because I wasn't holding on to it.

18    THE COURT:  Wait a minute.  New York has

19  a definition for everything related to court

20  processes. Being a victim means your stuff was

21  taken.  There is no fault involved.  There's no

22  reward for being a victim.

23    PROSPECTIVE JUROR:  It wasn't a personal

24  confrontation.

25    MR. BERLAND:  Ms. Mitchell, you said you

1   have friends who are police officers in

2   Westchester County. Are these close friends?

3         THE COURT:  You have to yell, because she

4   loses her job if she doesn't take down every

5   syllable and since she is responsible for

6   countless number of people, it's upon all of us to

7   ensure future employment.

8         PROSPECTIVE JUROR:  A neighbor and my

9   godfather.

10        MR. BERLAND:  Your relationship with the

11   two individuals affects your ability to be fair

12   and impartial when police officers take the stand

13   in this case -- let me rephrase.

14        Do you have a bias towards the police

15   department based on that relationship?

16        PROSPECTIVE JUROR:  I like them.

17        MR. BERLAND:  Can all of you keep an open

18   mind when you listen to the testimony of all the

19   witnesses who take the stand on this case?

20        PROSPECTIVE JURORS:  Yes.

21        MR. BERLAND:  Ms. Stubbendeck, Ph.D. in

22   the history of violent gangs.

23        PROSPECTIVE JUROR:  Urban gangs.

24        THE COURT:  Are there peace-loving urban

25   gangs?

=VOIR DIRE=

1    PROSPECTIVE JUROR:  Also a difference.

2    THE COURT:  Is that one of the community

3    activist things?

4    PROSPECTIVE JUROR:  Kind of a melting of

5    both of them.  I study perceptions of gangs and

6    public policy.

7    MR. BERLAND:  You've done research into

8    narcotics trafficking?

9    PROSPECTIVE JUROR:  I haven't actually

10   felt that at all.

11   THE COURT:  She speaks like an academic.

12   MR. BERLAND:  As the judge has told all

13   of you, the defendant is charged with possessing

14   more than half a kilogram of cocaine inside of an

15   apartment.  Not talking about a couple small

16   Ziploc bags, talking about more than a pound of

17   cocaine. With that being said -- this is the

18   general question.

19   Is there anyone here who, for whatever

20   reason, generally believes the possession of

21   cocaine, no matter what the amount is, should be

22   legalized?

23   Mr. Perez you said your father was

24   convicted of a narcotics crime?

25   PROSPECTIVE JUROR:  Yes.

=YVETTE PACHECO  SENIOR COURT REPORTER=

1    MR. BERLAND:  Would that -- do you have

2 any ill will or feelings about the police, how

3 they handled any aspect of your father 's case?

4    PROSPECTIVE JUROR:  No, I don't.

5    MR. BERLAND:  When police officers are

6 going to take the stand, testify, you will sit

7 back and listen to them and their testimony solely

8 on what you hear about this case?

9    PROSPECTIVE JUROR:  I'll hear the

10 evidence and when the evidence is finished, I can

11 make my judgment.

12    MR. BERLAND:  Mr. Wagner, I want to talk

13 about your DWI conviction.  Did that go to trial?

14    PROSPECTIVE JUROR:  It was in Hawthorne,

15 New Jersey. The judge gave me the sentence.

16    MR. BERLAND:  Did any police officer, I

17 am assuming they did, testify?

18    PROSPECTIVE JUROR:  They did.

19    MR. BERLAND:  Do you have ill will

20 towards police officers in general because of your

21 experience?

22    PROSPECTIVE JUROR:  No.

23    MR. BERLAND:  So you will be able to keep

24 an open mind and listen to the police officers in

25 this case fairly and impartially?

==VOIR DIRE==

1    PROSPECTIVE JUROR:  Yes.

2    MR. BERLAND:  You're sure.

3    PROSPECTIVE JUROR:  I'm positive.

4    MR. BERLAND:  Ms. Sullivan, you said you

5  were very young and your father was convicted of a

6  drug crime. Would that affect your ability to sit

7  on a case where the charge here is possession of a

8  large quantity of cocaine?

9    PROSPECTIVE JUROR:  No.

10    MR. BERLAND:  Are you sure?

11    PROSPECTIVE JUROR:  Yes.

12    MR. BERLAND:  You said your brother's in

13  the 17th Precinct?

14    PROSPECTIVE JUROR:  Yes.

15    MR. BERLAND:  Rookie?

16    PROSPECTIVE JUROR:  Yes.

17    MR. BERLAND:  Are you close with your

18  brother?

19    PROSPECTIVE JUROR:  I think so.

20    MR. BERLAND:  Do you speak a lot to him

21  about his job?

22    PROSPECTIVE JUROR:  Not really.

23    MR. BERLAND:  Would that relationship

24  affect your ability to keep an open mind?

25    PROSPECTIVE JUROR:  I will be impartial.

═══VOIR DIRE═══

1     MR. BERLAND:  Ms. Wicker, you were robbed

2  in your apartment?

3     PROSPECTIVE JUROR:  Home.

4     MR. BERLAND:  How many years ago?

5     PROSPECTIVE JUROR:  Five.

6     MR. BERLAND:  I think you said the

7  intruder was never captured?

8     PROSPECTIVE JUROR:  Uh-huh.

9     MR. BERLAND:  You reported it to the

10  police?

11     PROSPECTIVE JUROR:  Uh-huh.

12     MR. BERLAND:  How do you feel the police

13  handled the investigation?

14     PROSPECTIVE JUROR:  Good.

15     MR. BERLAND:  No lack of effort on their

16  part that no one was caught?

17     PROSPECTIVE JUROR:  No.

18     MR. BERLAND:  Ms. Pinker, you said you'd

19  like to go back to school to become a teacher.

20  What do you want to teach?

21     PROSPECTIVE JUROR:  Elementary schools,

22  fifth or sixth graders.

23     MR. BERLAND:  Mr. Caba, I didn't hear you

24  when you stated where you currently work.

25     PROSPECTIVE JUROR:  Maintenance.

═══VOIR DIRE═══

1       THE COURT:  You have seven minutes.

2       MR. BERLAND:  Left or into it?

3       THE COURT:  There's not much difference.

4       MR. BERLAND:  Your friends -- you said

5  you had friends more than one convicted of a drug

6  crime?

7       PROSPECTIVE JUROR:  Yes. Brother-in-law

8  is in prison.

9       MR. BERLAND:  Did you go watch any of the

10 court proceedings in those cases?

11      PROSPECTIVE JUROR:  No.

12      MR. BERLAND:  Will those representations

13 affect your ability to distance yourself and say

14 this is a drug trial, but has nothing do with

15 it?

16      PROSPECTIVE JUROR:  No.

17      MR. BERLAND:  No, you will not be fair.

18      PROSPECTIVE JUROR:  Not affect me.

19      MR. BERLAND:  No problem?

20      PROSPECTIVE JUROR:  No.

21      MR. BERLAND:  Mr. Taveras, same question

22 to you.

23      PROSPECTIVE JUROR:  I am a perceptive

24 fellow.

25      THE COURT:  He has no problem.

═══YVETTE PACHECO  SENIOR COURT REPORTER═══

═══════VOIR DIRE═══════

1          MR. BERLAND:  Family members convicted of

2  a drug crime?

3          PROSPECTIVE JUROR:  Yes.

4          MR. BERLAND:  Would that affect your

5  ability to be fair and impartial?

6          PROSPECTIVE JUROR:  No.

7          MR. BERLAND:  Are you sure?

8          PROSPECTIVE JUROR:  Yes, I am.

9          MR. BERLAND:  I will wrap it up.  The

10  judge briefly touched on this. There are people

11  who, for a variety of reasons, might be

12  uncomfortable of returning a verdict guilty.  I

13  know Ms. Sullivan told us she's in human resources

14  and has to make decisions whether to hire or fire

15  people.

