=VOIR DIRE=

1    Grand Jury decides if there is to be a trial and
2    simply different group of people to decide what
3    the verdict should be. Do you remember that?
4           PROSPECTIVE JUROR:  Yes. Never been in
5    the military. No law enforcement relatives. My
6    apartment has been robbed twice over the years.
7    I've been mugged at knifepoint twice over the
8    years.
9           THE COURT:  Did you report some or all of
10   them?
11          PROSPECTIVE JUROR:  All of them.
12          THE COURT:  Anybody arrested, as far as
13   you know?
14          PROSPECTIVE JUROR:  No.  No civil
15   lawsuits.  Given what I heard so far, my
16   experience on Grand Jury with narcotics, I think I
17   might have difficulty with large quantities of
18   drugs, being impartial. Not small amounts.
19          THE COURT:  Well, the word "may" is
20   something we should explore, but have to do it
21   relatively quickly. It's a silly question.  I'm
22   sure it was perceived as anybody in favor of
23   crime. Everybody is against crime. Everybody would
24   be against violence, against guns, against murder,
25   and some people against drugs, large quantities of

=YVETTE PACHECO  SENIOR COURT REPORTER=

===VOIR DIRE===

1  drugs.

2  The point of what happens in this room is

3  to see whether or not a person can be connected to

4  the event.  Let's call it a large amount of drugs.

5  Nobody likes that, but nobody wants to convict

6  somebody whose case hasn't been proven.

7  We look for intelligent people who do not

8  have an axe to grind, open minded. Stuff will be

9  presented and you make the decision. Even though

10  you might not like the idea of murder, guns,

11  drugs, rape, whatever the situation, can you do

12  that, or is your feeling exposed to smaller

13  amounts or bigger amounts like in the Grand Jury

14  such that you are uncertain about whether you can

15  decide the case fairly and appropriately?

16  PROSPECTIVE JUROR:  Not sure I can be

17  fair with a large quantity of drugs involved.

18  THE COURT:  So then you're excused.

19  THE CLERK:  Vincente Leon, seat

20  number 14.

21  THE COURT:  I try to keep myself out of

22  this.  Played a lot of baseball. That's the second

23  strike. The next person who doesn't say something

24  in the process early when your turn comes and

25  winds up being disqualified, I will yell at you.

═VOIR DIRE═

1    I understand that you can be injudicious, but your

2    time is being wasted by people who have now left.

3         Mr. Leon.

4         PROSPECTIVE JUROR:  I was born in Puerto

5    Rico.  I've lived in New York City for 16 years.

6    My relatives in New York City are my wife and son.

7    I am working.  I work as a banker. My wife is a

8    psychologist.  I have one child, 11 years old.

9         THE COURT:  Spoken with that person about

10   drugs?

11        PROSPECTIVE JUROR:  No -- oh, yes, I

12   have. Educational background, I have a graduate

13   degree.  I have never served on a jury of any

14   type.  I have never served in the military.  I

15   don't have any relatives employed by any law

16   enforcement agency.  I have been a victim of a

17   crime.

18        THE COURT:  What happened?

19        PROSPECTIVE JUROR:  My wife and I were

20   carjacked.

21        THE COURT:  Do you know why?

22        PROSPECTIVE JUROR:  Wrong place wrong

23   time.

24        THE COURT:  Were you hurt?

25        PROSPECTIVE JUROR:  My wife was held at

══════════════════VOIR DIRE══════════════════

1    gunpoint, taunted verbally.

2              THE COURT:  How long ago did this event

3    happen?

4              PROSPECTIVE JUROR:  Seven, eight years

5    ago.

6              THE COURT:  In the city, somewhere else?

7              PROSPECTIVE JUROR:  Puerto Rico.

8              THE COURT:  Anybody arrested ultimately?

9              PROSPECTIVE JUROR:  No.

10             THE COURT:  Did you report it?

11             PROSPECTIVE JUROR:  Yes.

12             THE COURT:  Okay.  Continue.

13             PROSPECTIVE JUROR:  I have been a party

14   of a civil lawsuit.

15             THE COURT:  Deposed or not?

16             PROSPECTIVE JUROR:  Yes.

17             THE COURT:  Challenged or not?

18             PROSPECTIVE JUROR:  Yes.

19             THE COURT:  Continue.

20             PROSPECTIVE JUROR:  I believe I can

21   follow the law as the Court instructs.  I live in

22   the Upper East Side.

23             THE COURT:  Anything else?

24             PROSPECTIVE JUROR:  No.

25             THE COURT:  Ms. Gibson.

═══════════YVETTE PACHECO  SENIOR COURT REPORTER═══════════

═══VOIR DIRE═══

1       PROSPECTIVE JUROR:  Born on Long Island.
2   Live in New York for 40 years.  My daughter and I
3   live in New York. I am not married. I'm working
4   for the city modulate programs. I have a Master's
5   degree in social work.  I have one child who
6   is 16.  We have talked about drugs. I have never
7   served on the jury.  Never served in the military.
8   I have no relatives or friends employed in law. I
9   have no close friends or relatives who have been a
10  victim of a crime.  I have never been a party to a
11  lawsuit.  I will follow the law, and I live on the
12  Upper East Side.
13          THE COURT:  Anything else?
14          PROSPECTIVE JUROR:  No.
15          THE COURT:  Ms. Gjika.
16          PROSPECTIVE JUROR:  I was born in
17  Albania. I'm United States citizen.  Been
18  here 15 years.  I have approximately 30 relatives
19  in New York City.  I am not married. I work as a
20  credit analyst at a bank. I have no children. I
21  have a college degree and presently working on my
22  Master's.  I have never served on a jury.  Never
23  served in the military. I have a rookie cousin
24  somewhere.
25          THE COURT:  A rookie cousin?  Is that

VOIR DIRE

1    somebody under six months old?

2            PROSPECTIVE JUROR:  I myself or close

3    relatives not been a victim of a crime or party to

4    any lawsuits.  I believe I can follow the law and

5    be impartial.  I live on Sutton Place.

6            THE COURT: Ms. Paulson.

7            PROSPECTIVE JUROR:  Born in Hawaii.  Live

8    in New York for two years.  No relatives.  Working

9    retail designer or clothing, sourcing and

10   development research.

11           THE COURT:  Wonder if you could come up

12   with any new raw materials.  Physiology.  That

13   probably is not a good idea, no.

14           PROSPECTIVE JUROR:  No children.  College

15   graduate.

16           THE COURT:  Did you graduate in Hawaii?

17           PROSPECTIVE JUROR:  No, in Boston.

18           THE COURT:  When did you leave Hawaii?

19           PROSPECTIVE JUROR:  When I was two.

20           THE COURT:  You didn't have a choice.

21           PROSPECTIVE JUROR:  I wasn't consulted.

22   Never been on a jury.  Never served in the

23   military. No friends or relatives in law

24   enforcement.  I have been a victim of a crime.  My

25   apartment broken into.

YVETTE PACHECO  SENIOR COURT REPORTER

VOIR DIRE

1      THE COURT:  Were you present?

2      PROSPECTIVE JUROR:  I wasn't present.

3      THE COURT:  Manhattan?

4      PROSPECTIVE JUROR:  Boston.  Never been a

5  party to a lawsuit. I can follow the law and be

6  fair and impartial. I live on the Upper West Side.

7      THE COURT:  Anything else?

8      PROSPECTIVE JUROR:  No.

9      THE COURT:  Ms. Ward.

10      PROSPECTIVE JUROR:  Born in New Jersey.

11  Lived in New York for 20 years.  I have one

12  nephew.  I'm married, not working.

13      THE COURT:  Have you worked?

14      PROSPECTIVE JUROR:  No.  I have two grown

15  kids. I'm a college graduate.  I have never served

16  on a jury. I've never served in the military. I do

17  not have relatives employed by law enforcement

18  agencies.  My home was broken into a long time

19  ago.

20      THE COURT:  Were you present when that

21  happened?

22      PROSPECTIVE JUROR:  I let him in.  He

23  said he was coming to fix the roof, and he went --

24  I think it was an inside job, and went into a

25  bedroom and took my jewelry.

VOIR DIRE

1      THE COURT:  You probably could have
2  afforded it, but I chose not to say that.
3      PROSPECTIVE JUROR:  I have not been a
4  party to a civil lawsuit.
5      THE COURT:  How about an acrimonious
6  lawsuit?
7      PROSPECTIVE JUROR: I can be fair and
8  impartial.  I live in the Upper West Side.
9      THE COURT:  Anything else?
10      PROSPECTIVE JUROR:  No.
11      THE COURT:  Mr. Jenkins.
12      PROSPECTIVE JUROR:  Born in New York
13  City.  I live New York City 46 years.  I have 15
14  relatives in New York. I'm single. No children.
15      THE COURT:  This poor lady walked all the
16  way over here to tell me I forgot Mr. Akbar.
17  We'll finish with you and go back to Mr. Akbar.
18      PROSPECTIVE JUROR:  No children.  High
19  school.
20      THE COURT:  Are you working now or worked
21  in the past?
22      PROSPECTIVE JUROR:  Oh, yeah.
23      THE COURT:  What do you do?
24      PROSPECTIVE JUROR:  Work in a limo
25  service.

YVETTE PACHECO  SENIOR COURT REPORTER

VOIR DIRE

1    THE COURT:  You take the subway, drive a
2 vehicle?
3    PROSPECTIVE JUROR:  Take the subway.
4    THE COURT:  I used to do that.  My first
5 jobs was as a messenger.  Fifteen cents is what a
6 token cost. Way to make the money is put the 15
7 cents in your pocket and walk.
8    PROSPECTIVE JUROR:  Never served on the
9 military.  Never served on a jury. No relative
10 working in law enforcement.
11    THE COURT:  You have to speak louder.
12 They're practically falling off their chairs over
13 there.
14    PROSPECTIVE JUROR:  No relatives or close
15 friends convicted of a crime. Never been a party
16 to a civil lawsuit.  I have been in court.
17    THE COURT:  What sort of thing got you
18 into court?
19    PROSPECTIVE JUROR:  Misdemeanor.
20    THE COURT:  Can you be fair and impartial
21 here?
22    PROSPECTIVE JUROR:  Yes.
23    THE COURT:  What neighborhood do you live
24 in?
25    PROSPECTIVE JUROR:  Upper West Side.

══VOIR DIRE══

1    THE COURT:  Anything else?

2    PROSPECTIVE JUROR:  No.

3    THE COURT:  I apologize, Mr. Akbar.

4    PROSPECTIVE JUROR:  Born in Hempstead,

5    Long Island. Live in New York City for ten years.

6    I have five relatives in the city. I'm not

7    married.  I'm unemployed now.  I don't have a

8    spouse.  No children. I have my go GED and some

9    college experience.  I never served on a criminal

10   or civil jury or Grand Jury.  I haven't served in

11   the military.  I don't have any relatives that are

12   in law enforcement.  I don't any relatives or

13   friends that are a victim of a crime. I have never

14   been a party to any kind of lawsuit.  I can be

15   fair and impartial.

16       THE COURT:  Have you been in school

17   recently?

18       PROSPECTIVE JUROR:  No.

19       THE COURT:  Not for a couple of years?

20       PROSPECTIVE JUROR:  Yeah.

21       THE COURT:   What neighborhood do you

22   live in?

23       PROSPECTIVE JUROR:  Harlem, within a

24   three-block radius.

25       THE COURT:  Three blocks from where we

══YVETTE PACHECO  SENIOR COURT REPORTER══

═VOIR DIRE═

1    are talking about?

2              PROSPECTIVE JUROR:  Yes.

3              THE COURT:  Does that bother you?

4              PROSPECTIVE JUROR:  It's okay.

5              THE COURT:  Nobody you know has been a

6    victim of a crime?

7              PROSPECTIVE JUROR:  No.

8              THE COURT:   You don't know anybody who's

9    a police officer?

10             PROSPECTIVE JUROR:  No.

11             THE COURT:  We'll go to Ms. Rojas.

12             PROSPECTIVE JUROR:  I was born in Puerto

13   Rico.  I lived in New York for 18 years. I have

14   about 20 relatives in the city.  Not married.

15   Fashion designer.  No spouse.  No children. I have

16   a Bachelor's degree.  Never served on a civil or

17   Criminal Court.  I've never served in the Grand

18   Jury. Never served in the military.  I have

19   retired cop cousin, two, and a cop friend.

20             THE COURT:  How often do you see those

21   folks?

22             PROSPECTIVE JUROR:  Not at all.

23             THE COURT:  Do you know whether they ever

24   did drug enforcement?  You don't know.  Okay,

25   continue.

========VOIR DIRE========

1          PROSPECTIVE JUROR:  I've been a victim of

2     a crime.

3          THE COURT:  What happened to you?

4          PROSPECTIVE JUROR:  Domestic violence.

5          THE COURT:  Did you call the police?

6          PROSPECTIVE JUROR:  Yes.

7          THE COURT:  Did it get into court or not?

8          PROSPECTIVE JUROR:  Yes.

9          THE COURT:  Did the court take care of it

10    the way you think they should have or not?

11    Continue.

12          PROSPECTIVE JUROR:  Never a party to a

13    civil lawsuit. I could be fair and impartial.  I

14    live in Harlem.

15          THE COURT:  Do you live within three

16    blocks of the area that we're talking about?

17          PROSPECTIVE JUROR:  No.

18          THE COURT:  Anything else we should know?

19          PROSPECTIVE JUROR:  My brother was killed

20    in Puerto Rico.  He was into drugs.

21          THE COURT:  About how long ago was that?

22          PROSPECTIVE JUROR:  Fourteen years ago.

23          THE COURT:  Were you living in Puerto

24    Rico or New York at the time?

25          PROSPECTIVE JUROR:  New York.

VOIR DIRE

1      THE COURT:  Was anybody arrested for that

2  crime?

3      PROSPECTIVE JUROR:  Five years after the

4  fact.

5      THE COURT:  Are you satisfied that you

6  can put that aside?

7      PROSPECTIVE JUROR:  Yes.

8      THE COURT:  Sorry you had to tell us, but

9  thank you for telling us.

10      Mr. Keister.

11      PROSPECTIVE JUROR:  Born in Colorado.

12  Live in New York for two and a half years.  One

13  relative in the city.  I'm married. Work as an

14  economist in the financial sector. My spouse is a

15  professor.  No children.  Graduate degree in

16  economics. Never been on a jury.  Served in the

17  Air Force from 1989 to 1992.

18      THE COURT:  What was your specialty?

19      PROSPECTIVE JUROR:  Communication.  No

20  friends or close relatives in law enforcement.

21  Not been a victim of a crime.  I have not been a

22  party to any sort of lawsuit. I believe I can be

23  impartial. I live on the Upper West Side.

24      THE COURT:  Anything else?

25      PROSPECTIVE JUROR:  No.

========VOIR DIRE========

1      THE COURT:  Ms. O'Connor.

2      PROSPECTIVE JUROR:  Born in Flushing, New
3  York. Lived in New York City for 13 years.  No
4  relatives who live in New York. I am widowed. I'm
5  retired.  I was a director of women's health
6  overseas programs. I have two grown children.
7  When they were adolescents, I instructed them
8  about drugs. I have a Master's degree in public
9  administration. I almost served on a jury. I was
10 selected, I went in, but after the two extra
11 jurors were released, one of the jurors got
12 hysterical because she thought she couldn't serve
13 so they had to have a mistrial. I never served on
14 a Grand Jury.  I never served in the military.  I
15 have no close friends or relatives employed by law
16 enforcement agency.  I have been the victim of a
17 violent crime 33 years ago, I was raped at
18 knifepoint.

19      THE COURT:  Somebody you know or did not
20 know?

21      PROSPECTIVE JUROR:  A stranger.

22      THE COURT:  Anybody arrested?

23      PROSPECTIVE JUROR:  Nobody ever arrested.

24      THE COURT:  Did you report it?

25      PROSPECTIVE JUROR:  Of course.  I've

═══VOIR DIRE═══

1    never been a party to a civil lawsuit. I believe

2    that  -- I am certain that I can be fair and

3    impartial. I live on the Upper West Side.

4              THE COURT:  Anything else?

5              PROSPECTIVE JUROR:  No.

6              THE COURT:  Did they arrest anybody?

7              PROSPECTIVE JUROR:  No.

8              THE COURT:  Anyone among you ever

9    convicted of or accused of a crime?

10             Then we'll go to family member,

11   civilians, spouses, domestic person, people with

12   whom you have a some time or often intimate

13   relationship, parents, children, sisters,

14   arrested, accused of, victim of a crime?

15             Mr. Sargenti.

16             PROSPECTIVE JUROR:  My brother has had a

17   couple, twice.

18             THE COURT:  Did he get a jail sentence on

19   any of them?

20             PROSPECTIVE JUROR:  No.

21             THE COURT:  In New York or some other

22   jurisdiction?

23             PROSPECTIVE JUROR:  New Jersey.

24             THE COURT:  Mr. Jenkins.

25             PROSPECTIVE JUROR:  My sister.

═══YVETTE PACHECO  SENIOR COURT REPORTER═══

VOIR DIRE

1    THE COURT:  What happened?

2    PROSPECTIVE JUROR:  She was arrested

3  three times for crack.

4    THE COURT:  Did she -- was she put in a

5  drug program, get a jail sentence or sometimes one

6  and sometimes the other or do you know?

7    PROSPECTIVE JUROR:  She got a jail

8  sentence.

9    THE COURT:  Do you see her still?  Is she

10  still alive?

11    PROSPECTIVE JUROR:  She passed away.

12    THE COURT:  Somebody else?  Mr. Higgins.

13    PROSPECTIVE JUROR:  Uncle arrested for

14  selling drugs, convicted.

15    THE COURT:  By a jury or did he plead

16  guilty?

17    PROSPECTIVE JUROR:  I believe he plead

18  guilty.

19    THE COURT:  Do you know what sentence he

20  got?  Was it a jail sentence?

21    PROSPECTIVE JUROR:  Yes.

22    THE COURT:  Did you ever visit him?

23    PROSPECTIVE JUROR:  No.

24    THE COURT:  Still in jail?

25    PROSPECTIVE JUROR:  No.

===VOIR DIRE===

1          THE COURT:  Somebody else?  Yes,
2     Mr. Akbar.
3          PROSPECTIVE JUROR:  My brother was
4     arrested for possession.
5          THE COURT:  How did it end or do you
6     know?
7          PROSPECTIVE JUROR:  Six-month sentence in
8     Riker's Island.
9          THE COURT:  Did you visit him there?
10          PROSPECTIVE JUROR:  Yeah, we visited him.
11          THE COURT:  Couple of times or once?
12          PROSPECTIVE JUROR:  Couple of times a
13     week.
14          THE COURT:  Somebody else?
15          Anybody know anyone who is now or in the
16     past prosecuted by the Manhattan district
17     attorney's office?
18          Mr. Berland goes first again.  He has the
19     same amount of time -- no, a little less time.
20          Go ahead.
21          MR. BERLAND:  Good afternoon.  I'm going
22     to jump right in. Hopefully we can get you out
23     quickly.
24          Ms. Steinberg, you said you were held up
25     at gunpoint.  Was that in California or New York?

VOIR DIRE

1      PROSPECTIVE JUROR:  California.

2      MR. BERLAND:  I believe you said you

3 reported the crime but no one was arrested?

4      PROSPECTIVE JUROR:  That's correct.

5      THE COURT:  Speak a little louder.

6 Apparently, school is out somewhere.

7      MR. BERLAND:  We're not talking about the

8 New York City Police Department.  How do you feel

9 the police treated the investigation?

10      PROSPECTIVE JUROR:  A little

11 disappointed. We were followed home off the

12 freeway.  We called the police immediately.  And

13 came and said people are followed off the freeway,

14 held at gunpoint, here are the books.

15      MR. BERLAND:  You are disappointed in

16 that case?

17      THE COURT:  They basically left it up to

18 you to solve your own crime?

19      PROSPECTIVE JUROR:  Yes.

20      MR. BERLAND:  That was California.  We

21 are in New York. That disappointment at all factor

22 into your ability to listen to NYPD with an open

23 and fair mind?