16          I can undoubtedly tell you the decision

17  in this case, whether or not you find the

18  defendant guilty or not guilty, will be a

19  difficult decision.

20          Anyone here for any religious reasons,

21  political beliefs or moral reasons will not be

22  able to say the words guilty if I prove this case,

23  the elements beyond a reasonable doubt?

24          This is my last or my only chance to

25  speak with you one-on-one.  I need to know if

═══════YVETTE PACHECO  SENIOR COURT REPORTER═══════

VOIR DIRE

1    there is anything that will prevent you from

2    saying the words guilty if the case is proven

3    beyond a reasonable doubt?  Anyone here that feels

4    that way?

5          Do you know weather when you go to a

6    wedding whether the priest or rabbi, says speak

7    now or forever hold your peace?  This is it.

8    Anything else that I should know, the defendant

9    should know that isn't covered in the

10   questionnaire?

11         I thank you for your time.

12         THE COURT:  Mr. Keith.

13         MR. KEITH:  I want to make sure I get the

14   names right.  Again, my name is Arnold Keith.  I

15   represent Edward Green.  As you know, this case is

16   a drug case.  He's being accused of possessing a

17   fair amount of narcotics.

18         Is there anybody here, based on what

19   they've heard so far, anyone here made any

20   decisions about this case?

21         Can you all promise me that you will

22   follow the legal instructions that are given to

23   you by Justice McLaughlin and put aside any

24   personal feelings you have about the law, that you

25   will follow the law that he gives to you?  Can you

=VOIR DIRE=

1    all promise me that you will do that if you are
2    picked to serve on this jury?  Nobody has a
3    problem with that concept?
4         Now, I want to ask a few of you some
5    individual questions.
6         Ms. Mitchell, I will start with you.  I
7    appreciate and understand you like police
8    officers.  Is that fair to say?
9         PROSPECTIVE JUROR:  Yes.
10        MR. KEITH:  You have relatives that are
11   police officers?
12        PROSPECTIVE JUROR:  Friends.
13        MR. KEITH:  Would you agree with me that
14   of the 30,000 or so New York City police officers
15   that there might be a few that you might not like?
16        PROSPECTIVE JUROR:  Yes.
17        MR. KEITH:  With regards to your
18   evaluation of testimony that you may hear in this
19   case, can you assure me that you will evaluate a
20   police officer's testimony the same way you would
21   the testimony of someone else?  Do you think you
22   will be able to do that?
23        PROSPECTIVE JUROR:  Um --
24        THE COURT:  You just hesitated. This is a
25   tough question because there is an unfamiliar

=YVETTE PACHECO  SENIOR COURT REPORTER=

═══VOIR DIRE═══

1      thing she's being asked.

2              PROSPECTIVE JUROR:  The only reason I

3      hesitate is because I think I hold police officers

4      in a higher regard.

5              THE COURT:  Are you open to the

6      possibility that any witness, but now he's

7      specifically asking regarding them, including a

8      police officer, could lie, exaggerate, be mistaken

9      or tell the truth?

10             PROSPECTIVE JUROR:  Yes.

11             THE COURT:  Actually sit here and then

12     not tell the truth.

13             PROSPECTIVE JUROR:  Can you repeat the

14     question?

15             THE COURT:  Sure.

16             Are you open to the possibility that a

17     police officer will come here and purposely lie to

18     you folks?

19             PROSPECTIVE JUROR:  No.

20             THE COURT:  Well then, have a nice day.

21     You cannot sit here.  Have a nice day.

22             Not to think that you are running a

23     nonsensical system, what just happened is the

24     following.  If you are on the street and you are

25     lost and you ask a police officer how do you get

═══YVETTE PACHECO  SENIOR COURT REPORTER═══

=VOIR DIRE=

1  to the Carnegie Hall and a police officer says you

2  take the number 7 up to whatever it is, 50th

3  Street and walk a little bit, you really would

4  have to be a bizarre individual, having heard what

5  the cop said about the directions, to say to

6  yourself, I wonder if she was lying to me.  You

7  just wouldn't do that. You would get on the subway

8  and find yourself to Carnegie Hall.

9       In a courtroom, though, when somebody

10  says something, whether it is the police or

11  nonpolice, your job is to scrutinize, examine.  If

12  you accept it, it's fine.  If you reject it,

13  that's fine.

14       She, apparently, could not conceive the

15  possibility that a police officer would perjure

16  himself. She could not sit here. She made up her

17  mind that a certain set of facts could not happen.

18  I'm not suggesting that it is or isn't going to

19  happen, but she cannot be here.

20       Go ahead.

21       MR. KEITH:  The testimony in this case,

22  the overwhelming majority of the testimony will

23  come from police officers. As the judge has

24  indicated, we're asking you to have an open mind,

25  and to fairly evaluate, fairly and impartially

=YVETTE PACHECO  SENIOR COURT REPORTER=

=========VOIR DIRE=========

1    evaluate the testimony and the evidence that you

2    will hear in this case if you are selected.

3            Mr. Wysock, your uncle is a retired

4    police officer.  Can you assure me if you are

5    selected as a juror, that you will carefully

6    evaluate what you are told, listen for the

7    inconsistencies, the consistencies, the

8    specificity, the lack of specificity and make a

9    decision in the end after instructed on the law by

10   the judge?

11           PROSPECTIVE JUROR:  Yes.

12           MR. KEITH:  You can assure me you can

13   have an open mind and listen to the testimony and

14   give Mr. Green a fair trial?

15           PROSPECTIVE JUROR:  Yes.

16           MR. KEITH:  Mr. Caba, I believe you

17   indicated that you have three police officer

18   friends. Can you make the same assurances to me,

19   that Mr. Green will get a fair trial?

20           PROSPECTIVE JUROR:  Yes.

21           MR. KEITH:  I have to ask you a couple of

22   other questions. You work as a maintenance man in

23   a residential building; is that correct?

24           PROSPECTIVE JUROR:  Yes.

25           MR. KEITH:  Do you repair things?

=======YVETTE PACHECO  SENIOR COURT REPORTER=======

VOIR DIRE

1      PROSPECTIVE JUROR:  No.

2      MR. KEITH:  Do you ever have occasion to

3  go into a person's apartment.

4      PROSPECTIVE JUROR:  Yes.

5      MR. KEITH:  On those occasions, are there

6  times when you have to go into a person's

7  apartment and the person isn't home?

8      PROSPECTIVE JUROR:  Sometimes.

9      MR. KEITH:  Moving on.  Mr. Taveras, I

10  believe you indicated that you work as a handyman

11  in a commercial building?

12      PROSPECTIVE JUROR:  Yes, sir.

13      MR. KEITH:  Do you repair things?

14      PROSPECTIVE JUROR:  Yes.

15      MR. KEITH:  I guess in a commercial

16  building you go into offices sometimes?

17      PROSPECTIVE JUROR:  Uh-huh.

18      MR. KEITH:  Sometimes you go into offices

19  not occupied by the person who works there?

20      PROSPECTIVE JUROR:  Most of the time they

21  have to be there.

22      MR. KEITH:  Ms. Johnson, do you have a

23  cousin who is a retired police officer?

24      PROSPECTIVE JUROR:  Yes.

25      MR. KEITH:  Can you assure me that if you

VOIR DIRE

1    get a chance to evaluate the testimony of a police
2    officer in this case, that you will give Mr. Green
3    a fair trial and listen carefully, evaluate what
4    the officer says?

5             PROSPECTIVE JUROR:  Yes.

6             MR. KEITH:  Mr. Ryan, your brother is
7    brand-new on the job.  Can you make the same
8    assurance?

9             PROSPECTIVE JUROR:  Absolutely.

10            MR. KEITH:  I can tell.

11            Now, under the law, my client is presumed
12   innocent.  Basic principles of American criminal
13   law.  Does anybody have a problem with that
14   concept?