24      PROSPECTIVE JUROR:  I'm not sure.

25      MR. BERLAND:  I will move on to

=VOIR DIRE=

1    Ms. August.  You were a victim of a burglary; is
2    that right?
3              PROSPECTIVE JUROR:  Yeah.
4              MR. BERLAND:  Again, you reported that
5    and no arrests were made?
6              PROSPECTIVE JUROR:  That's correct.
7              MR. BERLAND:  This was in New York?
8              PROSPECTIVE JUROR:  Yes.
9              MR. BERLAND:  How do you feel the police
10   handled the investigation in your case?
11             PROSPECTIVE JUROR:  Ultimately, I found
12   it disappointing. If I maintained pressure in
13   questioning, I expect I would have gotten more
14   response.  I didn't get --
15             MR. BERLAND:  It has been made clear that
16   there are 40,000 police officers in New York.
17             PROSPECTIVE JUROR:  Absolutely.
18             MR. BERLAND:  You can separate that
19   situation on this case and listen to police
20   officers with an open mind?
21             PROSPECTIVE JUROR:  I think so.  I think
22   I can listen with an open mind.
23             MR. BERLAND:  We need you to be able to
24   say you know you can. That's important.
25             PROSPECTIVE JUROR:  I know I can be

=YVETTE PACHECO  SENIOR COURT REPORTER=

======VOIR DIRE======

1    impartial.

2              MR. BERLAND:  Ms. Woodrow, what kind of

3    music on your radio station?

4              PROSPECTIVE JUROR:  Fairly eclectic.

5              THE COURT:  I guess that's beyond New

6    Wave.

7              PROSPECTIVE JUROR:  Pretty much anything

8    else.

9              MR. BERLAND:  Mr. Wall, you were a victim

10   of a carjacking at 75 and Park.  No arrest?

11             PROSPECTIVE JUROR:  No.

12             MR. BERLAND:  Do you feel the police

13   handled it?

14             PROSPECTIVE JUROR:  Yes.

15             MR. BERLAND:  Do you understand that

16   different police officers are testifying here?

17             PROSPECTIVE JUROR:  Yes.

18             MR. BERLAND:  Mr. Higgins, your uncle was

19   arrested for possession or sale?

20             PROSPECTIVE JUROR:  Sale.

21             MR. BERLAND:  Are you close to your

22   uncle?

23             PROSPECTIVE JUROR:  Sort of.

24             MR. BERLAND:  Will the fact that he was

25   arrested and convicted affect you in this case

=VOIR DIRE=

1   from being fair and impartial?

2           PROSPECTIVE JUROR:  No.

3           MR. BERLAND:  Are you sure?

4           PROSPECTIVE JUROR:  I'm sure.

5           MR. BERLAND:  Mr. Sargenti, any ill will

6   towards the police in your brother's beating that

7   nobody was arrested?

8           PROSPECTIVE JUROR:  Again, I would I'm

9   friends with cops, and things happen.  Is it great

10  that they didn't catch him?  No.

11          MR. BERLAND:  Any ill will you might have

12  that will spill over into this case?

13          PROSPECTIVE JUROR:  No.  It's years ago,

14  Upstate New York.

15          THE COURT:  You can give the defendant a

16  fair trial and listen to with an open mind to any

17  witness that takes that witness stand?

18          PROSPECTIVE JUROR:  Yea.

19          MR. BERLAND:  You are hesitating a little

20  bit.  We need you to be certain.

21          PROSPECTIVE JUROR:  Yes.

22          THE COURT:  We do not want answers

23  without thought, either.  Sometimes that requires

24  a little delay between processing and answering.

25          MR. BERLAND:  Ms. Paulson, similar

VOIR DIRE

1    question.  Your apartment was broken into in

2    Massachusetts.  Not talking about New York police

3    department.  How do you feel the police there

4    handled the investigation?

5            PROSPECTIVE JUROR:  Not well.

6            MR. BERLAND:  Mr. Akbar, how are you?

7    You said that you are currently unemployed. How

8    long have you been unemployed?

9            PROSPECTIVE JUROR:  March 3rd of this

10   year.

11           MR. BERLAND:  Where were you working

12   before that, prior to March 3rd?

13           PROSPECTIVE JUROR:  With a security

14   company.

15           MR. BERLAND:  Your brother was also

16   arrested?

17           PROSPECTIVE JUROR:  Yes.

18           MR. BERLAND:  That was for a narcotics

19   case?

20           PROSPECTIVE JUROR:  Possession.

21           MR. BERLAND:  Would you be able to

22   separate that case from the instant case?

23           PROSPECTIVE JUROR:  Yes.

24           MR. BERLAND:  It will not in any way

25   affect your ability to be fair and impartial?

===VOIR DIRE===

 1          PROSPECTIVE JUROR:  No.

 2          MR. BERLAND:  You all heard now numerous

 3     times that the defendant has been charged with

 4     possessing over half a kilogram of cocaine, large

 5     quantities of cocaine.  He's also charged with

 6     possessing the cocaine with intent to sell it.

 7          Anyone here who, for any reason

 8     whatsoever, has a general problem with the drug

 9     laws of New York, who says, you know, I don't

10     think position of cocaine or any narcotic drug

11     should be illegal?  Anyone at all?

12          Before I sit down, I said this this

13     morning.  Is there anything that you think that

14     this questionnaire doesn't cover, the Judge hasn't

15     asked that we should know about here?

16          Thank you for your time.

17          THE COURT:  Mr. Keith.

18          MR. KEITH:  Hello again everyone. Again,

19     my name is Arnold Keith and I represent

20     Mr. Edward Green.  There's been quite a few

21     moments where there's been laughter. I know I've

22     laughed quite a number of times today and seen a

23     number of you laugh.

24          The charges that Mr. Green is being

25     accused of are very serious.  I hope that everyone

═══ VOIR DIRE ═══

1    will take and analyze and evaluate the testimony

2    and take this very seriously if you are selected

3    to serve on the jury. Can you all promise me that

4    you will do that?

5            I'm hoping that there could be some more

6    light moments, easy moments where we could laugh.

7    Really, the charges here are very serious.  Even

8    though I think the issue is relatively simple, it

9    would require some analysis and some attention to

10   the evidence that you will hear in this case.  I'm

11   asking you, if you are selected, to please pay

12   careful attention to what you hear and take this

13   very seriously. Can you all promise me that?

14           Ms. Wigler, you live on the Upper West

15   Side; is that correct?

16           PROSPECTIVE JUROR:  Uh-huh.

17           MR. BERLAND:  You had a friend that he or

18   she passed away from a cocaine overdose; is that

19   correct?

20           PROSPECTIVE JUROR:  Yes.

21           MR. BERLAND:  And in this case, Mr. Green

22   is accused of the possession of a fairly large

23   amount of cocaine.  The evidence will come

24   primarily from police officers.  Knowing that, can

25   you be a fair juror in this case?

VOIR DIRE

1   PROSPECTIVE JUROR:  You know, I've never

2   done this before.  So I am trying to speak from my

3   heart and be fair, and I do believe in this

4   process, the fact that my friend was killed from

5   this substance -- the substance didn't kill him,

6   he chose that. I am trying to keep my mind as open

7   as I humanly can and I believe I can be fair.  He

8   was very, very dear to me, and I hear -- I can't

9   see that being a problem, but I thought it was

10  worth mentioning because of how close I was to

11  this person and how this substance and my friend's

12  use of the substance destroyed so many lives. I

13  don't know if that is helpful. I'm trying to be

14  honest.

15  MR. KEITH:  For everyone, just let it

16  out.  We're not here to judge you.  Mr. Green is

17  accused and I'm trying to give him a fair trial.

18  PROSPECTIVE JUROR:  I want the exact same

19  thing.

20  MR. KEITH:  I have another question I

21  have to ask you. Your husband is a rabbi.  Take a

22  look at Mr. Green.  He's wearing a keffiyeh, and

23  that may suggest certain things. Do you think that

24  might be a problem?

25  PROSPECTIVE JUROR:  I think the fact that

VOIR DIRE

1    I work at MTV and my husband is a rabbi evens out

2    my husband's rabbiness.

3              MR. KEITH:  Ms. Steinberger, again, you

4    had a friend who also met an untimely death.  I

5    would imagine due to cocaine abuse?

6              PROSPECTIVE JUROR:  She was severely

7    impaired thereafter.

8              MR. KEITH:  Sorry.  I have my notes

9    wrong. In any event, she's ill.  Will that fact

10   prevent you from being a juror in this case?

11             PROSPECTIVE JUROR:  You know, I don't

12   think so, but I don't know.

13             MR. KEITH:  You're going to hear

14   testimony from police officers and in the end, you

15   will be asked to evaluate the testimony, and then

16   the Judge will instruct you on the law.  Actually,

17   it will happen the other way around.  The Judge

18   will instruct you on the law and then you will be

19   asked to evaluate the testimony and apply it to

20   the law. If I'm understanding you correctly,

21   you're not really sure --

22             PROSPECTIVE JUROR:  It's sometimes

23   difficult to separate what's happened to you

24   personally.

25             MR. KEITH:  That's honest and straight.

─── VOIR DIRE ───

1      THE COURT:  How do you think that will

2   play out, to use a bad phrase, in this situation?

3   Sometimes you can't separate objectivity from

4   personal involvement?  I understand that you've

5   never done it before.  How does that factor as you

6   know yourself, how do you anticipate that will

7   affect your ability to be an appropriate juror?

8      PROSPECTIVE JUROR:  I think it may be

9   difficult.

10      THE COURT:  Nobody says this is an easy

11   process. When you say "it may be difficult," does

12   that mean a difficulty you can overcome or a

13   difficulty that you are fearful that you will be

14   unable to overcome?

15      PROSPECTIVE JUROR:  A difficulty I may be

16   fearful.

17      THE COURT:  Thank you.  You're excused.

18      MR. KEITH:  Mr. Higgins, you have friends

19   that are police officers, Bronx Task Force and

20   officers that are involved in precincts that are

21   close to the area where this incident happened.

22   You know that better than I. Can you give

23   Mr. Green a fair trial knowing that you will hear

24   testimony from other police officers from that

25   area?

VOIR DIRE

1          PROSPECTIVE JUROR:  If I don't know the

2     officers, yes.

3          THE COURT:  You don't know them. We'll

4     make sure of that right now.

5          MR. BERLAND:  Detective Alfred Hernandez

6     and Anthony Romero.

7          MR. KEITH:  Those names don't ring a

8     bell?

9          PROSPECTIVE JUROR:  No.

10          MR. KEITH:  Mr. Higgins, what I've heard

11     is if you had known the officers, your inclination

12     would be to accept what they say probably to the

13     detriment of Mr. Green?

14          PROSPECTIVE JUROR:  Yes.

15          MR. KEITH:  Do you agree with me that

16     there is a huge police force, approximately 40,000

17     police officers, there will be different types of

18     police officers, correct?

19          PROSPECTIVE JUROR:  Yes.

20          MR. KEITH:  And do you think you can be

21     fair to Mr. Green and evaluate what you hear in

22     this courtroom, despite your friendship with other

23     police officers?

24          PROSPECTIVE JUROR:  Like I said, if I

25     don't know, I don't care.

═══VOIR DIRE═══

1        MR. KEITH:  Mr. Sargenti, you have a

2    friend who is a police officer in a small town.

3    That shouldn't affect you in this case?

4        PROSPECTIVE JUROR:  No.

5        MR. KEITH:  You will give Mr. Green a

6    fair trial?

7        PROSPECTIVE JUROR:  Yes.

8        THE COURT:  Few more minutes.

9        MR. KEITH:  A number of you stated that

10   you believe you can follow the law.  I know that

11   may be a figure of speech, but I want you to

12   promise me that if you are selected, that you will

13   unequivocally follow the legal instructions that

14   Justice McLaughlin gives you. Can each of you

15   promise me that if you are selected, whatever

16   preconceptions you may have about the law,

17   whatever you think is right or wrong, try to push

18   that aside and follow the instructions that he

19   gives you with regard to the definition of

20   possession, that's dominion and control?  Those

21   are the issues in the case.  I want you to follow

22   the legal definitions that he gives you despite

23   what you may think.  Can you do that?

24        Is it Mr. Rojas?  No.  What's your name?

25        PROSPECTIVE JUROR:  Mr. Leon.

═══VOIR DIRE═══

1         MR. KEITH:  Mr. Leon, I didn't you see

2  you nod.  Do you have a problem with that concept?

3         PROSPECTIVE JUROR:  No.

4         MR. KEITH:  You will follow the Judge's

5  instructions on the law?

6         PROSPECTIVE JUROR:  Yes.

7         MR. KEITH:  Anybody has any reservation

8  about that?  Mr. Keister, you were one of the

9  people that said you believe you could be

10  impartial. Do you promise me that you will?

11        PROSPECTIVE JUROR:  Yes.

12        MR. KEITH:  Mr. Davar, you indicated that

13  you do believe you will follow the law, and after

14  hearing my gibberish, can you promise me that you

15  will?

16        PROSPECTIVE JUROR:  Yes.

17        MR. KEITH:  To the many of you that have

18  been victims of crime or know people who have been

19  victims of criminal activity, can you all promise

20  me that that incident, hopefully, will not have an

21  effect on the decision you make in this case?

22  This is a very narrow possession issue.  You're

23  not going to try to get revenge on Mr. Green?  Can

24  you promise me that?  Can everyone give me a

25  little nod?

═══YVETTE PACHECO  SENIOR COURT REPORTER═══

===VOIR DIRE===

1    THE COURT:  Or big nod?  Big nods are

2    good also.  Anything else?

3        MR. KEITH:  No, Your Honor.

4        THE COURT:  Please step out.  We'll have

5    you back shortly. Everybody step out.

6        (Prospective jurors exit.)

7        THE COURT:  First six, any cause by the

8    People?

9        MR. BERLAND:  Just to jump to number

10   four. I think she said she was the victim of a

11   burglary and not happy with the way the police

12   handled the situation and wasn't sure she could

13   keep an open mind. Pretty similar to the response

14   given by Ms. Steinberg.

15       MR. KEITH:  Cause challenge.

16       MR. BERLAND:  Cause for seat number four.

17       THE COURT:  Anything you want to say?

18       MR. KEITH:  No.

19       THE COURT:  Anybody's silent promise that

20   we'll do this round?  She's excused for cause.

21       Any other cause challenges on the first

22   six seats?

23       MR. BERLAND:  No.

24       THE COURT:  Cause challenges by the

25   defense.

===YVETTE PACHECO  SENIOR COURT REPORTER===

=VOIR DIRE=

1              MR. KEITH:  No, Your Honor.

2              THE COURT:  Peremptories by the People,

3   if any.

4              MR. BERLAND:  Just Cabrera, seat one.

5              THE COURT:  Mr. Keith, Mr. Green ask.

6              MR. KEITH:  Your Honor, the defense

7   exercises challenges as to Ms. Steinberg,

8   Ms. Wigler and Ms. --

9              THE COURT:  I know you don't want Wigler.

10  And you do or don't want Wardrop?

11             MR. KEITH:  Do not.

12             THE COURT:  But you do want Davar?

13             MR. KEITH:  Yes.

14             THE COURT:  Steinberg doesn't exist.

15             MR. KEITH:  Right, we caused her out

16  already.

17             THE COURT:  Davar becomes juror eight.

18             Next four, any cause by the People?

19             MR. BERLAND:  Number seven for cause.  I

20  really had -- language difficulties.

21             THE COURT:  What did she have to say?

22             MR. BERLAND:  Had a lot of trouble

23  understanding her.

24             THE COURT:  Oh, the -- yeah, yeah, yeah.

25             Bye-bye.  That would be granted.

=YVETTE PACHECO  SENIOR COURT REPORTER=

═══VOIR DIRE═══

1          Any cause by the defense on the remaining
2     three of that set of four?
3          MR. KEITH:  Well, no.
4          THE COURT:  People's position,
5     peremptorily.
6          MR. BERLAND:  Just number nine,
7     Mr. Akbar.
8          THE COURT:  Defense, what's your position
9     on Wah and Ward?
10         MR. KEITH:  Your Honor, we challenge
11    juror number eight, Mr. Wah.  And Mr. Akbar will
12    be juror number nine. Are we deciding on Wolffson?
13         THE COURT:  I have made my decision. What
14    is your decision?  Yes, Ward is to be the
15    concluding person in this round. When you say
16    "have we made a decision," some of you have.  You
17    are excusing her?
18         MR. KEITH:  Yes.
19         THE COURT:  We seem to be stuck at eight.
20         Next four, any cause by the People?
21         MR. BERLAND:  No.
22         MR. KEITH:  Was Akbar challenged?
23         MR. BERLAND:  Yes.
24         MR. KEITH:  How many challenges do I have
25    left?

═══YVETTE PACHECO  SENIOR COURT REPORTER═══

184

VOIR DIRE

1      THE COURT:  Eight.  On the next four, any
2  cause by the People?
3      MR. BERLAND:  No cause.
4      THE COURT:  Any cause by the defense?
5      MR. KEITH:  None for cause.
6      THE COURT:  The People's position
7  peremptorily?
8      MR. BERLAND:  Number 13, Gibson.
9      THE COURT:  What's the defense' position
10  on Paulson and Leon?
11      MR. KEITH:  Ms. Paulson is juror number
12  nine.  And we eliminate.
13      THE COURT:  What do you mean by
14  "eliminate"?
15      MR. KEITH:  Challenge.  We challenge
16  Mr. Leon.
17      THE COURT:  On the next three, any cause
18  by the People?
19      MR. BERLAND:  No.
20      THE COURT:  Any cause by the defense.
21      MR. KEITH:  None for cause.
22      THE COURT:  People's position
23  peremptorily?
24      MR. BERLAND:  15, Sargenti and 17, Rojas.
25      THE COURT:  What's your position on

VOIR DIRE

1        Mr. Higgins?

2                MR. KEITH:  We challenge Mr. Higgins.

3                THE COURT:  On the next three.  This

4        doesn't boat well.  Any cause by the People?

5                MR. BERLAND:  No.

6                THE COURT:  Cause by the defense.

7        Jenkins, Keister and O'Connor.

8                MR. KEITH:  No cause, Your Honor.

9                THE COURT:  People's position

10       peremptorily.

11               MR. KEITH:  Just number 18.

12               THE COURT:  Peremptories with respect to

13       Keister and O'Connor.

14               MR. KEITH:  Keister will be able to sit

15       through us.  Juror number ten.  Ms. O'Connor we

16       challenge.

17               THE COURT:  So we have ten.  Bring in the

18       folks and we get to do this again.

19               COURT OFFICER:  Panel entering.

20               THE CLERK:  Following jurors are to

21       remain seated. If I do not call your name, report

22       back to the room 1517.

23               Ushtavaity Davar, Shannon Paulson an

24       Donald Keister.  If you heard your name remain

25       seated.  If not, you are excused.

YVETTE PACHECO  SENIOR COURT REPORTER

VOIR DIRE

1        Are the remaining jurors satisfactory to
2    the People?
3             MR. BERLAND:  Yes.
4             THE CLERK:  To the defense?
5             MR. KEITH:  Absolutely.
6             THE COURT:  Stand up and take the oath.
7             THE CLERK:  Raise your right hand.
8             (Jurors sworn.)
9             JURORS:  Yes.
10            THE COURT:  You heard me say to the first
11    group that we'd start at 9:45.  To you, I'm going
12    to say we'll start at 10:30.  Not just when you
13    have to be here, but that we try to treat people
14    as adults. I didn't tell you to come in at 9:45.
15    Be here at 10:30 and we'll have the rest of the
16    jury, because we'll spend more time today and more
17    time tomorrow. Go with him. See you about 10:30
18    tomorrow.
19            Fill the box with 15 people.
20            THE CLERK:  Harold Sullivan, number one.
21    Elijha Smalls, seat number two. Richard Brea, seat
22    number three.  Iowa Wachtel, seat number four.
23    Fabian Leglet, seat number five.  Wendy Wolffson,
24    seat number six. David Bienenstock, seat number
25    seven. Daniel Lavecchia number eight.  Sydney

════════════════════════ VOIR DIRE ════════════════════════

1    Moskowitz, seat number nine.  Christopher Theokas,

2    seat number ten.  Stuart Friedman, seat number 11.

3    David /KHUPL, seat number 12.  Katelyn Moses, seat

4    number 13.  Louis Bernstein, seat number 14.