15            Does anybody have a problem with the idea
16   that he doesn't have to say anything, doesn't have
17   to do anything?  It's the People's burden to try
18   to prove his guilt beyond a reasonable doubt.  Can
19   you all accept that legal principle?  Anyone who
20   has a problem with that?

21            There will be other legal concepts,
22   including those concepts further described by
23   Justice McLaughlin. I ask you to promise me if you
24   are selected as a juror in this case, that you
25   will accept the legal principles in this courtroom

VOIR DIRE

1   unequivocally, no matter what your personal

2   'beliefs are.  Can everyone promise me that?

3        You will hear the definition of

4   possession and dominion and control.  These things

5   will be explained to you by the judge. I'm asking

6   you to follow the legal instructions that you get

7   in this case unequivocally.  Anyone have a problem

8   with that?

9        Mr. Daniels, I believe you served before

10  on a criminal case; it was a drug case?

11       PROSPECTIVE JUROR:  Yes.

12       MR. KEITH:  You also indicated that after

13  the case, you didn't speak to the lawyers or the

14  judge.

15       PROSPECTIVE JUROR:  No, we just left.

16       MR. KEITH:  I know it's a similar type of

17  case, you would think the same laws would apply.

18  I'm asking you, sir, if you are selected on this

19  case, you follow this judge's instructions.  Can

20  you do that?

21       PROSPECTIVE JUROR:  Absolutely.

22       MR. KEITH:  Mr. Perez, were you present

23  for your father's trial?

24       PROSPECTIVE JUROR:  Yes, I was.

25       MR. KEITH:  It was a judge trial, so you

=VOIR DIRE=

1 didn't hear any legal instructions?

2    PROSPECTIVE JUROR:  They were introducing

3 the evidence.

4    THE COURT:  Was there a jury like this

5 group?

6    PROSPECTIVE JUROR:  No.

7    MR. KEITH:  Mr. Haile, you indicated that

8 you've been arrested before, and you've been

9 accused by the police before.  So if you were to

10 serve on this jury, we, both myself and the

11 prosecutor and the judge, we need you to be fair

12 and impartial to both sides.

13    Can you assure us that if you are

14 selected, you will listen to the police officer

15 testimony, hear what they have to say, and decide,

16 after hearing all the evidence and hearing the

17 judge's instructions on the law, can you promise

18 me you can do that?

19    PROSPECTIVE JUROR:  Yes.

20    MR. KEITH:  Do you think having been

21 accused by the police so many times, that you can

22 be fair and give the prosecutor a fair trial?

23    PROSPECTIVE JUROR:  Yes.

24    MR. KEITH:  Can you give my client,

25 Mr. Green, a fair trial, and hold them to their

═════VOIR DIRE═════

1    burden of proof?

2                    PROSPECTIVE JUROR:  Yes.

3                    THE COURT:  Couple more minutes.

4                    MR. KEITH:  Thank you, Your Honor.

5                    THE COURT:  Don't get carried away.

6                    MR. KEITH:  Ms. Sullivan, I understand

7    that your father was a drug addict, and you

8    understand that Mr. Green is being accused of drug

9    possession.  Is there anything about those facts

10   that would affect your ability to be a fair juror

11   on this case?

12                   PROSPECTIVE JUROR:  I'd have to hear the

13   facts.

14                   MR. KEITH:  Well, we are going to hear

15   that he was in a room and in a closet and couple

16   of safes in that room there was a bunch of drugs.

17   Can you give him a fair trial?  He is accused of

18   possession of drugs.

19                   PROSPECTIVE JUROR:  Yes.

20                   MR. KEITH:  Ladies and gentlemen, the

21   issue in this case is going to be real simple.

22   The defense is going to be really simple.

23   Basically, wrong place, wrong time. All I am

24   asking you to do, if selected as a juror, I need

25   an assurance from all that you keep an open mind,

═════YVETTE PACHECO  SENIOR COURT REPORTER═════

═══ VOIR DIRE ═══

1    that you follow Judge McLaughlin's instructions on

2    the law, and you listen carefully to what the

3    police officers have to say about the evidence and

4    information that they were involved in on the day

5    in question.

6            Can all of you promise that if you are

7    selected, that you will do that?

8            Has anybody heard anything so far this

9    morning that thinks they cannot be a fair and

10   impartial juror in this case?

11           Thank you.

12           THE COURT:  Different instructions for

13   different groups of people now.  Of the people who

14   are prospective jurors, how many of you routinely

15   at work will get a two-hour lunch?  All right.

16   Upon your promise that you will not think this is

17   routine, that's what you are going to get because

18   this is not the only case I have to deal with

19   before I deal with the jury again.

20           You folks I'm going to ask to stay

21   because the lawyers and Mr. Green and I will make

22   decisions regarding you folks.  The prospective

23   jurors, I will tell you a time to be outside the

24   room, not to walk through the door, but be

25   available to us. The time is 2:30.  I have given

VOIR DIRE

1    you a schedule.

2              Next Monday or Tuesday you will decide

3    the case. I'm here until 2012. My guess is none of

4    you want to be here past next week.  If you come

5    back at a quarter of three or 3:15, I don't care.

6              Under the rules, they go back

7    about 8025 years, I have to wait and your fellow

8    citizens have to wait, so don't keep us waiting.

9              We'll let you know who among you have

10   been selected and then given further instructions

11   once we make the decisions.  When the flock has

12   left, you can leave.

13             COURT OFFICER:  The prospective juror

14   wants to say something to you not in front of the

15   other prospective jurors.

16             THE COURT:  Come on up.

17             (Whereupon, a sidebar conference was held

18   on the record out of the hearing of the jury.)

19             THE COURT:  Hi.  Under the rules, a

20   private conversation basically is with the lawyers

21   and myself.

22             What do you want to say?

23             PROSPECTIVE JUROR:  I was always told

24   what to say, but as I grew up, I found a way not

25   to discriminate against. Since my father has the

=VOIR DIRE=

1   same charges as him and other charges, I don't

2   know how to relate as I got older.  I was

3   brainwashed.

4           THE COURT:  Brainwashed in what presence?

5           PROSPECTIVE JUROR:  By lawyers, my mother

6   to tell me what to say.  Now that I have my own

7   opinion, I understand things now.  It's like I'm

8   half and half.

9           THE COURT:  You haven't gotten over the

10  brainwashing yet?

11          PROSPECTIVE JUROR:  I have, but I'm still

12  maybe I should say the right thing, maybe I should

13  say what I've been told, my own opinion.

14          THE COURT:  Are you satisfied that you

15  did tell us your own opinion?

16          PROSPECTIVE JUROR:  Yes, I did tell my

17  own opinion.

18          THE COURT:  Do you think you will be able

19  to give your truthful opinion in the jury room?

20          PROSPECTIVE JUROR:  Yes, but I feel

21  something will overtake, say I'll change my mind

22  during the process.

23          THE COURT:  Change your mind for a bad

24  reason or okay reason?

25          PROSPECTIVE JUROR:  Both.

=YVETTE PACHECO  SENIOR COURT REPORTER=

1        THE COURT:  What kind of bad reason?

2        PROSPECTIVE JUROR:  Like I'll think I

3    don't think this is correct, I don't think this is

4    correct.

5        THE COURT:  Well, maybe we should excuse

6    you.

7        Do you want to ask her some questions?

8        PROSPECTIVE JUROR:  There's still the

9    warrant out.  So it's like every year it's

10   something different.  Every year, new charges.

11       MR. KEITH:  I don't want to put you on

12   the spot.

13       THE COURT:  I do.

14       MR. KEITH:  I guess we do in so many

15   words.  This is now about Mr. Green.

16       PROSPECTIVE JUROR:  I know.

17       MR. KEITH:  You will hear testimony from

18   police officers, and part of the process is to

19   make decisions, to evaluate from what you hear in

20   this courtroom and that's all we ask you to do.

21   Do you think you can do it?

22       PROSPECTIVE JUROR:  I know I can.  In the

23   back of my mind, I will have a gut feeling.