5    Raymond Gandol, seat number 15.  Saralee

6    Smithwick, seat number 16.

7              THE COURT:  I implore you that if there

8    is a problem, mention it right away.

9              Mr. Sullivan.

10             PROSPECTIVE JUROR:  There is a problem.  I

11   am political science chair at John Jay College of

12   Criminal Justice.  I have fairly strong views

13   about the New York drug laws.

14             THE COURT:  The New York drug laws.  The

15   revised, recently revised?

16             PROSPECTIVE JUROR:  I don't think you

17   want me to get into details.

18             THE COURT:  True.  So you're excused.

19   Have a nice day.

20             Fill seat number one.

21             THE CLERK:  Linda Hirsh, seat number one.

22             THE COURT:  Go ahead, Ms. Hirsh.

23             PROSPECTIVE JUROR:  I live in New York.

24   Lived here all my life. No relatives in New York

25   City.  I am single.  I'm working.  I work as an

═══════════ YVETTE PACHECO  SENIOR COURT REPORTER ═══════════

════════════VOIR DIRE════════════

1    office worker.

2              THE COURT:  How long have you been at

3    that place?

4              PROSPECTIVE JUROR:  Twenty-six years.

5              THE COURT:  Continue.

6              PROSPECTIVE JUROR:  I have no children

7    I'm a college graduate.  I have served on a civil

8    and criminal jury.

9              THE COURT:  What was the charge, not the

10   verdict in the criminal case?

11             PROSPECTIVE JUROR:  One was a drug case

12   and it was solved out of court.

13             THE COURT:  You sat on one other criminal

14   case?

15             PROSPECTIVE JUROR:  One criminal, one

16   civil.

17             THE COURT:  Continue.

18             PROSPECTIVE JUROR:  I never served on a

19   Grand Jury.  Never been in the military. I don't

20   have any relatives employed by law enforcement

21   agency.  I have been the victim of a crime.  I was

22   mugged.

23             THE COURT:  Were you hurt?

24             PROSPECTIVE JUROR:  No.

25             THE COURT:  Did you report it to the

═══════════YVETTE PACHECO  SENIOR COURT REPORTER═══════════

1    police?

2           PROSPECTIVE JUROR:  Yes.

3           THE COURT:  Was anybody arrested?

4           PROSPECTIVE JUROR:  No.

5           THE COURT:  Continue.

6           PROSPECTIVE JUROR:  I haven't been a

7    party to a civil lawsuit.  Yes, I would be fair

8    and impartial.  I live in Inwood.

9           THE COURT:  Anything else?

10          PROSPECTIVE JUROR:  No.

11          THE COURT:  Mr. Smalls.

12          PROSPECTIVE JUROR:  Born in Harlem

13   Hospital.  Lived in New York City all my life, 36

14   years.  I have, maybe, 20 relatives, 25 relatives

15   in New York City. Not married, but a spouse for 15

16   years. I'm work working as a facilities

17   coordinator, a super.

18          THE COURT:  Residence?

19          PROSPECTIVE JUROR:  Residential building.

20   I do have three stepchildren, 21, 19, and 15.

21          THE COURT:  Do you speak to them about

22   drugs?

23          PROSPECTIVE JUROR:  Yes, sir, but they

24   are in college.  Some college.  I haven't served

25   on any jury whatsoever. I have not been in the

—VOIR DIRE—

1    military. No friends in the police department.

2    No, I have no friends who have been a victim of a

3    crime.  No civil lawsuits. Yes, I could be fair

4    and impartial.  I live in a section in Manhattan.

5    My spouse works for a lawyer.

6             THE COURT:  Thank you.

7             Mr. Brea.

8             PROSPECTIVE JUROR:  Born in New York.

9    I've been here for 26 years.  About 15 to 20

10   relatives live in New York City.  Not married.

11   Currently work at a law firm as a litigation

12   analyst.  I assist lawyers with collections,

13   assist them in court as well.

14            THE COURT:  How long have you been doing

15   that?

16            PROSPECTIVE JUROR:  Three years.

17            THE COURT:  Continue.

18            PROSPECTIVE JUROR:  I have no children.

19   Educational background, college degree.  I served

20   once in civil court.

21            THE COURT:  Were you asked to decide it

22   or was it settled?

23            PROSPECTIVE JUROR:  Asked to decide.

24            THE COURT:  The rules are different in

25   criminal.

═══VOIR DIRE═══

1  PROSPECTIVE JUROR:  I have not served in

2  the Grand Jury.  Not been in the military.  I do

3  have friends who are police and correction

4  officers.

5  THE COURT:  The police officer, what does

6  he or she do?

7  PROSPECTIVE JUROR:  Patrolling the

8  streets.

9  THE COURT:  How long?

10  PROSPECTIVE JUROR:  Two years.

11  THE COURT:  Do you know anybody who

12  specifically deals with drug enforcement?

13  PROSPECTIVE JUROR:  No. I have not had

14  any relatives or friends a victim of a crime.

15  Never been in a civil lawsuit. Yes, I would be

16  fair and impartial.  Live in Washington Heights.

17  THE COURT:  Anything else?

18  PROSPECTIVE JUROR:  No.

19  THE COURT:  Mr. Wachtel.

20  PROSPECTIVE JUROR:  I'm retired and I do

21  volunteer work for an organization called Getting

22  Out and Staying Out, and I advise and counsel

23  young men at Riker's Island and who have recently

24  gotten out and try career counseling.

25  THE COURT:  How do you think you are able

═VOIR DIRE═

1    to do this?

2              PROSPECTIVE JUROR:  I'm eminently able to

3    do this.  I have had previous experience on a

4    criminal jury. It was a drug-related case.  The

5    accused was and maybe still is a chemist who was

6    accused of being part of a drug deal outside of

7    New York, but the New York City Police Department

8    was involved, the Boston Police Department and the

9    Federal Drug Enforcement.

10             I was born in New York except for a

11   period of four years when I lived in Long Island,

12   I've been a resident of New York for 74 years. I

13   have two children living in New York, two

14   grandchildren living in New York.  I'm married and

15   I'm retired.

16             THE COURT:  What did you do when you were

17   working?

18             PROSPECTIVE JUROR:  I was a corporate

19   officer for a national exhibit company that did

20   exhibits and displays. After that, I opened a

21   small chain of video rental stores.  My spouse is

22   self-employed at a women's clothing design. I'm

23   college educated.  I've never served in the

24   military.  As I said, I've been on both criminal

25   and never been on a Grand Jury, and I had an uncle

———————VOIR DIRE———————

1    who was retired from the New York City Police

2    Department and since, deceased.  I've been the

3    victim of burglaries in New York.  No one was ever

4    apprehended.  Yes, I would be able to follow the

5    Court's instructions based on what I heard so far

6    and my life experience.  I live on the East Side

7    of Manhattan, in the Sutton area.

8              THE COURT:  Anything else we should know?

9              PROSPECTIVE JUROR:  That's about it.

10   That's my life story.

11             THE COURT:  Ms. Leglet.

12             PROSPECTIVE JUROR:  I was born in France.

13   I been living in New York for over ten years

14   and 15 years outside of New York and 15 years ago

15   again here.  I live with my husband and two

16   children in New York.  I'm married. I'm not

17   working for the moment.

18             THE COURT:  What kind of work do you do?

19             PROSPECTIVE JUROR:  I'm a gemologist.  I

20   serve once on a civil, I think, I don't remember,

21   but the case was settled before we went to trial.

22   No Grand Jury.  I don't have any friend in law

23   enforcement.  No victim.  I have never been party

24   to a lawsuit.

25             THE COURT:  You can follow the law here?

═══ VOIR DIRE ═══

1        PROSPECTIVE JUROR:  Yes.

2        THE COURT:  And be fair?

3        PROSPECTIVE JUROR:  Yes.

4        THE COURT:  That's all that we ask. What

5   neighborhood do you live in?

6        PROSPECTIVE JUROR:  Upper East Side.

7        THE COURT:  Ms. Wolffson.

8        PROSPECTIVE JUROR:  Born in New York City

9   and living here for the past 18 years.  One

10   relative here as well. I'm not married.  I'm

11   recently retired.  I was a teacher, and yes, I

12   spoke to my teenage students about drugs.  I'm not

13   married.  I don't have any children.  I have a

14   Master's in special education. I haven't served on

15   a civil jury, but I served on criminal jury, and

16   the case was about drugs.

17        THE COURT:  You decided it?

18        PROSPECTIVE JUROR:  Yes.

19        THE COURT:  Did anybody speak to you

20   afterwards?

21        PROSPECTIVE JUROR:  No.  I haven't been

22   on the Grand Jury. I haven't served in the

23   military.  Nobody I know is employed by a law

24   enforcement agency.  I have been a victim of a

25   couple of burglaries to my old apartment in

─── YVETTE PACHECO  SENIOR COURT REPORTER ───

========================= VOIR DIRE =========================

1     Yonkers. My cousin was also robbed.  A friend of

2     mine was held up at gunpoint, but everything was

3     okay, fortunately.  I've never been involved in a

4     lawsuit. I certainly could follow the law.  I live

5     in Hells Kitchen.

6                 THE COURT:  Anything else we should know?

7                 PROSPECTIVE JUROR:  No.

8                 THE COURT:  Next, please.

9                 PROSPECTIVE JUROR:  Born in Rahway, New

10    Jersey.  Lived in New York for six years. I have 2

11    second cousins who live in New York. I am not

12    married.  I'm a journalist.

13                THE COURT:  What does that mean, what

14    sort of publication?

15                PROSPECTIVE JUROR:  National magazine.

16                THE COURT:  What field or two or three

17    most common subjects matters do you write about?

18                PROSPECTIVE JUROR:  Canvass advocacy.

19                THE COURT:  How do you feel about

20    cocaine?

21                PROSPECTIVE JUROR:  The laws?

22                THE COURT:  No, the spelling of it.

23                PROSPECTIVE JUROR:  I think it's a

24    dangerous substance, but I think some of the laws

25    are problematic.

========== YVETTE PACHECO  SENIOR COURT REPORTER ==========

VOIR DIRE

1      THE COURT:  Can you follow whatever the
2  law turns out to be?
3      PROSPECTIVE JUROR:  Yes.
4      THE COURT:  Continue.
5      PROSPECTIVE JUROR:  No children.  I have
6  a college degree. I never served on a jury.  I
7  have never been in the military.  I don't have any
8  friends in law enforcement.  I've never been the
9  victim of a crime.  I have never been involved in
10  a civil lawsuit.  I can follow the law, and I live
11  in Manhattan.
12      THE COURT:  Anything else?
13      PROSPECTIVE JUROR:  No.
14      THE COURT:  Mr. Lavecchia.
15      PROSPECTIVE JUROR:  Seven years ago, 650
16  of my employees, colleagues and friends were
17  murdered this week on September 11th.
18      THE COURT:  Can you focus on this case or
19  not?
20      PROSPECTIVE JUROR:  Not a chance.
21      THE COURT:  You're excused.
22      Fill seat number eight.
23      THE CLERK:  John Shafa, seat number
24  eight.
25      THE COURT:  Go ahead, sir.

VOIR DIRE

1   PROSPECTIVE JUROR:  Born in Taiwan. I've

2   been living in New York for about three years. I

3   have one relative in the city.  Not married.  I

4   work in -- I filled in at JP Morgan Chase.  Not

5   married.  No children.  I have a college degree.

6   I've served on a civil jury.  Never served in the

7   Grand Jury.  I haven't served in the military. I

8   have a friend in law enforcement?

9        THE COURT:  What does that person do?

10       PROSPECTIVE JUROR:  He is in toxicology,

11  also.  I have a relative who is a victim of a

12  crime.  My aunt was mugged about 20 years ago and

13  she had a broken arm, but I don't think anybody

14  was apprehended.  I'm not sure -- I have been in a

15  car accident and there was a lawsuit that came out

16  of it.  I can be fair and impartial.  I live on

17  the Lower East Side.

18       THE COURT:  Ms. Smithwick.

19       PROSPECTIVE JUROR:  I was born in

20  Charleston, South Carolina.  I lived in New York

21  for 29 years.  I'm the only one in my family here.

22  Divorced.  Working.

23       THE COURT:  Doing what?

24       PROSPECTIVE JUROR:  Wholesale

25  accessories.  I have no children.  College

YVETTE PACHECO  SENIOR COURT REPORTER

VOIR DIRE

1  graduate.  I have never served on a jury or grand

2  or criminal.  I have never served on the military.

3  I have no friends in the FBI or law enforcement.

4  There was an armed robbery in my office in '94.

5        THE COURT:  Were you there?

6        PROSPECTIVE JUROR:  Yes.

7        THE COURT:  Did you see the guns?

8        PROSPECTIVE JUROR:  Yes.

9        THE COURT:  Pointed at you?

10        PROSPECTIVE JUROR:  Yes.

11        THE COURT:  Interviewed by the police?

12        PROSPECTIVE JUROR:  Yes.

13        THE COURT:  Anybody during the robbery

14  hurt?

15        PROSPECTIVE JUROR:  Minor.

16        THE COURT:  Continue.

17        PROSPECTIVE JUROR:  I have never been a

18  party of a civil lawsuit.  I think I could judge

19  the law impartially.

20        THE COURT:  When you say you think, is

21  that a close call or just phraseology?

22        PROSPECTIVE JUROR:  Just phraseology.

23        THE COURT:  Anything else?

24        PROSPECTIVE JUROR:  I live on the Lower

25  East Side.

VOIR DIRE

1      THE COURT:  Anything else?

2      PROSPECTIVE JUROR:  No.

3      PROSPECTIVE JUROR:  I was born in Sicily.

4  Live in New York City 15 years.  No relatives in

5  New York. I'm working for Albert Einstein College

6  of medicine, Shubert University.  I have no

7  children.  I'm college graduate.  Never in a civil

8  or criminal Grand Jury.  Never been in the

9  military.  No family or relatives employed by a

10  law enforcement agency.  No close relatives or

11  friends victim of a crime.  I haven't been in a

12  civil lawsuit.  I can be fair and impartial.  I

13  live in midtown.

14      THE COURT:  Is there anything else we

15  should know?

16      PROSPECTIVE JUROR:  No.

17      THE COURT:  Mr. Bernstein.

18      PROSPECTIVE JUROR:  Born in Glen Cove,

19  Nassau County.  Lived in New York City for a

20  little over 32 years.  Other than my immediate

21  family, no other relatives in New York City. I'm

22  married.  I'm retired from the position of

23  in-house lawyer at a large pharmaceutical company

24  for 30 years and in the interim, CEO of a small

25  company. I am at the moment not working.  Looking

YVETTE PACHECO  SENIOR COURT REPORTER

VOIR DIRE

1   to do that.  My spouse is a professor and program

2   executive director.  Three children, 22, 20 and

3   16, and have had conversations about drugs.  I

4   have a law degree.  I have served on criminal jury

5   that went to verdict about possession.  It was

6   possession with intent to distribute a certain

7   quantity of heroin.  Never served on a Grand Jury.

8   Never served in the military. I have a friend who,

9   years before I met him, had been an undercover

10  narcotics detective here in New York City.  He's

11  retired from that position before I met him. I

12  have several college and law school friends who

13  were assistant U.S. attorneys.

14          THE COURT:  Ever watch any of the

15  prosecutor's do their thing in the courtroom?

16          PROSPECTIVE JUROR:  Other than as a juror

17  in that case and observed a couple of other cases,

18  no, and never them personally.

19          THE COURT:  Your friend, the former

20  undercover cop, first name wasn't Frank?

21          PROSPECTIVE JUROR:  Correct.

22          THE COURT:  Continue.

23          PROSPECTIVE JUROR:  Relatives and friends

24  have been victims of various crimes, nobody

25  injured in any of them.  We had a car broken into.

═ VOIR DIRE ═

1    My mother had her purse snatched by someone who

2    ran away. A friend of mine was mugged in Central

3    Park. I think a watch was stolen.  My grandmother

4    who had a home health person, things were found

5    missing from her apartment.  She had people come

6    up she didn't know and distracted her and cleaned

7    out her drawers.  I have been a party to a civil

8    suit.  Once as a plaintiff, once as a defendant.

9    Was sued by a rival many years go.  Was resolved

10   outside of court.  My wife and I were involved in

11   a medical malpractice suit that we really haven't

12   pursued about 18 years ago.  I can be fair and

13   impartial.  I live on the Upper East Side.

14            THE COURT:  I know everybody is having a

15   good time. I know you are curious when this ends.

16   Because of the budget situation, we're ending

17   about now. In the better times, we'd go until we

18   finish this. These aren't the better times.

19            You heard me give the schedules of 9:45

20   to some and 10:30 to others.  I need you folks

21   here by 9:45. We need to finish this to get back

22   on track.

23            This is New York City.  This is

24   Manhattan. The weather seems to be okay. The

25   transit system, you never know what is going to

═ YVETTE PACHECO  SENIOR COURT REPORTER ═

1   happen.  Allow for all the contingencies.  Be here

2   by 9:45.  Have a nice evening.

3        If you happen to see any of us in and

4   around your neighborhood, the buildings, crossing

5   streets, you can't talk to us.  Do not smile at

6   us.  We cannot have any interactions with you.

7   Have a nice evening.

8        Your obligation is to this place.  Do not

9   go to the central jury room.  Outside the corridor

10  by 9:45.  We'll bring you in.

11

12

13       (CONTINUED ON NEXT PAGE.)

14

15

16

17

18

19

20

21

22

23

24

25

1    SUPREME COURT OF THE STATE OF NEW YORK.
       COUNTY OF NEW YORK          PART-93

2

3    THE PEOPLE OF THE STATE OF NEW YORK

4
                  -against-

5                         HEARING

6

7    EDWARD GREEN,
                      Defendant

8                    September 10, 2008

9

10   B E F O R E:  HONORABLE E. MCLAUGHLIN, JSC

11           (Appearances as previously mentioned.)
    --------------------------------------------------------

12          COURT OFFICER:  Panel entering.

13          THE COURT:  Well, we do what we can.

14   Somebody's watch is broken.  Somebody doesn't

15   believe what we're talking about.

16          So we're going to start with Ms. Moses.

17   Don't tell me you need the questionnaire.  You

18   don't remember the questions from yesterday.

19          PROSPECTIVE JUROR:  Some of them.

20          THE COURT:  How far did you get in

21   school?

22          PROSPECTIVE JUROR:  I have an

23   undergraduate degree.  I was born in Brooklyn.  I

24   lived in New York City for about 20 years. I have

25   about 12 relatives in New York City. I'm not

1    married.  I work for a nonprofit organization that

2    provides services for children with medical

3    challenges.  I do not have any children.  I have

4    an undergraduate degree.  I never served on a

5    jury, civil, criminal or grand.  I never served in

6    the military.  I do have a friend who is a police

7    officer.  He does work covering narcotics in Coney

8    Island, Brooklyn. I also do have a friend who is a

9    corrections officer on Riker's Island.

10        THE COURT:  The officer in Brooklyn who

11   does narcotics, do you know whether the person

12   works in plainclothes or uniform and do you know

13   more specifically what kind of assignment that

14   person has?

15        PROSPECTIVE JUROR:  I'm not hundred

16   percent sure. He just recently, I'd say in the

17   last year, was put on that beat.  I believe he

18   wears a uniform, but he might wear plainclothes.

19   Not sure.  I do not have any close -- I'm sorry.

20   Close friends, and I have personally been a victim

21   of petty crime.  A purse was stolen and my credit

22   credits were used.  I have never been a party to a

23   civil lawsuit or in court for any other reason.  I

24   think that I can be fair and impartial.

25        THE COURT:  When you use the word

PROCEEDINGS

1  "think," is that a close call after a long and
2  argues debate or phraseology?
3        PROSPECTIVE JUROR:  Phraseology. I live
4  on the Upper East Side.
5        THE COURT:  Anything else?
6        PROSPECTIVE JUROR:  Nope.
7        THE COURT:  Mr. Small.
8        PROSPECTIVE JUROR:  I was born in New
9  York.  I live here for 30 years.  I have ten
10  relatives in New York City.  Currently, married,
11  work in the hospital.  I do research.  My wife
12  does advertising. I have no children.  I have a
13  graduate degree.  Never served on any civil jury
14  or any Grand Jury.  Never served in the military.
15  I have several close friends in the NYPD.  I have
16  just been employed on the force one or two years,
17  doing street beat.  I have a close friend who is
18  an ADA in the Bronx.
19        THE COURT:  Ever watch him or her in
20  court?
21        PROSPECTIVE JUROR:  No.
22        THE COURT:  He or she talk about drug
23  trials?
24        PROSPECTIVE JUROR:  Most of the stuff
25  he's talked about is possession of drugs.