24       MR. KEITH:  You will take it out on

25   Mr. Green or out on the prosecution?

=VOIR DIRE=

1   PROSPECTIVE JUROR:  Honestly, I don't
2   know until we're in the process.
3   THE COURT:  I don't know whether she's
4   comfortable that she can make whatever decision
5   she's going to make and not be worried that either
6   she made a wrong one or that before it's actually
7   made, she will change.
8   Do you feel uncomfortable to do whatever
9   is required?
10   PROSPECTIVE JUROR:  When I heard the
11   address, it doesn't bother since that's the exact
12   place where I live, doesn't bother me.  Now that
13   he told me exactly what happened, I don't know if
14   it was he said, she said.
15   MR. KEITH:  It's drugs.
16   PROSPECTIVE JUROR:  Wrong place, wrong
17   time.
18   MR. KEITH:  That's my defense.
19   PROSPECTIVE JUROR:  Yeah I know.  Since I
20   heard his defense, I didn't know that before.
21   Since that's what I heard, like, I don't know.
22   THE COURT:  He's not a witness.
23   PROSPECTIVE JUROR:  I know.
24   THE COURT:  You have to decide on what
25   happens here.  Can you hold off judgment?  If

=YVETTE PACHECO  SENIOR COURT REPORTER=

VOIR DIRE

1   there weren't something to be said, we wouldn't be

2   having a trial. You have to make a decision about

3   something.  Can you wait to see or you are just so

4   uncomfortable about your ability to do this?

5           PROSPECTIVE JUROR:  Not uncomfortable.

6   Don't want to make the wrong mistake during the

7   time. I can't tell you during the time.

8           THE COURT:  Any questions?

9           MR. KEITH:  No further questions.

10          THE COURT:  Why don't you wait outside.

11          Do you want to say anything?

12          MR. KEITH:  Sounds like that is a part of

13   the deliberations process.  I don't necessarily

14   see that she has to be excused.

15          MR. BERLAND:  I respectfully disagree.  I

16   think there's cause.

17          THE COURT:  I was here, I watched it, I

18   saw her.  If there is a situation where I'm making

19   a mistake in excusing one disqualified juror for

20   another one, so be it. She cannot make a decision.

21   She's excused.

22          MR. BERLAND:  Any cause challenges?  I

23   just excused number three.  Any cause challenges

24   on the first 14 seats, the first 12 people?

25          MR. BERLAND:  Through Ms. Johnson, no.

══════════════════════════VOIR DIRE══════════════════════════

1        THE COURT:  Cause on the defense?

2        MR. KEITH:  No, Your Honor.

3        THE COURT:  Peremptory by the People,

4   first 12 people?

5        MR. BERLAND:  No, Your Honor.

6        THE COURT:  Defense.

7        MR. KEITH:  May I have a moment with my

8   client?

9        THE COURT:  Okay.

10        MR. KEITH:  The defense would like to

11   exercise challenges as to juror number one,

12   Ms. Shrijver; juror two, Wein; juror five, Cole;

13   juror number nine, Pinker; juror ten, Wicker;

14   juror 11, Ms. Sullivan. I think we have five

15   jurors; is that correct?

16        THE COURT:  Potentially, we have six. You

17   have not said a thing about 12, 13 and 14.

18        MR. KEITH:  They are okay.

19        THE COURT:  Then we have six.

20        MR. KEITH:  I'm sorry, juror number eight

21   we exercise a challenge on.

22        THE COURT:  Hall.

23        Carvin is one, Stubbendeck is two, Riley

24   is three, Wagner is four, Johnson is five.

25        On the next six, any cause by the People?

═══VOIR DIRE═══

1       MR. BERLAND:  I want to qualify that Caba

2   is 17 and Taveras is 20.

3       THE COURT:  Daniels is 17, Caba is 18.

4       MR. BERLAND:  Wysock is 19.

5       THE COURT:  Wysock is 19.

6       MR. BERLAND:  Cause to number 15,

7   Mr. Haile.  Although he stated that he could be

8   fair and impartial, in light of the fact nine to

9   10 narcotics conviction, I don't see that was

10  possible.

11      THE COURT:  Maybe he pled guilty because

12  he was guilty and they didn't want to waste

13  anybody's time.

14      MR. BERLAND:  That is always a potential,

15  Your Honor.

16      THE COURT:  Did you finish your

17  application?

18      MR. BERLAND:  That's it.

19      THE COURT:  Denied.  The very thing for

20  which and about which peremptories were created,

21  all three of them, unfortunately here we have 20.

22      Any cause by the defense?

23      MR. KEITH:  No, Your Honor.

24      THE COURT:  People's position

25  peremptorily.

═══YVETTE PACHECO  SENIOR COURT REPORTER═══

════════ VOIR DIRE ════════

1        MR. BERLAND:  Number 15, Mr. Haile,

2    number 16, Perez and number 18, Mr. Caba. That's

3    it.

4        THE COURT:  And the defense would opt to

5    do what?

6        MR. KEITH:  Your Honor, we challenge

7    Mr. Daniels, juror number 17.

8        THE COURT:  The other two are okay?

9        MR. KEITH:  Yes, sir.

10       THE COURT:  Dr. Wysock, juror number six

11   and Mr. Taveras, juror number seven.

12       Bring in everybody, please.

13       COURT OFFICER:  Panel entering.

14       THE COURT:  Thank you for being patient.

15   As is always the case, some have been selected,

16   some have not been.  If you have not been chosen,

17   it's not a reflection as a human being. Your

18   friends and family will still love you whether you

19   are on a case or not.

20       Tell them who has been excused and who

21   remains.

22       THE CLERK:  Following jurors remain in

23   your seat. If I do not call your name, you are

24   excused, and report back to room 1517.

25       Timothy Carvin.  Megan Stubbendeck,

1  David Riley, Michael Wagner, Gerforne Johnson,

2  James Wysock, and Rafael Taveras. If you heard

3  your name, remain seated.  If you are excused, go

4  back to the central jury room at 2:15.  We'll send

5  your ballots down there.

6          Are the remaining people satisfactory to

7  the prosecution?

8          MR. BERLAND:  Yes.

9          THE COURT:   To the defense?

10         MR. KEITH:  Yes.

11         THE COURT:  Stand up and take the oath,

12  please.

13         THE CLERK:  Raise your right hand.

14         Do you swear or affirm to try the case of

15  the People of the State of New York versus Edward

16  Green in a fair and impartial manner, and to the

17  best of your ability render a true verdict

18  according to the law and evidence.

19         JURORS:  Yes.

20         THE COURT:  I do not need you for the

21  rest of the day. Need you at 9:45 tomorrow. Go

22  with the sergeant or officer, give them what they

23  need, take the identification card from them.

24  Please be available because we're little ahead of

25  schedule. We'll finish it this afternoon and start

VOIR DIRE

1    the trial at 9:45 tomorrow morning.

2              (Whereupon, a lunch recess was taken,

3    after which the following proceedings were had:)

4              THE COURT:  Sorry it took a few minutes

5    longer.  We're almost ready. Once everybody comes

6    in, we'll call 20 more people and do another round

7    and probably pick a jury this afternoon.

8              Call 20 more people, please.

9              THE CLERK:  Michele Cabrera, seat number

10   one.  Beth Steinberg, seat number two.  Anna

11   Torres seat, number three.  Lisee August, seat

12   number four.  Steven Dunford, seat number five.

13   Helen Sher, seat number six. Grant Makarian, seat

14   number seven.  Andrew Wah, seat number eight.

15   Khalid Akbar, seat number nine.  Denise Ward, seat

16   number ten.  Shannon Paulson, seat number 11.

17   Anna Gjika, seat number 12.  Penny Gibson, seat

18   number 13.  Patricia Crystal, seat number 14.

19   Danillo Antonio, seat number 15.  Nathaniel

20   Higgins, seat number 16.  Brenda Rojas, seat

21   number 17. Robert Jenkins, seat number 18. Donald

22   Keister, seat number 19. Cornelia O'Connor, seat

23   number 20.