YVETTE PACHECO  SENIOR COURT REPORTER

PROCEEDINGS

1     THE COURT:   How long has that person had

2   that job?

3     PROSPECTIVE JUROR:   About five years.   I

4   have been a victim of a crime.   Last year I was

5   robbed with my wife on my honeymoon.

6     THE COURT:   Somewhere outside Manhattan I

7   gather.

8     PROSPECTIVE JUROR:   Yeah.

9     THE COURT:   Outside the country.

10     PROSPECTIVE JUROR:   Another country?

11     THE COURT:   Sorry to hear that.

12     PROSPECTIVE JUROR:   Never a party to a

13   lawsuit. I can be fair and impartial.   I live on

14   the Lower East Side.

15     THE COURT:   Anything else?

16     PROSPECTIVE JUROR:   No.

17     THE COURT:   Mr. Friedman.

18     PROSPECTIVE JUROR:   I should start at the

19   end because you are encouraging people if there's

20   something to discuss.

21     THE COURT:   What's the problem?

22     PROSPECTIVE JUROR:   Can I talk in

23   private?

24     THE COURT:   Sure.

25     (Whereupon, a sidebar conference was held

YVETTE PACHECO   SENIOR COURT REPORTER

===PROCEEDINGS===

1     on the record out of the hearing of the jury.)

2                THE COURT:  What do you need to say?

3                PROSPECTIVE JUROR:  I'm in recovery.

4                THE COURT:  Do you think seeing half a

5     kilogram of cocaine is a bad idea?

6                PROSPECTIVE JUROR:  In term of triggering

7     me, no, but I'm recovering from cocaine.

8                THE COURT:  That doesn't bother me.  Do

9     you think you can be fair?

10               PROSPECTIVE JUROR:  Yeah.

11               THE COURT:  When did you solve your

12    problem, within the last couple of years?

13               PROSPECTIVE JUROR:  Within the last

14    couple of years.  About a year and a half ago.

15               THE COURT:  Were you ever arrested?

16               PROSPECTIVE JUROR:  No.

17               THE COURT:  Okay.  If you think you're

18    fine, you can stay.  Thank you.

19               (The bench conference concluded and the

20    proceedings continued in open court as follows:)

21               PROSPECTIVE JUROR:  Native New Yorker

22    for 47 years.  Four relatives in New York City.

23    Not married.  Currently not working 'cause I'm

24    switching careers.

25               THE COURT:  What kind of work?

===YVETTE PACHECO  SENIOR COURT REPORTER===

=PROCEEDINGS=

1          PROSPECTIVE JUROR:  Advertising sales and
2     work with nonprofits in fund raising.  No
3     children.  College.  I have served on a couple of
4     criminal juries before, one of which was for drug
5     possession.
6          THE COURT:  Did you resolve the case?
7          PROSPECTIVE JUROR:  We decided the case.
8          THE COURT:  Did anyone speak with you
9     afterwards?
10          PROSPECTIVE JUROR:  No.
11          THE COURT:  Was that the only verdict you
12     reached or participated in a criminal case?
13          PROSPECTIVE JUROR:  There is a second
14     degree one, but I don't recall what it was.
15          THE COURT:  Continue.
16          PROSPECTIVE JUROR:  Have not served on
17     Grand Jury.  Not served in the military.  No close
18     family or friends -- yes, I mean, I've been the
19     victim of a crime and so has my family.  My car
20     was stolen.
21          THE COURT:  Any violent crime?
22          PROSPECTIVE JUROR:  No.
23          THE COURT:  Continue.
24          PROSPECTIVE JUROR:  Might have been part
25     of a lawsuit in relation to a car accident years

=YVETTE PACHECO  SENIOR COURT REPORTER=

=PROCEEDINGS=

1    ago. Yes, I can be impartial. I live on the Upper

2    East Side.

3              THE COURT:  Anything else.

4              PROSPECTIVE JUROR:  No.

5              THE COURT:  Mr. Theokas.

6              PROSPECTIVE JUROR:  Born in Arkansas.

7    Live in New York five years. No relatives in the

8    city.  Not married.  Copy editor at a medical

9    website. No kids that I'm aware of.  I have a

10   college degree.  Never served on a civil, criminal

11   or Grand Jury.  Never in the military.  No

12   relative or friend in law enforcement.  Two

13   friends victims of crimes.

14             THE COURT:  What sort of crimes.

15             PROSPECTIVE JUROR:  One was a rape.

16   Somebody she knew, but she didn't report it. The

17   other was a theft. Somebody stole her wallet.  She

18   did report that. It was in DC.  The person doing

19   it committed the same crime in Virginia, so the

20   Feds got involved. Never a party to a civil

21   lawsuit.  When my parents divorced, I was in court

22   a lot.  I can be fair and impartial. I live in

23   Harlem.

24             THE COURT:  Have you lived in another

25   State other than New York and Arkansas?

=YVETTE PACHECO  SENIOR COURT REPORTER=

============================ PROCEEDINGS ============================

1          PROSPECTIVE JUROR:  Virginia, Illinois,
2     North Carolina.
3          THE COURT:  Do you have a credit problem?
4          PROSPECTIVE JUROR:  My dad was in the
5     military.
6          THE COURT:  Mr. Moskowitz.
7          PROSPECTIVE JUROR:  Born in the Bronx.
8     Lived in New York City for 44 of my 54 years.
9     Lived in Maine for ten years.  Thirty relatives
10    living in the Metropolitan area.  I'm married.
11    Working. I work for a nonprofit developer of
12    affordable housing.  I am director of property
13    management.  My wife works.  She's the associate
14    of a special needs school in New Jersey.  I have
15    two grown children.  College educated.  I have
16    never served on a jury of any sort.  Never been in
17    the military.  I don't have a relative that works
18    for law enforcement or friends that work for law
19    firm.  My dad was a victim of a crime in 1974.  He
20    was robbed at gunpoint in a grocery store on 73rd
21    and First Avenue.  I have been a party to a civil
22    lawsuit as part of my work in property management
23    over the course of 20 years. I have no problem
24    whatsoever listening -- being fair and impartial.
25    I live on the Lower East Side.

═══ PROCEEDINGS ═══

1       THE COURT:  Anything else we should know?

2       Ms. Hirsh.

3       PROSPECTIVE JUROR:  Can I talk in

4   private?

5       (Whereupon, a sidebar conference was held

6   on the record out of the hearing of the jury.)

7       THE COURT:  Yes.

8       PROSPECTIVE JUROR:  My understanding is

9   that the person in the first seat is a foreperson.

10       THE COURT:  You do not have to worry

11   about that. You're not in the first seat.  Suppose

12   you were, what would be the problem?

13       PROSPECTIVE JUROR:  I'm not a leader.

14       THE COURT:  Foreperson doesn't even have

15   to do anything special.  You're not in any

16   position to be the foreperson.  Automatically it

17   is the foreperson in the first seat.

18       MR. BERLAND:  Can I ask a question?

19       THE COURT:  Yes.

20       MR. BERLAND:  If selected on the jury, at

21   the end of the case you have to be in the back of

22   the jury room deliberating.  Would you feel

23   comfortable giving an opinion when everyone is

24   discussing the evidence?

25       PROSPECTIVE JUROR:  Yeah, I'll give my

PROCEEDINGS

1    opinion.

2              MR. BERLAND:  You'll be open to

3    discussion?

4              PROSPECTIVE JUROR:  Yes.  I don't feel

5    comfortable being in control of people very well.

6              THE COURT:  That's my job.

7              (Whereupon, the sidebar conference

8    concluded and the proceedings continued in open

9    court as follows:)

10             THE COURT:  Anybody arrested, convicted

11   of a crime?

12             Mr. Smalls.  Is it you or somebody you

13   know?

14             PROSPECTIVE JUROR:  Arrested for

15   disorderly conduct in Manhattan.

16             THE COURT:  Did you do community service?

17             PROSPECTIVE JUROR:  They dismissed it.

18   Arrested for possession.

19             THE COURT:  Drug, marijuana?

20             PROSPECTIVE JUROR:  Marijuana.

21             THE COURT:  Somebody else?  Family

22   members.

23             Mr. Hsia.

24             PROSPECTIVE JUROR:  Friends.  Some were

25   incarcerated for smoking pot in public. My

213

PROCEEDINGS

1    brother, I think, went to -- was caught for

2    tearing off meter heads.

3             THE COURT:  Meter heads with money in

4    them?

5             PROSPECTIVE JUROR:  No.  That's all I can

6    remember.

7             THE COURT:  Somebody else prosecuted by

8    the Manhattan district attorney's office now or in

9    the past?

10            Okay, Mr. Berland.

11            MR. BERLAND:  Good morning.  We're now

12   here at day two.  We'll make this quick.

13            Mr. Smalls, I think you said yesterday

14   that you are a superintendent in a residential

15   building?

16            PROSPECTIVE JUROR:  Yes, sir.

17            MR. BERLAND:  Where is that building

18   located?

19            THE COURT:  General area.

20            PROSPECTIVE JUROR:  Lower Manhattan.

21            MR. BERLAND:  You also said that your

22   spouse works in a law firm.

23            PROSPECTIVE JUROR:  Works for a lawyer.

24            MR. BERLAND:  What type of law?

25            PROSPECTIVE JUROR:  Criminal law.

PROCEEDINGS

1              MR. BERLAND:  Is she here in this court

2      often, do you know?

3              PROSPECTIVE JUROR:  I don't know.  Mostly

4      out in Brooklyn.

5              MR. BERLAND:  Now, your brother was

6      convicted of possession.  Do you feel that that

7      would affect you or influence you in any way from

8      serving on this case?

9              PROSPECTIVE JUROR:  No.

10             MR. BERLAND:  How do you feel the police

11     handled the investigation and arrest of your

12     brother?

13             PROSPECTIVE JUROR:  Got caught.  You are

14     presupposing an investigation.

15             MR. BERLAND:  The police were doing their

16     job, made the arrest?

17             PROSPECTIVE JUROR:  Yeah.

18             MR. BERLAND:  Mr. Brea, how are you?

19             PROSPECTIVE JUROR:  How are you doing.

20             MR. BERLAND:  You said you assist lawyers

21     in court. How long have you been doing that?

22             PROSPECTIVE JUROR:  Three years.

23             MR. BERLAND:  What kind of law?  Any

24     criminal law?

25             PROSPECTIVE JUROR:  Not too familiar with

1          that.   Just mainly corporate.

2                    MR. BERLAND:  Ms. Wilson, you're a

3          retired teacher?

4                    PROSPECTIVE JUROR:  Yes.

5                    MR. BERLAND:  Where do you teach?

6                    PROSPECTIVE JUROR:  Lower East Side and

7          Chinatown.

8                    MR. BERLAND:  What age?

9                    PROSPECTIVE JUROR:  I taught children

10         from kindergarten to high school.  I'm

11         hearing-related service provider.

12                   MR. BERLAND:  Same kids?

13                   PROSPECTIVE JUROR:  The Little Red

14         Schoolhouse.

15                   THE COURT:  For 13 years?

16                   PROSPECTIVE JUROR:  Yeah. I'm a

17         hearing-related service teacher. I taught students

18         with hearing impairments.

19                   MR. BERLAND:  How long have you been

20         retired?

21                   PROSPECTIVE JUROR:  Just since June.

22                   MR. BERLAND:  Enjoying yourself?

23                   PROSPECTIVE JUROR:  I am so far.

24                   MR. BERLAND:  Mr. Theokas, you live in

25         Harlem.  Do you live within a three- or four-block

PROCEEDINGS

1   radius from 132nd Street?

2       PROSPECTIVE JUROR:  Maybe five, six

3   blocks.

4       MR. BERLAND:  Would that affect your

5   ability to sit on this case?

6       MR. BERLAND:  Mr. Sullivan, who was

7   sitting in the box yesterday was excused because

8   he said he had a problem with the New York drug

9   laws and could not sit on the case.  I want to

10  know if there's anyone else who feels that way.

11      I ask you Mr. Bienenstock, I know

12  yesterday you said that you had some problems with

13  the law, however you think you can put that aside,

14  listen to the Judge's instructions and be fair and

15  impartial to both sides; is that correct?

16      PROSPECTIVE JUROR:  Yes.

17      MR. BERLAND:  Are you sure?

18      PROSPECTIVE JUROR:  Yes.

19      MR. BERLAND:  Anyone else feel like

20  Mr. Sullivan did yesterday?  Again, this is a drug

21  possession case with a large amount of cocaine

22  recovered.

23      MR. BERLAND:  Thank you.

24      THE COURT:  Mr. Keith.

25      MR. KEITH:  I always feel compelled to

—PROCEEDINGS—

1    reintroduce myself.  My name is Arnold Keith.

2              Have all of you heard the previous

3    questions that were asked of the other groups of

4    jurors?  Everybody else did, all right.

5              I will start with you, Mr. Smalls. You

6    work as a superintendent in a residential

7    building; is that correct?

8              PROSPECTIVE JUROR:  Yes, sir.

9              MR. KEITH:  What type of duties do you

10   have?

11             PROSPECTIVE JUROR:  For the most part, I

12   make sure the handymen oversee their work, oversee

13   the porter's work.  I make sure the building is

14   clean.  Right now, the building is under

15   construction.  I deal with a lot of contractors

16   who are constantly out of the building; plumbing,

17   bricking.  You name it, I basically do it.

18             MR. KEITH:  Do you have occasion to be in

19   a resident's apartment to repair something?

20             PROSPECTIVE JUROR:  Yes, sir, all the

21   time.

22             MR. KEITH:  Are you sometimes in a

23   person's apartment alone?

24             PROSPECTIVE JUROR:  Yes, sir, all the

25   time.

PROCEEDINGS

1        MR. KEITH:  Your wife works for a

2   criminal lawyer.  Do you ever talk with her --

3        THE COURT:  I hate that expression. It's

4   a lawyer that practices criminal law, rather than

5   a criminal lawyer.

6        MR. KEITH:  That sounds better.

7        A lawyer that practices criminal law.

8   Does she ever talk to you about her work in the

9   criminal process?

10        PROSPECTIVE JUROR:  Yes, sir, sometimes.

11        MR. KEITH:  Mr. Smalls, can you promise

12   me that if you are selected on this jury, that

13   whatever law you've learned from her or from TV or

14   from anywhere else, I am asking you to try your

15   best to suppress it, and will you follow the law

16   that this gentleman gives you?

17        PROSPECTIVE JUROR:  Yes, sir.

18        MR. KEITH:  Even if it's different than

19   what you've learned, the law he gives, that's the

20   law I want you to follow.  Can you do that?

21        PROSPECTIVE JUROR:  Yes.

22        MR. KEITH:  Can we all promise to do

23   that?

24        PROSPECTIVE JURORS:  Yes, sir.

25        MR. KEITH:  Mr. Brea, police officer

========================== PROCEEDINGS ==========================

1    friends.  The testimony in this case will be

2    primarily police officers. Can you give Mr. Green

3    a fair trial?

4              PROSPECTIVE JUROR:  Yes.

5              MR. KEITH:  You will listen carefully to

6    these guys?

7              PROSPECTIVE JUROR:  Yes.

8              MR. KEITH:  You're going to scrutinize

9    it?

10             PROSPECTIVE JUROR:  Yes.

11             MR. KEITH:  If you are selected  as a

12   juror, when it is time to deliberate, you will

13   talk to the other jurors about what was said?

14             PROSPECTIVE JUROR:  If it needs me to,

15   yes.

16             THE COURT:  You're required to talk with

17   everybody.

18             PROSPECTIVE JUROR:  Okay.  Then, yes.

19             MR KEITH:  There's no stopwatch and

20   nobody is counting.  You spoke for five minutes

21   and you spoke for seven, so I have to let you

22   speak for two.  Everybody has to participate in

23   the deliberations. You do not go in there, think

24   about what you would want to do, what you think

25   and somehow there is a verdict. You talk.

====================== YVETTE PACHECO  SENIOR COURT REPORTER ======================

1          If you are selected as a juror, do you

2      promise to participate, say what you think, give

3      your point of view, that's it.  You can all do

4      that?

5          THE COURT:  I don't know what "that"

6      means.  That is your viewpoint.  That's the

7      discussion points.  He'll explain this more to you

8      later.

9          MR. KEITH:  Of course, participate,

10     exchange, but I want you to participate.  Every

11     juror that is selected, please participate in the

12     process, say what's on your mind, listen to other

13     people. The judge will explain the deliberations

14     process now in more detail.

15          Ms. Hirsh, do you have a problem with

16     that?

17          PROSPECTIVE JUROR:  No.

18          MR. KEITH:  Mr. Wachtel, your uncle is a

19     retired police officer?

20          PROSPECTIVE JUROR:  Yes.

21          MR. KEITH:  Are you okay for this case?

22          PROSPECTIVE JUROR:  Yes, I'm fine.  He

23     passed on when I was a little boy.  It's just that

24     I have his gold retirement shield in my safe

25     deposit box.

PROCEEDINGS

1          MR. KEITH:  You will give Mr. Green a

2    fair trial?

3          PROSPECTIVE JUROR:  Absolutely.

4          MR. KEITH:  Generally speaking, there is

5    a saying, there's two sides to every story. In

6    this case, you may not hear the other side.

7    Anybody have a problem with that?

8          THE COURT:  Wait a second, I think we

9    have a -- I don't think we can introduce the topic

10   that way.  I think it's better if I try it this

11   way.

12         Who has seen the county fairs?  The

13   strength test that you periodically see in a movie

14   where you've got that bell, the column, sometimes

15   a whimsical saying as you go up or down the chart.

16   You eat a better breakfast, try Wheaties, you are

17   weak.  You pay your money, take your chances you

18   bang the platform, try to drive the metal device

19   to ring the bell.

20         You are going to be watching and

21   listening to see if the prosecutor has enough

22   strength or to ring the bell. The defendant in

23   this and every other criminal case in the United

24   States has no burden of proving or doing anything.

25         Put aside any thoughts about what they

1    might do, what they might have done if they don't

2    do anything. Forget about why there is no defense

3    case, if it turns out there's no defense case.

4    We're here to see if I can ring the bell.

5         What the defense does or doesn't do

6    doesn't affect at all whether on his own he's able

7    to ring the bell.  That's the law.  In at least

8    more than half of the cases, there is no defense

9    case.  Acquittals, convictions.  The focus is on

10   what the prosecutor can do.

11        Go ahead.

12        MR. KEITH:  Ms. Wilson, you served on a

13   case before that involved narcotics.

14        PROSPECTIVE JUROR:  Yes.

15        MR. KEITH:  I believe you indicated that

16   after the case, the judge nor the lawyers spoke

17   with you.

18        PROSPECTIVE JUROR:  That's correct.

19        THE COURT:  That will be the case here,

20   too.

21        MR. KEITH:  Again, I know I'm repeating

22   myself, but can you promise me if you are

23   selected, you will follow the law that the judge

24   gives you?

25        PROSPECTIVE JUROR:  Yes.

═PROCEEDINGS═

1          MR. KEITH:  In particular that you do not

2     shift the burden of proof.  Mr. Green -- the

3     burden is on them to prove the case beyond a

4     reasonable doubt.  Can you accept that?

5          PROSPECTIVE JUROR:  Yes.

6          MR. KEITH:  Mr. Bernstein, did you do any

7     criminal law?

8          PROSPECTIVE JUROR:  Never practiced

9     criminal law.

10          MR. KEITH:  I know you know how to, if

11     you want to, to look up the laws that are involved

12     in this case, the jury charges, things of that

13     nature.  I hope you haven't done that already.

14     Can you promise me if you are selected, that you

15     will not do that?

16          PROSPECTIVE JUROR:  Yes, I can promise

17     that.

18          MR. KEITH:  Mr. Bernstein, I know in your

19     experience that you had some knowledge of criminal

20     law, just because that's the way it is.  I am

21     asking if you are selected, that you follow the

22     jury instructions that Justice McLaughlin gives.