24             THE COURT:  Those of you who will

25   ultimately be jurors and appearing here for

=VOIR DIRE=

1      several days should understand that the

2      temperature in this room fluctuates from 40 to 80

3      and the transition can take place within an hour,

4      and so perhaps with a little bit of hyperbole I

5      urge jurors to wear bathing suits under down coats

6      in order to deal with the temperature

7      fluctuations.

8           I will change the rule a little bit for

9      the second round, which you will be pleased which

10     will take will time because the lawyers have less

11     time this time, but also because of this rule

12     change.

13          When your turn comes, if there's

14     something that might potentially disqualify you,

15     mention that right away.  It does not necessarily

16     disqualify you, but for example we had Ms. Stuart

17     this morning said that she lived within three

18     blocks from where this event took place. That's

19     the sort of thing that might disqualify her.  I'm

20     not going to give you examples.

21          If there is something that might

22     disqualify you, mention it right away. It doesn't

23     mean automatically you will not be here, but if it

24     winds up excusing you, it's better to do it early

25     than late.

═══════════════════════════════ VOIR DIRE ═══════════════════════════════

1        Go ahead, Ms. Cabrera.

2        PROSPECTIVE JUROR:  I was born -- I was

3    born --

4        THE COURT:  It's like listening to my

5    radio which doesn't work too well.

6        PROSPECTIVE JUROR:  I was born here in

7    New York City.  I have lived here 19 years, all my

8    life.  --

9        THE COURT:  This will be speech class.

10   We're going to do it as we never heard of these

11   things. As a leader, I'll do the same thing, let's

12   go.  I'm the only one who wants to be here

13   till 2012. Tell us about yourself in accordance

14   with the questionnaire.

15       PROSPECTIVE JUROR:  I was born here in

16   New York City.  I lived here 19 years, my whole

17   life.  I have about 15 to 20 relatives that live

18   here in the city. Am not married. I work.  I'm a

19   mail processor.

20       THE COURT:  You process the people of the

21   male gender?

22       PROSPECTIVE JUROR:  Mail as in postage

23   mail.

24       THE COURT:  How do you do that?

25       PROSPECTIVE JUROR:  It's a DVD company

═══VOIR DIRE═══

and we mail -- receive and mail out DVDs to the

right people.

        THE COURT:  Continue.

        PROSPECTIVE JUROR:  I don't have any

children.  I have a high school diploma and some

college background.  I have never served in a

civil, criminal or Grand Jury. I never served in

the military.  I have no close friends or family

members that have worked in law enforcement.  None

of my relatives or friends have been victims of a

crime.  I've never been a party to a civil

lawsuit. Yes, I would follow the law as the Court

instructs me and I will be fair and impartial.  I

live in Midtown Manhattan.

        THE COURT:  Anything else we should know?

No.  Then we'll go to Ms. Steinberg.

        PROSPECTIVE JUROR:  Born in Los Angeles.

Lived in New York and Los Angeles for the last

eight years. I have a couple of cousins who live

in New York.  I was married.  Currently living

with my boyfriend.  I am an investment banker.  My

boyfriend is an investment banker, we do not have

any children.  I am a college graduate.  Never

served on a civil, criminal or any other jury.

Never served in the military.  I was held up at

════VOIR DIRE════

1    gunpoint 10 years ago.

2              THE COURT:  In Los Angeles?

3              PROSPECTIVE JUROR:  In Los Angeles.

4              THE COURT:  During that robbery, was

5    there more than one robber?

6              PROSPECTIVE JUROR:  Two robbers.

7              THE COURT:  One gun, one knife?

8              PROSPECTIVE JUROR:  Two guns.

9              THE COURT:  Did you report that event to

10   the police?

11             PROSPECTIVE JUROR:  Yes.

12             THE COURT:  Continue.

13             PROSPECTIVE JUROR:  I have never been a

14   party to a civil lawsuit or in court for any

15   reason.  I will follow the law to the best of my

16   ability.  I live in the West Village. I had a

17   college roommate who OD'd on cocaine.

18             THE COURT:   Died?

19             PROSPECTIVE JUROR:  Did not die.

20             THE COURT:  Cocaine, heroin or do you

21   know the substance?

22             PROSPECTIVE JUROR:  Cocaine.

23             THE COURT:  Do you live west or east of

24   Hudson Street?

25             PROSPECTIVE JUROR:  East of Hudson

════YVETTE PACHECO  SENIOR COURT REPORTER════

VOIR DIRE

1    Street.

2              THE COURT:  That's my own personal survey

3    of what constitutes the West Village. Anything

4    else we need to know?

5              Ms. Torres.

6              PROSPECTIVE JUROR:  I speaking a little

7    bit, not too much.

8              THE COURT:  All right.  This would be a

9    problem.  What do you do for a living?  How do you

10   make money?

11             PROSPECTIVE JUROR:  Work.

12             THE COURT:  What work do you do?

13             PROSPECTIVE JUROR:  I baby-sitting.

14             THE COURT:  Are the babies under two

15   years old?

16             PROSPECTIVE JUROR:  Three.

17             THE COURT:  Doesn't speak English,

18   Spanish at all?

19             PROSPECTIVE JUROR:  She speaking English.

20             THE COURT:  Little bit?

21             PROSPECTIVE JUROR:  Yeah.

22             THE COURT:  How much of what I said have

23   you not understood?

24             PROSPECTIVE JUROR:  Tell me again.

25             THE COURT:  How much of what I have said



YVETTE PACHECO  SENIOR COURT REPORTER

VOIR DIRE

1  did you not understand?  Do you understand?

2           PROSPECTIVE JUROR:  I understand --

3           THE COURT:  I'll tell you what, practice

4  talking with the three-year old as he gets older

5  and come back here in a couple of years. You're

6  excused for now.

7           Fill seat number three.

8           THE CLERK:  Amy Wigler, seat number

9  three.

10          THE COURT:  Thank you for trying,

11  Ms. Torres.

12          Ms. Wigler.

13          PROSPECTIVE JUROR:  Born in Detroit. I've

14  lived in New York City for ten years.  I have four

15  relatives living in New York City.  I'm married. I

16  work in entertainment.

17          THE COURT:  What does that mean?

18          PROSPECTIVE JUROR:  I do marketing for an

19  entertainment company, MTV Networks.

20          MR. KEITH:  What is it she does?

21          THE COURT:  She does marketing for MTV

22  Networks that purportedly entertains me.

23          PROSPECTIVE JUROR:  My husband is a

24  rabbi.

25          THE COURT:   She should stop there.  If

=VOIR DIRE=

1    there anybody who was a minister or spouse or

2    companion of a minister, I ask the following

3    questions.  You heard me say a couple of times

4    that you have to follow New York 's law.

5    Sometimes New York's law and a person's moral or

6    ethical or philosophical code, religious beliefs

7    differ. You heard me say that you have to follow

8    New York's law. That means, that if there were, I

9    don't see it happening in this case, if there were

10   a moral difference between your view of something

11   and New York's view of something, you'd be

12   required to follow me or leave.  Do you

13   potentially have any problem like that?

14             PROSPECTIVE JUROR:  No.

15             THE COURT:  Go ahead.

16             PROSPECTIVE JUROR:  I do have a baby at

17   home.

18             THE COURT:  Small baby?

19             PROSPECTIVE JUROR:  Yeah, ten months.

20   I'm a college graduate. I've never served on a

21   jury of any sort.  Never served in the military.

22   I don't know anyone from law enforcement agency. I

23   do have a close friend who has been a victim of a

24   violent crime.