23     Can you do that?

24          PROSPECTIVE JUROR:  Yes.

25          MR. KEITH:  You have friends that are

═YVETTE PACHECO  SENIOR COURT REPORTER═

PROCEEDINGS

1   assistant DAs. I know those folks are very

2   prosectorially minded.  Can you give Mr. Green a

3   fair trial?

4           PROSPECTIVE JUROR:  I can consider

5   everything open mindedly and participate in

6   deliberations and not be biased either.  I can do

7   it collectively.

8           MR. KEITH:  Can you give him a fair

9   shake, not prejudge against Mr. Green because of

10  your friendship with prosecutors?

11          PROSPECTIVE JUROR:  They're formerly

12  prosecutors, but yes, I can.

13          MR. KEITH:  Mr. Small, close friends are

14  police officers and very friendly with the Bronx

15  assistant DA.

16          PROSPECTIVE JUROR:  Yes.

17          MR. KEITH:  Will you give him a fair

18  trial?

19          PROSPECTIVE JUROR:  Yes.

20          MR. KEITH:  Listen carefully to the

21  police officers if you are selected and follow the

22  judges instructions?

23          PROSPECTIVE JUROR:  Yes.

24          MR. KEITH:  Mr. Friedman, you served

25  before a couple of times?

1          PROSPECTIVE JUROR:  Yes.

2          MR. KEITH:  Can you please follow the

3     instructions of Judge McLaughlin?

4          PROSPECTIVE JUROR:  Yes.

5          MR. KEITH:  After hearing everything

6     you've heard and sharing with us what you have

7     shared, do you still feel as though you can give

8     Mr. Green a fair trial?

9          PROSPECTIVE JUROR:  Yes.

10          MR. KEITH:  That's it.

11          THE COURT:  Please both groups step

12     outside.

13          (PROSPECTIVE JURORS EXIT.)

14          THE COURT:  On first two, any cause by

15     the People?

16          MR. BERLAND:  No.

17          THE COURT:  Any cause by the defense?

18          MR. KEITH:  No, Your Honor.

19          THE COURT:  The People's position on

20     these two.

21          MR. BERLAND:  I challenge both.

22          THE COURT:  Next two, any cause?

23          MR. BERLAND:  No.

24          THE COURT:  Defense, any cause?

25          MR. KEITH:  No.

1          THE COURT:  People's position.

2          MR. BERLAND:  Challenge both.

3          THE COURT:  Next two, any cause?

4          MR. BERLAND:  No.

5          THE COURT:  Defense, any cause?

6          MR. KEITH:  No, Your Honor.

7          THE COURT:  People's position.

8          MR. BERLAND:  No challenges.

9          THE COURT:  Defense.

10         MR. KEITH:  The defense exercise

11    challenge to Ms. Leglet.

12         THE COURT:  Yes, number five.  Six,

13    Wolffson, is okay?

14         MR. KEITH:  Yes.

15         THE COURT:  Wolffson is 11.

16    Cause by the prosecution?

17         MR. BERLAND:  No.

18         THE COURT:  Cause by the defense on the

19    next?

20         MR. KEITH:  No.  We challenge number

21    seven.

22         THE COURT:  Mr. Hsia.  Any cause

23    challenge by the People?

24         MR. BERLAND:  No.

25         THE COURT:  Cause by the defense, Hsia,

PROCEEDINGS

1           the fellow at the end?

2                     MR. KEITH:  We have a jury.

3                     THE COURT:  He's number 12.  Let's start

4           for two alternates.

5                     Challenge by the People.

6                     MR. BERLAND:  No cause.

7                     MR. KEITH:  No cause.

8                     THE COURT:  People's position on

9           Moskowitz.

10                    MR. BERLAND:  Challenge.

11                    THE COURT:  Any cause on Theokas?

12                    MR. BERLAND:  No.

13                    MR. KEITH:  No.

14                    THE COURT:  People's position on Theokas.

15                    MR. BERLAND:  No challenge.

16                    MR. KEITH:  That's alternate one?

17                    THE COURT:  Yes. Any cause on Friedman by

18          the People?

19                    MR. BERLAND:  No.

20                    MR. KEITH:  No.

21                    THE COURT:  People's position on

22          Friedman.

23                    MR. BERLAND:  Fine by the People.

24                    MR. KEITH:  Alternate number two.

25                    THE COURT:   That's it.  I don't see the

PROCEEDINGS

1    need for more.  Bring everybody in.  Tell the

2    people from yesterday, which should be a total of

3    ten people, that I need them to stay outside.  As

4    soon as we swear these people, I'll let this group

5    go and bring in the ten.

6           COURT OFFICER:  Panel entering.  The

7    choreography at this stage becomes really a

8    disaster.

9           THE CLERK:  The following jurors remain

10   in your seat.  If I do not call your name, you're

11   excused and report back to room 1510.

12          Windy Wolffson, John Hsia, Christopher

13   Theokas and Stuart Friedman. If you heard your

14   name called, please remain seated.

15          THE COURT:  The last five, for the time

16   being, could you folks sit in the back just in

17   case there is an unexpected disaster. If you are

18   in the front row and name not called, go back to

19   the central jury room.

20          These folks acceptable to the

21   prosecution?

22          MR. BERLAND:  Yes.

23          THE COURT:  To the defense?

24          MR. KEITH:  Yes.

25          THE COURT:  Stand up and take the oath.

═ PROCEEDINGS ═

1      THE CLERK:  Do you solemnly swear or

2    affirm to try the case of the People of the State

3    of New York versus Edward Green in a fair and

4    impartial manner, and to the best of your ability

5    render a true verdict according to the law and

6    evidence?

7      JURORS:  Yes.

8      THE COURT:  Go with him. We will be ready

9    to start in a couple of minutes. The five who are

10   there, stay there.

11      Folks, sorry, we didn't get a chance to

12   chat. I'm hear until 2012 and you may be back, so

13   I'll see you.  Go back to the central jury room.

14   Your ballots will be down there forthwith, as we

15   like to say.

16      COURT OFFICER:  Jury entering.

17      THE CLERK:  Timothy Carvin, seat number

18   one.  Megan Stubbendeck, seat two. David Riley,

19   seat three.  Michael Wagner, seat four.  Gerforne

20   Johnson, seat five. James Wysock, seat number six.

21   Rafael G. Taveras, seat number seven.  Ushtavaity

22   Davar, seat number eight.  Second row.  Shannon

23   Paulson, seat number nine.  Donald Keister, seat

24   number ten.  Wendy Wolffson, seat number 11.

25   John Hsia, seat number 12.  Christopher Theokas,

1    seat number 13, alternate number one.

2    Stuart Friedman, seat number 14, alternate number

3    two.

4            This is the case of the People of the

5    State of New York versus Edward Green. All parties

6    present and jurors present and properly seated.

7            THE COURT:  As soon as the jury is picked

8    as has happened, the judge gives preliminary

9    instructions which are brief, which will give you

10   the order that a trial takes so you can follow the

11   proceedings.  I'll tell you a little bit about

12   what you should anticipate with respect to the

13   interaction between the lawyers and myself with

14   regard to evidence and rulings.

15           When I finish speaking, the assistant is

16   required to give an address known as an opening

17   statement.  The law requires that at the start of

18   the case, the People, because they have the burden

19   of proof here, must explain to the jury in outline

20   form what it expects the evidence to prove in

21   support of the charge they've brought.

22           Since the defendant in this case and

23   every other criminal case has no burden of proving

24   anything, they may if they choose to, but they are

25   not both obligated to, give an opening statement.

1      The content of an opening statement is

2  not evidence. The only thing on which you will be

3  allowed to make your decision is your judgment and

4  your assessment of what happens from the witness

5  stand, whether it's testimony itself or physical

6  exhibits introduced during testimony.

7      There is also a stipulation about what a

8  chemist would say regarding the nature of the

9  substance that will be introduced.

10      Since the opening is not evidence, you

11  have to use it as a preview or as a guide. If you

12  hear something during an opening statement that

13  doesn't happen from the witness stand, you cannot

14  use it during your deliberations in any way.

15      After the People give their opening

16  statement, the defense has the option, but not the

17  obligation, of also giving one. The purpose of an

18  opening, irrespective of who gives it, is to give

19  preview of what is established during the course

20  of the trial.

21      After the opening, the assistant will

22  call witnesses and present physical exhibits.

23  There aren't many in this case.  Whenever the

24  presentation by the People is finished, which

25  might end before the end of today, the defense has

PROCEEDINGS

1    the option, but no obligation, to do something.

2         Whenever the evidentiary part is

3    finished, the lawyers give their closing or

4    summation.  By law, the defense goes first and

5    then the prosecution goes second.  Only then will

6    I tell you what the law is regarding all the

7    things you need to know because as I've said

8    yesterday and perhaps today, this trial like every

9    other trial is about one thing, whether the People

10   can meet a certain burden of proof.

11        Since I will not explain what the

12   definition and what is it that burden of proof is,

13   in a real sense you have no idea how the case is

14   going because in the absence of definition and the

15   law, you do not know where it has to go if there

16   is a conviction. You are required and practically

17   you need to keep an open mind until I explain to

18   you what you need to do.

19        Trials are conducted according to rule of

20   evidence. Basically, it goes back as long as 825

21   years ago.

22        You have heard on T.V., seen reports

23   about objection.  All right, well, that means I

24   have to do something.  I either sustain it or

25   overrule it.  Now, that means, not to be

PROCEEDINGS

1   egomaniacal, that means a quick review of

2   825 years of evidence. It doesn't take me long.

3   Doing that, I have a lot of dead judges whispering

4   in my ear.

5        If I say "Sustained," it means, from a

6   legal reason, the question or answer cannot

7   continue.  If I sustain something, it means it's

8   not in what I refer to as the book of trial.

9        If I sustain an objection or having heard

10  something that you hear, I may, well, like every

11  judge virtually in every criminal case, look at

12  you and say disregard that, forget about that.

13  That's my removing it from the book of the trial.

14  If it's not in the book of trial, there is no way

15  in which you can use it in your deliberations.

16  It's out of the case.

17       On the other hand, if I overruled an

18  objection, it means from a legal reason, you can

19  listen to the answer and evaluate it later on as

20  you choose to.

21       Let's hear the People's opening.

22       MR. BERLAND:  This is an extremely

23  straightforward and simple case.  On November 1,

24  2007, at approximately 5:20 in the evening, a

25  detective from a New York Police Department

1    narcotics unit went to an apartment building

2    located at 451 Lenox Avenue with two duly

3    authorized search warrants in hand.

4         You will hear that a few days before

5    going to execute these two warrants, a narcotics

6    detective came to court, appeared before a judge,

7    and obtained one warrant to search an apartment

8    located on the second floor of 451 Lenox Avenue

9    and one warrant to search what was believed by the

10   police at the time was an apartment located on the

11   third floor of 451 Lenox Avenue.

12        Now, the evidence will show that on

13   November 1, 2007, this experienced team of

14   detectives went to the location, went to 451 Lenox

15   Avenue, which was a four-story brownstone building

16   located in Harlem, between 132nd and 133rd

17   Streets, and they went there in order to search

18   for cocaine and narcotics paraphernalia, which

19   they had reason to believe was present inside of

20   these two apartments.

21        When the detective arrived at the

22   location, they split up into two and three teams.

23   One team was going to enter the second floor

24   apartment and the other team was going to enter

25   what was believed at the time to be a third floor

1    apartment.

2           During this very short trial, you will

3    first hear from Detective Alfred Hernandez,

4    a 22-year veteran of the New York police

5    department. Detective Hernandez, one of the most

6    experienced narcotics detective in all of New York

7    City is now part of the Federal task force

8    investigating drug trafficking.

9           On November 1st of last year,

10   Detective Hernandez was part of the team that

11   entered the second floor apartment.  He's going to

12   explain to you how the team going to the upper

13   floor, the third floor, entered the building

14   first.  He will explain the layout of the building

15   of 451 Lenox Avenue.

16          On the street level you will hear there

17   is a laundromat.  Directly next to the laundromat

18   is a locked entrance to the residential portion of

19   the building.

20          On entering the residential portion of

21   the building there is a stairway which leads to a

22   landing on the second floor. There is one door,

23   only one door on to the second floor at this

24   landing. This door leads to an apartment that has

25   a few rooms; the kitchen, a living room and a

1   bathroom. From the second floor landing, there is

2   a stairway which leads up to a third floor landing

3   and one there on the third floor landing.

4          At the time they obtained the search

5   warrants, the police believed that there was a

6   single multi-room apartment located behind the

7   third floor door. They believed that the layout of

8   the third floor was the same as the second floor.

9          Detective Hernandez is going to take the

10   witness stand and explain to you why his people,

11   the team responsible for entering the second floor

12   apartment didn't go in first. They wanted to

13   ensure no congestion in the hallways or stairwell,

14   that would slow up the team going to the upper

15   floor.

16          The third floor entry team, went up the

17   stairs, went to the third floor and opened a

18   locked door on the third floor with a metal ram

19   known as a ram. Around the time the third floor

20   team went up and passed the second floor landing

21   and went up to the third floor, that's when

22   Detective Hernandez and his team went up to the

23   second floor apartment.

24          The door to this apartment you will hear

25   had a sign on it. The sign read office of Browns.

========================================OPENING - PEOPLE========================================

1    The door to the office of Browns was wide open,

2    completely open. There was a lock on the door, but

3    the door was open.

4           Now, sitting on a table towards the front

5    of the apartment, it's not a very big apartment

6    you will see pictures and hear testimony about the

7    apartment, sitting towards the front of the

8    apartment was an individual by the name of

9    Steven Brown. Steven Brown was all alone in the

10   apartment.

11          In the front room was a television

12   monitor showing live footage of both the front of

13   the building and the stairwell leading up to the

14   second floor, to the landing. Detective Hernandez

15   will tell you that he could actually see the rest

16   of his field team on this live monitor. He could

17   see the team, the team behind him actually

18   entering building.

19          Next to the front room where Steven Brown

20   was sitting was an extremely small open kitchen.

21   There was an exposed glass bookcase with four

22   shelves.  On top of the exposed shelf was a large

23   wooden cigar box that contained approximately 17

24   Ziploc bags of cocaine. The tops of the Ziploc

25   bags were sealed, heat sealed closed. These bags

1    were packaged for sale. There was also money

2    inside of the cigar box.  To be exact, $965.

3         You will also hear there were two smaller

4    cigar boxes, red Philly Blunt.  That's the brand.

5    There were two red cigar boxes also on the exposed

6    shelf that contained the cocaine.

7         One of the small boxes contained numerous

8    plastic bags which you will hear is used for the

9    packaging of cocaine.  These bags are labeled Red

10   Apple. They were individually marked.

11        Now, also recovered from the room, on top

12   of the table where Steven Brown was sitting was a

13   bag of marijuana and empty --

14        MR. KEITH:  Objection.

15        THE COURT:  Overruled so far.

16        MR. BERLAND:  A bag of marijuana and

17   empty gun holster.

18        MR. KEITH:  Objection to that.

19        THE COURT:  Same ruling.

20        MR. BERLAND:  At the table where

21   Steven Brown was sitting.  The police placed

22   Steven Brown under arrest and took all the

23   narcotics and narcotics paraphernalia for

24   safekeeping.  You will also hear that the police

25   recovered additional $942 dollars and set of keys

1    from Steven Brown.

2         You will hear around time that

3    Steven Brown was being placed under arrest, a

4    member of third floor entry team, the other team,

5    came down into the second floor apartment, the

6    third floor entry team.  You will hear they had a

7    dilemma.  There were actually four locked doors

8    behind this main third floor door.

9         See, the police believed behind the third

10   floor door the layout was going to be just as the

11   second floor. That wasn't the case. There were

12   four additional doors behind the door and another

13   stairwell leading up to the fourth floor of the

14   brownstone.

15        You will hear that behind this fourth

16   floor, there were also four additional rooms,

17   locked rooms.  You will hear from the detective

18   who will testify that the third and fourth floors

19   of the building were converted into single --

20        MR. KEITH:  Objection.

21        THE COURT:  Overruled.

22        MR. BERLAND:  That these eight rooms,

23   four on the third and four on the fourth floor,

24   were converted into single room occupancy

25   apartments, all no bigger than the size of jury

1    box.  Each floor had a common bathroom.

2              You will hear, ladies and gentlemen, that

3    at the time the third floor entry team rammed

4    opened the door, they heard running above them and

5    heard a door slam on the fourth floor.

6              Because there were now eight locked doors

7    on the third and fourth floor, and because the

8    initial warrant authorized the police to search

9    what they believed to be a single third floor

10   apartment, the detectives exercised caution and

11   held off on executing the search warrant.  They

12   decided, we're going to stop and secure the third

13   and fourth floors. That's exactly what they did.

14             You will hear that the police then took

15   the keys that were recovered from the

16   Steven Brown and they went up to search the fourth

17   floor to determine who had run into one of the

18   fourth floor rooms and slammed the door while they

19   were searching the premises for narcotics, for

20   cocaine.

21             You are also going to hear there was a

22   surveillance camera leading into one the locked

23   rooms on the fourth floor.  A cable identical to

24   the one that ran into the second floor apartment

25   where Steven Brown was arrested.

1    You will hear that on November 1, 2007,
2    this cable did not run into any of the other rooms
3    in the building, just to the second floor
4    apartment where Steven Brown was located with 17
5    bags of cocaine and the fourth floor apartment
6    with small rooms on the fourth floor.
7         The police placed one of the keys they
8    recovered from Mr. Brown into the lock in the door
9    on the fourth floor room that was wired for
10   surveillance. Once it was determined that the key
11   fit into the lock and could actually open the
12   door, they knocked on the door.  The police
13   knocked and announced themselves.  They said,
14   Police.  Open up. You are going to hear the
15   detective knocked and announced themselves many,
16   many times.
17        Again, ladies and gentlemen this fourth
18   floor room, just like all of the converted rooms
19   on the third and fourth floor, is extremely tiny.
20   You will hear testimony and you will see pictures.
21   It was actually smaller than the jury box you are
22   sitting in right now.
23        After receiving no response, the police
24   opened the door. You will hear that the lights
25   were completely out inside of the room.  In fact,

1    the blinds were down and black plastic bags were

2    taped in front of the blinds.  It was pitch black

3    in the small tiny room.

4         A detective then took a flashlight,

5    shined it in the room.  Do you know what he

6    observed?  The defendant, Edward Green sitting on

7    a couch.  The defendant was sitting completely

8    still in the dark inside of this tiny room.

9         The police turned on lights and told the

10   defendant to lay on the ground for safety reasons,

11   but the defendant sat there stone cold and refused

12   to do anything or say a word.

13        MR. KEITH:  Objection.

14        THE COURT:  He's saying what the

15   testimony will be. The jury will figure out what,

16   if anything, it all means.

17        MR. BERLAND:  Detective Hernandez will

18   take the witness stand and explain to you exactly

19   what he observed.  Everything he observed when the

20   lights to the fourth floor room were turned on,

21   located in plain view throughout this very small

22   room was numerous and extensive narcotics

23   paraphernalia. There were empty bags used to

24   package cocaine.

25        There were digital scales used to weigh

=OPENING - PEOPLE=

1    cocaine.  There were heat sealers used to seal

2    bags of cocaine, such as the heat sealed bags

3    which were found ready for sale on the second

4    floor.  There was baking soda, hydrogen Peroxide

5    and other solutions used to cut or dilute cocaine

6    before it's packaged. These items were out in the

7    open on the mantel.  Inside of the garbage bags

8    were kilogram wrappers used to package mass

9    quantities of cocaine.  There was also a table, a

10   table that was used to cut and process cocaine.

11   This table was covered in cocaine residue.

12        You will hear there were spoons and cards

13   also containing cocaine residue inside of the room

14   out in the open. You will hear that there was

15   cocaine residue sprinkled through the entire room,

16   the room being used to package and store mass

17   quantities of cocaine.

18        The room where the defendant, ladies and

19   gentlemen, was desperately hiding in and in the

20   dark was clearly, clearly a drug den, and you will

21   hear that from the detectives who take the witness

22   stand, veteran narcotics detective who have been

23   doing this combined for 40 years.