25             THE COURT:   What happened to him or her?

=YVETTE PACHECO  SENIOR COURT REPORTER=

─VOIR DIRE─

1      PROSPECTIVE JUROR:  Mugged, attacked and
2   kidnapped.
3      THE COURT:  Survived but injured?
4      PROSPECTIVE JUROR:  Injured seriously.
5      THE COURT:  Hospitalized?
6      PROSPECTIVE JUROR:  Hospitalized.
7      THE COURT:  Recovered?
8      PROSPECTIVE JUROR:  Yes.
9      THE COURT:  In New York?
10     PROSPECTIVE JUROR:  In New York.
11     THE COURT:  Within the last five years?
12     PROSPECTIVE JUROR:  No.
13     THE COURT:  Anybody arrested as far as
14   you know?
15     PROSPECTIVE JUROR:  No.
16     THE COURT:  Continue.
17     PROSPECTIVE JUROR:  I've never been a
18   party to a civil lawsuit.  Given -- I would be
19   fair and impartial. I live on the Upper West Side.
20     THE COURT:  Anything else?
21     PROSPECTIVE JUROR:  I have a friend who
22   recently overdosed on cocaine.
23     THE COURT:  Died?
24     PROSPECTIVE JUROR:  Yes. I would be fair
25   and impartial.

─YVETTE PACHECO  SENIOR COURT REPORTER─

═══VOIR DIRE═══

1        THE COURT:  You satisfied you could be
2    fair notwithstanding that?
3        PROSPECTIVE JUROR:  Yes. The death was in
4    the City of New York borough of Manhattan?
5        PROSPECTIVE JUROR:  Yes. Recently.
6        THE COURT:  Funeral happen?
7        PROSPECTIVE JUROR:  Yes.
8        THE COURT:  Within the last month?
9        PROSPECTIVE JUROR:  No.
10       THE COURT:  How do you know it was
11   cocaine?
12       PROSPECTIVE JUROR:  I was told it was.
13       THE COURT:  You are satisfied you can do
14   this?
15       PROSPECTIVE JUROR:  Uh-huh.
16       THE COURT:  Next is Ms. August.
17       PROSPECTIVE JUROR:  Born in New York
18   City.  Lived here for 43 years, my whole live
19   life.  Three relatives in New York City.  I'm
20   married.  I work.  I'm a primary care giver at a
21   company that I design and manufacturer. My High
22   School is in commercial real estate. I have two
23   kids. I'm a college graduate.
24       THE COURT:  How old?
25       PROSPECTIVE JUROR:  Nine.

═══YVETTE PACHECO  SENIOR COURT REPORTER═══

VOIR DIRE

1    THE COURT:  Speak yet about drugs?

2    PROSPECTIVE JUROR:  Yes, I have. I have

3    served on a criminal jury.

4    THE COURT:  Don't tell me the verdict,

5    but what was the charge, if you recall?

6    PROSPECTIVE JUROR:  Robbery.

7    THE COURT:  A face-to-face confrontation?

8    PROSPECTIVE JUROR:  Yea.

9    THE COURT:  More than one person or just

10   one?

11   PROSPECTIVE JUROR:  Just one.

12   About 20 years ago.

13   THE COURT:  Did anyone speak to you after

14   you reached the verdict, such as judge or lawyers?

15   PROSPECTIVE JUROR:  No.

16   THE COURT:  Continue.

17   PROSPECTIVE JUROR:  I have never served

18   on a Grand Jury. Never served in the military.

19   Neither I or anybody I know ever served in law

20   enforcement.  I have been the victim of a crime.

21   My brother-in-law recently, last week, was

22   involved in a crime.

23   THE COURT:  What happened?

24   PROSPECTIVE JUROR:  He was in the bank

25   and the bank was held up at gunpoint in Boston.

=VOIR DIRE=

1        THE COURT:  Were guns fired?

2        PROSPECTIVE JUROR:  I don't know if shots

3    were fired. It's being investigated by the FBI

4    right now.

5        THE COURT:  What happened to you?

6        PROSPECTIVE JUROR:  My apartment was

7    burglarized.

8        THE COURT:  Were you home when it

9    happened?

10        PROSPECTIVE JUROR:  No.

11        THE COURT:  Did you report it?

12        PROSPECTIVE JUROR:  I reported it.

13        THE COURT:  You spoke with the police?

14        PROSPECTIVE JUROR:  Yes.

15        THE COURT:  As far as you know, was

16    anybody arrested?

17        PROSPECTIVE JUROR:  Nothing has happened.

18        THE COURT:  Continue.

19        PROSPECTIVE JUROR:  I have never been a

20    party to a civil lawsuit or in court for any other

21    reason.  I would be fair and impartial.  Able to

22    be fair and impartial, I believe.  I live in the

23    Upper East Side.

24        THE COURT:  Anything else we should know?

25        PROSPECTIVE JUROR:  No.

=YVETTE PACHECO  SENIOR COURT REPORTER=

VOIR DIRE

1  THE COURT:  Mr. Dunford.

2  PROSPECTIVE JUROR:  I was born in

3  Bermuda.   I have lived in New York for three

4  years.

5  THE COURT:  U.S. citizen?

6  PROSPECTIVE JUROR:  Yes.

7  THE COURT:  No relatives in New York

8  City.  Not married.  I'm work with a design

9  company and handbag company.  I don't have any

10  children. I have a college education.  I've never

11  served in a criminal jury or jury or verdict or

12  anything like that. Never did Grand Jury.  Never

13  did military service.  I have an uncle who's a

14  judge, but haven't talked to him in the last two

15  or three years.

16  THE COURT:  He might be lonely.

17  PROSPECTIVE JUROR:  I've been part of a

18  crime.  Gotten bashed in the head with a thing or

19  two.

20  THE COURT:  Were you hurt when you were

21  bashed?

22  PROSPECTIVE JUROR:  Yes, in my 'hood,

23  Spanish Harlem.

24  THE COURT:  Were you bashed by more than

25  one person?

═VOIR DIRE═

1    PROSPECTIVE JUROR:  It was one time. It
2    was an object that someone threw at me. That's how
3    I have this scar.  Never a party of a lawsuit.  I
4    think I can be fair and impartial.
5         THE COURT:  What does "I think" mean?
6         PROSPECTIVE JUROR:  I have friends who
7    have done drugs.  I never done anything. I'm
8    pretty compliant with them, so it's okay.  I'm
9    currently -- I live in Spanish Harlem, but I'm
10   moving to Washington Heights.
11        THE COURT:  Your friends do some drugs?
12   A lot of drugs?  A lot of your friends do a lot
13   drugs?
14        PROSPECTIVE JUROR:  Six degrees of
15   separation is a more or less amount.  For me, once
16   every year or so.
17        THE COURT:  Since that's illegal and I
18   gather you've seen them doing it and it doesn't
19   grow on trees.
20        PROSPECTIVE JUROR:  I have no clue. Don't
21   want to know. That's about it.
22        THE COURT:  This gentleman is accused of
23   possessing a certain amount of drugs.  Your
24   friends possessed a certain amount of drugs.
25   Nobody would ask you to assess your friend's

=VOIR DIRE=

1    situation, but are you in a position of worrying

2    about them, but for some fortuitous circumstance,

3    perhaps your friends might be.

4              PROSPECTIVE JUROR:  No.

5              THE COURT:  Can you decide this case

6    without imagining your friends there?

7              PROSPECTIVE JUROR:  Yeah, I'm fine.

8              THE COURT:  If you are fine, I'm fine.

9    Anything else we need to know?

10             PROSPECTIVE JUROR:  Everything is a

11   little blurry from here on.  I just had laser

12   surgery.  I can read kind of.

13             THE COURT:  Part of the assessment of

14   witnesses has to do with looking at them and

15   gauging whatever you can glean from how they

16   appear. Do you think it will clear up by tomorrow?

17             PROSPECTIVE JUROR:  I hope so.

18             THE COURT:  What has the doctor told you?

19             PROSPECTIVE JUROR:  I have my

20   appointment -- they put a contact on your eye.

21   It's kind of protected. They'll take it out and it

22   will be clear.

23             THE COURT:  How will you be a juror if

24   you are not here tomorrow?