24        You will hear how the fourth floor room

25   had a video monitor, a monitor similar to the

=YVETTE PACHECO  SENIOR COURT REPORTER=

OPENING - PEOPLE

1    monitor found in the second floor apartment.  Both

2    Steven Brown and Edward Green were inside of the

3    rooms that had comprehensive video surveillance on

4    the exterior of the building stairwells.

5         You will hear from Detective Hernandez

6    that video surveillance is paramount to a drug

7    trafficking operation.

8         MR. KEITH:  Objection.

9         MR. BERLAND:  That drug --

10        MR. KEITH:  Objection.

11        THE COURT:   There is an objection.

12   For 825 years, silence has reigned when there is

13   an objection.

14        Let's wait.  What the testimony is about

15   is the various uses of these things.

16        Sustained for the time being.

17        MR. BERLAND:  Edward Green, the defendant

18   just like Steven Brown was placed under arrest for

19   narcotics possession. You will hear that he had

20   approximately $333 on him at the time he was

21   arrested.

22        You are also going to hear that there was

23   a closet inside of this small fourth floor room,

24   and when the police entered the room, they opened

25   the closet door to ensure nobody was inside for

YVETTE PACHECO  SENIOR COURT REPORTER

═OPENING - PEOPLE═

1    safety purposes.  Inside of the closet were

2    additional heat sealers, additional digital

3    cocaine scales and empty Ziploc bags used for

4    packing cocaine. Many of the empty bags were

5    labeled Red Apple in the same exact way as the

6    empty bags referred to from the second floor.

7         You will also hear that there were two

8    locked safes inside of the closet.  The safes had

9    combination locks that could not be opened with a

10   key.

11        You're going to hear that based on all

12   the narcotics paraphernalia scattered in plain

13   view throughout the very tiny room, the fact that

14   cocaine was recovered in the second floor

15   apartment, and because there were two locked safes

16   inside of this closet, the police decided to

17   secure the room, just like they secured the third

18   and fourth floors of the building, and come back

19   to court, to this building in order to obtain a

20   supplemental search warrant to remove property and

21   search the two safes.

22        During the trial, you will hear from

23   Detective Romero, a 17-year veteran of the police

24   department. He was part of Detective Hernandez'

25   entry team. In fact, he was the detective who

═YVETTE PACHECO  SENIOR COURT REPORTER═

1    opened the door to the fourth floor room and who

2    looked in with the flashlight.

3            After observing the two safes in the

4    room, Detective Romero left 451 Lenox Avenue and

5    came down here to this building, met a judge and

6    obtained the supplemental warrant.  Upon receiving

7    the warrant, he contacted the members of team.

8    They were still located at 451 Lenox Avenue

9    securing the room on the fourth floor.  Detective

10   Hernandez will tell you that minutes after the

11   supplemental warrant, the second warrant was

12   authorized.

13           The police used sledgehammers to open up

14   these two locked safes.  Inside one of these safes

15   were two cigar boxes.  One of the boxes was a red

16   Philly Blunt box, identical in appearance to the

17   box found in the second floor apartment.  Inside

18   of the two cigar boxes were numerous, hundreds of

19   plastic bags containing smaller Ziploc Baggies of

20   cocaine. The cocaine was heat sealed just as was

21   the cocaine on the second floor and packaged and

22   ready for sale. The bags were identical to the

23   sealed bags on the second floor.  Also inside one

24   of the cigar boxes within the safe was $1,103.

25           You will hear inside the second safe was

OPENING - PEOPLE

1   a large baby gift bag. Inside of this gift bag

2   were three plastic bags, each containing large

3   chunks of cocaine.  This cocaine was still in raw

4   form and not yet packaged for sale. There were

5   more than 500 grams of pure cocaine in these three

6   bags alone.

7          After all of the cocaine was recovered in

8   this case, it was sent to the police laboratory to

9   be tested.  You're going to hear that all the

10  cocaine recovered inside of fourth floor room

11  alone weighed over one pound.  It weighed more

12  than 17 ounces. It was more than half a kilogram

13  of cocaine.

14         Now, the evidence is going to show,

15  ladies and gentlemen, that the defendant was

16  arrested hiding inside a drug den with

17  paraphernalia and residue scattered everywhere in

18  a room smaller than the jury box you are sitting

19  in.

20         Detective Hernandez is going to explain

21  to you at that the prepackaged bags from both the

22  second and fourth floor were half gram bags that

23  sell in New York City after being diluted and cut

24  for approximately $20 a bag. He will explain how

25  the street level of a hundred grams of cut cocaine

═OPENING - PEOPLE═

is about $20,000.

      Now, recovered inside of the fourth floor room was more than 500 grams of pure cocaine. Meaning, after being cut, there would be more than 500 grams and the value well over $20,000.

      During the extremely short trial, as the judge mentioned, the People's case might last just today. You will not only hear from the police department detectives, but you will have an opportunity to review all the cocaine and paraphernalia in this case. It will be in court on this table for your review.

      You will also have an opportunity to look at Polaroid pictures taken when the search warrants were executed. Although they are not the best pictures, in fact I must admit the pictures are pretty awful in quality than what was used at the time by the search warrant teams, the Polaroid pictures will give you an idea of the layout of the apartments and some of the property recovered.

      Now, yesterday during jury selection defense counsel told you, just as I am telling you, this is going to be a simple and straightforward case. He's absolutely right. This is a simple, straightforward and overwhelming

━━━━━OPENING - PEOPLE━━━━━

1    case. There really is very little evidence that's

2    in dispute.

3            Defense counsel said numerous times

4    yesterday that the defendant was inside of the

5    fourth floor apartment, merely in the wrong place

6    at the wrong time.  Members of the jury, the

7    evidence will speak for itself and the evidence

8    will prove otherwise.

9            The judge explained to you during jury

10   selection, one way for a case to be resolved is

11   through a jury trial, and here we are.  Here we

12   are.  Just because we're here does not mean that

13   it's even a close call.  The evidence is

14   overwhelming. At the close of evidence, I will

15   have one opportunity to appear before you.

16           At this time, I ask that after you

17   consider all of the overwhelming evidence, that

18   you come to the only logical and inescapable

19   conclusion, and that's that the defendant

20   absolutely knew what was taking place inside of

21   the fourth floor apartment and that he had control

22   over mass quantities of cocaine and narcotics

23   paraphernalia and that he possessed all of this

24   with the intent to sell it. It really is that

25   simple.

PROCEEDINGS

1          Thank you.

2          THE COURT:  Would you like to make an

3     opening statement, Mr. Keith?

4          MR. KEITH:  No, Your Honor.  In fact, I

5     have to make a motion outside the presence of the

6     jury.

7          THE COURT:  But you will not make an

8     opening statement?

9          MR. KEITH:  Legally, I think I have to

10    make my motion first.

11         THE COURT:  Come on over.

12         MR. KEITH:  I you think it will take a

13    few minutes.

14         THE COURT:  I don't think so.

15         (Whereupon, a sidebar conference was held

16    on the record out of the hearing of the jury.)

17         THE COURT:  What do you want to say?  I'm

18    curious about the gun holster.  Go ahead.

19         MR. KEITH:  Your Honor, without the keys

20    this case has changed dramatically, and the Court

21    of appeals has ruled on this issue.  The case of

22    People V Headly, 74 NY2d 858.

23         Your Honor, even if I were to -- what's

24    the word I'm looking for?  If we agreed that

25    everything the prosecutor said in his opening

PROCEEDINGS

1    statement was absolutely correct, the Court of

2    Appeals in Headley tells us that there's

3    absolutely no way he would be able to prove the

4    possession, dominion and control by Mr. Green.

5          In Headley, there --

6          THE COURT:  Is Headley a case with a safe

7    where there is no proof that the person in the

8    room with the safe had the combination?

9          MR. KEITH:  No.

10          THE COURT:  What's point of Headley?

11          MR. KEITH:  Headley says four defendants

12    were inside of a heavily barricaded door, the

13    police came, knocked on the door, they didn't open

14    the door. The police used a battering ram, over 25

15    hits.

16          THE COURT:  The Court of Appeals and

17    First Department know whatever the facts of

18    Headley are, I don't.  What's the black letter

19    principles that you think is where your want to

20    go?

21          MR. KEITH:  Okay.  In Headley the facts

22    are far more egregious than in this case.

23    Decision -- let me just go through my notes here.

24          In Headley, there were three men in the

25    living room.  When the police officers came in,

YVETTE PACHECO  SENIOR COURT REPORTER

PROCEEDINGS

1   there was weapons, drugs and machinery found,

2   concealed in a metal box on an end table.

3        Now, in a bedroom, the defendant Headley

4   was found hanging from a window. In close

5   proximity to the defendant Headley, the police

6   found a loaded gun.  They found an open pocketbook

7   with over $2,000.  There was money on the floor,

8   another gun found between the mattress and

9   bedding, drug paraphernalia, scale, sifter,

10  pyramid paper.

11       In the bedroom closet, the door was ajar,

12  a leather tote bag that contained cocaine and

13  marijuana, two more guns, two holsters and

14  ammunition --

15       THE COURT:  So what happened?

16       MR. KEITH:  The Court held that the

17  failure of the defendants to open the door does

18  not warrant an inference of criminal intent.  The

19  Court of Appeals held that statutory supervision

20  did not apply to drugs not in open view.  The

21  drugs in the container in the living room --

22       THE COURT:  So far I'm --

23       MR. KEITH:  The big issue did not

24  establish that the defendants had actual or

25  constructive possession of the drugs and weapons

YVETTE PACHECO   SENIOR COURT REPORTER

1   and the Court issued a trial order of dismissal.

2   Now, this case, of course, has been cited and a

3   number of other cases.

4       THE COURT:  I'm not going to take this

5   any longer. I think there are enough differences.

6   I thought you were going to focus on what's in the

7   safe. The fact that there is a similarity of bags

8   and stamps between the fourth floor and the second

9   floor, and Mr. Green is charged with what's on the

10  second floor, as well as what's on the fourth

11  floor.

12      Even if the jury says there's not enough

13  proof that he knew the combination or any proof

14  that he knew the combination and knew of what was

15  inside the safe, it's enough on which the jury can

16  decide he's liable for what was down on the second

17  floor.

18      I can't stop the trial at this juncture.

19  I can't and will not do it. The fact that somebody

20  had a trial order of dismissal in Headley seems

21  against what the Court of Appeals wants us to do

22  because the Brown case, which is given to the

23  jury, reserves decision.

24      See whether there is an acquittal and

25  give the People the option of appealing if the

=PROCEEDINGS=

1    trial order of dismissal is granted following a

2    verdict. Trust me, your record is preserved.

3         MR. KEITH:  Your Honor, I want to give

4    you two other cites. People V Edwards.  It was a

5    similar search warrant.  A search warrant was

6    executed.  They described the location as a

7    narcotics factory.  In that case there is a

8    language that says even if the defendant was aware

9    and had knowledge, that's not enough.

10        THE COURT:  Enough for what?

11        MR. KEITH:  To show that he had

12   constructive possession because he didn't live

13   there.

14        THE COURT:  This is not the time to make

15   this kind of motion after the People's opening. I

16   thought you were going to object that the opening

17   statement was not the form of an argument.  It was

18   long, repetitious.

19        MR. KEITH:  Your Honor, I think should

20   dismiss these cases. Even if the People's evidence

21   comes out the way it is, these cases are saying

22   that it's not going to be enough.

23        THE COURT:  I disagree.  Maybe I agree on

24   count one, but I don't agree on count two.

25        MR. KEITH:  Possession with intent to

1    sell. There is basically a chain. I can see you

2    have a real good argument with regard to the A

3    felony, but not the B felony.

4              THE COURT:  Okay.  If there is a defense

5    opening, now is the time.

6              (Whereupon, the sidebar conference

7    concluded and the proceedings continued in open

8    court as follows:)

9              MR. KEITH:  Good morning, ladies and

10   gentlemen.  What was just said by the assistant

11   DA, Mr. Berland, and what I'm about to say is not

12   evidence. The evidence will come from the witness

13   stand.  Basically, what we're doing is outlining

14   what we expect the evidence to show.

15             Ladies and gentlemen, even if the

16   evidence shows everything that the assistant DA

17   claimed, I submit that it still will not be enough

18   information or evidence for you to conclude that

19   Mr. Green constructively possessed the cocaine

20   found in locked safes in the closet in the room

21   where Mr. Green was found.

22             The testimony will show that Mr. Green

23   was not the target of the search warrants --

24             MR. BERLAND:  Objection.

25             THE COURT:  He can make his opening

OPENING - DEFENSE

1    statement.  If there are any requests to charge, I

2    will be glad to supply any information that is

3    necessary based on what has gone on up until that

4    point.

5         MR. KEITH:  I expect the evidence to show

6    that the police had no information that Mr. Green

7    was involved in any prior transactions at that

8    location or a suspect in any way before they got

9    to the location.

10         Now, at the end of the case, when Judge

11    McLaughlin explains the law, he will give you law,

12    he will give you examples and ask you to consider

13    whether the drugs were in a place or a thing that

14    Mr. Green had dominion and control.  Was it his

15    home?  No.  Was it his apartment?  Was it his

16    hotel room?  No.  Was it his business

17    establishment?  Is it?  No.  Obviously, not his

18    automobile.  Did he have the power and authority

19    to do with it as he pleased?  How would he know

20    the stuff was in a closet in a locked safe?

21         The judge will instruct you along the

22    lines with regards to whether or not the People

23    can prove possession beyond a reasonable doubt.

24    I'm asking you, ladies and gentlemen, to not shift

25    the burden of proof.  You may not hear anything

1    from Mr. Green.  I may decide not to put any

2    witnesses on.  You all promised that you would

3    hold the People to their burden of proof.

4         Are the drugs in a trunk, a bag of

5    clothing or some item that belongs to and

6    exclusively used by Mr. Green?  There will be no

7    proof of that.  What we will learn from the

8    evidence is that this apartment is not owned or

9    leased by Mr. Green.  This is a place where

10   clearly others --

11        MR. BERLAND:  Objection.  He says that's

12   what the jury will learn.

13        THE COURT:  There is no objection that I

14   can think of.  Overruled.

15        MR. KEITH:  We will learn that this is a

16   place where clearly others had access to.  As the

17   police, when they went in the second floor

18   apartment, they found a set of keys which gave

19   them access to this apartment.

20        Ladies and gentlemen, it's really rather

21   simple and straightforward.  After evaluating all

22   the evidence and looking at the evidence, I think

23   you will be able to conclude that there is a

24   reasonable doubt.

25        Ladies and gentlemen, I ask you to listen

OPENING - DEFENSE

1    carefully to the evidence.  The evidence

2    unfortunately, will not be as clear and

3    straightforward as it seems.  Detective Romero, in

4    particular, his testimony will reveal several

5    inconsistencies from prior sworn statements. You

6    will have to ask yourself what is the truth?  What

7    actually happened?  I submit you will see in the

8    end that evidence in this case does not amount to

9    proof beyond a reasonable doubt.

10        I want to leave you with this thought,

11   ladies and gentlemen.  You may recall during the

12   jury selection process, I asked two jurors, both

13   maintenance men in residential buildings, I asked

14   them both whether or not they've ever been alone

15   in a residential apartment --

16        MR. BERLAND:  Okay. This is not opening

17   statement.

18        THE COURT:  What's good for the goose, et

19   cetera.  Overruled.

20        MR. KEITH:  Both gentlemen answered yes.

21   I ask you, ladies and gentlemen, to just think

22   about that. Thank you.

23        THE COURT:  The choreography of the trial

24   is complicated.  We need to take about 20 minutes

25   to get witnesses and property. I need you folks

YVETTE PACHECO  SENIOR COURT REPORTER

================ OPENING - DEFENSE ================

1    outside the room at five to 12.  We'll start

2    hearing the testimony.  I will tell you more about

3    scheduling at the end of today's session.

4              Give me twenty five minutes or

5    thereabouts. Don't go far. You can go out of the

6    building or anywhere you want, just be out of the

7    room at five of 12.

8              Keep an open mind.  Do not discuss the

9    case.  What you heard just now is arguments, not

10   evidence.  See you at five to 12.

11             (JURORS EXIT.)

12             THE COURT:  Take him up.  Let's have him

13   back at five to 12.

14             (Continuing with trial.)

15             COURT OFFICER:  Jury entering.

16             THE COURT:  We're just about ready.

17   Soon, somebody will be crashing through the door,

18   looking flagrant and we'll be on the way.  Call

19   somebody and on we go.

20             MR. BERLAND:  The People call Detective

21   Alfred Hernandez to the stand.

22             COURT OFFICER:  Witness entering.

23             Raise your right hand and face the clerk.

24             (Witness complies.)

25             THE CLERK:  Do you swear the testimony

============= YVETTE PACHECO  SENIOR COURT REPORTER =============

HERNANDEZ - DIRECT - PEOPLE

1     you are about to give will be the truth, the whole
2     truth and nothing but the truth?
3                THE WITNESS:  I do.
4                THE CLERK:  Be seated.
5                COURT OFFICER:  State your name, spelling
6     the last name, shield number and present command.
7                THE WITNESS:  Detective Alfred Hernandez,
8     H-E-R-N-A-N-D-E-Z, shield 5046 of New York Drug
9     Enforcement Task Force.  Good afternoon.
10                THE COURT:  Go ahead.
11    DIRECT EXAMINATION BY
12    MR. BERLAND:
13    Q.   Good afternoon, Detective.
14    A.   Good afternoon, sir.
15    Q.   How long have you been with the New York
16    Police Department?
17    A.   Over 22 years.
18    Q.   What is your current assignment?
19    A.   Assigned to the New York Drug Enforcement Task
20    Force.
21    Q.   What is your current rank within the Drug
22    Enforcement Task Force?
23    A.   Detective first grade.
24    Q.   How long have you been a first grade
25    detective?

HERNANDEZ - DIRECT - PEOPLE

1    A.   I was promoted to the rank of first grade

2    in 2006.

3        Q.   How many grades of a detective are there in

4    the police department?

5        A.   Three, sir.

6        Q.   What is the highest rank?

7        A.   Detective first grade.

8        Q.   How long have you generally been a detective

9    within the New York police department?

10       A.   I was promoted to detective in 1995.

11       Q.   Sorry, 1990 --

12       A.   1995.

13       Q.   Can you explain to the jury the type of cases

14   that the Drug Enforcement Task Force handles?

15            MR. KEITH:  Objection.

16            THE COURT:  He can testify about the

17       kinds of cases he handled before being promoted,

18       assigned or admitted to the task force, since

19       Mr. Green is not charged with one of those, right?

20       He can describe what he did right before.

21       Q.   Where were you doing before joining the Drug

22   Enforcement Task Force?

23       A.   The Narcotics Borough Manhattan North here in

24   New York County.

25       Q.   And please describe for the members of the

YVETTE PACHECO  SENIOR COURT REPORTER



1    jury what exactly the Narcotics Borough Manhattan North

2    is.

3         A.   It's the borough division, the narcotics unit

4    responsible for the coverage of narcotics enforcement

5    and conducting narcotics investigations in the northern

6    part of Manhattan, specifically from 59th Street, both

7    East and West Side north.  The investigations, can, of

8    course, proceed out of Manhattan north, but our primary

9    concern is the Manhattan North region.

10        Q.   Just to be clear, back on November 1st of last

11   year, were you assigned to Narcotics Borough Manhattan

12   North?

13        A.   Yes, sir.

14        Q.   How long had you worked at Narcotics Borough

15   Manhattan North?

16        A.   Over 14 years.

17        Q.   Within Manhattan North, were you assigned,

18   back on November 1, 2007 to a specific unit?

19        A.   Yes, sir, I was.

20        Q.   What unit would that be?

21        A.   The major case team.

22        Q.   Explain to the members of the jury what the

23   Manhattan North Narcotics major case team is.

24        A.   The team within or the unit within -- each

25   borough has, within Narcotics Borough Manhattan North,

HERNANDEZ - DIRECT - PEOPLE

1    the unit responsible for investigating mid-level to

2    large scale narcotics organizations or operations or

3    the sale, large distribution and sale of narcotics

4    within New York giving, of course, priority and primary

5    concern to the narcotics -- to the Manhattan North

6    region of New York County.