25             PROSPECTIVE JUROR:  I made it later in

=YVETTE PACHECO  SENIOR COURT REPORTER=

════════════════════VOIR DIRE════════════════════

1          the day.

2                    THE COURT:  Can't have a juror who might

3          not be able to see the witnesses.  You're excused.

4                    PROSPECTIVE JUROR:  Karachi, Pakistan.  I

5          have lived in the U.S. for 27 years.  I've lived

6          in New York for three years.  Live in New Jersey

7          prior to that.  I have three relatives in New York

8          City.  I'm married.  I'm genetic counselor and I

9          run a center for prenatal pediatrics for women in

10         pregnancy with human anomalies. My husband is in

11         business school.  We have no children. I have a

12         Master's in human genetics. I never served on a

13         criminal or civil jury, never Grand Jury.  Never

14         been in the military. I don't have any close

15         relatives or friends employed by law enforcement

16         agency. I don't have any close relative or friends

17         ever been a victim of a crime. I've never been a

18         party to a civil lawsuit or in court for any

19         reason. I do believe I will follow the law as the

20         Court instructs.  I live on the Upper West Side.

21                   THE COURT:  Anything else?

22                   PROSPECTIVE JUROR:  No, sir.

23                   THE COURT:  Ms. Sher.

24                   PROSPECTIVE JUROR:  Well, I have an adult

25         child who was a drug addict.

1       THE COURT:  You don't think this is a

2   good idea?

3       PROSPECTIVE JUROR:  I'm not sure.

4       THE COURT:  You're excused. Sorry you had

5   to say that in public.

6       Fill seat number six.

7       THE CLERK:  Sarah Wardrop, seat number

8   six.

9       PROSPECTIVE JUROR:  Born in Ontario,

10   Canada.  U.S. citizen.

11       THE COURT:  Duel?

12       PROSPECTIVE JUROR:  Yes.

13       THE COURT:  Do you fight?

14       PROSPECTIVE JUROR:  What's that?

15       THE COURT:  It's what I do, and have.

16   After lunch it's more difficult to keep people

17   focused out there, so there might be a little more

18   of the idiocy in the afternoon than in the

19   morning.

20       PROSPECTIVE JUROR:  Lived in New York

21   City three years.  One relative in the city.  Not

22   married.  I work in radio.  I don't have any

23   children.

24       THE COURT:  What do you do in radio?

25       PROSPECTIVE JUROR:  Producer and on air

VOIR DIRE

1    host.

2              THE COURT:  Public affairs, comedy?

3              PROSPECTIVE JUROR:  Music radio.

4              THE COURT:  Go ahead.

5              PROSPECTIVE JUROR:  College. Never served

6    on any kind of jury or the military.  Don't have

7    friends or relatives who work in law enforcement.

8    I've been the victim of identity theft.

9              THE COURT:  Is that situation over with

10   or not?

11             PROSPECTIVE JUROR:  Not over with.

12             THE COURT:  Knock on wood means, yes,

13   it's over.

14             PROSPECTIVE JUROR:  Hoping it's over.

15             THE COURT:  In what state did you

16   experience the problem?

17             PROSPECTIVE JUROR:  It was while I was --

18   currently living in New York City, but happened in

19   Chicago.

20             THE COURT:  Did it require police to get

21   involved?  Was it store security?

22             PROSPECTIVE JUROR:  There was a police

23   report filed.

24             THE COURT:  Continue.

25             PROSPECTIVE JUROR:  My sister was the

============== VOIR DIRE ==============

1    victim of a robbery.  Never a party to a civil

2    lawsuit or in court for any other reason.  I

3    believe I will follow the law as the Court

4    instructs and will be fair and impartial.  I live

5    in Inwood.

6                THE COURT:  Anything else?

7                PROSPECTIVE JUROR:  No.

8                THE COURT:  Next is Mr. Makarian.

9                PROSPECTIVE JUROR:  I was born in a

10   Aveniun (phonetic).  Former Soviet Socialist

11   Republic country.  I lived in New York City

12   for 30 years. I have about five relatives in New

13   York City.  I'm married.  Working as a commodities

14   trader. My spouse is an attorney.  I have two

15   kids.

16                THE COURT:  How old are your children?

17                PROSPECTIVE JUROR:  They are 13 and

18   three.

19                THE COURT:  Have you spoken to

20   the 13-year-old about drugs?

21                PROSPECTIVE JUROR:  You bet.

22                THE COURT:  Have you spoken to the

23   three-year old about drugs?

24                PROSPECTIVE JUROR:  Almost.  Starting it.

25   College degree.  Never served in criminal jury.

========= YVETTE PACHECO  SENIOR COURT REPORTER =========

1   Never served on a Grand Jury as well.  Haven't

2   served in the military.  I have a friend in

3   California who is a judge, and friends who are

4   police officers.

5          THE COURT:  Where do the police officers

6   work?

7          PROSPECTIVE JUROR:  Westchester County.

8          THE COURT:  Any of them do principally

9   drug enforcement?

10          PROSPECTIVE JUROR:  Sheriff.  I'm victim

11   of a homicide.  My father was shot in New York

12   City.

13          THE COURT:  Do you remember what kind of

14   event?

15          PROSPECTIVE JUROR:  It was a funeral and

16   was attending with my mother. He tried to correct

17   a disturbance and he was called out and shot

18   twice.

19          THE COURT:  How long ago was that?

20          PROSPECTIVE JUROR:  This was 1985.

21          THE COURT:  Was anybody arrested?

22          PROSPECTIVE JUROR:  Yes.

23          THE COURT:  Do you know what happened to

24   that case?

25          PROSPECTIVE JUROR:  Yes.

=VOIR DIRE=

1   THE COURT:  Are you satisfied with what

2   happened to that case?

3   PROSPECTIVE JUROR:  Not really.

4   THE COURT:  How is that going to affect

5   you here?

6   PROSPECTIVE JUROR:  I don't know.

7   THE COURT:  You are excused.  Please step

8   out.

9   Fill seat number seven.

10  THE CLERK:  Ardelia Leonardo, seat number

11  seven.

12  THE COURT:  I'm not going to criticize

13  somebody whose father was shot and killed. That's

14  the sort of thing and a lot less than that that

15  you should mention right away if there's something

16  that might disqualify you.

17  Ms. Leonardo, go ahead.

18  PROSPECTIVE JUROR:  I'm Dominican. Born

19  Dominican Republic.  I live like seven years.  I

20  know like 20 people.

21  THE COURT:  Twenty people relatives here?

22  PROSPECTIVE JUROR:  Around my

23  neighborhood.  I not married.  I working.

24  THE COURT:  What do you do?

25  PROSPECTIVE JUROR:  Sale.

=YVETTE PACHECO  SENIOR COURT REPORTER=

=VOIR DIRE=

1      THE COURT:  Sales?

2      PROSPECTIVE JUROR:  Yes.

3      THE COURT:  What do you sell?

4      PROSPECTIVE JUROR:  Furniture.

5      THE COURT:  Is it easier to sell tables

6  or chairs?

7      PROSPECTIVE JUROR:  Chairs.  I don't have

8  children.  I never been over here.

9      THE COURT:  Not bad right?  Meet some

10 nice people?

11     PROSPECTIVE JUROR:  Okay, yeah.

12     THE COURT:  Have you served on a Grand

13 Jury?

14     PROSPECTIVE JUROR: No.

15     THE COURT:  This will be a Grand Jury,

16 but it's not a Grand Jury. It's a grand group of

17 folks.  No, you haven't been on one, I can tell.

18     PROSPECTIVE JUROR:  Yeah, my brother is

19 undercover.

20     THE COURT:  How long has he been a police

21 officer?

22     PROSPECTIVE JUROR:  Like 20 years.

23     THE COURT:  You are his little sister?

24 Continue.  Nobody has taken your property, stole

25 anything from you?

VOIR DIRE

1          PROSPECTIVE JUROR:  No.

2          THE COURT:  Have you ever been in court

3     at all?