7         Q.   Just to be clear, 132nd Street and Lenox

8    Avenue, does that fall under the jurisdiction of

9    Manhattan North?

10        A.   Yes, sir, it does.

11        Q.   What were some of your duties and

12   responsibilities during the years you were a detective

13   with the major case unit?

14        A.   They varied from conducting buy and bust

15   operations to conducting short-term and long-term

16   investigations into the sale and distribution,

17   possession with intent to distribute narcotics within

18   New York and Manhattan North, to investigate and review

19   complaints from the community regarding narcotics

20   transactions and narcotics sales within their building

21   or their area and target individuals who were

22   responsible for those operations or organizations that

23   were selling narcotics in those areas.

24        Q.   Now, during your lengthy career, approximately

25   how many arrests have you made?

HERNANDEZ - DIRECT - PEOPLE

1    A.    As the official arresting officer, actually

2    the individual who is down on paperwork as the

3    arresting officer, over 750.

4    Q.    Seven hundred fifty?

5    A.    Yes, sir.

6    Q.    Approximately how many arrests have you

7    assisted in during your career?

8    A.    Several thousands.

9    Q.    Approximately how many of these, talking about

10   the several thousand arrests, were for narcotics

11   possession?

12   A.    Over 95 percent of those arrests.

13   Q.    Approximately how many -- out of

14   the 95 percent of cases, how many were for possession

15   of a half kilogram of cocaine or more?

16   A.    I don't know if I can put in percentage.  A

17   large number.  Having been assigned to the major casing

18   for over ten years, a large number of investigations

19   that I was involved in were for large selling. A good

20   number. I can't tell you specifically, but several

21   hundred of those arrests.

22   Q.    Have you had specialized training in the

23   field, based on what you testified to, this might seem

24   like a silly question, did you have specialized

25   training in the field of narcotics enforcement?

HERNANDEZ - DIRECT - PEOPLE

1    A.    Yes, sir.

2    Q.    Have you been trained in recognizing the

3  packaging and pricing of various narcotics drugs in

4  Manhattan?

5    A.    Yes, sir.

6    Q.    What about training in determining whether

7  certain household products are being used in the

8  distribution of cocaine?  I'm referring to --

9            MR. KEITH:  Objection to the form.

10   Leading.

11           THE COURT:  Overruled.

12   Q.    I am referring to what's commonly called drug

13  paraphernalia.  Have you received training in

14  recognizing drug paraphernalia?

15   A.    Yes, sir.

16   Q.    Please explain all the training you have

17  received.

18   A.    Um, well, the training commences right from

19  the assignment to the narcotics division where we

20  receive several weeks of training before our assignment

21  from the narcotics division in regards to the

22  identification of narcotics, the packaging used, value

23  of the narcotic, the methods utilized by operations to

24  package and distribute narcotics, the execution of

25  search warrants, recovery of evidence and the

1    investigation and the obtaining of probable cause of

2    the evidence in order to obtain a search warrant and to

3    continue forward with an investigation.

4         Um, each year from that point we receive

5    training at least on two occasions from the organized

6    crime control unit, special projects unit, there is a

7    training unit which consists of updating our training

8    with regards to narcotics distribution, new methods to

9    package and sell, new prices.

10        On a monthly basis, we receive training

11   within our command from a supervisory officer who is

12   assigned to training over at the command which gives us

13   additional training and updates on new policies, any

14   new items that have been seen in New York or throughout

15   the United States and outside of the United States in

16   regards to trends in narcotics.

17   Q.   Now, you mentioned a few times during your

18   testimony so far search warrants.  During your career,

19   approximately how many search warrants have you been

20   involved with?

21   A.   Several hundred.

22   Q.   Is that both -- withdrawn.

23        How many of those several hundred search

24   warrants were for narcotics and narcotics

25   paraphernalia?

HERNANDEZ - DIRECT - PEOPLE

1    A.   The majority of them.

2    Q.   Detective Hernandez, I want to direct your

3    attention to November 1, 2007.  Were you working that

4    day?

5    A.   Yes, I was.

6    Q.   What was your assignment?

7    A.   Um, initially my assignment was a recording

8    officer as a member of a team, a search warrant team

9    that was to execute two search warrants on that date.

10   Basically, my job is to assist the investigator in

11   charge or the arresting officer for the search warrants

12   of that day.

13        MR. KEITH:  Your Honor, I object.  I ask

14   that it be stricken.  He didn't answer the

15   question.

16        THE COURT:  Overruled.  It's fine.  He

17   was going to be the recording officer writing down

18   what needed to be written down regarding the

19   execution of the search warrant.  Might have been

20   said more tersely, but fine.

21        What's next?

22   Q.   You just testified that your team was going to

23   execute two search warrants.  What was the location you

24   were going to be executing the warrants at?

25   A.   451 Lenox Avenue in Manhattan county.

HERNANDEZ - DIRECT - PEOPLE

1    Q.   Generally speaking, can you explain to the

2    members of the jury what a search warrant is?

3    A.   A search warrant is an order approved by the

4    Court providing us with permission to enter a location

5    specified in the warrant in order to conduct a search

6    for the items specified on the warrant, whether

7    contraband or paraphernalia connected with the

8    contraband.

9         THE COURT:  The area you can search

10        largely depends on what you are authorized to look

11        for?  For example, a stolen diamond ring, as

12        opposed to a tractor-trailer truck, you can look

13        in anything that is small enough to contain a

14        diamond ring or a stolen antique postage stamp for

15        example.

16        Go ahead.

17    Q.   Who at your unit actually obtained the two

18    search warrants, came to court to get the search

19    warrants?

20    A.   Detective Romero.

21    Q.   Do you know when the two search warrants were

22    obtained?

23    A.   Yes, several days earlier.  In late October.

24    Q.   Can you please tell the jury about the

25    locations, the two locations that your unit was

HERNANDEZ - DIRECT - PEOPLE

1    authorized to search?

2         A.   Ah, yes, two apartments, one on the second

3    floor and one that was believed to be on the third

4    floor. I think they were known as apartment one and

5    apartment two.

6         Q.   Did there come a time, Detective, that

7    Manhattan North Narcotics actually executed the two

8    search warrants?

9         A.   Yes, sir.

10        Q.   Can you explain what it means to the members

11   of the jury -- withdrawn.

12             Please explain what it means to execute a

13   search warrant.  I know you discussed what a search

14   warrant is.

15        A.   To execute a search warrant means basically to

16   discuss the search warrant, to do creative tactile plan

17   on the execution of the search warrant and to actually

18   go with a team into the location and secure the

19   location and search the -- if it's a location or an

20   apartment, to search that apartment specified in the

21   warrant.

22        Q.   You mentioned a tactile meeting.  Back on

23   November 1st of last year, did you and your fellow

24   officers, before going to 451 Lenox Avenue, have a

25   tactile meeting?

HERNANDEZ - DIRECT - PEOPLE

1    A.    Yes.

2    Q.    How many officers were at this meeting,

3    roughly, if you recall?

4    A.    Um, I would say, 15 or so, a minimum.  About

5    15.

6    Q.    Were all of these 15 or so officers involved

7    in the search warrant execution that took place at 451

8    Lenox Avenue?

9    A.    Yes, sir.

10   Q.    Now, were the officers split up into separate

11   search teams?  I know there were two separate

12   locations.  Explain that to the jury.

13   A.    Each officer is assigned to a tactile plan

14   with a specific supervisor, and their responsibilities

15   are to provide safety and backup and to enter a

16   location, and they're each given a specific role in the

17   execution of the particular apartment they're assigned

18   to and then there are individuals who are assigned to

19   if there's two search warrants in one particular

20   building, there's one set of guys that will go on both

21   tact plans, usually assigned to front security, to

22   safeguard the front, close down the area of the

23   building, safeguard the back of the building, any other

24   locations that can be generally watched over while the

25   teams execute the search warrant.

HERNANDEZ - DIRECT - PEOPLE

1    Q.   Let's talk specifically --

2              THE COURT:  I rather he testify. You said

3    "Let's talk."  I assume you're going to ask him

4    questions.

5              MR. BERLAND:  Of course.

6    Q.   I'd like for you to --

7              THE COURT:  Your style causes me to get

8    nervous.

9    Q.   I want you to discuss the specific search

10   warrants executed on November 1, 2007.  How many teams

11   were there executing --

12             THE COURT:  Still two?

13             THE WITNESS:  Yes, sir.

14             THE COURT:  The same two we have heard

15   about several times?

16             THE WITNESS:  Yes.

17             THE COURT:  What's next?

18   Q.   Approximately what time did you and the rest

19   of your team arrive at the location?

20   A.   Shortly before -- sometime after five o'clock.

21   Shortly around 5:15 or so, that time.

22   Q.   Were members of the search team in uniform or

23   plainclothes?

24   A.   In plainclothes.

25   Q.   Did you or any members of either of the two

HERNANDEZ - DIRECT - PEOPLE

1    search teams have special equipment to be used in the

2    execution of the search warrants?

3        A.   Yes, sir.

4        Q.   Can you please explain what are rams?

5        A.   Rams, battering rams which are used to gain

6    entry into locked locations, and what's known as a

7    ballistic shield, a bunker is also the word for it,

8    it's a plastic device, a device that's supposed to

9    protect you from any -- from rounds being fired, which

10   has a glass opening so that you can see through it and

11   has the NYPD logo in front of it, and as well as we

12   took out tools in case we needed the tools, Kelly tools

13   and items used to open locked compartments.

14       Q.   You just said "Kelly tools."  What are you

15   referring to?

16            THE COURT:  Is that because the police

17       commissioner is named Kelly?

18            THE WITNESS:  No, sir.

19       A.   It's a long piece of iron, the fire department

20   uses it often, has a hook at the end, used to pry open

21   closed areas or closets or break open doors, things of

22   that nature.

23       Q.   Can you describe for the jury the layout of

24   the building as you observed it when you arrived there?

25       A.   The building has four floors.  It has a

HERNANDEZ - DIRECT - PEOPLE

1   commercial establishment on the primary floor, the

2   ground floor, and then residences above that commercial

3   establishment, which was a laundromat.

4       Q.   The entrance to the laundromat, was that

5   separate from the entrance to the residential portion

6   of the building?

7       A.   Yes, sir.

8       Q.   Where was the entrance to the residential

9   portion of the building in relation to the entrance of

10   the laundromat?

11       A.   Just to the right of the laundromat.

12       Q.   Okay, what happened?  What happened once your

13   team arrived at the location?

14       A.   Once the supervisors gave the green light to

15   enter, a person was sent to try to get the front door

16   open that goes in the residential part of the area.

17   Once that person was in place, the supervisor gave the

18   green light for the teams to move in.  The team that

19   was going to head up to the third floor landing went

20   before the team that I was part of that was going to

21   the second floor landing. They went in and headed up.

22   We headed up behind them.  We went upstairs behind

23   them.  We stopped at the second floor landing and they

24   continued upstairs to the third floor landing.

25       Q.   I want to back up for one minute. The front

YVETTE PACHECO  SENIOR COURT REPORTER

HERNANDEZ - DIRECT - PEOPLE

1  door on the ground level to the residential portion of
2  the building, was there a buzzer system on that door?
3      A.   Yes, sir.
4      Q.   Was there a lock on this door?
5      A.   Yes, sir.
6      Q.   Did there come a time -- withdrawn.
7           I know you testified that your team went
8  in after the third floor team. Did there come a time
9  that you were on the second floor landing?
10     A.   Yes, sir.
11     Q.   How many doors on this landing?
12     A.   Just one.
13     Q.   Was this door open or closed?
14     A.   It was open.
15     Q.   Were there any signs on the open door?
16     A.   Yes, sir.
17     Q.   What did the sign say?
18     A.   Office Browns.
19     Q.   Browns, plural?
20     A.   Yes, sir.
21     Q.   At the time you were on the second floor
22  landing, could you see anything upstairs towards the
23  third floor?
24     A.   Yes, the field team or the other search
25  warrant team heading up to the next landing where there

YVETTE PACHECO  SENIOR COURT REPORTER

HERNANDEZ - DIRECT - PEOPLE

1    was another door.

2         Q.   Other than the top of the landing and the

3    other door, could you see anything else at that point?

4         A.   Um, just basically them heading up to that

5    landing and coming upon a door that was there.

6         Q.   What happened next?  What did you and your

7    team do?

8         A.   We entered into that second floor residence or

9    apartment, which was -- it was an apartment, but it

10   basically was made up almost like an office as it said

11   on the door, an office.  It was a living room area.  To

12   the left there was a separate little room which had a

13   card table and had playing cards on it. To the right,

14   there was an individual, and there was a small kitchen

15   alcove and a bathroom, and there were a lot of items

16   all over the place, shelves, TV monitors,

17   refrigerators, normal stuff that you would see in an

18   apartment, but also large tables, circular tables and

19   items you would see in an office.

20        Q.   Now, you said there was -- you stated that

21   there was an individual inside of this room?

22        A.   Yes, sir.

23        Q.   Did you come to learn this person's name?

24        A.   Yes, sir.

25        Q.   What was the individual's name?

HERNANDEZ - DIRECT - PEOPLE

1    A.    Mr. Steven Brown.

2    Q.    Where exactly in the apartment was

3  Steven Brown located when you entered?

4    A.    Just to the right of the entranceway -- to the

5  right of the living room area where he was situated in.

6    Q.    Was he seated at a table?

7    A.    Yes, sir.

8    Q.    Was anyone else located in the apartment?

9    A.    No, sir.

10   Q.    Now, what, if anything, was recovered by your

11  team inside of this apartment, the second floor

12  apartment pursuant to the search warrant?

13   A.    Several items. A bag of marijuana --

14            MR. KEITH:   Objection.

15            THE COURT:   Overruled.

16   A.    A wooden box containing several bags of

17  cocaine, several plastic baggies.  There were small,

18  clear plastic baggies, Ziplocs in there, Ziploc bags in

19  there.  I think a gun holster was also recovered in

20  that apartment.

21   Q.    Now, you testified that the cocaine was within

22  a wooden box?

23   A.    Yes, sir.

24   Q.    What type of box was this?  Please describe

25  it.

HERNANDEZ - DIRECT - PEOPLE

1    A.    A wooden box.  I would say some sort of like a

2 cigar box or jewelry box and it was brown in color.

3    Q.    Where was the brown wooden box located within

4 the apartment?

5    A.    A living area by the kitchen alcove on a glass

6 shelving that had several items on it, including the

7 wooden box.

8    Q.    Was the shelving open or closed?

9    A.    Open.

10    Q.    So the wooden box that contained the cocaine,

11 the box was in plain view?

12    A.    Yes, sir.

13        MR. KEITH:  Objection to the form.

14        THE COURT:  I don't think it's leading.

15    Overruled.

16    Q.    Anything else recovered inside the wooden box

17 other than cocaine?

18    A.    I think some packaging.  I am not too sure,

19 there may have been other items.  I remember cocaine

20 and the cocaine bags.

21    Q.    Do you recall if money was recovered?

22    A.    Yes, a quantity of United States currency.

23    Q.    Do you recall how much money was recovered in

24 the apartment?

25    A.    Think at least $900 -- over $900.

YVETTE PACHECO  SENIOR COURT REPORTER

HERNANDEZ - DIRECT - PEOPLE

1   Q.   And do you know where the money was recovered

2   within the apartment?

3   A.   I don't remember exactly.  I think it also was

4   where the shelving was. It may have been the same box,

5   but I'm not hundred percent sure.

6   Q.   Is there anything that would help refresh your

7   recollection?

8   A.   A copy of the voucher.

9        MR. BERLAND:  Your Honor, would you like

10   this premarked.

11        THE COURT:  Well, premarked would have

12   been before we were here.  Who knew this was going

13   to happen?  Sure.  Have you started the numbers

14   already.

15   Q.   Handing you what has been premarked People's

16   Exhibit 100.

17        THE COURT:  One hundred?

18        MR. BERLAND:  Just to be safe.

19        THE COURT:  Does that help?

20        THE WITNESS:  Yes, sir.

21        THE COURT:   Where was it?

22        THE WITNESS:  In the wooden box with the

23   cocaine.

24   Q.   Were there any other cigar boxes recovered

25   within the apartment?

YVETTE PACHECO  SENIOR COURT REPORTER

HERNANDEZ - DIRECT - PEOPLE

1   A.   There were cigar boxes inside that apartment,
2   yes, sir.

3   Q.   Do you recall where these cigar boxes were
4   located?

5   A.   Next to the wooden box on the same shelving.

6   Q.   Can you describe the physical appearance of
7   the box, what color or was it labeled in any way?

8   A.   Pink, I think red.  They were Philly cigar
9   boxes.  What I mean by Philly cigar boxes, boxes that
10  were for Philly Blunts.  They say Blunt on it.  Philly
11  cigars are commonly found in all grocery stores in New
12  York behind the counter and the cigars are sold from
13  them.

14  Q.   You testified earlier that empty bags were
15  recovered from the apartment?

16  A.   Yes, sir.

17  Q.   Where were those recovered from?

18  A.   In the Philly cigar boxes.

19  Q.   Based on your vast training and experience in
20  narcotics enforcement, what was the significance of all
21  the empty plastic bags?

22          MR. KEITH:  Objection.

23          THE COURT:  Overruled, but we need to
24      know not so much what the significance was to him,
25      but what he thinks their use were for others.

HERNANDEZ - DIRECT - PEOPLE

1    A.   They're used to package cocaine for -- to get

2    it ready for sale purposes.

3    Q.   Were any of the plastic bags labeled in way?

4    A.   Some of them had the common red label, Red

5    Apple stamp on them, on the clear plastic bag.

6         THE COURT:  What did you mean by the use

7         of the word "common"?

8         THE WITNESS:  These are plastic bags seen

9         on numerous occasions, clear plastic bags used to

10        utilize cocaine for sale. I have seen them in

11        multiple apartments after a search warrant

12        execution for narcotics.

13   Q.   You said you seen them multiple times.

14   Referring to red labels or labels in general?

15   A.   Red labels on the specifically clear plastic

16   Ziploc bags, very small.

17   Q.   Have you seen Ziploc bags during your career

18   and search warrant executions and bags that have other

19   types of labels?

20   A.   Yes, sir.

21   Q.   Explain to the jury the significance of

22   labeling.

23   A.   The significance of labeling goes by --

24        MR. KEITH:  Objection. It's irrelevant.

25        THE COURT:  No, the jury is entitled to

YVETTE PACHECO  SENIOR COURT REPORTER

1  be schooled in things that might not be within

2  their normal understanding as they traverse our

3  borough.   Overruled.

4      A.   The significance with labeling is basically to

5  identify a particular product, a particular narcotic,

6  cocaine or other substance, for the buyer with the

7  knowledge that this item comes from a particular

8  location, particular seller in the region or area.

9      Q.   Was any cocaine residue discovered inside of

10 the second floor apartment?

11         MR. KEITH:  Objection to the form.

12         THE COURT:  What is residue?

13         THE WITNESS:  Residue is basically small

14 amounts, leftover amounts of cocaine.

15         THE COURT:  Residue is what is left over,

16 whether it be the crumbs on a countertop after you

17 put a piece of bread or sandwich there?  The

18 definition of residue is the stuff left over?

19         THE WITNESS:  That's correct.

20         THE COURT:  Ask him what supposedly

21 cocaine residue is and how he knows that.

22     Q.   What is cocaine residue and how do you know

23 that?

24     A.   Cocaine residue --

25         THE COURT:  Well put.

YVETTE PACHECO   SENIOR COURT REPORTER

1   A.    -- just the same thing, white powdery

2   substances found in its light form, scattered amounts

3   such as on countertops or in plastic bags or items

4   where there was cocaine and the cocaine was packaged or

5   moved and still remnants of it on the item, whether the

6   countertop or glass top or whatever the cocaine was set

7   on or sitting in.

8   Q.   Was any cocaine residue recovered inside of

9   the second floor apartment?

10          MR. KEITH:  Objection to the form.

11          THE COURT:  There is certainly a point

12   there with respect to what the white stuff was, if

13   in fact, the jury decides there was white stuff.

14   He may answer.  He may be confused as to what we

15   are talking about.

16          Why do you think the white stuff you said

17   was there was cocaine as opposed to something

18   else?

19          MR. BERLAND:  If I may.

20          THE COURT:  I prefer that he actually --

21          MR. KEITH:  Let's let him answer the

22   question.