4          PROSPECTIVE JUROR:  This is the first

5     time.

6          THE COURT:  Can you be fair here?

7          PROSPECTIVE JUROR:  Yeah.

8          THE COURT:  In what neighborhood do you

9     live?

10          PROSPECTIVE JUROR:  Washington Heights.

11          THE COURT:  Anything else we should know?

12          PROSPECTIVE JUROR:  No.

13          THE COURT:  Mr. Wah.

14          PROSPECTIVE JUROR:  Born in New York

15     City.  Lived here my whole life. Ten relatives.

16     Single.  I work.  Venture capital. I have no

17     children.  I have a graduate degree.  I've never

18     been on a jury. Never been in the military.  I

19     don't have any friends in law enforcement.  I was

20     the victim of a crime.

21          THE COURT:  What happened?

22          PROSPECTIVE JUROR:  Carjacked

23     about 12 years ago in the city.

24          THE COURT:  Why do you think that

25     happened?  Wrong place wrong time?

================================ VOIR DIRE ================================

1   PROSPECTIVE JUROR:  If you consider 75th

2   and Park the wrong place?

3   THE COURT:  Were you physically hurt?

4   PROSPECTIVE JUROR:  No.

5   THE COURT:  As far as you know, was

6   anybody arrested?

7   PROSPECTIVE JUROR:  No.

8   THE COURT:  Continue.

9   PROSPECTIVE JUROR:  I have been a party

10  to civil suits.

11  THE COURT:  Roughly how many times?

12  PROSPECTIVE JUROR:  Four or five.

13  THE COURT:  During time the cases were

14  ongoing, were you ever questioned by the other

15  side's lawyer?

16  PROSPECTIVE JUROR:  Yes. During

17  depositions.

18  THE COURT:  Did it seem as if your word

19  was being challenged or did they want additional

20  information?

21  PROSPECTIVE JUROR:  Both.

22  THE COURT:  During the course of a

23  litigation people get challenged and you're likely

24  to see that here.

25  PROSPECTIVE JUROR:  Yeah. I'm sure I can

================ YVETTE PACHECO   SENIOR COURT REPORTER ================

=VOIR DIRE=

1    be impartial. I live in Tribeca.

2              THE COURT:  Anything else we should know?

3              PROSPECTIVE JUROR:  No.

4              THE COURT:  Mr. Higgins.

5              PROSPECTIVE JUROR:  Born in the Bronx.

6    Currently live in Harlem. I've been in New York

7    City all my life.

8              THE COURT:  Do you live within three

9    blocks of Lenox and 132nd?

10             PROSPECTIVE JUROR:  No.  I have about 15

11   relatives in the city. Not married. Working,

12   consultant, fund raising marketing.

13             THE COURT:  How do you know how to do

14   that?

15             PROSPECTIVE JUROR:  It's a people sort of

16   job.

17             THE COURT:  You can be a judge. Go ahead.

18             PROSPECTIVE JUROR:  No children.  College

19   degree.  Never served on a jury.  Never served on

20   a Grand Jury.  No military.  I have a few friends

21   who are officers.

22             THE COURT:  What kind of work do they do,

23   if you know?

24             PROSPECTIVE JUROR:  Couple of friends in

25   the 32nd Precinct and 28th Precinct.

=YVETTE PACHECO  SENIOR COURT REPORTER=

VOIR DIRE

1      THE COURT:  Every see of any of them as

2   you are walking around your neighborhood, see any

3   of your friends driving or walking by, in police

4   cars or plainclothes?

5      PROSPECTIVE JUROR:  Yes.

6      THE COURT:  Do they wave or keep

7   themselves quiet?

8      PROSPECTIVE JUROR:  No.

9      THE COURT:  Some of them do drug

10   enforcement?

11      PROSPECTIVE JUROR:  Yes.

12      THE COURT:  Do you call them about how

13   you should do your fund raising?

14      PROSPECTIVE JUROR:  No.

15      THE COURT:  Do they ever call you about

16   how they should do their drug enforcement?

17      PROSPECTIVE JUROR:  No.

18      THE COURT:  Continue.

19      PROSPECTIVE JUROR:  I don't think I have

20   any relatives who have been convicted of a crime.

21   I have been a party to lawsuit twice.

22      THE COURT:  Is it over?

23      PROSPECTIVE JUROR:  Yes.

24      THE COURT:  During time it was going on,

25   were you deposed?

=VOIR DIRE=

1      PROSPECTIVE JUROR:  Yes.

2      THE COURT:  Were you challenged?

3      PROSPECTIVE JUROR:  Kind of same way he

4  felt.  I can be fair and impartial.

5      THE COURT:  How long have you been a fund

6  raiser?

7      PROSPECTIVE JUROR:  About six years.

8      THE COURT:  Thank you.

9      Mr. Antonio.

10     PROSPECTIVE JUROR:  Sorry, don't

11 understand.

12     THE COURT:  I'm sorry you don't

13 understand.  You can leave.

14     THE CLERK:  Robert Sargenti.

15     PROSPECTIVE JUROR:  I was born in New

16 Jersey. I listed in New York for 12 years. I have

17 five relatives.  I'm married.  Two kids, three and

18 five.  All we talk about is cough medicine.  Those

19 are the only drugs we talk about.

20     THE COURT:  Which one do they like?

21     PROSPECTIVE JUROR:  They like cherry.

22     THE COURT:  Grape was well when I left.

23 Go ahead.

24     PROSPECTIVE JUROR:  I'm a self-employed

25 architect.  My wife is a stay-at-home mom.

=YVETTE PACHECO  SENIOR COURT REPORTER=

VOIR DIRE

1    Education, graduate degree.  I have not been on --

2    I've been on no jury.  I have never been in the

3    military.  I have never been in the military.  My

4    cousin is a state cop who I haven't seen many,

5    many years and a friend who is a policeman in New

6    Jersey.  He's, I don't know, just a regular

7    small-town cop.  I've been a victim of a crime,

8    robbed at knifepoint.

9              THE COURT:  More than one person or one

10   person?

11             PROSPECTIVE JUROR:  One person.  I had my

12   car stolen in New York.

13             THE COURT:  Something you arranged or did

14   it just happen?

15             PROSPECTIVE JUROR:  I definitely did not

16   have it arranged.

17             THE COURT:   How long ago was that?

18             PROSPECTIVE JUROR:  Five, six years ago.

19             THE COURT:  You can't be prosecuted if

20   you had your car stolen because it's past the

21   statute of limitations.

22             PROSPECTIVE JUROR:  My brother was beaten

23   in an altercation, severely hurt.  It was college

24   kids fighting, that kind of thing.

25             THE COURT:  Was anybody arrested?

=VOIR DIRE=

1    PROSPECTIVE JUROR:  No.  I've been in

2    lawsuits before, mostly architecture and

3    construction type of thing.

4         THE COURT:  Questioned by the adversary's

5    attorneys?

6         PROSPECTIVE JUROR:  No, I have not.  Not

7    in a formal sense.  I live in the Upper East Side.

8    I can be fair and impartial.

9         THE COURT:  Anything else we should know?

10        PROSPECTIVE JUROR:  No.

11        THE COURT:  Ms. Crystal.

12        PROSPECTIVE JUROR:  Born in Pittsburgh.

13   Lived in New York 40 years.  I have about five

14   relatives in New York.  I'm divorced.  I am an

15   executive recruiter. I have two grown children.

16   College graduate.  I served on New York City

17   criminal Grand Jury, narcotics division.

18        THE COURT:  How long were you on that

19   Grand Jury?

20        PROSPECTIVE JUROR:  Exactly eight years

21   ago today, and get excused for eight years from

22   jury duty after.

23        THE COURT:  Sounds like a memorable

24   experience.  So you remember, I hope, I trust,

25   that you know your services at Grand Jury, that a

=YVETTE PACHECO  SENIOR COURT REPORTER=