23          THE COURT:  Go ahead.

24   A.   There was residue on the area where the

25   cocaine was recovered from on the shelving in that

HERNANDEZ - DIRECT - PEOPLE

1    apartment from what I recall.

2           THE COURT:  Why do you think that was

3    cocaine as opposed to baking powder, baking soda,

4    unprocessed flour, talcum powder, lint?

5           THE WITNESS:  The proximity of the

6    cocaine to where the residue was.

7           THE COURT:  Anything about sight, smell,

8    touch, consistency?

9           THE WITNESS:  The cocaine residue and the

10    white powder on the shelving resembles and is

11    consistent with the cocaine in the packaging

12    recovered in the wooden box.

13           THE COURT:  I have to do a sentencing and

14    then we'll have to take the lunch break.

15           MR. BERLAND:  I think this will be a good

16    time, unless you'd like me to ask a few more

17    questions.  This is a logical stopping point.

18           THE COURT:  Then far be it for me to do

19    anything illogical.

20           Keep an open mind. Do not discuss the

21    case. You're basically it now. We'll be able to

22    start at ten after two.

23           (JURORS EXIT.)

24           (Whereupon, a lunch recess was taken,

25    after which the following proceedings were had:)

YVETTE PACHECO  SENIOR COURT REPORTER

HERNANDEZ - DIRECT - PEOPLE

1       THE COURT:  Have a seat. You are still

2   under oath.  Next question.  Please continue.

3   Q.   Good afternoon, Detective.

4   A.   Good afternoon, sir.

5   Q.   Before we broke for lunch, you were describing

6   what you had observed inside of the second floor

7   apartment at 451 Lenox Avenue. You testified that

8   Steven Brown was sitting at a table. Was anything

9   recovered from on top of that table?

10  A.   Yes, sir.

11  Q.   What would that be?

12  A.   A small bag of marijuana.

13  Q.   Was a gun recovered inside of that apartment?

14  A.   No, sir.

15  Q.   How about a gun holster?

16  A.   Yes.

17  Q.   To the best of your recollection, was anything

18  recovered on Steven Brown's person, on him?

19  A.   Yes, sir.

20  Q.   What would that be?

21  A.   A denomination of United States currency, a

22  quantity of United States currency and a set of keys.

23  Q.   Do you know how much money was recovered on

24  him?

25  A.   Um, I think it was also in the 900 range.

HERNANDEZ - DIRECT - PEOPLE

1    Q.    Now, did you notice any type of video

2    surveillance system in place inside of the second floor

3    apartment?

4    A.    Yes, sir.

5    Q.    Can you describe to the members of the jury

6    the video system you observed?

7    A.    Yes, sir. In this particular apartment it was

8    basically a TV screen that was up on a wall unit in the

9    living room area to the right of the entranceway, which

10   had a split screen, and on the screen, you could

11   observe the entranceway into the building, as well as

12   the stairwell leading up towards the second floor

13   apartment.

14   Q.    Just to be clear, was the video monitor on at

15   the time you entered the second floor apartment?

16   A.    Yes, sir.

17   Q.    What, if anything, did you observe on the

18   video monitor at this time?

19   A.    Um, I observed the front of the building and

20   members of the team in front of the building that were

21   doing front security at the door and members of the

22   department, of our unit that were on the stairwell.

23   Q.    Where was the video monitor in relation to

24   where Steven Brown was sitting?

25   A.    If you are sitting in the same seat that

YVETTE PACHECO  SENIOR COURT REPORTER

HERNANDEZ - DIRECT - PEOPLE



1    Mr. Brown was sitting on, facing the wall, it would be

2    to his right.

3        Q.   Detective Hernandez, based on your training

4    and experience in executing narcotics-related search

5    warrants, what was the significance to you of this live

6    video feed when you first entered the apartment?

7              MR. KEITH:  Objection.

8              THE COURT:  I think the jury doesn't need

9        help figuring that out. Sustained.

10       Q.   Did you later come to learn whether or not

11   there was a video surveillance system in any of the

12   other apartments or rooms within the building?

13             MR. KEITH:  Objection to the form.

14             THE COURT:  The form is all right.  There

15       has to be some basis on which he is going to give

16       an answer.  Sustained.

17       Q.   During the time you were at 451 Lenox Avenue,

18   did you notice any wires leading to any of the

19   apartments or apartment in the building?

20       A.   There was a wire coming into the window on the

21   apartment on the fourth floor which was leading to a

22   monitor which was above a TV in the wall unit in the

23   apartment on the top floor.

24       Q.   Right now are you referring to a monitor

25   inside the fourth floor room?

HERNANDEZ - DIRECT - PEOPLE

1     A.   Yes, sir.

2     Q.   We'll get to that room in a little bit.

3          Were you personally responsible for

4     safeguarding all the narcotics and paraphernalia

5     recovered in conjunction with the search warrant

6     execution?

7     A.   No, sir.

8     Q.   Who was responsible for safeguarding the

9     apartment?

10    A.   The individual responsible was

11    Detective Romero.

12    Q.   Anthony Romero?

13    A.   Yes, sir.

14    Q.   You are being handed what was premarked for

15    identification as People's Exhibit's 1. Do you

16    recognize this?

17    A.   Yes, sir.

18    Q.   What is this?

19    A.   A picture of Steven Brown.

20    Q.   Did you take the photograph?

21    A.   No, sir.

22    Q.   Is this photograph a fair depiction of the way

23    Steven Brown appeared when he was arrested on

24    November 1, 2007, of last year?

25    A.   Yes, sir.

1        MR. BERLAND:  I ask that that be received

2    into evidence, Your Honor, as People's Exhibit 1.

3        MR. KEITH:  No objection.

4        THE COURT:  Received number one.

5        (People's Exhibit 1 was received in

6    evidence.)

7        THE COURT:  You are to decide any issues

8    as to Mr. Green.  You're not to speculate about

9    what happened, if anything, to Mr. Brown or his

10   case.  There will be some description by me about

11   the law where two people are accused of crimes

12   together.  There is a circumstance under which

13   evidence relating to one is applicable to you

14   depending on certain factual conclusions you'll

15   reach. I'll explain that all to you.

16        For the time being, the point you focus

17   on is Mr. Green.  Forget Mr. Brown for the time

18   being.  We will come back and I'll describe what,

19   if anything, you'll be able to do with regard to

20   circumstances of Mr. Brown as it relates to

21   Mr. Green.

22        MR. BERLAND:  This is premarked for

23   identification as 2.

24        (HANDING.)

25        THE COURT:  What is 2, Detective?

HERNANDEZ - DIRECT - PEOPLE

1      THE WITNESS:  This is a wooden box,
2   Your Honor.  Specifically inside is one of the
3   wooden boxes which contained the cocaine recovered
4   in the second floor apartment, and also the clear
5   plastic baggies, some of them marked with the
6   Apple logo also recovered in that apartment, and
7   also there is a gun holster inside this envelope.
8      Q.   Again, you testified earlier that you observed
9   the evidence you are holding in People's Exhibit 2 for
10  identification inside of the apartment?
11     A.   Yes, sir.
12     Q.   Do the items within People's Exhibit's 2 for
13  identification, are they in the same condition or
14  substantially the same condition as they were when they
15  were recovered from the second floor apartment back on
16  November 1, 2007?
17     A.   That is correct, sir.
18     Q.   Just to be clear --
19     A.   They are.
20     Q.   Did all the evidence taken from 451 Lenox
21  Avenue, where was it sent to, if you know?
22     A.   Depending on the item.  It was sent to the lab
23  if it was a narcotic.  If it was not a narcotic, it was
24  sent to a police storage facility where it's stored and
25  maintained in case it's needed in the future.

YVETTE PACHECO  SENIOR COURT REPORTER

HERNANDEZ - VOIR DIRE - DEFENSE

1    Q.   Were you personally responsible for picking up

2    the item from the storage facilities?

3    A.   No, sir.

4    Q.   Who was?

5    A.   Detective Romero, Anthony Romero.

6          MR. BERLAND:  Your Honor, at this time I

7    move into evidence People's Exhibit 2 subject to

8    connection.

9          MR. KEITH:  Can I do a brief voir dire?

10         THE COURT:  Sure.

11   VOIR DIRE EXAMINATION BY

12   MR. KEITH:

13   Q.   You did not find the items; is that correct?

14   A.   I initially observed them in the apartment

15   when we entered shortly after going in with

16   Detective Romero in the apartment, but I didn't do the

17   recovery of the items.

18         THE COURT:  Recovery, meaning pick it up

19    and vouchering it?

20         THE WITNESS:  That is correct.

21         THE COURT:  Finding means what, seeing it

22    or what?

23   Q.   Detective Romero, he is the arresting officer

24   in this case; is that correct?

25   A.   That is correct.

HERNANDEZ - VOIR DIRE - DEFENSE

1      Q.   With regard to the paperwork, everything is

2   done in Detective Romero's name?

3      A.   Ah --

4      Q.   Just about?

5      A.   Just about, sir.

6      Q.   With regard to the property voucher,

7   Detective Romero would be listed as the finder of the

8   property; is that fair to say?

9      A.   It can be.  Detective Romero as the finder or

10   the actual person who picked it up and secured it for

11   Detective Romero.

12      Q.   So with regard to this stuff, do you know if

13   Detective Romero is the person that's listed as the

14   finder of the property?

15      A.   I am not too sure. I wouldn't have that

16   voucher. Detective Romero would have prepared that

17   voucher.

18      Q.   Correct.

19           So if you were to see that voucher, that

20   would refresh your recollection with regard to

21   Detective Romero being the finder of the property?

22      A.   It would refresh your recollection as to --

23           THE COURT:  Whoever did.  Do you want to

24   show it to him.

25           MR. KEITH:  May this be marked

HERNANDEZ - VOIR DIRE - DEFENSE

1    defendant's A for identification.

2         THE COURT:  Sure can.

3         (Defendant's Exhibit A was marked for

4    identification.)

5    A.   Yes, sir.

6    Q.   Romero is the person who vouchered these

7    particular items?

8    A.   That is correct, sir.

9         MR. KEITH:  Thank you.

10        THE COURT:  Any objection to number two

11   now?

12        MR. KEITH:  No, Your Honor.

13        THE COURT:  Two is received.  What's

14   next?

15   CONTINUED DIRECT EXAMINATION BY

16   MR. BERLAND:

17   Q.   What does it mean to be designated the

18   arresting officer?

19   A.   You are the individual who is basically going

20   down on the paperwork as having made the arrest,

21   documented as the arresting officer. Several officers

22   can assist, but the arresting officer is the official

23   person on record as the person who placed the

24   individual under arrest.

25   Q.   There's nothing in the police guidelines that

YVETTE PACHECO  SENIOR COURT REPORTER

HERNANDEZ - DIRECT -PEOPLE

1    says the arresting officer is the only person who could

2    see paraphernalia or drugs in plain view; is that

3    right?

4        A.   That is correct, sir.

5             THE COURT:  You said seized or see?

6             MR. BERLAND:  See.

7        Q.   Let's move on to People's Exhibit 3 for

8    identification.

9             MR. BERLAND:  I'm showing it to counsel.

10       Q.   What are you looking at?

11       A.   This is a sealed envelope from the police

12   laboratory which contains an analysis report, an

13   envelope that was utilized by the police department to

14   safeguard narcotics, as well as the security envelope

15   and the narcotics, the cocaine and marijuana that was

16   recovered from the second floor apartment at 451 Lenox

17   Avenue.

18       Q.   How do you recognize that to be the cocaine

19   and marijuana recovered from the second floor

20   apartment?

21       A.   It has the marijuana and the cocaine, which I

22   recognized, as well as Detective Romero's name and

23   voucher number which was associated with the drugs that

24   were recovered from the second floor apartment.

25       Q.   As I asked you regarding People's Exhibit 2 --

YVETTE PACHECO  SENIOR COURT REPORTER

HERNANDEZ - DIRECT -PEOPLE

1    withdrawn.

2                Who personally picked up those items from

3    the property clerk's office?

4        A.   That would be Detective Romero.

5        Q.   And where, again, was the cocaine within

6    People's Exhibit 3 located in the apartment?

7        A.   In what is considered the living area, large

8    area of the apartment in the brown wooden box on glass

9    shelves.

10       Q.   That would be this wooden box right here in

11    People's Exhibit 2?

12       A.   Yes.

13       Q.   The bottom one?

14       A.   Yes.

15       Q.   You also stated, Detective, there was

16    marijuana within that exhibit?

17       A.   Yes, sir.

18       Q.   Is that the marijuana that was recovered on

19    the table?

20       A.   Yes, sir.

21       Q.   How do you know that?

22       A.   It's listed on the same voucher as the cocaine

23    was listed.

24            MR. BERLAND:  I ask that People's

25    Exhibit 3 be moved into evidence.

YVETTE PACHECO   SENIOR COURT REPORTER

HERNANDEZ - VOIR DIRE -DEFENSE

1          MR. KEITH:  Just a brief voir dire.

2          THE COURT:  Sure.

3    VOIR DIRE EXAMINATION BY

4    MR. KEITH:

5        Q.   Detective Hernandez, would it be accurate to

6    say that with regards to the items in the exhibit

7    before you, that you do not have an independent

8    recollection of them, that basically you're testifying

9    and using the property voucher to refresh your

10   recollection?

11       A.   Both.  Would be the type of packaging. I

12   recall type of packaging that was used in items

13   utilized for the items recovered from the second floor

14   apartment as well as the voucher number that's on the

15   lab.

16       Q.   With regard to your activities that day, did

17   you generate any paperwork as a result of your

18   involvement?

19       A.   A memo book entry.

20       Q.   Other than that --

21       A.   I think that was it.

22       Q.   So you didn't prepare any of the property

23   vouchers?

24       A.   No, the property vouchers I definitely

25   assisted in the preparation of them, but not this

HERNANDEZ - VOIR DIRE -DEFENSE

1    (indicating).

2        Q.   Is it fair to say that was found by someone

3    else and your testimony is based on your recollection

4    being refreshed by looking at the paperwork?

5        A.   That and looking at the items and recognizing

6    the items that were in the brown box on that date.

7              MR. KEITH:  Thank you.

8              THE COURT:  It's received in evidence.

9              (People's Exhibit 3 was received in

10   evidence.)

11   CONTINUED DIRECT EXAMINATION BY

12   MR. BERLAND:

13       Q.   You are about to be handed what was premarked

14   for identification as People's Exhibit 4?

15             THE COURT:  What's in there?

16       A.   That looks like that came from the apartment

17   on the fourth floor, the door itself to get into the

18   room and keys to the box to the lock.

19       Q.   You testified earlier that the keys were

20   recovered from Steven Brown?

21       A.   That is correct.

22       Q.   Do you know if the keys contained within

23   People's Exhibit 4 was one of the keys recovered from

24   Steven Brown?

25       A.   Yes, sir.

1    Q.    Yes. It was?

2    A.    Yes, sir.

3    Q.    Do the contents of --

4            THE COURT:  Is that what was part of the

5    door on the fourth floor?

6            THE WITNESS:  Yes.

7            THE COURT:  Any problem with admitting

8    this?

9            MR. KEITH:  No.

10           THE COURT:  All right.

11   Q.    Please take a look at People's Exhibit 3. The

12   cocaine located within that exhibit, can you describe

13   how it's packaged?

14   A.    Yes, sir, in a small clear not Ziplocs which

15   would have the ties on the top, but small plastics that

16   are sealed by heat.

17   Q.    Can you tell, based on your experience and

18   looking at the small plastic bags the rough weight or

19   how they were packaged?  Grams?  Half grams?  If you

20   can tell.

21   A.    They appear to be half grams, but depending on

22   the weight, they could also be grams of cocaine.  These

23   size bags are usually $20 bags being the ones that are

24   in here or half grams.

25   Q.    When you say "usually $20 bags," can you

HERNANDEZ - DIRECT - PEOPLE

1    elaborate for the jury how you come to that conclusion?

2         A.   Um, yes. When an individual is going to buy a

3    $20 bag or purchase a $20 bag of cocaine, the amount --

4    the specific amount and quantity in the bag can alter a

5    little bit, depending on the operation, depending on

6    how much product is put into it; but, roughly, you're

7    going to get about a half a gram of cocaine for $20,

8    and they'll package it in a small bag and weigh out

9    about a half of a gram or so in that area and place

10   that and sell it for $20.  Usually, a full gram of

11   cocaine can go for about $30, $35.  It's gone up

12   significantly since then.  When you cut it down, take a

13   gram, cut it in half, you charge $20. You wouldn't

14   charge the half of 35.

15        THE COURT:  Okay, the horse died.  Let's

16   go.  We are beat the horse to death.  Go ahead.

17        Q.   Detective, did there come a time while you and

18   your team were executing the warrant on the second

19   floor that you came to learn there was a problem with

20   the second search warrant?

21        A.   Yes, sir.

22        MR. KEITH:  Objection.  Form.

23        THE COURT:  He opened on it. I think the

24   jury knows what is coming.  I don't think we need

25   to tarry.  For some reason, the police decided

YVETTE PACHECO  SENIOR COURT REPORTER

HERNANDEZ - DIRECT - PEOPLE

1      that they were not going to break down a door

2      above the second floor.

3             THE WITNESS:  That is correct, sir.

4      Q.    Can you please explain why?

5      A.    Um, when the field team reached the door on

6  the second floor landing, instead of finding what was

7  supposed to be an apartment or believed was to be an

8  apartment, they found multiple doors to multiple rooms.

9      Q.    You just testified behind the second floor

10  door --

11      A.    Sorry, going to the third landing.  From the

12  second floor going up to the third floor.

13      Q.    There came a time that you were informed of

14  this problem?

15      A.    Yes, sir.

16      Q.    What did you personally do at this time, you

17  and members of your entry team?

18      A.    We spoke to the supervisors at the location.

19  We went up.  We had people posted upstairs on the --

20  that had went up to look and to safeguard the floors.

21  We went up. I went up with Romero and the supervisors

22  and we took a look at the floors and realized that

23  there was four rooms -- four doors and an open door

24  which was a bathroom on both the -- that floor and a

25  stairwell that led to another floor above that.  We

HERNANDEZ - DIRECT - PEOPLE

1    went back downstairs and spoke again to supervisors. We

2    had communications with members of the team that were

3    in the rear security, and after that, after receiving

4    communications from them, I went back up with Detective

5    Romero, and we went to a corner apartment door on the

6    fourth floor to the rear of the building.

7         Q.   Before we get to the fourth floor, can you

8    describe can you please what a single occupancy

9    residence see is?

10        A.   Usually an apartment door, floor that's cut up

11   into multiple dwellings, but only just one room and

12   they have on that floor or somewhere in the building a

13   common bathroom.  In particular with these, one room,

14   with a closet and each floor of the two floors was a

15   bathroom in the middle.

16        Q.   Would you characterize the a rooms as single

17   occupancy residences?

18        A.   Yes. Just one person would be in that

19   location. It was a tiny room, tiny apartment.

20        Q.   One last question before I move to the fourth

21   floor. The four doors on both the third floor and four

22   doors on the fourth floor, how close were they to one

23   another in proximity?

24        A.   They were several feet apart, but not a big

25   distance because the rooms for each apartment were

HERNANDEZ - DIRECT - PEOPLE

1    small.

2         Q.   So there came a time that you personally went

3    up to the fourth floor; is that right?

4         A.   Yes, sir.

5         Q.   What information, if any, was provided to lead

6    you up to the fourth floor?

7         A.   That the rear security had observed the lines

8    from the monitoring, from the cameras, found where the

9    cameras were placed, they had followed the lines into

10   the second floor apartment, one of the apartments that

11   we were in and that there had been a second line coming

12   from that going into an apartment on the fourth floor

13   in the rear of the building.

14        Q.   Did you receive any information regarding any

15   door slamming or people running?

16        A.   The field team, when they reached the third

17   floor landing door, indicated that they had heard

18   running and a door slamming above them.

19        Q.   "Above them," meaning above the third floor?

20        A.   Yes, sir.

21        Q.   How many floors did the brownstone have?

22        A.   Four.

23        Q.   Please tell the members of the jury what

24   happened once you got to the fourth floor room with the

25   wires of cable.

YVETTE PACHECO   SENIOR COURT REPORTER