HERNANDEZ - DIRECT - PEOPLE

1     A.    We went to a door, I think it was the
2   southwest door at the end when you turn to the right
3   coming onto the landing, and we went up to the door on
4   the corner that would be the door to the apartment to
5   the rear, and Detective Romero tried the keys in the
6   lock that he recovered from the second floor apartment.
7     Q.    Referring to these keys (indicating)?
8     A.    Yes, sir.
9     Q.    Is this the lock you put the key in?
10    A.    Yes.
11    Q.    Did it turn?
12    A.    Yes, sir.
13    Q.    Please tell the members of the jury what
14  occurred when Detective Romero attempted to open the
15  southwest apartment door with the key?
16    A.    Once we realized that it was working and it
17  was the key for the apartment, we started knocking on
18  the door.  We yelled at the police that were at the
19  door that we were at the door.  The supervisors were
20  there.  They saw --
21          THE COURT:  You can't say what the
22      supervisors saw.  Just what you saw, what you
23      heard, what you did.
24    A.    I was standing there with several people and I
25  started yelling police.  I heard other people yelling

YVETTE PACHECO  SENIOR COURT REPORTER

HERNANDEZ - DIRECT - PEOPLE

1   it.  We waited there. Detective Romero turned the key,

2   pushed the door open.  Um, it was pitch dark.  Couldn't

3   see anything in the room, nothing.  There was no light

4   on.  There was nothing on in the room.  He closed the

5   door back again and then left and went downstairs. He

6   returned back with one of the police stick shields, one

7   of the bunkers and a flashlight. Once I was ready, he

8   opened the door and several -- myself and Detective

9   Romero and several other members of my team entered

10  into the room, into that apartment. He put on a

11  flashlight, turned into the apartment to the right and

12  started yelling -- we all started yelling, police,

13  don't move.  At that point, we observed there was an

14  individual sitting on a sofa, on a couch to the right

15  of the entry on the sofa not saying anything.  Yelled

16  again for the person to get down on the ground. The

17  person did not move. We went in. We found a light

18  switch, turned it on, and secured the individual in the

19  apartment.

20      Q.   Just to back up one moment. How big was this

21  room --

22              THE COURT:  Is this one of the minuscule

23          rooms we have talked about so much so often?

24              THE WITNESS:  Yes, sir.

25              THE COURT:  Fine. Tiny room, he says.

HERNANDEZ - DIRECT - PEOPLE

1    Q.   In relation to the jury box, would you say

2  bigger, smaller, the same size?

3    A.   About the size of this, from the end from

4  where the wall is to about the end here.  Almost the

5  same in width, maybe a little thinner.  The passageway

6  was very small to walk in.

7    Q.   Do you recall how many windows were in this

8  room?

9    A.   One, if I remember correctly.

10   Q.   You said it was pitch black.  The shades were

11  down?

12   A.   Shades were down and black garbage bags over

13  the glass.

14   Q.   Did this room have a closet?

15   A.   Yes, sir.

16   Q.   Can you explain the layout of the room?

17   A.   As soon as you go in, there is a closet

18  immediately to your left and the rest of the room goes

19  to your right.  At the end of it, there's a window.

20   Q.   Now, you said at the time the lights went on,

21  you saw an individual sitting, not moving, on the

22  couch; is that right?

23   A.   That is correct.

24   Q.   Did you come to learn that individual's name?

25   A.   Yes, sir.

YVETTE PACHECO  SENIOR COURT REPORTER

HERNANDEZ - DIRECT - PEOPLE

1    Q.    What was that individuals name?

2    A.    Mr. Edward Green.

3    Q.    Do you see Edward Green in the courtroom here

4    today?

5    A.    Yes, sir.

6    Q.    Can you point to him and indicate an article

7    of clothing?

8    A.    To my right. He has a -- a beige-colored shirt

9    and beard and eyeglass case sticking out of his shirt

10   pocket.

11            THE COURT:  So that's the defendant,

12   Mr. Green.

13   Q.    Is there anyone else in the room at this time

14   with the defendant?

15   A.    No, sir.

16   Q.    Please explain exactly how the defendant was

17   sitting when you entered the room.

18   A.    Just sitting there, not saying anything.

19   Q.    Please tell the members of the jury everything

20   you observed inside of this room once the light switch

21   went on.

22   A.    Okay, the minute the lights went on and we

23   secured Mr. Green to make sure that everyone was safe

24   and we checked the closet to make sure no one was in

25   there, immediately in the closet, I observed two safes,

HERNANDEZ - DIRECT - PEOPLE

1   two large safes in the closet. Throughout the room,

2   specifically, there was a fireplace, like a mantel,

3   fireplace mantel on it was several boxes of baggies,

4   clear plastic baggies a bottle of Peroxide, box of

5   baking soda. On the TV stand above that was a DVD

6   player and above that was a monitor, like a small

7   monitor I've observed in the past.  There was a small

8   black digital scale sitting on the stand by where the

9   TV was.  Towards the rear by the window, there was a

10  metal tin.  In the tin, there were a whole bunch of

11  small, clear plastic baggies, some of them with the Red

12  Apple label on it and a pink Philly box, similar to the

13  ones observed downstairs on the second floor, sitting

14  on an end table. Those were the things that

15  immediately, upon entry to the apartment, I observed.

16       Q.   Did you notice in the apartment a table that

17  would be used to process or package narcotics?

18       A.   Yes, sir.  As soon as you went into the

19  apartment, basically a little to your left, next to the

20  closet door, there was a glass table. On the glass

21  table was, again, cocaine residue --

22            MR. KEITH:  Objection.

23            THE COURT:  Why do you think it is

24       cocaine residue?

25            THE WITNESS:  Because it was consistent

YVETTE PACHECO  SENIOR COURT REPORTER

HERNANDEZ - DIRECT - PEOPLE

1    with the appearance of cocaine and of cocaine

2    residue that I observed hundreds of times in the

3    past.

4            THE COURT:  Overruled.

5            Go ahead.

6    A.   Underneath that was a heat sealer utilized to

7    seal plastic, underneath that table.

8    Q.   When you say a heat sealer utilized to seal

9    plastic, take a look at the exhibit in front of you.

10   Are those bags heat sealed closed?

11   A.   Yes.

12   Q.   You would need a heat sealer like the one

13   found in the fourth floor to seal bags found on the

14   second floor?

15   A.   That is correct, sir.

16   Q.   In total, in this room, do you know how many

17   digital scales were recovered?

18   A.   I think ten, approximately ten digital scales

19   were recovered.

20   Q.   Were these scales different shapes and sizes?

21   A.   Yes, sir.  There -- they were all digital

22   scales and they varied from small black digital scales

23   to large scales of multiple colors.  Some of them were

24   used and some of them were brand-new.

25   Q.   Were these scales --

HERNANDEZ - DIRECT - PEOPLE

1    THE COURT:  Do we have them?

2    MR. BERLAND:  I'm going to get to them.

3    THE COURT:  Then we do not have to test

4    his memory.  What's next?

5    Q.    Heat sealers, let's talk about that. You

6    testified to observing a heat sealer on the ground. How

7    many heat sealers recovered within the room?

8    MR. KEITH:  Objection to the form.

9    THE COURT:  On what grounds?

10    MR. KEITH:  I think he can be a little

11    more specific as to where the heat sealers were

12    found.

13    THE COURT:  How many heat sealers did you

14    see?

15    THE WITNESS:  Three, sir. One was

16    underneath the table, and I think -- there's notes

17    on the other one.  I think one was in a closet and

18    one on the end table.

19    Q.    We'll get to the closet in a minute?

20    MR. KEITH:  One in the end table.

21    THE WITNESS:  I think so.  I'm not

22    hundred percent sure.

23    THE COURT:  We'll spend time until we get

24    to that, but let's get to it somehow, some day,

25    today.

HERNANDEZ - DIRECT - PEOPLE

1     MR. BERLAND:  Getting there, Your Honor.

2     THE COURT:  But not fast enough, but

3  that's my problem. Go ahead.

4     Q.   Can you describe the characteristics of all

5  the plastic bags you observed inside the back room?  I

6  know you testified to recovering plastic bags.

7     A.    They were clear plastic bags, like sandwich

8  type bags, in boxes and there were multiple, hundreds

9  of thousands of small Ziploc bags which have the Apple

10  logo on it and numerous other bags of different sizes.

11     Q.   You testified a few moments ago about

12  observing on a mantel baking soda?

13     A.   Yes, sir.

14     Q.   As a trained narcotics detective, what is the

15  significance of the presence of this types of products

16  in a room such as this room?

17          MR. KEITH:  Objection.

18          THE COURT:  Sustained as to form.

19          What are the things used for?  What can

20     they be used for regarding drugs as opposed to

21     bleaching your hair and cleaning wounds?

22          THE WITNESS:  Mixing items, such as

23     baking soda, use liquids to cut, to mix the baking

24     soda with the cocaine so that, one, you can lower

25     the concentration and purity of the cocaine, the

HERNANDEZ - DIRECT - PEOPLE

1    strength of it, and so you can increase the amount

2    of viable substance, a mixed cocaine substance

3    that you have for sale. It increases the quantity

4    you have available.

5    Q.   What exactly is a kilo wrapper?

6    A.   We call it a kilo wrapper because it's wrapped

7  in the shape of a brick which is commonly the shape of

8  a brick of kilo, thousand grams of cocaine. It's

9  pressed into a brick form, and the wrappers, when they

10 are recovered, they are in the brick form still with

11 residue.

12   Q.   Any kilo wrappers recovered within the fourth

13 floor room?

14   A.   Yes, sir.

15   Q.   Approximately how many, if you recall?

16   A.   At least two.

17   Q.   And where were these wrappers located?

18   A.   Inside a black garbage bag.

19   Q.   Let's talk about the closet in the room that

20 you mentioned earlier.

21        You testified the closet was open. Did

22 you do that or somebody else?

23   A.   No, the closet door was open, but I went and

24 pushed it open further to make sure that there was no

25 one hiding inside.

HERNANDEZ - DIRECT - PEOPLE

1    Q.    When you say "it was open," do you mean it was

2    open when you and your team entered the fourth floor or

3    you observed someone open it?

4    A.    That when we went there, it wasn't locked, and

5    it was pulled open by Detective Romero since he had the

6    bunker, and then I looked into it to make sure there

7    was no one inside.  It wasn't so big that somebody

8    could hide on top of the safes, but we wanted to make

9    sure.

10    Q.    You just said a safe. How many safes in the

11    closet?

12    A.    Two of them.

13    Q.    Anything else in closet other than the two

14    safes?

15    A.    Yes, there were other what we call drug

16    paraphernalia or packaging equipment.  A lot of the

17    clear plastic bags with the Apple label, a couple of

18    boxes containing plastic bags in it, in the closet,

19    literally around the closet. I think there were digital

20    scales in there also.

21    Q.    Were the scales inside the safe?

22    A.    Outside.

23    Q.    But in the closet?

24    A.    That's correct.

25    Q.    Can you describe the two safes to the members

1    of the jury?

2        A.    Yes. One was a white -- they're both fire

3    retardant safes with combination, spindle dials on the

4    front of them. They were pretty large and heavy. One

5    was white and one was gray.

6        Q.    Now, did these safes have a key lock or

7    combination to enter the safe?

8        A.    They had the combination spindle wheel on it.

9        Q.    Just out of curiosity --

10            THE COURT:   Curiosity?  Where in the

11       rules of evidence is curiosity?  Do you want to

12       ask a question?  Do not give me that kind of a

13       lead in because I likely would say no.  You want

14       curiosity, go have a beer with the witness

15       sometime.

16       Q.    Detective Hernandez, did you observe the

17    combination to a lock on Mr. Green's hand?

18       A.    Did I observe it?

19       Q.    Yes.

20       A.    Not that I can recall.

21       Q.    Did you observe, if you can recall, a

22    combination to a lock on his forehead?

23       A.    No, sir.

24       Q.    What did you do once you realized there were

25    the two safes in the closet?

1    A.   Well, they were, as all the other items,

2  everything was -- everything was left where it was,

3  safeguarded.  When we had permission to enter it, we

4  took them out and broke them open --

5    Q.   I'm going stop you.  I apologize.

6         MR. KEITH:  Your Honor, the witness

7  should be allowed to finish the answer to the question.

8  That was pretty good.

9         THE COURT:  I agree that we stop and

10       start.  He's correct, that while I haven't told

11       the jury that there's not one thing related to the

12       mechanics and legality of executing search

13       warrants that you have anything to do with, he is

14       entitled to establish from his standpoint that

15       they had another warrant to do this and forgot to

16       do that.

17            Before you smashed open the safe,

18       Detective Romero came down and got a search

19       warrant?

20            THE WITNESS:  Yes, sir.

21    A.   We used a sledge hammer and Kelly tool, and

22  used it on the two safes to open the safes.

23    Q.   When Detective Romero came down to this

24  building to get a supplemental search warrant, what

25  were you doing in the fourth floor apartment?

HERNANDEZ - DIRECT - PEOPLE

1    A.    Hanging out.  I was basically just standing

2   around killing time.

3    Q.    Securing the property?

4    A.    Yes, sir, and safeguarding the room until we

5   heard from Detective Romero.

6    Q.    Let's get back into smashing the safes.

7   Continue.

8    A.    We opened up both safes.  In the gray safe, the

9   one that was a little bit bigger was a white I would

10  describe it as baby gift bag that you put gifts in.   In

11  there was three plastic bags, each containing a large

12  chunk of cocaine.  That was in the gray safe.  In the

13  white safe there were several items.  There was a

14  couple more Philly cigar boxes, there was actually two,

15  I think a Dutch Master cigar box and Philly blunt cigar

16  box. One of the boxes contained about $1,100 in United

17  States currency and also several quantities of packaged

18  cocaine.  The other box, the Dutch Masters box had a

19  couple of bags of cocaine. The smaller one, the Philly

20  box had the cocaine sealed up and ready for sale,

21  packaged.

22    Q.    Did there come a time when you were inside of

23  the fourth floor apartment that the defendant was

24  placed under arrest?

25    A.    Yes, sir.

YVETTE PACHECO  SENIOR COURT REPORTER

HERNANDEZ - DIRECT - PEOPLE

1    Q.   Was any money recovered from him?

2    A.   Yes, sir.

3    Q.   Do you recall how much?

4    A.   I think it was about $330, somewhere

5    around $330.

6    Q.   Now, inside of baby bag, you said there were

7    three large chunks of cocaine?

8    A.   Yes, sir.

9    Q.   Did you later come to learn the weight of the

10   chunks?

11   A.   Yes, sir.

12   Q.   What would that be?

13   A.   Each was about 125 grams, maybe off by 125,

14   126 and 125.  They came out to close to 375, 400 grams

15   of cocaine.

16        MR. BERLAND:  This is People's Exhibit 5

17        for identification.

18   Q.   What is this?

19   A.   The heat sealers recovered in that room, that

20   apartment.

21   Q.   Again, where were the heat sealers recovered?

22   A.   I know one was underneath the glass top in the

23   right when you came into the apartment on a desk. I

24   would have to take a look at the notes to see where I

25   recovered the other ones.

1    Q.   That would refresh your recollection?

2    A.   Yes, sir.

3    Q.   Take a look what's marked 101 for

4    identification?

5         MR. KEITH:  May I have a moment with the

6    prosecutor?

7         THE COURT:  Sure.  What's the difficulty?

8    It's only being used to refresh his recollection.

9         MR. KEITH:  Let's approach.

10   Q.   The question was, do you recall where the

11   additional four heat sealers were located within the

12   apartment?

13   A.   Yes, sir.

14        MR. KEITH:  Your Honor, the detective is

15   reading from something.  Can we have that

16   explained?

17        THE COURT:  Are these notes you created

18   or somebody else created?

19        THE WITNESS:  Both, Your Honor.

20        MR. KEITH:  I object to him reading from

21   it.

22        THE COURT:  Technically, you're

23   absolutely correct.  He should not read it.  He

24   should look at it, put it down, see if it

25   refreshes his recollection.  If it doesn't, he can

HERNANDEZ - DIRECT - PEOPLE

1     pick it up and take another look at it.  That is

2     the rule, which he's perfectly entitled to.

3     Q.  Now, that you have looked at it, does that

4  document refresh your recollection?

5     A.  Yes, sir.

6     Q.  Where were the other heat sealers located?

7     A.  In the top drawer of the end table, which was

8  right next to the glass top, in that end table itself.

9     Q.  Were there three, two, more there?

10    A.  The one that was right next to the end table

11  on the floor underneath the glass top and the one in

12  the end table right next to the glass top on the top

13  drawer.

14    Q.  In total, how many heat sealers were recovered

15  in the apartment?

16    A.  Three.

17        THE COURT:  Where do you buy a heat

18  sealer?  People know about buying plastic bags,

19  Peroxide.

20        THE WITNESS:  Several locations. You can

21  buy a heat sealer at any appliance store, like a

22  Walmart, but in Manhattan, especially, any small

23  grocery stores where they sell packaging, digital

24  scales, they also sell heat sealers.

25    Q.  Before you take a look at the digital scale, I

HERNANDEZ - DIRECT - PEOPLE

1    ask that that exhibit be moved into evidence?

2              MR. KEITH:  I object. I don't think a

3         sufficient connection has been made.

4              THE COURT:  We can wait for Detective

5         Romero.  We'll suspend with that one.

6    Q.   Take a look at People's Exhibit 6, please.

7    A.   Yes, sir.

8    Q.   What is that?

9    A.   These are some, most of the digital scales

10   recovered in that apartment on the fourth floor.

11   Q.   How many digital scales contained within

12   People's Exhibit 6, if you know?

13   A.   I think's two of them in here.

14   Q.   Did you recover the items within the

15   apartment?

16   A.   Yes, sir.

17   Q.   Where in the room were the items located?

18   A.   Several locations. They were recovered in

19   small Philly boxes on an end table by the window. They

20   were recovered in the closet.  Most of them were

21   recovered in the closet in the apartment.

22             THE COURT:  The punctuation of your last

23        sentence confused me.  When you talk about end

24        table by the window, is it end table, and also by

25        a window or the end table which was by the window?

HERNANDEZ - DIRECT - PEOPLE

1    When you are talking about an end table by the

2    window, is that describing the location of one

3    scale or two sales?

4            THE WITNESS:  The end table by the window

5    and it's two scales, Your Honor.

6            MR. KEITH:  The two scales are inside the

7    end table?

8            THE WITNESS:  No.  One of the Philly

9    boxes on top of the end table.

10   Q.   Did you personally recover these items?

11   A.   Yes, sir.

12   Q.   What did you do with the items after

13 recovering them?

14   A.   They were safeguarded by myself and I went

15 with Detective Romero once he returned with all the

16 property back to my command.

17   Q.   As far as the items contained within the

18 exhibit, did you do the voucher?

19   A.   In this exhibit, no.  I think Detective Romero

20 did them, but I did not.

21           MR. BERLAND:  Your Honor, at this time, I

22   offer People's Exhibit 6 into evidence.

23           THE COURT:  Mr. Keith --

24           MR. BERLAND:  Actually, one more

25   question.

YVETTE PACHECO  SENIOR COURT REPORTER

HERNANDEZ - DIRECT - PEOPLE

1   Q.   The items contained within People's Exhibit

2   section are the same or substantially the same

3   condition as they were when you recovered them on

4   November 1, 2007?

5   A.   Yes, sir.

6           MR. BERLAND:  I ask that they be offered

7   into evidence.

8           MR. KEITH:  No objection.

9           THE COURT:  Number 6 is received.  We'll

10  mark it more formally later.

11          (People's Exhibit 6 was received in

12  evidence.)

13  Q.   What is that in front of you?

14  A.   This is the two cameras that were recovered

15  from the building, which were the cameras being

16  utilized in the surveillance of the front of the

17  doorway and the hallway, the stairwell, and a small

18  black digital scale which was recovered on the TV

19  stand, on the entertainment center or where the TV was

20  and monitor was.

21  Q.   The TV stand, was it enclosed or open?

22  A.   Open.

23  Q.   Where on the stand was the scale located?

24  A.   There were some CDs, DVDs and on top of that.

25  Q.   Was the TV monitor on or off when you entered

HERNANDEZ - DIRECT - PEOPLE

1     the apartment?

2         A.   The monitors were off.

3         Q.   Did you personally take down the cameras

4     located outside of the building and in the stairwell?

5         A.   No, sir.

6         Q.   Did there come a time they were given to you?

7         A.   Yes, sir.

8         Q.   Do you know if you vouchered that evidence?

9         A.   I assisted in the vouchering of this evidence.

10        Q.   Did the contents of People's Exhibit 7 fairly

11    and accurately depict -- in the same condition as they

12    were when you vouchered them on November 1, 2007?

13        A.   Yes, sir.

14              MR. BERLAND:  I ask that People's 7 be

15         moved into evidence.

16              MR. KEITH:  Brief voir dire.

17              THE COURT:  Sure.

18    VOIR DIRE EXAMINATION BY

19    MR. KEITH:

20        Q.   With regard to the TV and monitor in the

21    fourth floor apartment, it's correct that you never saw

22    those items in working condition?

23        A.   I saw the TV screen -- the T.V. was in working

24    condition and the monitor was working, but had static

25    on it.

YVETTE PACHECO  SENIOR COURT REPORTER

HERNANDEZ - VOIR DIRE - DEFENSE

1    Q.   When you say "had static," you couldn't see

2  anything?

3    A.   Yeah, it was just a white screen.

4    Q.   With regard to the TV, what were you able to

5  see on the TV screen?

6    A.   The fact that it was connected to a DVD

7  player. The DVD logo came on.

8    Q.   So, is it fair to conclude, just being

9  precise, if I understood you correctly, you just saw a

10 white screen on the monitor, and you were unable to

11 discern that the TV was connected to a DVD player?

12   A.   That is correct.

13        THE COURT:  Is this as you entered the

14   first time?

15        THE WITNESS:  This is while I was at the

16   location and after being there for some time

17   turned them on.

18        THE COURT:  Did you see anything as a

19   light source, however faint, when you and

20   Detective Romero opened the door for the first

21   time?

22        THE WITNESS:  No, sir.

23        THE COURT:  So the monitor that you say

24   later had static when you came in was black?

25        THE WITNESS:  That's correct.

YVETTE PACHECO  SENIOR COURT REPORTER

HERNANDEZ - VOIR DIRE - DEFENSE

1          THE COURT:  It was not emitting any

2     light?

3          THE WITNESS:  That's correct, sir.

4          THE COURT:  The exhibit is admitted.

5          MR. KEITH:  I don't see the relevance.

6          THE COURT:  I think the evidence is

7     there.  Objection is overruled.  Number seven is

8     received.

9          (People's Exhibit 7 was received in

10    evidence.)

11         THE COURT:  Continue.

12    CONTINUED DIRECT EXAMINATION BY

13    MR. BERLAND:

14    Q.   There came a point you turned on the monitor

15    and saw static?

16    A.   Yes.

17    Q.   Had the cameras been ripped down by members of

18    your field team?

19    A.   Yes.

20    Q.   Based on your training and experience and

21    common knowledge, when the camera is ripped down, will

22    you be able to see anything?

23         MR. KEITH:  Objection.

24         THE COURT:  Sustained.

25         MR. KEITH:  Thank you.

HERNANDEZ - DIRECT - PEOPLE

1          THE COURT:  Don't thank me.  I am just

2     doing my job.

3     Q.    Were both the cameras when People's Exhibit 7

4     taken down or ripped off the wall at the time you

5     switched on the monitor and saw static?

6          MR. KEITH:  Objection.

7          THE COURT:  Overruled.  If he knows the

8     sequence.

9     A.    It was ripped down before I turned on the

10    monitor.

11         THE COURT:  Is this number eight?

12         MR. BERLAND:  It is Your Honor.

13    Q.    What is this?

14    A.    This is all -- the Philly box or one of the

15    Philly boxes, pink boxes, cigar boxes recovered from

16    the end table which is by the window in the fourth

17    floor room apartment which had contained a scale and

18    some plastic Baggie packaging, as well as plastics that

19    were removed from the garbage inside the apartment,

20    including the wrappers, the kilo wrappers that I spoke

21    about earlier.

22    Q.    The kilo wrappers are within that exhibit?

23    A.    Yes, sir.

24    Q.    Did you recover any playing cards within the

25    fourth floor apartment?

1    A.   Yes, sir.

2    Q.   And was anything of significance to you on

3  those playing cards?

4    A.   Yes.  They also contained signs of white

5  powder on them, residue from cocaine on them.

6    Q.   How many of those playing cards did you

7  voucher?

8    A.   I think there's one in here. There were

9  multiple cards in the garbage and they were left in the

10  garbage.

11    Q.   I don't think I ever asked you; what does it

12  mean to voucher property?

13    A.   To take it into police custody, to account for

14  it and to place it into safekeeping in case it needs to

15  be reviewed, utilized or observed in the future.

16    Q.   The items in People's Exhibit 8, you recovered

17  those items?

18    A.   Yes, sir.

19    Q.   Are they in the same condition or

20  substantially the same condition as they were on

21  November 1, 2007?

22    A.   Yes, sir.

23         MR. BERLAND:  I ask that this be offered

24     into evidence as People's Exhibit 8.

25         THE COURT:  Mr. Keith.

HERNANDEZ -VOIR DIRE - DEFENSE

1          MR. KEITH:  I need to ask a couple of

2      questions, Your Honor.

3  VOIR DIRE EXAMINATION BY

4  MR. KEITH:

5      Q.   With regard to the playing cards, do you

6  recall where they were located?

7      A.   Yes, sir.  One was by the end table with the

8  glass counter.

9      Q.   On it or in it?

10     A.   Actually, excuse me, one in the Philly box

11  that was in the safe and the majority of them were in

12  the garbage bag.

13     Q.   How many playing cards were there?

14     A.   There were several.

15     Q.   Several?

16     A.   Yes.

17          THE COURT:  Ten?  Fifteen?  Twenty?

18          THE WITNESS:  I would say between five

19      and ten, something around there Your Honor.

20     Q.   One was inside the Philly box and several were

21  in the garbage?

22     A.   Yes, sir.

23          MR. KEITH:  No objection.

24          THE COURT:  All right, 8 is received.

25          (People's Exhibit 9 was received in

YVETTE PACHECO  SENIOR COURT REPORTER

HERNANDEZ - DIRECT - PEOPLE

1    evidence.)

2                THE COURT:  What else?

3    CONTINUED DIRECT EXAMINATION BY

4    MR. BERLAND:

5        Q.   Within Exhibit 8, there's a Philly box in

6    there?

7        A.   Yes, sir.

8        Q.   Before lunch or earlier this afternoon, you

9    were discussing the Philly box you observed in the

10   second floor apartment.  Do you recall that?

11       A.   Yes, sir.

12       Q.   I will withdraw that and back up a moment.

13            Was there any residue or what you believe

14   to be a white powder substance within the Philly box in

15   People's Exhibit 8?

16       A.   Yes, sir.

17       Q.   The Philly box from the second floor, did you

18   observe residue or white powdery substance in that box?

19       A.   I don't recall if there was.  I know there was

20   on the glass tops, but I'm not too sure -- I don't

21   recall now whether there was in the Philly boxes

22   downstairs in the second floor or not.

23       Q.   The Philly boxes down on the second floor,

24   were they vouchered evidence?

25       A.   No, sir.

1    Q.    Were pictures taken of those?

2    A.    Yes, sir.

3    Q.    Do you know, sitting here, why those Philly

4    boxes on the second floor were not vouchered?  If you

5    know.

6    A.    Because the items were recovered from them

7    that were significant to the case, the plastic Baggies,

8    that was it.

9    Q.    And you took -- withdrawn.

10              Pictures were taken of everything

11    recovered from the second floor?

12    A.    That is correct, sir.

13    Q.    That is People's Exhibit 9 for identification.

14    Do you recognize that all that?

15    A.    Yes, sir.

16    Q.    What is it?

17    A.    Also items recovered in the fourth floor

18    apartment, specifically the Dutch Master box which

19    contained bags of cocaine recovered in the white safe.

20    The Philly blunt pink box that was also recovered with

21    money and sealed ready bags of cocaine. The sandwich

22    bags recovered on the mantel in the -- next to the TV

23    unit and boxes of plastic bags that were also recovered

24    in the closet, as well as multiple Apple and clear

25    plastic bags, clear Ziploc bags recovered from the

HERNANDEZ - DIRECT - PEOPLE

1   window and the closet and in the end table.  Also, I'm

2   sorry, the gift bag that had the three plastic bags

3   containing chunks of cocaine recovered in the gray safe

4   is also in here.

5       Q.   You testified to a lot of plastic bags

6   contained within the exhibit. Can you break down, if

7   you can, where in the apartment everything was?

8       A.   Some of the Ziploc Baggies were in the Philly

9   box on top of the end table by the window at the end of

10  the room.  Some of them were in the end table by the

11  glass countertop.  Some of them were in -- a good

12  portion of them were in the closet by the safes and on

13  little shelves that were in the closet.

14      Q.   Did you personally recover the items contained

15  within that exhibit?

16      A.   Yes, sir.

17      Q.   Are the items within Exhibit 9 the same

18  condition or substantially the same condition as when

19  you recovered them on November 1st of last year?

20      A.   Yes, sir.

21           MR. BERLAND:  I ask that these be

22      received into evidence as People's Exhibit 9.

23           THE COURT:  What are the smaller

24      cardboard boxes that don't appear to have labels

25      on them?

YVETTE PACHECO  SENIOR COURT REPORTER

1      THE WITNESS:  They also contain bags in

2   them of different colors to be sealed.

3      MR. KEITH:  That was stuff from out of

4   the closet?

5      THE WITNESS:  These boxes, yes, came out

6   of the closet.

7      THE COURT:  Were they purchasable?

8      THE WITNESS:  Yes, in grocery stores

9   where you buy newspapers and DVDs and those types

10   of items, stationery-type stores that you see with

11   magazines.  A lot of them will sell this and

12   digital scales and other packaging materials

13   needed to package cocaine.

14      THE COURT:  Putting aside packaging.  The

15   boxes you were just referring to, they're

16   purchasable, but not labeled?  The white Baggies

17   in the envelope are labeled?

18      THE WITNESS:  Yes, sir.

19      THE COURT:  One is advertising itself and

20   the other isn't?

21      THE WITNESS:  That is correct, sir.

22      MR. KEITH:  I have no objection.

23      THE COURT:  Nine is received.

24      (People's Exhibit 9 was received in

25   evidence.)

HERNANDEZ - DIRECT - PEOPLE

1      THE COURT:  What's next?

2   Q.   You've been handed People's Exhibit 10 for

3   identification.  What is that?

4   A.   Yes, sir.  This is all the cocaine that was

5   recovered from the safes, from both safes in the fourth

6   floor apartment of 451 Lenox Avenue on November 1,

7   2007.

8   Q.   Can you explain how it was broken down?  I see

9   there is a lot of cocaine in that bag?

10  A.   Yes. I took the items and broke them down,

11  too, depending on where they were, which safe, and how

12  they were packaged.  I wanted to keep them basically

13  together when they were vouchered.  So, they were

14  broken down to I think about possibly eight items, with

15  each item in it; one plastic bag containing ten bags,

16  one plastic bag containing 20 bags of cocaine and so on

17  and so forth.

18  Q.   The larger bag within People's Exhibit 10, how

19  was that packaged?

20  A.   In clear plastic bags, sandwich-type.

21  Q.   Heat sealed, tied, loose?

22  A.   They were loose.

23  Q.   Based on your training and experience as a

24  narcotics officer, are they in pure form, raw or have

25  they been cut?

YVETTE PACHECO  SENIOR COURT REPORTER

HERNANDEZ - DIRECT - PEOPLE

1    A.   They're basically in the way that they're

2  received before the cocaine is repackaged for sale or

3  into smaller packaging.

4    Q.   Putting side the three large bags.  The other

5  cocaine, was that recovered in the white safe?

6    A.   Yes, sir.

7    Q.   How was that packaged?

8    A.   Various methods.  In small Ziplocs, small

9  heated bags and also in clear plastic bags.

10   Q.   More similar to the cocaine found in People's

11 Exhibit 3?

12   A.   That is correct, sir.

13   Q.   Which was recovered on the second floor?

14   A.   Yes, sir.

15   Q.   Now, the table that you testified to earlier,

16 that was in the fourth floor apartment, is that the

17 type of table that could be used to process or cut

18 cocaine, such as the large cocaine in People's

19 Exhibit 10?

20   A.   Yes, sir.

21   Q.   Now, was there -- withdrawn.

22        Did you notice white powdery substance

23 that you believe to be residue scattered or anywhere

24 within the fourth floor apartment?

25   A.   Yes, sir.

1    Q.    Where?

2    A.    On the tabletop, on the glass tabletop and on

3    several other items recovered, such as the Philly box,

4    such as the scale and the packaging and the garbage bag

5    with all the plastics?

6    Q.    When you entered into the fourth floor

7    apartment, based on your years of narcotics work and

8    search warrant executions, what did you believe was

9    taking place in that apartment?

10             MR. KEITH:  Objection.

11             THE COURT:  Sustained.  The jury will

12        figure it out one way or the other.

13    Q.    Based on your training and experience, was the

14    fourth floor room consistent with a --

15             MR. KEITH:  Objection to leading.

16             THE COURT:  I think you should focus on

17        the individual items and that's pretty much where

18        I will tell to you leave it. You can go over the

19        individual items quickly.

20    Q.    You recovered the cocaine from within the

21    safes?

22    A.    Yes sir.

23    Q.    Is the cocaine in the same condition or

24    substantially the same condition as it was in on

25    November 1, 2007?

HERNANDEZ - DIRECT - PEOPLE

1    A.   Yes, sir.

2            MR. BERLAND:  I ask that that be moved

3    into evidence as People's Exhibit 10.

4            MR. KEITH:  Can I just see it again?

5            THE COURT:  Yes, sir.

6            (HANDING.)

7            MR. KEITH:  No objection.

8            THE COURT:  All right.  Ten is received.

9            (People's Exhibit 10 was received in

10   evidence.)

11   Q.   I will move back very quickly to People's

12   Exhibit 5.  There was a question I forgot to ask you.

13           THE COURT:  These are the things

14   identified as the heat sealers?

15           MR. BERLAND:  Correct.

16           THE COURT:  Go ahead.

17   Q.   Did you recover the heat sealers in the

18   apartment?

19   A.   Yes, sir.

20   Q.   And are these heat sealers in the same

21   condition or substantially the same condition today as

22   they were back on November 1, 2007?

23   A.   Yes, sir.

24           MR. BERLAND:  Now, I ask that these be

25   offered into evidence now.

1    THE COURT:  There are two new questions

2    which give an additional basis for five to be

3    accepted.  Anything you want to say, Mr. Keith?

4    The only thing I suspended introduction of until

5    we heard from Detective Romero.  That's why I said

6    there are two additional questions and answers

7    which might serve as a second basis or alternate

8    basis for receiving these. Then I said is there

9    anything you wish to say.

10    MR. KEITH:  I still object to that.

11    THE COURT:  Now received over objection,

12    Exhibit 5.

13    (People's Exhibit 5 was received in

14    evidence.)

15    MR. BERLAND:  The photographs are

16    People's Exhibits 11 through 19, which I will show

17    to the detective in a moment.  I believe that will

18    be nine.

19    THE COURT:  These are the pictorially

20    challenged Polaroids?

21    MR. BERLAND:  Pretty much sums it up.

22  Q.   What are you looking at?

23  A.   The second floor apartment.

24  Q.   Who took the pictures?

25  A.   A member of the team.

HERNANDEZ - DIRECT - PEOPLE

1    Q.   You didn't take them?

2    A.   That is correct.

3    Q.   Do these pictures fairly and accurately depict

4  everything you've testified to here today as to the

5  location, the narcotics and paraphernalia within the

6  apartment?

7    A.   Yes, sir.

8    Q.   Briefly go through each picture.  Should be a

9  number on the back.

10    A.   Number 11 is the glass stand with the wooden

11  box and the Philly boxes next to an empty freezer.

12              MR. KEITH:  On the second floor?

13              THE WITNESS:  Yes, sir.

14              THE COURT:  All second floor.

15    A.   Number 12 is just a picture from the

16  entranceway into the apartment on the second floor.

17  Number 13 is the room to the left when you first enter

18  the apartment that has a video box on it and a table.

19  Number 17 -- sorry, number 14 is a picture, again, of

20  the glass stand and of the freezer and TV screen above

21  with the green all staticie also, whited out.

22  Number 15 is the door to that second floor apartment

23  that says Office of Browns on it.  Number 16 is looking

24  into the apartment to the right towards the kitchenette

25  and the bathroom.  Number 17 is actually a picture of

YVETTE PACHECO  SENIOR COURT REPORTER

HERNANDEZ - DIRECT - PEOPLE

1  the bathroom.  Number 18 is a close-up photo of the

2  brown box with the bags of cocaine and the United

3  States currency.  Number 19 is a partial picture of the

4  stand as well as of the kitchenette area, little alcove

5  of the kitchen.

6          MR. BERLAND:  I ask that this be moved

7      into evidence as People's Exhibit 11 through 19.

8          MR. KEITH:  No objection.

9          THE COURT:  Pictures received.

10         (People's Exhibits 11 through 19 were

11  received in evidence.)

12         THE COURT:  All of these exhibits which

13     actually are admitted into the evidence as opposed

14     to something simply for identification, for

15     example, the voucher that was labeled A, A is not

16     in evidence, all these exhibits plus the

17     photographs which are in evidence probably will be

18     shown to you during the course of the trial.

19     Whether they are or aren't, they are available for

20     you during your deliberations if you need them or

21     want them.  They can even stay in there during

22     your deliberations.  If you want the exhibits, any

23     of them, all of them, just ask me and they'll be

24     supplied.  The point is if we show them to you,

25     hand them to you, like the photographs, show you

YVETTE PACHECO  SENIOR COURT REPORTER

1   by holding the drug exhibits in front of you, you

2   do not have to memorize the details of each

3   because if you want them during the deliberations,

4   you can ask and they'll be in the room with you.

5          So we have decide at the end of his

6   examination of the witness, maybe before, maybe

7   after cross-examination we'll show you the

8   exhibits.

9          MR. BERLAND:  Counsel is looking at

10  People's Exhibits 20 through 26 for

11  identification.

12  Q.   You are holding People's Exhibits 20

13  through 26 for identification.

14  A.   Yes, sir.

15  Q.   Do you recognize these?

16  A.   Yes, sir, I do.

17  Q.   What are they?

18  A.   They are photos that I took inside of the

19  fourth floor apartment at 451 Lenox Avenue.

20  Q.   You took the photographs on the fourth floor?

21  A.   Yes, sir.

22  Q.   The narcotics division couldn't do any better

23  than a Polaroid?

24  A.   This is what we use when we go out.

25  Q.   Let's go through each one.

1       A.   Number 20 is the white safe which contains a

2  picture of the Philly blunt box and Dutch Master box

3  which each contained cocaine. Picture number 21 is what

4  I mentioned like the fireplace, like a mantel that was

5  in the room next to the TV stand with a DVD player and

6  a monitor, and on it the pictures of certain items.

7  Number 22 is a picture of a tin and some plastic

8  baggies that were by the window towards the rear of the

9  apartment.  Number 23 were the shelves inside the

10  closet in that room showing what was on those shelves.

11  Number 24 was the white safe again, but items that were

12  inside the white safe inside the boxes.  Number 25 is

13  the gray safe showing the gift bag with the items that

14  were inside the gift bag.  Number 26 was a closer view

15  of the three clear plastic bags inside the gift bag.

16  Number 27 was the glass top table with a picture of the

17  heat sealer and end table right next to it in that

18  room.

19       Q.   Now, do these pictures fairly and accurately

20  depict the way all of the items located in the fourth

21  floor appeared on November 1, 2007?

22       A.   Of these items, yes, sir.

23       Q.   And you took these pictures?

24       A.   Yes.

25       MR. BERLAND:  I ask the photographs be

HERNANDEZ - VOIR DIRE - DEFENSE

1        moved into evidence as People's Exhibits 20
2        through 26.
3               MR. KEITH:  I have some questions.
4    VOIR DIRE EXAMINATION BY
5    MR. KEITH:
6        Q.   Would you please take a look at People's
7    Exhibit 22 for identification.
8        A.   Yes, sir.
9        Q.   What do you believe is depicted in that
10   picture?
11       A.   A tin, like a box with plastic Baggies inside
12   of it.
13       Q.   With regard to the fourth floor apartment,
14   where do you believe those items are?
15       A.   By the -- by a window.
16       Q.   Detective, didn't you testify earlier that
17   there was, I believe you said there was some garbage
18   bags or something over the windows?
19       A.   No, garbage bags like this that you were going
20   to throw away were by the entrance to the apartment.
21       Q.   Did you say garbage bags were by the entrance
22   to the apartment?  The garbage bags were in the closet?
23       A.   No, the garbage bags were by the entrance
24   inside the apartment.
25              THE COURT:  Was something covering the

HERNANDEZ - VOIR DIRE - DEFENSE

1      window?
2                THE WITNESS:  Yes, sir.
3                THE COURT:  What?
4                THE WITNESS:  A shade.
5      Q.    In the pictures were Venetian blinds?
6      A.    Yes, sir.
7      Q.    Were there Venetian blinds in the fourth floor
8      apartment?
9      A.    Yes, sir.
10     Q.    That's your recollection?
11     A.    Yes, sir.  Underneath the Venetian blinds was
12     a black garbage bag.
13                THE COURT:  Does that mean underneath as
14           in below or underneath as in behind the blinds
15           closer to the glass?
16                THE WITNESS:  Close to the glass.
17                THE COURT:  Blinds, bag and pane of
18           glass?
19                THE WITNESS:  That's correct.
20                THE COURT:  There was a garbage bag
21           against the window?
22                THE WITNESS:  Yes.
23                THE COURT:  And at least one other
24           garbage bag someplace in the apartment.  You are
25           testifying that it was by the entrance to that

HERNANDEZ - VOIR DIRE - DEFENSE

1   apartment?

2           THE WITNESS:  Garbage bags yes, sir, by

3   the entrance.

4           THE COURT:  Were they attached to

5   something or on the floor?

6           THE WITNESS:  The garbage bag were full

7   of garbage on the floor.

8           THE COURT:  Go ahead.

9           MR. KEITH:  May I have the series of

10  photographs marked --

11          THE COURT:  This is on his introduction,

12  supposedly, 22 through 27.

13          MR. KEITH:  Yes, Your Honor.  I want to

14  see if he looks at these photographs whether or

15  not they refresh his recollection.

16          THE COURT:  I sense this will move it

17  along.  May not fit precisely within the evidence.

18  Show them and ask the questions.

19          MR. BERLAND:  I may need to voir dire on

20  those.  I perceive some issues.

21          THE COURT:  Let's wait until he offers

22  them.

23          MR. KEITH:  May they be marked

24  Defendant's B and C for identification.

25          May I approach the witness, Your Honor?

YVETTE PACHECO  SENIOR COURT REPORTER

HERNANDEZ - VOIR DIRE - DEFENSE

1          THE COURT:  Sure.

2      Q.   With regard to the item labeled B, taking a

3  look at that item, what do you see?

4      A.   That's the second floor.

5          THE COURT:  Sustained.  Ask him to

6      familiarize himself then a question. Since it's

7      not in evidence, I will not have him describe it

8      just yet, if at all. This is somehow helping if

9      I'm going to admit 20 through 27. He looked at it

10      and has a mental picture of the picture.

11      Q.   With regard to the item labeled B for

12  identification, looking at that item, do those

13  photographs fairly reflect the physical layout of the

14  second floor apartment at 451 Lenox Avenue?

15          MR. BERLAND:  On what date?

16          THE COURT:  We're not doing the second

17      floor because he's trying to do the fourth floor.

18          MR. KEITH:  I believe he misidentified

19      the other photograph. I think if he looks at the

20      photograph, he can see how.

21          THE COURT:  Walk over.

22          MR. BERLAND:  May I, Your Honor.

23          THE COURT:  Come on up.  I heard, "I took

24      the pictures." 20 through 27 are admitted.

25          (People's Exhibits 20 through 27 were

HERNANDEZ - DIRECT - PEOPLE

1    received in evidence.)

2              MR. KEITH:  I was talking about 22.

3              THE COURT:  What's next?

4    CONTINUED DIRECT EXAMINATION BY

5    MR. BERLAND:

6        Q.  Detective Hernandez, based on your training

7    and experience in warrant executions, can you please

8    explain to the jury the relationship between a room

9    that is being used to sell narcotics and a room being

10   used to package narcotics?

11             MR. KEITH:  Objection.

12       A.  Yes.

13             THE COURT:  You can ask him generally

14       whether every function related to the sale must

15       happen in one place, but you can't relate it to

16       this event.  You have to leave it up to the jury

17       to make whatever ultimate decision you will ask

18       him to make. Go ahead.

19       Q.  Generally speaking, is it common for drugs to

20   be processed in and packaged in the same location

21   they're sold from?

22             MR. KEITH:  Objection.

23             THE COURT:  Overruled.

24       A.  Generally speaking, no, it would be in

25   separate locations.

YVETTE PACHECO  SENIOR COURT REPORTER

1     Q.   Why is that?

2     A.   You don't want the bulk of your merchandise

3  that has a high value to be in the same place that you

4  have clientele coming into and alerting them to the

5  fact that the product is there, which then makes you

6  victim to robberies and anyone coming in there trying

7  to remove the property and the drugs from you without

8  paying.

9     Q.   I think you testified a while back that some

10  money was recovered on the defendant, Edward Green; is

11  that right?

12     A.   Yes, sir.

13     Q.   You said 330-something dollars?

14     A.   That's correct.

15     Q.   Were any tools recovered on the defendant?

16     A.   No, sir, not that I recall.

17     Q.   Was any identification recovered on the

18  defendant, if you recall?

19     A.   I'm not sure if there was or not.  I don't

20  recall any specified indication, but I don't know.  I

21  can't tell you whether he did or not.

22     Q.   Was there anything recovered on the defendant

23  indicating his employment, if you recall?

24     A.   No, sir.

25     Q.   Had you ever met Steven Brown prior to

HERNANDEZ -CROSS - DEFENSE

1    November 1, 2007?

2         A.   No, sir.

3         Q.   Had you ever met the defendant before

4    November 1, 2007?

5         A.   No, sir.

6              MR. BERLAND:  I have nothing further.

7              THE COURT:  Mr. Keith.

8    CROSS-EXAMINATION BY

9    MR. KEITH:

10        Q.   Good afternoon, Detective Hernandez.

11        A.   Good afternoon, sir.

12        Q.   How old are you?

13        A.   Excuse me?

14        Q.   How old are you?

15        A.   I'm 42, going on 43.

16        Q.   What's your educational background?

17        A.   Completed high school, went to college for a

18   little while before going into the police department,

19   and currently attempting to obtain my Bachelor's in

20   criminal justice. Going to school right now.

21        Q.   So you are in your second year of college?

22   How many credits do you have?

23        A.   I have about 70.

24        Q.   Now, at the time of the execution of the

25   search warrant, November 1, 2007, you were a member of

HERNANDEZ -CROSS - DEFENSE

1    the Manhattan North Narcotics?

2        A.   That is correct.

3        Q.   At the time, how long had you been a member of

4    Manhattan North Narcotics?

5        A.   Since 1993.  For over 14 years.

6        Q.   On direct, I believe you said you had been

7    involved in several thousand arrests; is that correct?

8        A.   That is correct.

9        Q.   Now -- and you've been the assigned officer or

10   arresting officer approximately 750 times?

11       A.   Approximately.

12       Q.   And you were not the assigned officer on this

13   case, were you?

14       A.   That is correct, sir.

15       Q.   That was Detective Romero?

16       A.   That is correct.

17       Q.   Now, with regard to your experience as a

18   witness, with regard to the thousands of cases that

19   you've been involved in, approximately how many times

20   have you testified before a Grand Jury, approximately?

21       A.   I don't know. Large amount of time,

22   significant amount of time.

23       Q.   Several hundred?

24       A.   Maybe about 100 or so. I can't give you a

25   number on the Grand Jury terms.

YVETTE PACHECO  SENIOR COURT REPORTER

HERNANDEZ -CROSS - DEFENSE

1    Q.    Now, with regard to testifying in a pre-trial

2    hearings or trial hearings where you are cross

3    examined, how many times have you experienced that?

4    A.    A few.

5             THE COURT:  Under a dozen?

6             THE WITNESS:  Yes, sir, I would think so.

7    Q.    In this case, you were part of the team of

8    officers that were assigned to execute two search

9    warrants at that building, 451 Lenox Avenue, on

10   November 1, 2007; is that correct?

11   A.    That is correct.

12   Q.    And the team broke up into two groups; isn't

13   that correct?

14   A.    There were two separate teams that were

15   executing on that day.

16   Q.    There was a group of officers that went up to

17   the third floor; is that correct?

18   A.    That is correct.

19   Q.    And a group of officers that went to the

20   second floor?

21   A.    That is correct.

22   Q.    You are part of that second group?

23   A.    That is correct.

24   Q.    Detective Romero was the supervisor or the

25   leader of that group?

YVETTE PACHECO  SENIOR COURT REPORTER

—————HERNANDEZ -CROSS - DEFENSE————

1    A.    No, supervisors, sergeants, lieutenants and

2    captains were the leaders of the group.  Detective

3    Romero was the detective, as I say, in charge of any

4    arrests or of the execution of the search warrants.

5    Q.    So, is it fair to say before you guys went to

6    execute the search warrants that you had at that time,

7    he had been designated to be the arresting officer?  If

8    there were arrests to be made, Detective Romero would

9    get credit for the arrests?

10    A.    Not that he was assigned.  It was that he was

11    responsible -- he conducted -- he was the one who

12    conducted the preliminary work that occurred to obtain

13    search warrants, to execute the search warrants at the

14    location.

15    Q.    Before you went in, you knew Detective Romero

16    would be the arresting officer if there were arrests

17    made?

18    A.    Yes, sir. They were his warrants. He was the

19    arresting officer.

20    Q.    He would have to then necessarily do the

21    majority of the paperwork?

22    A.    Um, he would be responsible for the majority

23    of the paperwork or would be the one receiving any

24    paperwork or any other work done by other members of

25    the team.

HERNANDEZ —CROSS - DEFENSE

1    Q.   On direct, you described yourself as the
2   recorder. Explain to the jury what the recorder does.
3    A.   A recorder basically assists the person
4   assigned, the primary investigator in whichever matter
5   that primary investigator wants.   Traditionally a
6   recorder is a person who can make entries or jot down
7   notes. Basically what it comes down to in a search
8   warrant execution team in narcotics is whatever the
9   arresting officer wants that person to do for him.
10    Q.   Now, to prepare yourself for your testimony
11   today, you reviewed the reports that were prepared by
12   Detective Romero?
13    A.   I reviewed the vouchers.
14    Q.   You reviewed the vouchers?
15    A.   Yes, sir.
16    Q.   You didn't read over his arrest report or any
17   other police reports he filled out?
18    A.   No, sir.
19    Q.   And did you read over the testimony you gave
20   before the Grand Jury?
21    A.   Yes, sir.
22    Q.   Did you read over his testimony?
23    A.   No, sir.
24    Q.   You, of course, had conversations with
25   ADA Berland?

HERNANDEZ -CROSS - DEFENSE

1    A.   I had conversations with the assistant.  I

2  wouldn't say they were numerous.

3    Q.   Since November 1, 2007, approximately how many

4  search warrants have you participated in, the execution

5  of a search warrant?

6    A.   I wish I could say many, but there were few

7  because I was transferred in February 2008 to the Drug

8  Enforcement Task Force.

9    Q.   So approximately how many?

10   A.   Maybe four, five, maybe, at that.

11   Q.   Approximately how many arrests have you been

12  involved in since November 2007, approximately?

13   A.   I don't know, maybe 20, 25.

14   Q.   With regard to the money recovered from

15  Mr. Green, do you recall that money being found in a

16  wallet in his pocket?

17   A.   The money was found in his pants pocket, but I

18  wasn't the individual who recovered it.

19   Q.   Are you saying you do not recall the wallet?

20   A.   I don't recall the money was recovered from

21  the wallet. I'm not too sure if he had one or not.

22   Q.   Do you recall Mr. Green having a New York

23  State identification card?

24   A.   I don't recall whether he did or not.

25   Q.   Do you recall him having a South Carolina

1   driver's license?

2        A.   I wouldn't recall if he did or not.

3        Q.   Is it fair to say that there was no

4   documentation indicating that Mr. Green lived at 451

5   Lenox Avenue?

6        A.   I can't answer that question 'cause I did not

7   review any documentation that was on him.

8        Q.   And you didn't look at any of the paperwork

9   prepared by Detective Romero?

10       A.   In regards to the arrests, that was

11  Detective Romero's responsibility.

12       Q.   I am saying, in your preparation, you didn't

13  look at any of Detective Romero's paperwork?

14       A.   I would have looked at the on-line booking

15  sheets on the date of the arrest.

16       Q.   On the on-line booking sheet, do you recall

17  what Mr. Green's address was?

18       A.   I wouldn't recall. I would have to look at the

19  sheets.

20            MR. BERLAND:  I'd object to this anyway,

21       Your Honor.

22            THE COURT:  Object to what?

23            MR. BERLAND:  He is about to show him the

24       on-line booking sheets.

25            MR. KEITH:  He said he looked at it.

HERNANDEZ -CROSS - DEFENSE

1     THE COURT:  He really says he doesn't

2     have one, but you go right ahead and show it to

3     him.

4          MR. KEITH:  Showing him Defendant's D.

5          THE COURT:  Somebody else's on-line

6     booking sheet prepared regarding the arrest of

7     Mr. Green.  Okay.

8     Q.   After looking at that document, is your

9     recollection refreshed with regard to Mr. Green's

10    address?

11         MR. BERLAND:  Without reading from it.

12         THE COURT:  And more specifically it

13    would be, if anything, whether Mr. Green said it

14    was his address rather than some independent

15    documentation of the address.

16         THE WITNESS:  I don't recall what he gave

17    to Detective Romero.

18         THE COURT:  Sustained.  We'll have to

19    wait for Detective Romero.  What's next?

20    Q.   In order to get a search warrant, generally

21    speaking, what type of information has to be given to

22    the judge?

23    A.   I guess the circumstances and what we believe

24    the probable cause is for us to believe that a crime is

25    being committed or has been committed at a location.

HERNANDEZ -CROSS - DEFENSE

1        Q.   For example in this case some of the

2    information given to the judge to get the first set of

3    warrants was that someone had gone to that location and

4    purchased narcotics?

5                  MR. BERLAND:  Can we approach?

6                  THE COURT:  No. So far I don't see a need

7         to.  Somebody went to that building and bought

8         drugs I don't think is a reason we have to

9         approach.  Overruled.

10       Q.   Generally speaking, is that the type of

11   information that was made available to a judge to sign

12   the search warrant for the execution of the search

13   warrants at 451 Lenox Avenue?

14                 THE COURT:  When you say "generally,"

15        that doesn't help. There is a standard.

16                 You are absolutely not prepared nor asked

17        to make any decision about the procedures used in

18        filing a warrant or even executing it. The topic

19        of generally how one gets a warrant is okay, but I

20        don't want anybody to think the wrong thing. I

21        will not instruct them much about warrants.  You

22        can try to get more information of the nature that

23        you are interested in, but I may pepper you with

24        help periodically.

25                 Go ahead.

YVETTE PACHECO  SENIOR COURT REPORTER

HERNANDEZ -CROSS - DEFENSE

1    Q.   With regards to the investigation at 451 Lenox
2    Avenue, Mr. Green wasn't the subject of that
3    investigation; is that fair to say?
4              THE COURT:  All right, let's do it this
5         way. There is a search warrant and sometimes there
6         is a person described or several people described,
7         generally you don't know somebody's name. Often
8         times, one person's description is contained in
9         the search warrant.  Is that usually the
10        situation?
11             THE WITNESS:  That is correct.
12             THE COURT:  As best you can glean from
13        the description, if any, contained in the search
14        warrant and Mr. Green's description, was he the
15        person or persons specifically described in there?
16   A.   What specifically was described in the search
17   warrant, I don't recall, but there were descriptions of
18   individuals that were put into the search warrants.
19   Q.   Individuals with an S?
20   A.   I believe so.
21             THE COURT:  This is fine, but keep in
22        mind that you do not have to decide anything about
23        the execution of it and the fact that somebody is
24        or isn't named, labeled, described in the search
25        warrant doesn't have anything to do with regard to

HERNANDEZ -CROSS - DEFENSE

1   the fact that the police are allowed to enter into

2   and search the place described.  If during your

3   deliberations you need me to answer some more

4   specific question, you can ask me.

5            Continue, Mr. Keith.

6   Q.   Yes or no, was Mr. Green the target of the

7   search warrant?

8            MR. BERLAND:  It was asked and answered.

9            MR. KEITH:  It wasn't.

10  Q.   If he was, he was.  If he wasn't, he wasn't.

11           MR. BERLAND:  Can you please --

12           THE COURT:  I'm willing to say that he's

13  not the person specifically described in the

14  warrant, but that has limited applicability for

15  you folks in this case. We'll move on. That's in

16  the record now.

17  Q.   Now, when you testified before the Grand Jury,

18  that was testimony that was under oath?

19  A.   That is correct.

20  Q.   You told the truth before the Grand Jury;

21  isn't that correct?

22  A.   Yes, sir.

23  Q.   When you testified before the Grand Jury, you

24  didn't testify at all about the second floor; isn't

25  that correct?

YVETTE PACHECO  SENIOR COURT REPORTER

HERNANDEZ -CROSS - DEFENSE

1    A.    I think that is correct.

2    Q.    I want to direct your attention back to that

3    day.  You were part of the team that searched the

4    second floor or the group of officers that searched the

5    second floor?

6    A.    I was part of the team that entered the second

7    floor and did look around the second floor, yes, sir.

8    Q.    Before I ask more questions about that, with

9    regard to the first team that went in, would it be fair

10   to say that they used a battering ram to get through

11   that door to get to the third floor; isn't that

12   correct?

13   A.    Yes, sir.

14   Q.    Now, going back to the second floor. There

15   came a time during the execution of the search warrant

16   on the second floor that some keys were recovered;

17   isn't that correct?

18   A.    Yes.

19   Q.    Did you see the recovery of those keys?

20   A.    Yes, when Detective Romero recovered them,

21   yes, sir.

22   Q.    Where did -- specifically where did Detective

23   Romero recover those keys?

24   A.    If I remember correctly, they were on the

25   waistband of Mr. Smith.

1    Q.    Would it refresh your recollection any if I

2    were to say to you that the keys were recovered from a

3    jacket, from the pocket of a jacket?

4    A.    You can say, but I remember Detective Romero

5    having keys in his hands when he was searching

6    Mr. Smith -- Mr. Brown, Mr. Brown, Steven Brown.

7    Q.    You don't recall there being a jacket on a

8    chair?

9    A.    I don't recall if there was a jacket on the

10   chair or not.

11   Q.    Isn't it correct that after those keys were

12   recovered, whether from a jacket or from Mr. Brown's

13   waistband, officers then went to check and see where

14   those keys were to be utilized; isn't that fair to say?

15   A.    I remember I went upstairs with Detective

16   Romero and went and checked what we were being told

17   about regarding the floors, and there were several SROs

18   on the third and fourth floors --

19   Q.    You mean individual apartments?

20   A.    Yes, sir, and that we return back, and we

21   spoke to the supervisor about it and we went upstairs

22   because we were told that there was a loud slamming

23   above the third floor and then we received radio

24   communication regarding the fact that the surveillance

25   camera and a wire leading up to the fourth floor

HERNANDEZ -CROSS - DEFENSE

1   window, and with that, Detective Romero went up to the

2   fourth floor, I accompanied him, as well as several

3   supervisors and we went to a corner apartment and he

4   tried the key there.

5       Q.   Before going up to the fourth floor, do you

6   recall officers going to each apartment on the third

7   floor and trying the keys?

8       A.   That, I don't recall. I recall there being

9   several officers throughout the building since they

10  heard a slamming above the third floor. When they

11  reached the third floor door landing and we were trying

12  to make a determination where the noise was coming from

13  and what was the layout of those floors.

14      Q.   I guess you don't recall on the third floor

15  that some doors were knocked on?

16          THE COURT:  It really doesn't legally

17      matter for the jurors what they did either on the

18      third or the fourth floor for that matter.

19          MR. KEITH:  Well, it does with regard to

20      his recollection, Your Honor.

21          THE COURT:  No, it doesn't. It's not much

22      difference than if he doesn't remember what he

23      wore that day.  You are going to focus on the

24      apartment or any supposed connection with Mr.

25      Green, and that's our trial.

HERNANDEZ -CROSS - DEFENSE

1    Q.   Do you recall seeing any other civilians in
2    the building other than Mr. Green and Mr. Brown?
3    A.   I think on the third floor there was a person
4    who was coming out of one of the rooms but went back in
5    and saw the police in the building.
6    Q.   Is it your recollection that there was no
7    follow-up investigation by any of the officers when
8    that happened?
9    A.   No, because the person came out.  The person
10   went back in, appeared to be startled, when the person
11   saw us on the floor.
12   Q.   So when a person came out, he was startled and
13   goes back into his apartment.  You are saying during
14   the execution of the warrants, the officers said okay
15   and moved on?
16   A.   Because -- yes, that was before we had
17   discovered the information about the fourth floor
18   apartment.
19   Q.   Now, with regard to the fourth floor, you
20   testified about some wires.  These wires were on the
21   outside of the building, inside of the building?  Where
22   were these wires?
23   A.   Wires were on the outside but had came into
24   the window that was in that fourth floor apartment.
25   Q.   Now, it's correct that 451 Lenox Avenue, the

HERNANDEZ -CROSS - DEFENSE

1    front of the building faces Lenox Avenue; is that

2    correct?

3         A.   That is correct, sir.

4         Q.   And on the street level, there's a laundromat;

5    is that correct?

6         A.   That is correct.

7         Q.   A four-story building?

8         A.   That is correct.

9         Q.   The apartment that Mr. Green was found in, you

10   wouldn't be able see any windows to that apartment from

11   looking at the front of the building from Lenox Avenue;

12   isn't that correct?

13        A.   That is correct.

14        Q.   His apartment was in the back; is that

15   correct?

16        A.   Yes, sir, his apartment was in the back.

17        Q.   So --

18        A.   Or I should say the apartment he was in was in

19   the back.

20             MR. KEITH:  I'd like to mark this

21        Defendant's Exhibit I for identification.

22             THE COURT:  We'll call this a photograph.

23             (Defendant's Exhibit I was marked for

24   identification.)

25        Q.   I ask you to take a look at what has been

HERNANDEZ - VOIR DIRE - PEOPLE

1    marked I for identification. Do you recognize that?

2         A.   Yes, sir. It appears to be 451 Lenox Avenue.

3         Q.   Looking at that photograph, does it appear to

4    be a fair representation of 451 Lenox Avenue as it

5    looked on November 1, 2007?

6         A.   I could say that the building itself and the

7    laundromat canopy appear to be consistent with what I

8    remember from November 1, 2007.

9              MR. KEITH:  I offer that as Defendant's I

10        in evidence.

11             MR. BERLAND:  Can I see it briefly,

12        please?  May I voir dire?

13             THE COURT:  Sure.

14   VOIR DIRE EXAMINATION BY

15   MR. BERLAND:

16        Q.   Detective, on that picture it appears that

17   there are numerous wires going into a variety of

18   different windows.  Do you see that?

19        A.   Yes, sir.

20        Q.   Is that how you recall the exterior of the

21   building looking on November 1, 2007?

22        A.   I don't recall all the wires that appear to be

23   hanging over the roof and coming down, but I could

24   recall the building and the canopy on the laundromat as

25   I had indicated.

HERNANDEZ –CROSS - DEFENSE

1     Q.   You don't know when that picture was taken, do

2  you?

3     A.   No, no.

4     Q.   You didn't take the pictures?

5     A.   No.

6     Q.   The wires weren't there that day?

7     A.   Not that I recall.

8          MR. BERLAND:  I object.

9          THE COURT:  The picture is admissible.

10  It shows the exterior of the building, quite a

11  clear picture, shows the laundromat.  It does show

12  the southwest apartment that seems to be the

13  subject apartment. It's admitted for any use the

14  jury wants to make of it.

15          (Defendant's Exhibit I was received in

16  evidence.)

17  CONTINUED CROSS-EXAMINATION BY

18  MR. KEITH:

19     Q.   Taking a look at Exhibit E, with regard to the

20  wire you saw going to the southwest apartment on the

21  outside of the building, looking at that photograph,

22  can you just show us where that wire was back on

23  November 1, 2007.

24     A.   No, sir.

25          THE COURT:  I must not have been paying

HERNANDEZ -CROSS - DEFENSE

1   attention to my own question. I know you said the

2   southwest apartment, the apartment which we seem

3   to be having the trial in that picture and he said

4   no.  Is that still the situation?

5          THE WITNESS:  That is still the

6   situation.

7          THE COURT:  We're asking whether a wire

8   that may or may not have been in the window that

9   isn't in the picture can be seen.

10          MR. KEITH:  Your Honor, he said he saw it

11   on the outside of the building.  I'm asking if

12   that picture could help us to see what he saw.

13          THE COURT:  The objection to that

14   question is sustained.  What's the next question?

15   Q.  These were previously marked as Defendant's

16   Exhibits C and D for identification -- B and C for

17   identification.

18          THE COURT:  Your question is what?  For

19   the record, B and C, each are some sort of

20   photographic print paper with four separate

21   photographs on each.

22          Go ahead.

23   Q.  Looking first at what has been marked B for

24   identification, looking at those photographs, do they

25   reflect the physical layout of the second floor room as

HERNANDEZ -CROSS - DEFENSE

1   it appeared on November 1, 2007?

2       A.   It's consistent with the layout.

3       Q.   Looking at Defendant's C for identification,

4   does that  -- do those photographs give a fair

5   representation of the physical layout of the fourth

6   floor apartment as it looked on November 1, 2007?

7       A.   At least from two of the photos I can say it

8   looks like it. Two of them, I can't. I have no idea

9   what this belongs to.

10          THE COURT:  The upper left and lower

11      right seem to be consistent with the layout of the

12      apartment on the fourth floor.  The lower left and

13      upper right, he cannot tell where they are and

14      what they are.

15          "If anything," you are saying for the

16      benefit of the jury.  You have to say it louder.

17      If it was to help the lawyers, that tone of voice

18      was fine.

19          MR. KEITH:  Your Honor, I offer

20      Defendant's Exhibits B and C into evidence.

21          MR. BERLAND:  All the pictures or the one

22      he recognizes?

23          MR. KEITH:  Except the one picture he

24      doesn't recognize, which is on Defendant's C in

25      the upper right.

YVETTE PACHECO  SENIOR COURT REPORTER

HERNANDEZ –CROSS – DEFENSE

1      MR. BERLAND:  I believe there were two

2  pictures the defendant did not recognize.

3      THE COURT:  You said something about the

4  other one. The one that you are staring at now,

5  does that relate to the fourth floor as you

6  recall?

7      THE WITNESS:  I can't say hundred

8  percent, Your Honor, because the door is not open

9  and I cannot see inside. They look like they're

10  all similar.

11      THE COURT:  Those three are admitted as

12  are four on Exhibit B.  One is not.

13      (Defendant's Exhibit B was received in

14  evidence.)

15  Q.   I apologize for jumping around. Directing your

16  attention back to the start of the execution of the

17  search warrants, I believe you indicated that to the

18  right of the laundromat there is the door to 451 Lenox

19  Avenue?

20  A.   To the residences, yes, sir.

21  Q.   And that door, I believe you indicated is a

22  door that's locked and has a buzzer system, people

23  usually buzzed in?

24  A.   That is correct.

25  Q.   With regard to the execution of the warrants,

HERNANDEZ -CROSS - DEFENSE

1   do you know how the officers got into the building that

2   day?

3       A.   Yes, sir. A walk-on was sent to the building

4   to stand in the doorway milling around and to attempt

5   to gain the door open either by hitting the buzzer or

6   waiting for somebody to come out.

7       Q.   When you say a walk on to?

8       A.   Another detective.

9       Q.   Dressed in plainclothes, milled around the

10  door and when someone came out, he was able to gain

11  access to the building?

12      A.   That is correct, sir.

13      Q.   Detective Hernandez, in the second floor

14  apartment, I believe you indicated that you saw some

15  empty bags -- empty Ziploc bags that had the Red Apple

16  stamp on them; is that correct?

17      A.   Yes, sir.

18      Q.   And it's correct that you saw the Red Apple

19  stamp in other cases involving other search warrants at

20  other locations?

21      A.   That is correct.

22      Q.   Now, with regard to cocaine, based on your

23  training and experience, would you agree with me that

24  the cocaine that's sold on the street, that it's rare

25  that cocaine is pure, hundred percent cocaine; is that

HERNANDEZ -CROSS - DEFENSE

1    correct?

2        A.    That is correct.

3        Q.    Based on your training and experience, the

4    street level cocaine, the stuff sold on the street,

5    what percentage is cocaine and what percentage is

6    something else?

7        A.    Depends on the seller.  Depends on how the

8    seller cuts it. It could be anywhere from 30 to 40

9    to 50 to 60, in that general range, 70.  Somewhere

10   between 30 and 70, usually.  Depending on the location

11   and what the clientele from that particular area or

12   that particular seller expects.

13       Q.    Cocaine is cut with various substances. Are

14   you familiar with a substance called mannitol?

15       A.    Yes, sir.

16       Q.    What is mannitol?

17       A.    It's basically look like a bar of soap, but

18   just like other cutting agents. It's a crystalline

19   substance that's mixed up with cocaine basically for

20   that same purpose, like any other cutting agent to

21   lower the purity, to increase the amount to bind the

22   cocaine.

23       Q.    Other agent used to mix cocaine for street

24   sales is lactose; is that correct?

25       A.    That is correct, sir.

YVETTE PACHECO  SENIOR COURT REPORTER

HERNANDEZ -CROSS - DEFENSE

1    Q.    Both mannitol and lactose and the other

2    substances used to mix cocaine, they look a lot like

3    cocaine, would that be fair to say?

4    A.    Some of them do. By the consistency and by the

5    smell and by the odor, you can put out by them, you can

6    tell the difference, but they basically use a product

7    that's basically the same type of coloring or try close

8    to consistency, so that it makes up well and doesn't

9    make the drug look bad.

10    Q.    So, in terms of being precise and accurate,

11    when you testified that you see cocaine residue, in

12    fact, you're testifying that you see a white powdery

13    substance at different locations, isn't that fair to

14    say?

15    A.    A white powdery substance that was consistent

16    with cocaine, yes, sir.

17    Q.    And it's also consistent with mannitol or

18    lactose or any other substances that you testified to?

19    A.    It can be.

20    Q.    I mean, you, yourself, didn't test any of the

21    stuff?

22    A.    No, sir, but I also didn't find any quantities

23    of those in those apartments, either.

24            THE COURT:   Who wants to be the

25        designated elbower?  Ah, okay, there you go.

HERNANDEZ -CROSS - DEFENSE

1    You're going to ask for a bathroom break.  Not a

2    surprise.  Do we have to stop right now, unless

3    profound embarrassment will occur?  How about five

4    minutes and we'll be finished for the day.

5    Q.   I want to direct your attention now to the

6    fourth floor?

7    A.   Yes, sir.

8    Q.   It's true that when you guys entered into the

9    apartment, you saw some things that led you to

10   believe -- withdrawn.

11            I believe you testified that the closet

12   door was slightly open; is that correct?

13   A.   Yes, sir.

14   Q.   It was closed and you guys went in and opened

15   it up; is that correct?

16   A.   It wasn't locked, but it was slightly open,

17   but we had to pull it open. Detective Romero had to

18   pull it open to get it completely open.

19   Q.   This, of course, was done before you guys

20   secured the search warrant?

21   A.   After, yes, sir.

22   Q.   And when you found the safes, you were

23   particularly curious to see what was in safes and you

24   got your sledgehammers out; isn't that fair to say?

25   A.   Not at that time.

HERNANDEZ -CROSS - DEFENSE

1          THE COURT:  That was a two-part question.
2     I wouldn't be surprised they were particularly
3     curious immediately, but the question then shifts
4     potentially to different events.  It's difficult
5     to combine two things in the same sentence and
6     expect one answer.  If you get my drift.
7          Q.   Detective Hernandez, I want you to think back
8     to what you recall, what your observations were back on
9     November 1, 2007.
10         A.   Yes, sir.
11         Q.   Now, your recollection is very clear that it
12    was Detective Romero that used the key to get into the
13    fourth floor apartment?
14         A.   I'm pretty sure it was, sir.
15         Q.   Pretty sure. That's more than 50 percent?
16         A.   Yes.
17         Q.   More than 75 percent?
18         A.   Yes, I think so, sir.
19         Q.   So you're pretty sure that it was Detective
20    Romero that put the key into the lock, turned the lock
21    and then pulled the key back out, is that what
22    happened, initially?
23         A.   Yes.
24         Q.   I believe you testified that your recollection
25    is that instead of going right in, that you guys went

1   and got a police shield?

2        A.   Yes, he did.

3        Q.   What else did you get?

4        A.   A flashlight, or he may have had it on him

5   already.

6             THE COURT:  Finish up the topic.

7             Go ahead.

8        Q.   The plastic shield was brought with a group

9   to execute the search warrant in the first place; is

10  that correct?

11       A.   Yes, sir.

12       Q.   So he gets the plastic shield.  Is it

13  Detective Romero using the shield or someone else?

14       A.   Yes, sir.

15       Q.   It's Detective Romero?

16       A.   Yes.

17       Q.   And he uses the key to open the door again and

18  with the shield in front of him, he goes back in; is

19  that correct?

20       A.   Unlocks it, pulls the key out, and when we're

21  all ready and the supervisors tell him to go ahead, he

22  pushes the door open.

23       Q.   He pushed the door open, the room is, as you

24  said, very dark, is that your testimony?

25       A.   That is correct.

=HERNANDEZ -CROSS - DEFENSE=

1    Q.   But he has a flashlight in his hand, so he's

2  shining the flashlight around, he sees Mr. Green?

3    A.   That is correct.

4    Q.   Mr. Green is sitting on the couch?

5    A.   That's correct.

6    Q.   Of course he's grabbed right way and secured?

7    A.   Yes, after he was requested a couple of times

8  to get down.

9    Q.   So he was told to get down on the floor.  He

10  did that?

11   A.   No, he remained sitting in the chair, on the

12  couch.

13   Q.   He didn't say a word.  So the officers yelled

14  at him, get down, get down, he sat there for a moment

15  and then got down on the floor?

16   A.   No, sir, he just stayed there.

17   Q.   He was put on the floor?

18   A.   No, he stayed there and he wouldn't get up

19  from the couch, so, myself and Detective Romero while

20  the other members of the team are also coming in, grab

21  Green and stood him up and secured him.

22   Q.   Handcuffed him?

23   A.   That is correct.

24   Q.   Behind his back?

25   A.   That's correct.

=YVETTE PACHECO  SENIOR COURT REPORTER=

HERNANDEZ -CROSS - DEFENSE

1    Q.   Put him down on the floor?

2    A.   I don't think we put him down on the floor. I

3    think we put handcuffs on him.

4    Q.   Okay, I can't --

5         MR. BERLAND:  Objection.  He said he

6    doesn't think so.

7         MR. KEITH:  I mumbled.

8         THE COURT:  None of this matters.

9    Q.   Detective Hernandez, is it correct that after

10   Mr. Green is handcuffed, he's taken out of the

11   apartment; is that correct?

12   A.   Yeah, shortly thereafter.

13   Q.   Now, in the apartment, is it your recollection

14   that there was a light switch that was turned or was it

15   a pull string?  How was the room illuminated?

16   A.   I don't remember, but I do remember we had

17   light turned on in the apartment, whether a switch or

18   pull switch, the lights went on.

19   Q.   On direct you said it was a switch, but you

20   are not sure?

21   A.   Could have been a pull switch or a regular

22   light switch on the wall.

23   Q.   Do you recall that a bulb was simply inserted

24   and turned?

25   A.   I don't know if a bulb was simply inserted and

HERNANDEZ -CROSS - DEFENSE

1    turned. I think the lights were there already. We just

2    turned them on.

3        Q.   You just turned the bulb; isn't that correct?

4        A.   I don't know about turning the bulb. I think

5    the light was turned on.

6        Q.   Before going into the closet, opening the

7    closet door and going in the closet, would it be fair

8    to say that you saw the table with the glass top; is

9    that correct, that was one of the things you saw?

10       A.   It was one of the things we quickly saw.

11       Q.   You saw that table --

12       A.   Quickly saw pieces of furniture --

13            THE COURT:  She's really good and even if

14       it was the beginning of the day, she couldn't take

15       two people talking at the same time. At the end of

16       the day, regardless of her competency, she cannot

17       take two people at the same time.

18       Q.   You saw a table with some white powdery

19   substance on it, residue?

20       A.   Eventually, yes, sir.

21       Q.   And you also saw a digital scale. Where did

22   you see that scale?

23       A.   On the stand, the entertainment shelving that

24   had the TV and the monitor.

25       Q.   Do you recall what color the scale was?

1    A.    Yes, black.

2    Q.    It was a black scale and on one of the end

3 table I believe you indicated you saw a closed cigar

4 box; isn't that correct?

5    A.    Yes, sir.

6    Q.    I believe you also indicated that you saw one

7 heat sealer that was on the floor under the glass top

8 table; is that correct?

9    A.    Yes, sir.

10            THE COURT:  Can we stop at this juncture?

11            MR. KEITH:  Yes, we can.

12            THE COURT:  Okay.  Tomorrow, I don't need

13        you until about ten after two.  Tomorrow is a day

14        that we all have our own private memories. I know

15        you want to leave, and I'll let you leave in a

16        minute, but either on the way home or when you

17        come in tomorrow, 111 Centre Street is across the

18        way.  Outside on the side of the building is a

19        memorial with some pictures and three of the court

20        officers who were alive and who were up here,

21        which is a good distance from the World Financial

22        Center, and they could have stayed here, and they

23        didn't, and they're dead, and a whole bench of

24        court officers went down there, because that's

25        what they felt they should do, even though there

HERNANDEZ -CROSS - DEFENSE

1    was no legal or moral obligation for them to do

2    it. Three of them died. Go take a look, see who

3    they were, find out a little about them. So there

4    is a service and a recognition of that tomorrow,

5    but that's not the reason that we are going to

6    start at ten after two.  It has to do with

7    scheduling of this trial. It will not affect the

8    schedule I've given you.  I respect you will be

9    put in a position to decide the case probably on

10   Monday.  Let's see what we can accomplish tomorrow

11   afternoon and I might revise the trial schedule.

12       At the end of the trial, each judge gives

13   you the following admission. Keep an open mind. Do

14   not discuss the case with people you will spend

15   time with.  Do not read or listen to any account

16   in media form. I don't think there's publicity

17   regarding the case.  If you think you're being

18   exposed to something in the media or similar case,

19   disassociate yourself from it and let me know.

20   Don't let anybody speak with you or attempt to

21   influence your judgment in the case.  The fact

22   that I mention it, doesn't mean somebody is going

23   to attempt to do it in this case and it's what I'm

24   required to mention to each juror in the case. You

25   can do whatever you want to do tomorrow. Do not go

YVETTE PACHECO  SENIOR COURT REPORTER

```
========HERNANDEZ -CROSS - DEFENSE========
```

1    to work if you will jeopardize your punctuality

2    tomorrow. You get full credit for jury service.

3    Have a nice day.

4    ----------------------------------------------------------

5    SUPREME COURT OF THE STATE OF NEW YORK
     COUNTY OF NEW YORK                    PART-93
6

7    THE PEOPLE OF THE STATE OF NEW YORK,

8

9                        -against-
                                         TRIAL
10

11   EDWARD GREEN,
                              Defendant
12
                              September 11, 2008
13

14   B E F O R E:  HONORABLE E. MCLAUGHLIN, JSC

15                  (Appearances as previously mentioned.)
     ----------------------------------------------------------
16                  THE CLERK:  Calling case on trial,

17   Edward Green.

18                  MR. BERLAND:  Your Honor, I believe that

19   during the opening, the defense opened the door

20   and was talking about the introduction of the

21   keys. Mr. Keith said the evidence will show that

22   this was not the defendant's home, the evidence

23   will show that this was not the defendant's

24   apartment, and that he was merely in the wrong

25   place at the wrong time.

```
========YVETTE PACHECO  SENIOR COURT REPORTER========
```

1        The defense is trying to attempt to show
2    that the defendant doesn't have any dominion and
3    control on the apartment.  This is misleading
4    given the facts we know he had keys on him.
5        I want to hand up case, People V Rojas,
6    92 New York 32, Court of Appeals case from 2001,
7    September 12th. This is a case where the door was
8    open to allow a prior crime which had been
9    previously excluded the defendant was in state
10   custody.  He attempted to assault an inmate and
11   put into solitary confinement --
12       THE COURT:  I remember it because I had
13   to do what you are asking me to do.
14       MR. BERLAND:  In that case, as you are
15   aware, the Court allowed testimony as to the
16   assault on the prior inmate with limited
17   instruction. The Court allowed that attempted
18   assault.  The trial court permitted the
19   prosecution to refute defendant as misleading
20   contentions. I believe that was the case here.
21       The Court went on to say having chosen to
22   make an opening statement the defense adopted a
23   single theme and expressed it during the opening.
24   In that statement, the defense strongly suggested,
25   if not argued, that the jury should acquit the

PROCEEDINGS

1    defendant because he had done nothing wrong.

2              I think it is akin to the case and the

3    door has been opened to the point the jury has

4    been misled and should hear evidence about the

5    keys.

6              THE COURT:  I will hear what Mr. Keith

7    has to say.  We do not have a printed transcript

8    of the statement, but I got this little stuff here

9    that I make.  Pretty much that point of the

10   opening, Mr. Keith said with reference to the

11   police, they found keys, I believe what he said

12   was they found keys on or near Mr. Brown and so

13   thereby got access to the apartment.

14             Think the way to hear it if you are a

15   juror, that the police got into the apartment by

16   virtue of keys from Brown, and since Mr. Green had

17   no keys, he must have been let in by somebody with

18   the real control over the apartment. So it is more

19   than just arguable that the jury should understand

20   about the keys, but go ahead.

21             MR. KEITH:  Your Honor, I don't think the

22   keys should come in. I don't think the door has

23   been opened. Even with the keys, the apartment is

24   still not Mr. Green's apartment.

25             THE COURT:  Let's not talk about what

YVETTE PACHECO  SENIOR COURT REPORTER

PROCEEDINGS

1    will the record show by the end of the case.  As I

2    understand it, he's not testifying and I

3    understand pretty much that they do not have, I

4    don't know, but I don't think they have access to

5    a document that would be admissible regarding this

6    person who I think I've heard, if this is the

7    right case, is in Chicago who might be the real or

8    fictional owner, lessee of the place.

9         I'd like you to argue what you are going

10   to say about his being in the apartment in the

11   absence of a document or a person saying I let him

12   in.  It's in that context clearly you are making

13   your opening.  I need to know what it is I will be

14   dealing with at the end of the case.

15        MR. KEITH:  Well, with regard to him

16   being in the apartment, I wasn't going to offer

17   any explanation for him being in the apartment.

18   That's their burden of proof.

19        THE COURT:  That's fine. But what you did

20   in the opening was contrast to the police finding

21   keys.

22        MR. KEITH:  They found keys in the second

23   floor.

24        THE COURT:  I was here.  I've been living

25   with this thing for as long as you have, perhaps

YVETTE PACHECO  SENIOR COURT REPORTER

1    even longer.  I don't know that they did not mix

2    Mr. Green up and magically deposit him in the

3    room.  The jury is going to want to know what do

4    we do with the fact that the Green is in the

5    apartment and the way the police got in there was

6    by keys. No damage to the door, so obviously,

7    Mr. Green got in there by keys also because the

8    lock that is here is not broken.

9            MR. KEITH:  Right.

10           THE COURT:  By addressing an issue, not

11   addressing, you personally, any defense lawyer or

12   prosecutor, by raising a topic innocently,

13   craftily, sinisterly or however, everybody's got

14   to take the consequences, so to speak, as to what

15   is said because we all know in the criminal case,

16   since the prosecution can't never appeal, they

17   don't get a do-over; defense does get a do-over.

18           MR. KEITH:  Your Honor, when the keys

19   were suppressed in this case --

20           THE COURT:  Of course, it was --

21           MR. KEITH:  Hear me out.

22           THE COURT:  I will let you apologize.

23   For the benefit of the defendant sitting here and

24   family, who doesn't know what's going on, but

25   since you are arguing with me, you must be right

======PROCEEDINGS======

1    and I'm out of my mind.  Virtually all opening the

2    door cases sanctioned by Court of Appeals allows

3    suppressed evidence back in the case because of

4    what happened regarding references to it or

5    mis-impressions created about. So go ahead.

6         MR. KEITH:  Your Honor, as I argued at

7    the end of the People's opening, without the keys,

8    the Court of Appeals says that in this instance,

9    they can never prove dominion and control.  But be

10   that as it may, and there is a Court of Appeals

11   case right on point and at least a dozen cases

12   that follow it, but be that as it may, in my

13   opening, I said what is left in this case is a man

14   in a room.  It's not his home.

15        I did not suggest or open the door with

16   regard to any keys.  I totally disagree with the

17   prosecutor's argument.  The keys were suppressed.

18   The facts are that the officers got into that

19   apartment with keys they got from somewhere else,

20   I don't believe that opens the door. That's what's

21   left.

22        Without those keys, it's impossible for

23   the People to prove dominion and control under the

24   facts of this case.  That's what the Court of

25   Appeals says.

PROCEEDINGS

1      THE COURT:  You keep saying because they

2   have a problem they should never be allowed to

3   bring the stuff back in. In two sentences, why do

4   you think you are allowed to bring keys in?

5      MR. BERLAND:  There is a gaping hole left

6   for the members of the jury.  The police got in

7   through Mr. Brown's key.  How did the defendant

8   get in the apartment?  That's one.  Even more than

9   that because Counsel said this isn't his home, his

10   apartment, merely in the wrong place at the wrong

11   time, with the two issues coupled together, it's

12   completely misleading.

13      MR. KEITH:  Without the keys that have

14   been suppressed, what's left?

15      THE COURT:  This is what we'll do. We'll

16   keep going with the testimony. We'll sum up

17   tomorrow, probably, and tonight you folks will

18   read many of the "Opening the Door" cases.

19      I have made up my mind, but you will see

20   that all of them deal with the line that the

21   defense is allowed, perfectly justifiably, to go

22   up to and maybe even lean over, and I'm not

23   suggesting that I decided that you did it, but all

24   of the cases, it's in the face of the suppressed

25   evidence, a purposeful misleading of the jury

1    about whether that evidence or circumstances ever

2    existed.

3              Bring in the jury.  Bring back the

4    witness.

5              COURT OFFICER:  Jury entering. Witness

6    entering.

7              THE COURT:  You are still under oath.

8    Have a seat.  I had to try to decide something.  I

9    apologize for keeping you.

10             More keys questions, Mr. Keith?

11             MR. KEITH:  Yes, Your Honor.

12   CONTINUED CROSS-EXAMINATION BY

13   MR. KEITH:

14   Q.    Good afternoon, Detective.

15   A.    Good afternoon, sir.

16   Q.    When we stopped yesterday, Detective

17   Hernandez, I was asking you about the observations you

18   made when you entered the fourth floor apartment, and I

19   believe you agreed with me that you saw a table with a

20   glass top that had a white powdery substance on it, you

21   described it as cocaine residue?

22   A.    That's correct.

23   Q.    I believe you also indicated that you saw a

24   digital scale that also had residue on it; is that

25   correct?

HERNANDEZ - CONTINUED CROSS - DEFENSE

1    A.   Yes.

2    Q.   You also indicated there was a heat sealer on

3    the floor underneath that table with the glass top; is

4    that correct?

5    A.   Yes.

6    Q.   With regard to other items that you saw that

7    were in plain view, what else is there?

8    A.   The boxes of Baggies that were on the mantel

9    and near the window, a tin that had plastic Baggies in

10   it, also apple bags in it.

11   Q.   I'm sorry a tin that had --

12   A.   Empty plastic Baggies, apple bags in them

13   also.

14   Q.    The Baggies you found on the counter like,

15   those were sandwich bags?

16   A.   That's correct.

17   Q.   Taking a look at People's Exhibit 21 in

18   evidence -- before I ask you a question about that, I

19   am sorry, the Polaroid photographs, those pictures were

20   taken by you?

21   A.   Yes, sir.

22   Q.   When were they taken?

23   A.   At the apartment on that night.

24   Q.   That night after you guys entered with the

25   shield and subdued and handcuffed Mr. Green, you

1 brought him out of the apartment; is that correct?

2     A.   Shortly thereafter, yes.

3     Q.   If I understood you correctly, there came a

4 point in time where -- withdrawn.

5           While in the apartment, would it be fair

6 to say that when you saw the door to the closet, you

7 opened that door?

8     A.   Yes.

9     Q.   When you saw there were certain items in

10 there, you saw garbage bags in there?

11     A.   No, the garbage bags were on the floor by the

12 door.

13     Q.   By the door to the apartment?

14     A.   That is correct.

15     Q.   So right by the closet door. The closet door

16 is right to the left when you enter?

17         THE COURT:  Please don't say "right to

18     the left."

19     Q.   Immediately to the left.

20         THE COURT:  "Right to the left" confuses

21     a whole lot of people, but especially me.

22     Q.   When you entered the apartment, to the

23 immediate left was the door to the closet; is that

24 correct?

25     A.   Yes, sir.

HERNANDEZ - CONTINUED CROSS - DEFENSE

1   Q.   Where were the garbage bags?

2   A.   Closer to where the couch was, to the entrance

3   of the apartment.

4   Q.   Was it Detective Romero with the shield?

5   A.   Yes.

6   Q.   When he enters with a shield, basically in

7   front of him are the garbage bags?

8   A.   To the side, by the sofa, by where the sofa is

9   placed.

10  Q.   To Detective Romero's right?

11  A.   Right.

12  Q.   The sofa is to the right?

13  A.   That's correct.

14  Q.   Basically right there the garbage bag was

15  after you entered the apartment?

16  A.   Yeah, right near the doorway.

17  Q.   The lights are turned on, Mr. Green is taken

18  out of the apartment, you look through the closet; is

19  that fair to say?

20  A.   I had already looked with Detective Romero in

21  the closet to make sure that there was no one in the

22  closet when we first entered the apartment.

23  Q.   When you look into the closet, you see the two

24  safes and what else do you see?

25  A.   I see that no one is in there.

YVETTE PACHECO   SENIOR COURT REPORTER

HERNANDEZ - CONTINUED CROSS - DEFENSE

1     Q.   What do you see in the closet?  I know what I
2   don't see.  What do you see?
3     A.   I looked to the right, I see an empty area.  I
4   look up and around, I see a little shelving with a box
5   and to the left is the safes.
6     Q.   What did you do next?
7     A.   What I did next is at that point, the
8   apartment was secure.
9     Q.   What do you mean by "the apartment was
10  secure"?
11     A.   There was no one else in the apartment, so
12  we -- basically, we say that the apartment is secure.
13     Q.   So what do you do?
14     A.   I stand there and I wait to assist
15  Detective Romero.
16     Q.   It's at that point a decision is made that
17  maybe you need a search warrant to start looking around
18  in the apartment; is that basically what happens?
19     A.   Shortly thereafter.
20     Q.   What do you mean by "shortly thereafter"?
21     A.   When Detective Romero approaches Mr. Green and
22  starts processing Mr. Green.
23     Q.   What do you mean by "processing Mr. Green"?
24     A.   Obtaining pedigree information from him before
25  he's taken out of the apartment.

HERNANDEZ - CONTINUED CROSS - DEFENSE

1    Q.   How does he go about obtaining pedigree

2  information?

3    A.   Asking him his information.

4    Q.   Did you hear that conversation?

5    A.   I knew he was asking him for pedigree

6  information, but I didn't pay too much attention to it

7  because the supervisor was there and I was busy talking

8  to the supervisor while keeping an eye on

9  Detective Romero.

10    Q.   Did you see when Mr. Green's wallet was taken

11  from him?

12    A.   No, sir.

13    Q.   What, if anything, do you recall hearing about

14  the pedigree information?

15    A.   I think I remember him asking his name, and,

16  at that point, I was engaged in a conversation with the

17  supervisor.

18              MR. KEITH:  May we approach?

19              THE COURT:  Yes.

20              (Whereupon, a sidebar conference was held

21  on the record out of the hearing of the jury.)

22              MR. KEITH:  Can I ask him if they asked

23        Mr. Green if they lived there?  Can I ask him if

24        it was determined where Mr. Green lived?

25              THE COURT:  What do you want to say?

YVETTE PACHECO  SENIOR COURT REPORTER

HERNANDEZ - CONTINUED CROSS - DEFENSE

1          MR. BERLAND:  If he asks him that, can I

2     follow up to say do you know if he worked there?

3     We know he said he worked in the building.

4          MR. KEITH:  I don't know if he said it to

5     him at that time.

6          MR. BERLAND:  I know he said it to

7     Detective Romero.

8          MR. KEITH:  That's the first time I'm

9     hearing that.

10         MR. BERLAND:  He wants to ask the

11     question.

12         MR. KEITH:  We had statement notice.

13     There was a big issue about Huntley.  That was the

14     first time that came up. That would have come up

15     with regard to the Huntley issue.

16         THE COURT:  I don't know if it would

17     have.

18         MR. KEITH:  It would have.

19         THE COURT:  Both sides could have decided

20     pedigree never is the subject of Miranda, Huntley

21     or inquiry and just pedigree may well have gone

22     beyond anybody's thought process.  What would be

23     the relevance of what he said, if it's not for the

24     truth of the matter?

25         MR. KEITH:  Not living there?

HERNANDEZ - CONTINUED CROSS - DEFENSE

1      THE COURT:  Clearly it sounds to me like

2   the only reason to bring this is in is if his

3   statement is truthful.  If that's the case, it's

4   excluded because it's hearsay and the only way it

5   can get in is if he testifies.

6      MR. KEITH:  The truth of the matter, in

7   his wallet there was his New York State ID with

8   his Bronx address.  That was taken from Mr. Green

9   and ultimately returned to his family.  That's

10   where his money was.

11      THE COURT:  But that basically begs the

12   question of whether that's actually where he

13   lived.  If he wants to get on the stand and say I

14   lived in the Bronx, he can do that, but then he's

15   subjected to how did you get here.

16      The answer to your question is you cannot

17   ask the witness what your client said or didn't

18   say about where he lived because in this instance,

19   it seems to me the only point in eliciting that if

20   the answer was true, and so much centers about

21   this place and his being there, that he should be

22   testifying regarding it and subject to

23   cross-examination.

24      MR. KEITH:  That shifts the burden.

25      THE COURT:  Then make the seventh issue

1    on appeal.  That's the present ruling.

2            MR. KEITH:  So I can't ask him what

3    the --

4            THE COURT:  You have a whole bunch of

5    family people who if you want to put one of them

6    on to say I retrieved from the police department

7    this wallet which was this identification and

8    limit it to that, I suppose you can do that, but

9    you cannot do it through what Mr. Green after he

10   is arrested, pardon me, for the third or fourth

11   time, second or fourth time for drugs in New York

12   State, what he says usually --

13           MR. KEITH:  I don't think Mr. Green said

14   anything. I think they got information off the ID

15   He's 58 years old.  He's been around the

16   block. He's not going to say anything.

17           THE COURT:  If you cannot get it through

18   one of the officers, it is the first time in the

19   history that something you are certain about what

20   happens doesn't get into the record because you

21   can't get somebody to admit it.  What am I

22   supposed to do about it?  I've been in this

23   situation and you've been in that situation.

24           MR. KEITH:  The bottom line is I can't

25   ask him whether or not in this conversation he

HERNANDEZ - CONTINUED CROSS - DEFENSE

1      overhears about pedigree, whether it was

2      determined where Mr. Green lives.

3             THE COURT:  Yes, because it wasn't

4      determined where he lives. We're -- the answer is

5      you can't ask it.

6             (Whereupon, the sidebar conference

7      concluded and the proceedings continued in open court

8      as follows:)

9             THE COURT:  Go ahead.

10     Q.   So Detective Hernandez, after dealing with

11     Mr. Green, then Detective Romero leaves to go and get a

12     warrant.  Is that what happens next?

13     A.   Sometime after that, yes.

14     Q.   How long after that?

15     A.   A little while after.

16     Q.   What's a little while?

17     A.   I don't know.  Within the next few minutes.

18     After making some calls and speaking to the

19     supervisors.

20     Q.   Did he call from his cell phone?

21     A.   I think so.

22     Q.   What are you doing at that time?

23     A.   Standing there.

24     Q.   You are in the apartment looking around?

25     A.   Standing in the apartment.

HERNANDEZ - CONTINUED CROSS - DEFENSE

1    Q.    Looking around?

2          THE COURT:  Did you have your eyes

3    closed?

4          THE WITNESS:  No, sir.

5    A.    Yes, I was looking around.

6    Q.    With regard to the apartment, what's your

7    recollection with regard to the window?  You described

8    something about garbage bags covering the window?

9    A.    A regular black garbage bag covering the

10   window.

11   Q.    Taking a look at C in evidence.

12   A.    Yes, sir.

13   Q.    Take a look at that fourth photograph, I guess

14   that photograph.  The window looked a little different

15   than that?

16   A.    You mean on that date?

17   Q.    Yes, on November 1, 2007. Do you recall the

18   curtain being on the window?

19   A.    There may have been curtains.

20         THE COURT:  He wants to know if you

21   recall it.  That curtain in that picture, was that

22   curtain there the night or evening you were in the

23   apartment?

24         THE WITNESS:  I can't recall that.

25         THE COURT:  You don't recall?

YVETTE PACHECO  SENIOR COURT REPORTER

HERNANDEZ - CONTINUED CROSS - DEFENSE

1          THE WITNESS:  That is correct.

2      Q.    Do you recall seeing venetian blinds on the

3  window?

4      A.    Yes, if I remember, there were blinds.

5      Q.    Venetian blinds?

6      A.    Some type of blinds, some type of shade.

7      Q.    When you say "some type of shade," can you be

8  a little more descriptive?

9      A.    No, sir.  Some type of shade that behind it

10  was the garbage bags.

11     Q.    There was a shade and then behind the shade

12  was a garbage bag?

13     A.    That is correct.

14     Q.    I want to redirect your attention again to the

15  second floor apartment.  Do you recall seeing venetian

16  blinds on the front windows of that apartment?

17     A.    I don't recall, sir.

18     Q.    Did you take the Polaroid pictures that were

19  taken on the second floor?

20     A.    No, sir.

21     Q.    I'd like you to take a look at People's

22  Exhibit 16 and see if it refreshes your recollection

23  with regards to venetian blinds on the windows?

24     A.    It doesn't refresh my recollection, but in the

25  picture here I see venetian blinds over one of the

HERNANDEZ - CONTINUED CROSS - DEFENSE

1    windows.

2         Q.   Detective Hernandez, is it possible that in

3    the time period from November 1st to today, that with

4    regard to -- withdrawn.

5              The photographs that you took on the

6    fourth floor, they were taken while Detective Romero

7    was getting a search warrant, or do you recall when

8    they were taken?

9         A.   Sometime during the time that I was there.

10             THE COURT:  You couldn't have taken the

11        pictures at a time you weren't there, unless you

12        had a fancy shmancy long-distance camera.

13             Do you remember, when you took the

14        pictures, was Detective Romero on the way down to

15        get a warrant or do you have any idea at all?

16             THE WITNESS:  Some of the pictures --

17        yeah, they would have to be when he was down --

18        was downtown already in court.

19        Q.   You were taking pictures at that time for what

20   purpose?

21        A.   Just so that I can recall where certain items

22   were at.

23        Q.   So is it fair to say that you didn't clean

24   anything up or move anything while you were taking

25   pictures?

1    A.   No, I don't think I would have cleaned

2  anything up.

3          THE COURT:  Assuming that you'd taken

4      pictures before Detective Romero left, would you

5      have given Detective Romero a picture to have

6      taken down to the judge?  Is it more likely that

7      you didn't take pictures when Detective Romero was

8      still there since that didn't happen?

9          THE WITNESS:  That's correct, Your Honor.

10    Q.   You testified that there was a glass table

11  which appeared to have cocaine residue on it.  Let me

12  show you what's marked People's Exhibit 27.  Is that

13  picture reflective of that table?

14    A.   That is correct, sir.

15    Q.   Do you recall how many other pictures you took

16  while Detective Romero was away?

17    A.   The pictures that were turned over to the data

18  that should be in that pile.

19    Q.   I'm asking do you recall approximately how

20  many pictures did you take?

21    A.   Six or seven.

22    Q.   Directing your attention to the closet door,

23  your recollection is that that door was unlocked and

24  all you had to do was pull it open?

25    A.   Yes, sir.

================ HERNANDEZ - CONTINUED CROSS - DEFENSE ================

1    Q.   You did not use any tools to pop the lock on

2  the door?

3    A.   Not that I can recall.

4    Q.   With regard to the money recovered from

5  Mr. Green's person, do you recall what the

6  denominations of the money were?

7    A.   No, sir.

8    Q.   Do you recall it being a number of small

9  bills?

10    A.   I wouldn't know, sir.

11    Q.   In your preparation to testify today, did you

12  take a look or did you review the search warrant

13  affidavit that was prepared by Detective Romero?

14    A.   No, sir.

15    Q.   You didn't look at the facts delineated in the

16  affidavit or affirmation to refresh your recollection

17  with regards to the incident of that night?

18    A.   No, sir.  There was no reason for me to do

19  that?

20    Q.   Well, isn't it correct that the only notations

21  you made with regards to your activity that night was a

22  one-or-two-line entry in your memo book, isn't that

23  correct?

24    A.   Yes, sir.

25    Q.   So to refresh your recollection with regard to

================ YVETTE PACHECO  SENIOR COURT REPORTER ================

HERNANDEZ - CONTINUED CROSS - DEFENSE

1   that night, why wouldn't you look at the search warrant

2   affidavit which lists all the facts that were given to

3   a judge?

4        A.   Because what's on the affidavit is not

5   important to what I recovered when I searched the

6   apartment.

7              THE COURT:  It's also nothing that these

8        folks have anything whatever to do with.

9        Q.   I'm talking about your preparation to testify.

10             THE COURT:   He says he didn't read it.

11       Q.   You didn't look at the affidavit to refresh

12  your recollection?

13       A.   No, sir.

14       Q.   You read over your Grand Jury minutes; isn't

15  that correct?

16       A.   That is correct, sir.

17       Q.   You had conversations with the ADA?

18       A.   That is correct, sir.

19       Q.   Did you speak with Detective Romero?

20       A.   Did I speak to Detective Romero?  Have I?

21  Yes, I have.

22       Q.   Of course you did, right?

23       A.   Yes.

24       Q.   So why wouldn't you look over the affidavit?

25             MR. BERLAND:  Objection.

HERNANDEZ - REDIRECT - PEOPLE

1      THE COURT:  Sustained.  We have been over
2   it.  It's finished.
3      MR. KEITH:  No further questions.
4      THE COURT:  Anything else?
5      Mr. Berland, when I said it's finished, I
6   meant the topic of the affidavit.  You understood
7   it that way, and his reading of that was finished.
8      If you have some other questions on some
9   other topics, we'll see, but I didn't think that
10   you misunderstood what I said.  We're copacetic.
11      MR. KEITH:  Yes.  I have a couple of
12   questions I have to ask.
13      THE COURT:  We're back to exhibit?
14      MR. KEITH:  Yes.
15      THE COURT:  Go ahead.
16   Q.  Take a look at what has been marked as
17   Defendant's N in evidence?
18      MR. KEITH:  For identification?
19      THE COURT:  It's in evidence.
20      MR. KEITH:  If it's in evidence, then I
21   have no questions.
22   REDIRECT EXAMINATION BY
23   MR. BERLAND:
24   Q.  Was there anything this Detective Romero did
25   on November 1, 2007, other than conduct preliminary

YVETTE PACHECO  SENIOR COURT REPORTER

1   work that you were not present for?

2       A.   That is correct, sir.

3       Q.   There was nothing other than getting the

4   search warrants that you were not present for; is that

5   right?

6       A.   That is correct.

7       Q.   All of the property recovered on the fourth

8   floor was recovered by you; is that right?

9       A.   That is correct.

10      Q.   So would it be fair to say that the title

11  "arresting officer," is merely a designation given to

12  the person who obtains the warrant and does paperwork?

13              MR. KEITH:  Objection.

14              THE COURT:  That's leading.  I suppose I

15          should sustain it.

16      Q.   What does it mean to you when someone is

17  designated arresting officer?

18      A.   To me, it means that he is the person who is

19  in charge of, in regards to narcotics, in charge of the

20  investigation and ultimately responsible for the

21  arrest.

22      Q.   And is that person responsible for doing

23  paperwork?

24              MR. KEITH:  Objection.

25              THE COURT:  Overruled.

HERNANDEZ - REDIRECT - PEOPLE

1     A.   Yes.

2     Q.   Is it that person who would come to court and

3  obtain a warrant?

4     A.   Yes, sir.

5     Q.   You were asked by defense counsel on direct if

6  Manhattan North Narcotics had information that someone

7  was selling drugs in the second floor apartment.  Do

8  you remember being asked that yesterday?

9     A.   Yes, sir.

10    Q.   You said that you had information that Steven

11  Brown was selling cocaine on the second floor. Do you

12  remember giving that answer?

13    A.   I remember giving an answer that I was aware

14  of the investigation in regards to the sales occurring

15  at the location.

16    Q.   Let me ask you this.  Did Narcotics Borough

17  Manhattan North have any information that drugs were

18  being stored in a floor above the second floor?

19    A.   Yes, sir.

20    Q.   Could you please -- withdrawn.

21         Is there a chain of supply in a drugs

22  operation?  Is there what it is called?

23         MR. KEITH:  Objection.  Form.

24         MR. BERLAND:  Withdrawn.

25    Q.   What is a chain of supply in a drug operation?

YVETTE PACHECO  SENIOR COURT REPORTER

HERNANDEZ - REDIRECT - PEOPLE

1     A.   A chain of supply is basically the levels of

2   the individuals or the way the operation is set up on

3   where -- who is responsible for the stash or the drugs,

4   where they come from, where they're stored, where they

5   are packaged, where they go to be sold and the proceeds

6   of the money taken into the operation.

7     Q.   You just mentioned a stash apartment. What is

8   a stash apartment?

9     A.   A stash apartment is the location where the

10   narcotics that are going to be sold at a particular

11   location are stored so that they're available for the

12   sellers whenever clientele comes to wherever the seller

13   is operating from.

14     Q.   Now, generally speaking, does a seller

15   typically sell from a stash apartment?

16     A.   No.

17     Q.   Why not?

18     A.   Because that would put the product at risk and

19   also any proceeds or any money gained from the drug

20   selling, put it at risk, as well as the individual

21   selling.

22     Q.   Generally speaking, would someone buying drugs

23   know anything about a supplier's stash apartment?

24     A.   It's better -- organizationalwise, it's better

25   for the buyer not to know where the stash apartment is,

HERNANDEZ - REDIRECT - PEOPLE

1    stash house or the individual actually responsible for

2    stashing or holding drug or ownership.

3        Q.   You said it would be better not to know, of

4    course. Can you explain why that's the case for the

5    jury?

6        A.   It prevents, from the owner's standpoint, the

7    people operating it or stashing the drugs, it puts the

8    information that the buyer has at a minimum. The person

9    only knows who they're actually dealing with, who is

10   actually selling to them for multiple purposes. One, to

11   give out the information to a team of robbers who can

12   come to the location and rob the place for the drugs

13   and money.  And, the person could be a person working

14   with the police department who can then give the

15   information to the police which will result in search

16   warrants.

17       Q.   Can you take a look at Defendant's B and C for

18   a moment in evidence.  You see those?

19       A.   Yes, sir.

20       Q.   Are those pictures of the fourth floor

21   apartment?

22       A.   They appear to be so, yes, sir.

23            THE COURT:  Both?

24            THE WITNESS:  One is, Exhibit C.

25       Q.   You stated yesterday that the picture depicted

HERNANDEZ - REDIRECT - PEOPLE

1    the general layout of the room; is that right?

2         A.   That is correct, sir.

3         Q.   What about the furniture in the picture --

4    withdrawn.

5              Is that how the furniture in the room

6    appeared on November 1, 2007?

7         A.   Some of the item, but some of the items are

8    also missing.

9         Q.   Did you take that picture?

10        A.   No, sir.

11        Q.   Is there a glass table with white powdery

12   substance in that picture?

13        A.   No, sir.  That is not in this picture.

14        Q.   So the picture that the defense introduced

15   into evidence doesn't have a picture of a table with a

16   white powdery substance?

17        A.   No, sir.

18        Q.   You have no idea what date that was taken?

19        A.   That is correct, sir.

20        Q.   Finally, Defendant's E.

21        A.   Yes, sir.

22        Q.   What is that?

23        A.   It's picture -- they are --

24        Q.   What is Defendant's E?

25        A.   451 Lenox Avenue.

HERNANDEZ - RECROSS - DEFENSE

1        THE COURT:  With the nice laundromat

2    sign?

3        THE WITNESS:  Yes, they are.

4    Q.   That pic -- you do not know when that was

5    taken?

6    A.   I don't know, sir.

7    Q.   But on November 1, 2007, there were no wires

8    in front of the building like there are in that

9    picture?

10   A.   No, I don't recall there being wires like this

11   hanging down.

12        MR. BERLAND:  I have nothing further.

13        THE COURT:  Further questions?

14   RECROSS-EXAMINATION BY

15   MR. KEITH:

16   Q.   Before November 1, 2007, before you entered

17   that fourth floor apartment, did you have any

18   information whatsoever that suggested that Mr. Edward

19   Green had anything to do with that operation or

20   whatever at 451 Lenox Avenue?

21   A.   Well, I personally didn't, but I was not the

22   investigating officer.

23        THE COURT:  So you didn't.

24        THE WITNESS:  I did not.

25   Q.   Have you --

HERNANDEZ - RECROSS - DEFENSE

1          THE COURT:  He decided the shortest
2    truthful answer.  The best answer is no.
3          MR. KEITH:  That's what I was hoping for,
4    Your Honor, just no.  I didn't get that.
5    A.   No.
6          MR. KEITH:  No further questions.
7          THE COURT:  Anything else?
8          MR. BERLAND:  No, I think we're good.
9          THE COURT:  Forget the editorializing.
10   You're excused.
11          Call somebody else.
12          MR. BERLAND:  The People call Detective
13   Anthony Romero to the stand.
14          COURT OFFICER:  Witness entering.  Remain
15   standing and face the clerk.
16          THE CLERK:  Do you swear the testimony
17   you are about to give will be the truth, the whole
18   truth and nothing but the truth?
19          THE WITNESS:  I do.
20          COURT OFFICER:  State your name, spell
21   the last name, shield and command.
22          THE WITNESS:  Detective Anthony Romero,
23   R-O-M-E-R-O, 5726, assigned to Manhattan North
24   Narcotics Major Case Team.
25          THE COURT:  Go ahead.

ROMERO - DIRECT - PEOPLE

1     DIRECT EXAMINATION BY

2     MR. BERLAND:

3          Q.   Good afternoon, Detective Romero.

4          A.   Good afternoon.

5          Q.   How long have you been with the New York

6     Police Department?

7          A.   One month shy of 18 years.

8          Q.   How long, specifically, with Manhattan North

9     Narcotics?

10         A.   Twelve years, sir.

11         Q.   What is your current rank?

12         A.   Detective second grade.

13         Q.   How long have you been a detective with the

14    New York Police Department?

15         A.   Ten years.

16         Q.   Are you assigned to a specific unit within the

17    Manhattan North Narcotics?

18         A.   Yes, I am, the Major Case Unit.

19         Q.   Please tell the members of the jury some of

20    your duties and responsibility as a detective in the

21    Major Case Unit.

22         A.    In the Major Case, we also assist all the

23    other teams in the building with their investigations,

24    we develop long-term cases, short- and long-term cases

25    on larger targets and larger weight investigations.

ROMERO - DIRECT - PEOPLE

1    Q.    Now, during your career, approximately how

2  many arrests have you made?

3    A.    More than five.

4    Q.    Approximately how many -- when you say you

5  assisted, how many would you say you assisted in?

6    A.    Easily more than 2000.

7    Q.    Approximately how many of these arrests were

8  for narcotics possession?

9    A.    I would say about 75 percent of those.

10    Q.    What about the narcotics sale?

11    A.    Sale?  I'd say at least 100 to 200.

12    Q.    Have you had specialized training in the field

13  of narcotics enforcement?

14    A.    Numerous training.

15    Q.    Have you been trained in recognizing, pricing,

16  and packaging of narcotics in New York?

17    A.    Yes.

18    Q.    Please explain for the members of the jury

19  some of the training you've received.

20    A.    Initial training when a patrol officer.  I was

21  in the street narcotics unit, and that was where I

22  learned how to identify sales, difference between

23  buyers and sellers, how drugs are packaged and price of

24  drugs. Then, when I went to narcotics in '96, much more

25  vigorous training; how to utilize undercovers, how to

ROMERO - DIRECT - PEOPLE

1   do investigations, how to identify larger drugs, how to

2   work your way from making a simple arrest and working

3   your way up in the investigation.

4        Q.   Now, during your career, approximately how

5   many search warrants have you conducted?

6        A.   As the affiant?

7        Q.   Yes.

8        A.   About more than 50.

9        Q.   What does it mean to be the affiant of the

10  search warrant?

11       A.   I actually sweared out the search warrant in

12  my name.

13       Q.   How many of the search warrants that you have

14  sworn out were for narcotics or narcotics

15  paraphernalia?

16       A.   All of them.

17       Q.   Let's move now to November 1, 2007.  Were you

18  working that day?

19       A.   Yes, I was.

20       Q.   What was your assignment?

21       A.   I was the arresting officer on two search

22  warrants to be executed at 451 Lenox Avenue.

23       Q.   Who from your unit obtained the two search

24  warrants?

25       A.   I did.

ROMERO - DIRECT - PEOPLE

1    Q.    When did you obtain them?

2    A.    I believe it was a few days prior, the 24th of

3    October, I believe.

4              THE COURT:  Both of them before the date

5         of November 1st?

6              THE WITNESS:  Yes, sir.

7    Q.    Referring to the initial two search warrants?

8    A.    The initial two was for apartment one and

9    third floor apartment.

10   Q.    Where did you go to obtain the warrants?

11   A.    To here, to Manhattan Supreme Court.

12   Q.    Did you meet with anyone to go over the

13   information that would be included in the search

14   warrant application?

15   A.    I met with you, ADA Berland, to go over it.

16   Q.    Where did we meet?

17   A.    Your office, this building here.

18   Q.    Did there come a time we went before a judge?

19   A.    Yes, we did.

20   Q.    Who was that judge, if you recall?

21   A.    Judge Solomon.

22   Q.    Did there come a time that you were given two

23   search warrants authorizing the police to search two

24   apartments?

25   A.    Yes.

ROMERO - DIRECT - PEOPLE

1    Q.   Tell the jury about the location that you were
2    authorized to search?
3    A.   The first search warrant was for apartment
4    one, only apartment on the second floor of 451 Lenox
5    Avenue, and what we called apartment two, which was on
6    the third floor of 451 Lenox Avenue.
7    Q.   Did there come a time, Detective, that you
8    actually executed the two search warrants?
9    A.   Yes -- No, I only executed one of the search
10   warrants?
11   Q.   Let's get back to November 1, 2007 now.
12        Did there come a time that you and your
13   team went to 451 Lenox Avenue?
14   A.   Yes, we did.
15   Q.   Was Detective Alfred Hernandez part of your
16   team?
17   A.   Yes.
18   Q.   Can you describe the layout of the building
19   for the jury as you observed it when you first arrived
20   at 451 Lenox Avenue?
21   A.   451 Lenox Avenue is on the west side of Lenox
22   Avenue between 132nd and 133rd Street.  The south side
23   of the building houses a laundromat.  Just to the north
24   of the laundromat is one single locked door going into
25   the upstairs residence.

ROMERO - DIRECT - PEOPLE

1    Q.   Tell the jury what happened once your team or

2    teams arrived at the location.

3    A.   The outer door of the building is locked, so

4    we utilized a walk-on, a member of our team that would

5    be able to walk up to the building without racing up

6    the neighborhood. He hung out in front of the building

7    for a few minutes until somebody went to open the door.

8    When they opened the door, he held the door opened and

9    engaged the gentleman in conversation.  At that time,

10   we gave the move-in order. We are only a block away at

11   the time. He stepped to the side. The first entry team

12   which was going to the third floor went into the

13   building first. I was the first person in the second

14   entry team.  The reason we did it that way was it was a

15   narrow stairway.  If the first team went in, the second

16   team would never be able to get past it.

17   Q.   Did there come a time when you and your team

18   entered the building?

19   A.   Correct.

20   Q.   Did there come a time when you made your way

21   up to the second floor landing of the building?

22   A.   Yes.

23         THE COURT:  Did you know about the

24   narrowness of the staircase before you got to the

25   building that day?

ROMERO - DIRECT - PEOPLE

1        THE WITNESS:  Yes.

2        Q.   What did you do once you got to the second

3   floor?

4        A.   The original plan was to use the ram to open

5   the door.  As I got to the first landing, the door was

6   open. I entered the apartment with my field team

7   following me.

8        Q.   Please tell the members of the jury what you

9   observed once you entered the second floor apartment.

10       A.   Even before I entered the apartment, there was

11  a mirror on the far wall. I could see a man sitting in

12  a room just to the right of the doorway, who was

13  Mr. Brown.  As I went into the -- first I put him in

14  custody. As we entered the apartment on a search

15  warrant, we put each person in custody until we cleared

16  the whole apartment.

17       Q.   Please take a look at what's in evidence as

18  People's 1.  Do you recognize that picture?

19       A.   Yes, I do.

20       Q.   Who is it?

21       A.   Steven Brown.

22       Q.   After Steven Brown was placed into custody,

23  please tell the members of the grand jury --

24            THE COURT:  Members of the jury.

25       Q.   Please tell the members of Grand Jury --

YVETTE PACHECO  SENIOR COURT REPORTER

ROMERO - DIRECT - PEOPLE

1      THE COURT:  They're group of grand

2  people, not members of the Grand Jury.

3      Q.   -- what was recovered from inside the

4  apartment?

5      A.   Initially, I recovered from a wooden box on a

6  glass shelf 18 bags of cocaine and U.S. currency, $965.

7      Q.   Did you notice a video surveillance system in

8  place inside of the second floor apartment?

9      A.   Yes, there was a TV monitor. When I looked at

10  the monitor, it was a split screen.  I could see my

11  field team -- my front security people out on the

12  street.

13      Q.   At that time -- you said it was a split screen

14  monitor. Explain the monitor.

15      A.   Half the screen showed the stairwell, and

16  other half, the front of the building.

17      Q.   When you were looking at the monitor, could

18  you see anything in the stairwell?

19      A.   Just the stairs.  All personnel where they

20  were assigned already.

21      Q.   So there was nobody on the stairs at that

22  point?

23      A.   No.

24      Q.   Did you later come to learn, Detective,

25  whether or not there was a video surveillance system in



1    any other apartment or rooms in the building?

2         A.   Yes, we later found -- we followed wires to a

3    second apartment.

4         Q.   Where was the second apartment located?

5         A.   On the fourth floor, the southwest corner of

6    the building.

7         Q.   Were you considered the vouchering detective

8    on the case?

9         A.   Yes.

10        Q.   As the vouchering detective, were you

11   responsible for safeguarding all the narcotics and

12   paraphernalia that was recovered in conjunction with

13   the search warrant execution?

14        A.   Yes, I am.

15        Q.   What did you personally do with all of the

16   narcotics and paraphernalia recovered?

17        A.   When I returned to the building after

18   obtaining the third search warrant, I then, with

19   Detective Hernandez, we loaded all of the property into

20   my van and we took it back to our office at 147th

21   Street.

22        Q.   Was it placed inside of a secured location?

23        A.   Yes, it was brought to my office.

24        Q.   And do you know where the narcotics and

25   evidence is sent from there?

==ROMERO - DIRECT - PEOPLE==

1    A.   From there, after vouchering, each thing is

2   sent to a different place, the narcotics, the drugs are

3   sent to the police lab which is out in Jamaica, the

4   other property is sent to the police headquarters.

5    Q.   Did there come a time that you retrieved this

6   property from the different secured locations?

7    A.   Yes, I did.

8    Q.   When was this?

9    A.   Yesterday -- excuse me, yesterday and the day

10   before.

11    Q.   What did you do with the property after you

12   picked it up?

13    A.   Brought it all to your office and secured it

14   there.

15    Q.   Detective Romero, did there come a time that

16   you went up to the fourth floor at 451 Lenox Avenue?

17    A.   Yes, I did.

18    Q.   Once you got to the fourth floor, did you

19   attempt to -- what did you see when you got up to the

20   fourth floor?

21    A.   The first time I went up to the fourth floor

22   or --

23    Q.   Yes.

24    A.   Do you want me to explain what led us up to

25   the fourth floor?

=ROMERO - DIRECT - PEOPLE=

1    Q.    What led you up to the fourth floor?

2    A.    Originally, the second team who was executing

3    the search warrant which was identified as apartment

4    two on the third floor, the leader of the floor team

5    came down and asked me which apartment.  At that time,

6    I went back upstairs with the lieutenant and realized

7    that there were four apartments on each floor.  The

8    outer door was a locked door.

9           That was a separate apartment, and at

10   that time, I decided that we were not going to execute

11   the search warrant because we were not totally sure

12   which apartment it was.  At that time, the lieutenant

13   had people from the field team on the fourth floor and

14   third floor just securing the floor.

15          I went back downstairs to continue the

16   search in apartment one on the second floor. At that

17   time, I recovered keys from Mr. Brown's jacket, and

18   myself and Detective Hernandez and my supervisor went

19   back up to the fourth floor.  At the same time --

20          Let me step back one step. When we

21   originally -- I had mentioned that I informed the field

22   team when we first entered the apartment that I was

23   able to see them on the outside on the street.  What we

24   do is take the cameras with us. So we identified where

25   the camera was at in front of the building.

=YVETTE PACHECO  SENIOR COURT REPORTER=

ROMERO - DIRECT - PEOPLE

1      We do it by the radio.  I tell the
2  officer in front to keep looking and I tell him
3  when he's looking exactly in the camera so he has a
4  direction to start searching.  So they found the camera
5  and told me the cable went up to the top of the
6  building.
7      My rear security informed me that there
8  were cables going into the windows of the back of that
9  apartment. That's what brought us back up to the fourth
10  floor. Also, the lieutenant said when they opened --
11  when they breached the door on the fourth floor with
12  the ram, that they heard a door slam on the fourth
13  floor.
14    Q.   Did he say anything about running and then a
15  door slamming, if you recall?
16         MR. KEITH:  Objection.  Leading.
17         THE COURT:  Sustained.
18    Q.   What did the lieutenant say?
19    A.   Heard somebody on the stairs and heard a door
20  slam.
21    Q.   Once you -- now, once you had a target door on
22  the fourth floor with the wire leading into it, what
23  did you do?
24    A.   Took the keys I recovered from Mr. Brown, and
25  tried it in the lock. The lock turned.  I went to open

YVETTE PACHECO  SENIOR COURT REPORTER

ROMERO - DIRECT - PEOPLE

1    the door, Detective Hernandez said -- when we enter a

2    search warrant apartment, we enter it with a full

3    plastic bunker.   Detective Hernandez suggested that I

4    go down and get the bunker. He and the lieutenant

5    stayed there at the door.  We relocked the door. Also,

6    at that time we're knocking on the door, announcing

7    ourselves, police.  No one answered. I go down and I

8    get a bunker and flashlight and come back up, then we

9    open the door, swing the door open and I enter bunker

10   first with the flashlight because it was pitch black in

11   the apartment.

12       Q.   Why did you use a bunker when you opened the

13   door?

14       A.   It's procedure, but it's a ballistic bunker.

15   If something were to happen, fire on us, the bunker

16   takes the hit and not us.

17       Q.   Before you opened the door, you said you

18   knocked on it. Approximately, how many times would you

19   say you knocked on the door?

20       A.   Numerous doors, announcing who we were, if

21   there was anybody in the apartment, to answer, to come

22   out, and there was no reply.

23       Q.   When you say "numerous times," do you mean

24   more than ten?

25       A.   Yes.

ROMERO - DIRECT - PEOPLE

1    Q.   More than 20?

2    A.   Well, the entry team that originally breached

3    the third floor door, they thought they were going into

4    an apartment.  What we yell is police, search warrant.

5    I knocked on the door.  I loudly said it was the

6    police, open the door.  No one answered.  Numerous

7    times.  Once I came back upstairs with the bunker,

8    announce it again, and still no reply.

9    Q.   So when you opened the door, explain to the

10   jury -- I know you sad it was dark. Explain the

11   lighting conditions.

12   A.   Pitch black in the apartment.

13   Q.   Couldn't see anything?

14   A.   Nothing at all.

15   Q.   What did you do next?

16   A.   The door swang (sic) from right to left, and I

17   entered the apartment.  As soon as I took a step into

18   the apartment with the light, I could see Mr. Green

19   sitting on the couch.

20   Q.   When you say with the lighting, referring to

21   the flashlight or the lights in the apartment?

22   A.   There's lights on the front of the bunker. You

23   squeeze the handle and it lights up.

24   Q.   Did there come a time that you turned the

25   lights on to the room on the fourth floor?

ROMERO - DIRECT - PEOPLE

1    A.   Yes -- I don't believe I did because my

2  hands -- I had a bunker in one hand, the gun in the

3  other hand. I think it was Detective Hernandez.

4    Q.   Do you recall if there was a light switch or

5  bulb that had to be turned?

6    A.   It was definitely a switch. I believe it was a

7  switch on the wall.

8    Q.   Would you tell the jury what you observed at

9  the moment the lights to the room were turned on?

10    A.   Very small room.  The room, I would say, is

11  about the width of the jury box and half the length,

12  and Mr. Green was sitting on the couch staring -- the

13  couch was on the same wall as where I entered, and he

14  was staring at the wall with no response.

15    Q.   Do you see Edward Green in the courtroom here

16  today?

17    A.   Yes, I do.

18         THE COURT:  Sorry. You said he was to the

19    door's right?

20         THE WITNESS:  Yes, sir.

21         THE COURT:  When you ultimately looked in

22    his direction, he was not looking at you.

23         THE WITNESS:  No, sir.  This was the

24    door.  He'd be sitting right where your books are,

25    facing away from me.

YVETTE PACHECO  SENIOR COURT REPORTER

ROMERO - DIRECT - PEOPLE

1    Q.   So you weren't face-to-face with Mr. Green?

2    A.   Not until I walked up on him.

3    Q.   When you first saw him, you were not

4    face-to-face, you were still speaking to him and

5    announcing who you were?

6    A.   Once I saw him, I stopped right there and

7    ordered him to get to the ground and he didn't move.

8    Q.   Did he turn his head at all and look towards

9    you?

10   A.   No.

11   Q.   Do you see Edward Green in the courtroom here

12   today?

13   A.   Yes, I do.

14   Q.   Please point to him and indicate an article of

15   clothing.

16   A.   Sitting right there and wearing a white shirt.

17        MR. BERLAND:  Let the record reflect the

18        witness has identified the defendant.

19        THE COURT:  Sure.

20   Q.   I'm handing you what has been marked for

21   identification as People's Exhibit 28.  Do you

22   recognize this?

23   A.   This is Mr. Green as he looked on the date of

24   the arrest.

25   Q.   So does it fairly and accurately depict the

ROMERO - DIRECT - PEOPLE

1    way he looked on November 1, 2007?

2         A.   Yes.

3              MR. BERLAND:  I ask that the photograph

4         be moved into evidence.

5              MR. KEITH:  Can I see that?

6              THE COURT:  Show it to the defense,

7         please.

8              MR. BERLAND:  Oh, I'm sorry.

9              (HANDING.)

10             THE COURT:  Any objection?

11             MR. KEITH:  No.

12             THE COURT:  28 is received.

13             (People's Exhibit 28 was received in

14        evidence.)

15             THE COURT:  We'll mark it more formally

16        later.  Please continue.

17        Q.   Please tell the members of the jury what you

18   observed inside of this tiny fourth floor room.

19        A.   Like I said, to the right was a couch with

20   Mr. Green sitting on it, table in the corner. In front

21   of me was like a work desk.  Underneath it, there was

22   paraphernalia all over. There was a heat sealer on the

23   floor. There was cocaine residue in the desk top.

24   There was Baggies on top of what was like a fake

25   fireplace mantel.  Once we had him in custody, we

YVETTE PACHECO  SENIOR COURT REPORTER

ROMERO - DIRECT - PEOPLE

1  finished to clear the room.  There was one closed door,

2  which turned out to be a closet and in the closet were

3  two safes.

4       Q.  The closed door, was there a lock on it?

5       A.  No.

6       Q.  Did there come a time that the closet was

7  open?

8       A.  Yes, to make sure there was no one else in the

9  apartment.

10      Q.  What, if anything, was located in that closet?

11      A.  Two safes.

12      Q.  What happened next?  What did you do?

13      A.  At that time, I spoke with my lieutenant and

14  we -- I went down to see Mr. Berland to obtain a search

15  warrant for that apartment.

16      Q.  Did there come a time that you obtained a

17  supplemental search warrant?

18      A.  Yes, I did.

19      Q.  What did you do upon obtaining a warrant?

20      A.  After I obtained it.

21      Q.  Yes.

22      A.  I then called Detective Hernandez, who was

23  securing the apartment for me and told him to begin the

24  search, that we had a search warrant for that

25  apartment.

YVETTE PACHECO  SENIOR COURT REPORTER

════ROMERO - DIRECT - PEOPLE════

1    Q.    Did there come a time that you went back to
2    451 Lenox Avenue?
3    A.    Yes.
4    Q.    Tell the members of the jury what you observed
5    once you got back there.
6    A.    In apartment one, I let Detective Salvatore,
7    another member of the team, they finished the search of
8    that apartment and went through all the evidence with
9    Detective Salvatore, where everything was located and I
10   took possession of that property.  I then went upstairs
11   to Detective Hernandez and they were just about
12   finishing up.  And they -- once again, he was the
13   recovering officer and he showed me where everything
14   was and what they recovered and then transported
15   everything back.
16   Q.    When you say Detective Hernandez was the
17   recovering officer, are you referring to the property
18   solely in the fourth floor room?
19   A.    Correct.
20   Q.    By the way, was any money recovered from the
21   defendant?
22   A.    $333.
23   Q.    From where?
24   A.    I believe his pants pocket.
25   Q.    Had you ever met Steven Brown before

════YVETTE PACHECO  SENIOR COURT REPORTER════

ROMERO - DIRECT - PEOPLE

1   November 1, 2007?

2        A.   No.

3        Q.   Had you ever met the defendant, Edward Green,

4   before November 1, 2007?

5        A.   No, sir.

6             MR. BERLAND:   I have no further

7   questions.   May I ask two follow-up questions?

8             THE COURT:   Sure.

9             Go ahead.

10       Q.   From the money recovered from Steven Brown,

11  Edward Green and the two apartments, was that

12  vouchered?

13       A.   Yes.

14       Q.   Once money is vouchered, what happens to it?

15       A.   There's three reasons to voucher money; for

16  safekeeping, arrest evidence or forfeiture. In the case

17  of proceeds of narcotics sale, we take the money

18  forfeiture, process it for forfeiture.

19       Q.   The physical money when you came back to

20  see --

21       A.   We get a receipt from the bank.  If we take it

22  for arrest evidence, it's perforated at headquarters

23  and kept intact taken for forfeiture, but put back in

24  the system and we get a record from the bank.

25            MR. BERLAND:   Nothing further.

YVETTE PACHECO  SENIOR COURT REPORTER

ROMERO —CROSS - DEFENSE

1    CROSS-EXAMINATION BY

2    MR. KEITH:

3        Q.    Good afternoon.

4        A.    Good afternoon.

5        Q.    How old are you?

6        A.    Forty-nine years old.

7        Q.    What's your educational background?

8        A.    High school diploma and one year of college.

9        Q.    Directing your attention to November 1, 2007.

10   After entering the fourth floor apartment and seeing

11   Mr. Green, there came a time where you went to get a

12   search warrant for that apartment; isn't that correct?

13       A.    That is correct, sir.

14       Q.    And you went and you spoke with Assistant

15   District Attorney Berland?

16       A.    That is correct, sir.

17       Q.    And you sat down with him and you told him

18   truthfully and honestly the observations you made

19   at 451 Lenox Avenue; isn't that correct?

20       A.    That is correct, sir.

21       Q.    You were in his office?

22       A.    Yes.

23       Q.    Was he taking notes?

24       A.    He took notes to write out the affidavit for

25   the warrant, yes, sir.

ROMERO -CROSS - DEFENSE

1    Q.    So he's writing on a paper or notepad or

2    something to that effect?

3    A.    I believe he typed it into the computer which

4    prints out the affidavit.

5    Q.    He was sitting down typing onto the computer

6    as you were describing to him the activities at 451

7    Lenox Avenue?

8    A.    I believe first I described to him just as I

9    just did and then he wrote the affidavit and asked

10   questions as he was writing it.

11   Q.    And you were with him for approximately an

12   hour, isn't that correct?

13   A.    I believe so.

14   Q.    When he finished the affidavit, you had a

15   chance to read it over?

16   A.    Of course.

17   Q.    You signed it?

18   A.    Yes, I did -- I signed it in front of the

19   judge.

20   Q.    This is the second affidavit before Criminal

21   Court judge, Judge White?

22   A.    That's correct.

23   Q.    In your review of that affidavit, was it

24   accurate and complete?

25   A.    I believe so, yes.

ROMERO -CROSS - DEFENSE

1    Q.   Now, I believe on direct examination you

2    indicated that when you were in the second floor

3    apartment, you recovered some keys from Steven Brown;

4    isn't that correct?

5    A.   From Mr. Brown's jacket, yes.

6    Q.   And to be accurate and precise, would it be

7    fair to say that you recovered the keys from a jacket

8    that was on a chair near Mr. Brown?

9    A.   Correct.

10   Q.   Describe again what was done with those keys.

11   A.   I took keys and I went up to the fourth floor

12   and I tried the door in the southwest apartment of that

13   building.

14   Q.   That was the first thing that was done with

15   the keys?

16   A.   Yes. I took possession of them and I went back

17   up to the fourth floor with a supervisor and

18   Detective Hernandez.

19   Q.   Isn't it true that in the affidavit that you

20   gave the judge to get the search warrant, you indicated

21   in the affidavit that was prepared by ADA Berland and

22   yourself that the keys were first taken by a member of

23   your team to the apartments on the third floor, and

24   each of those apartments, they tried to open the doors

25   to those apartments, isn't that what you indicated to

YVETTE PACHECO  SENIOR COURT REPORTER

ROMERO -CROSS - DEFENSE

1    the judge?

2         A.   I tried those apartments after I made entry

3    into the apartment.  I didn't do it beforehand.  I only

4    did it afterwards to confirm that the key only opened

5    the door on the fourth floor.

6         Q.   You told the judge the other way around, you

7    told the judge in the affidavit that you went to the

8    third floor first?

9         A.   I don't believe I tried the keys.  I had to go

10   through the third floor to get to the fourth floor.

11            MR. BERLAND:  Your Honor, can we

12       approach?

13            THE COURT:  No.  Very, very limited

14       amount of this is even arguably admissible in

15       front of the jury, since I have told them a couple

16       of times that nothing related to the execution of

17       the search warrant has anything to do with them,

18       their ability to make the decision.  A search

19       warrant is so complicated, that no jury is asked

20       to deal with it.

21            MR. KEITH:  Your Honor, I'm not asking

22       the jury to have any consideration with regard to

23       the search warrant.

24            THE COURT:  Objection sustained.

25            MR. KEITH:  May we approach?

YVETTE PACHECO  SENIOR COURT REPORTER

ROMERO -CROSS - DEFENSE

1          THE COURT:  Sure.

2          (Whereupon, a sidebar conference was held

3      on the record out of the hearing of the jury.)

4          THE COURT:  I gather that Exhibit F that

5      started this is the affidavit itself?

6          MR. KEITH:  Yes.

7          THE COURT:  What is it that you wanted to

8      come over with?

9          MR. KEITH:  I just wanted to attack his

10      credibility.  He says one thing to you, he says

11      another thing to Judge Whiten, another thing to

12      the jury.  The search warrant is totally

13      irrelevant. It's just his inconsistency.  The lack

14      of credibility.

15          THE COURT:  Suppose all of that happened,

16      suppose we did that for an hour and a half and you

17      were successful as you could possibly be and

18      became a teary-eyed jellyfish, what would you then

19      say to the jury in the summation?  I can't attack

20      his credibility.  Please answer my question.

21          MR. KEITH:  Well, Your Honor, ultimately,

22      I guess the People have going to argue that

23      because of the way the stuff was situated in the

24      room, that somehow that imputes knowledge to

25      Mr. Green.

ROMERO -CROSS - DEFENSE

1      THE COURT:  Sure.

2      MR. KEITH:  I think Detective Hernandez

3  mischaracterized what he saw in the room. I think

4  that credibility has become an issue in this case.

5  They just didn't bring it out the way it happened.

6      THE COURT:  Well, then if you can show me

7  a Court of Appeals case that says that as in a

8  Huntley hearing, as with a Wade hearing,

9  notwithstanding a decision by a judge in a hearing

10 specifically constituted to deal with the

11 credibility issues related to the application for

12 a search warrant, notwithstanding that, that a

13 jury gets a second bite at the search warrant

14 procedure the way they would a second bite at a

15 Huntley hearing and Wade hearing, I will yield.

16      In the absence of your ability to show me

17 a case that says anything other than what I think

18 both of us know the law is, you can't do what you

19 want to go do because there's nothing that you

20 could do with it and there's nothing that the jury

21 can evaluate, because as I said, suppose you were

22 successful, this isn't the place to attack the

23 credibility of the search warrant.

24      MR. KEITH:  You can't let this officer

25 come in here and just say what he wants to say

ROMERO -CROSS - DEFENSE

1    when you know --

2            THE COURT:  How do I know?  I wasn't

3    there.

4            MR. KEITH:  You read the search warrant.

5    We have dealt with this in the Darden-type

6    hearing. You asked him questions.  He gave you

7    answers that are completely different than what he

8    is giving me right now.

9            THE COURT:  I don't remember completely

10   different. I remember having a certain disparaging

11   comment or two about this witness, but ultimately

12   the decision was as it was.

13            If in fact you said that the facts about

14   the placement of the stuff in the fourth floor is

15   inaccurate because I guess your client says he saw

16   the police move the stuff or bring it from

17   someplace else, your conviction is to put him on

18   the stand.  The objection is sustained.

19            MR. KEITH:  Your Honor, with regard to

20   the affidavit, they had to go to Judge Whiten with

21   some information in order to get him to sign the

22   warrant. Some of the information is the

23   observations of the officer when he goes up to the

24   fourth floor. That's in the affidavit.

25            THE COURT:  Like what?  I don't remember

ROMERO -CROSS - DEFENSE

1    everything. They turn the key.

2         MR. KEITH:  He describes how the search

3    was conducted.  They do everything on third floor,

4    go to the fourth floor, enter the room and make

5    certain observations. The observations in the

6    affidavit are different than what he testified to.

7         THE COURT:  Can you show me?

8         MR. KEITH:  Paragraphs 13 and 14.

9         MR. BERLAND:  There's nothing different.

10        THE COURT:  According to the affidavit,

11    the detective witness swore to in front of

12    Judge Whiten, paragraph 13 says a member of the

13    team unsuccessfully attempted to open locked rooms

14    on the third floor with the keys recovered from

15    Mr. Brown.  I'm not -- I'm read it quickly.  I

16    don't know whether there's language in here that

17    says what Mr. Keith assumes, namely that that's

18    the sequence. Let's assume that's the sequence.

19        MR. KEITH:  Just read the next sentence.

20    He says somebody else did. He's saying he did it.

21        THE COURT:  I don't think that's a big

22    deal.

23        MR. KEITH:  It is as far as being

24    precise.

25        THE COURT:  The objection is still

ROMERO -CROSS - DEFENSE

1   sustained.

2              (Whereupon, the sidebar conference

3   concluded and the proceedings continued in open court

4   as follows:)

5              THE COURT:  Go ahead.

6      Q.   Detective Romero, I think you indicated on

7   direct examination that you were the person that put

8   the key into the lock of the door on to the fourth

9   floor and tried it and then decided not to go in; is

10  that correct?

11     A.   That is correct, sir.

12     Q.   Is your recollection clear on that?  Is that

13  the way you remember it?

14     A.   That's the way I remember, sir.

15     Q.   On the night of the incident, isn't it correct

16  that your affidavit to the judge --

17              MR. BERLAND:  Objection.

18              THE COURT:  Overruled.

19     Q.   You indicated that you and members of the

20  executing team then back up to the fourth floor of the

21  target building and you observed a member of the team

22  place one of the keys recovered from JD mustache, who

23  is also Steven Brown, inside of the doorknob to the

24  target premises?

25     A.   I opened the door, I turned the key in the

1    door.

2         Q.   Didn't you --

3              THE COURT:  The night that you swore in

4         front of Judge White, the affidavit says that you

5         saw somebody do it.

6         A.   No, I did it.  The member of my team turned

7    the key to open to the door when we made entry because

8    I had no hands available.  The key was in the door.  I

9    originally tested the door and then when we were ready

10   to go into the apartment, Detective Hernandez had to --

11   'cause there was no way to turn the key; firearm in my

12   right hand and shield in my left hand.

13        Q.   You are saying Detective Hernandez turned the

14   key?

15        A.   I turned it the first time and saw the door

16   open.  Went to open the door, and Detective Hernandez

17   said to me we should get a bunker.  I closed the door

18   and locked it again, leaving the key in the door.  Went

19   downstairs to get a bunker and flashlight and then came

20   back.  When we went to go in, I was holding a bunker in

21   my left hand, firearm in my right hand, so

22   Detective Hernandez had to turn the key to open the

23   door.

24        Q.   Now, other than preparing that sworn affidavit

25   on the date that you obtained the search warrant,

ROMERO -CROSS - DEFENSE

1  there's been other occasions in this case where you've

2  given sworn testimony; isn't that correct?

3      A.   Yes, there is.

4      Q.   And do you recall that you testified before

5  the Grand Jury?

6      A.   Yes, I did.

7      Q.   And did you tell the truth when you testified

8  before the Grand Jury?

9      A.   Yes, I did.

10     Q.   And there was also a pretrial hearing in which

11  you gave testimony to Justice McLaughlin.  Do you

12  recall testifying in that hearing?

13     A.   Yes, I did.

14     Q.   Did you tell Justice McLaughlin the truth?

15     A.   Yes, I did.

16     Q.   Now, page 306, starting at line --

17          THE COURT:  Of which proceeding.

18          MR. KEITH:  Of the hearing with you,

19     Your Honor.  Let's start line 19, page 36.  Do you

20     recall being asked these questions and giving

21     these answers?

22          Question by Justice McLaughlin: "You said

23     inside the room on the fourth floor where the

24     fellow was, he was sitting in the room on a

25     couch?"

ROMERO -CROSS - DEFENSE

1   Your answer: "Yes, sir."

2   Justice McLaughlin:  "Did you open the

3   lock that got you in there or was it somebody else

4   whom you watched do it?"

5   You answered:  "No, I opened the door.

6   Before we did it, I noticed the key turn, I banged

7   on the door, announced it was the police, if

8   anyone was in there to come out.  There was no

9   response.  I did it again.  I opened the door. The

10   room was totally dark.  I shined my flashlight in

11   the room.  So the gentleman sitting on the floor

12   was crouched, just sitting there in the dark.  At

13   that time, we took him into custody, brought him

14   out.  Once we turned the lights on in the

15   apartment, that's when we saw all the

16   paraphernalia."

17   Do you recall being asked those questions

18   and giving that answer?

19   A.   Yes I do, sir.

20   Q.   As you sit here now, what's the truth?

21   A.   Exactly what you just read. There is a

22   difference between turning the key and opening the door

23   once the key is turned.  Detective Hernandez is behind

24   me. I would not unlock the door, as I said before,

25   because my hands were full. Detective Hernandez turned



1  the lock to unlock the door. What I mean by opening the

2  door is with the force of my body, I hit the door and

3  entered the apartment.

4      Q.   I believe you told the judge you shined the

5  flashlight?

6      A.   There is a flashlight built into the bunker.

7      Q.   You didn't tell the judge about the bunker?

8      A.   It's a flashlight, sir.

9            THE COURT:  Let me tell the jury what is

10  happening.  If a person is thought to have given

11  somewhat or completely different testimony on the

12  same subject in an earlier proceeding, the jury is

13  entitled to know that for two reasons.  One, so

14  that you could assess credibility.  If you decide

15  there is a variance, then you get to decide

16  whether the variance affects your assessment on

17  credibility on issues you will be asked to decide.

18            Continue.

19      Q.   Now, with regard to this TV monitor or

20  television or what have you on the fourth floor, did

21  there come a time that day that you saw that television

22  operate, did you see it on at any time?

23      A.   After we tested the TV -- both TVs were off.

24  The monitor and television below were off when we

25  entered the room.  When they turned them both on, the

ROMERO -CROSS - DEFENSE

1   lower T.V. was hooked to the DVD and the top monitor

2   was all fuzzed because the two cameras had already been

3   removed by my field team outside after I directed them

4   to the cameras.

5       Q.   As you sit there right now, that's your

6   recollection?

7       A.   Yes, it is, sir.

8       Q.   Now, again, I direct your attention to the

9   hearing we had when you were questioned by Justice

10  McLaughlin.  I asked if you recall being asked these

11  questions and giving the answers.  Page 37, line 14.

12           "Did you ever figure out how to turn the

13      monitor on?"

14           And you answered: "Yes."

15           And the Judge asked you:  "When you

16      turned it on, could you see the street?"

17           And you answered:  "Yes."

18           Do you recall being asked those questions

19      and giving those answers to Judge McLaughlin?

20      A.   Yes. The only monitor that I saw the street

21  was from apartment two -- apartment one on the second

22  floor.

23      Q.   These questions were specifically about the

24  about monitor on the fourth floor?

25      A.   As I said before, when I turned on the monitor

ROMERO -CROSS - DEFENSE

1    on the fourth floor the cameras were already

2    disconnected and the monitor didn't work, so ...

3        Q.   When you told the judge that you see the

4    street back in this hearing, you were mistaken or

5    lying --

6                MR. BERLAND:  Objection.

7                THE COURT:  He's giving him options.  Did

8        I use fourth floor in the question or was it

9        obvious in the question that that was the fourth

10       floor?

11               MR. KEITH:  Yes, Your Honor.

12       Q.   Going back to Page 36, I will repeat the

13   answers from the previous question.

14               "Did you open the lock that got you in or

15       was it somebody else you watched do it?

16               No, I opened the door.  Before we did,

17       once I noticed the key turn, I banged on the door,

18       announced it was the police, if anybody was in

19       there, to come out.  There was no response. I did

20       it again, opened the door, the room was totally

21       dark, I shined my flashlight.  The gentleman

22       sitting in the room was crouched sitting in the

23       dark. At the time we placed him in custody and

24       brought him out. Once we turned the light on in

25       the apartment, that's when we saw the

YVETTE PACHECO  SENIOR COURT REPORTER

ROMERO -CROSS - DEFENSE

1    paraphernalia."

2            Your Honor asked him:  "Among the

3    paraphernalia was the TV monitor?"

4            The witness:  "Correct."

5            Your Honor asked:  "Was it working."

6            He says:  "No.  Everything was off.  The

7    room was totally black at the time."

8            Your Honor asked him:  "Did you ever

9    figure out how to turn the monitor on?"

10           He says:  "Yes."

11           "When you turned it on, could you see the

12   street?"

13           He said:  "Yes."

14           THE COURT:  So same instructions that I

15   gave you a minute ago.

16           THE WITNESS:  Understanding it was my

17   mistake.  The only monitor I saw the street on was

18   the monitor on the second floor because I knew the

19   cameras had already been disconnected.

20   Q.   It's fair to say then that you are assuming

21   that that TV monitor on the fourth floor was able to

22   see the street?  You never saw it working; is that the

23   truth?

24   A.   That's correct.

25   Q.   Now, with regard to -- I believe you said

YVETTE PACHECO  SENIOR COURT REPORTER

1  there was a wire that went from the camera to the

2  fourth floor; is that correct?

3       A.   My front security people told me that the

4  wires, once they found the camera outside, that it went

5  all the way up to the fourth floor and over. My rear

6  security man, we have people in the front and rear just

7  in case something comes out of windows, people try to

8  flee from windows, he told me the cable were running

9  into that apartment, into the fourth floor.

10      Q.   The front security people are people standing

11 on Lenox Avenue?

12      A.   Front security on Lenox Avenue, rear security

13 behind the building, yes, sir.

14      Q.   This was front security?  I believe that's

15 what you said.

16      A.   Front security told me they went to the top of

17 the building and the rear security told me it went in

18 the back of the apartment.

19      Q.   So I'm sorry, what did front security tell

20 you?

21      A.   When they found the camera, the wires from the

22 camera went up to the top of the building, which led up

23 to the fourth floor. The rear security then told me

24 that it went into the back corner apartment.

25      Q.   Let me show you what has been marked

ROMERO -CROSS - DEFENSE

1  Defendant's Exhibit I in evidence.  Before I show it to

2  you, that day or some point in time during the

3  investigation of 451 Lenox Avenue, did you look at the

4  front of the building?

5      A.   Numerous times.

6      Q.   I'd like you to take a look at what has been

7  marked Defendant's Exhibit I in evidence.

8      A.   Yes.

9      Q.   Do you recognize what's in that item?

10     A.   This is the front of the building.

11     Q.   It doesn't show the entrance to the building?

12     A.   No.

13     Q.   Looking at that photograph carefully, would

14  you say it fairly and accurately represents the front

15  of the building as it appeared on November 1, 2007?

16     A.   No.

17     Q.   What's different?

18     A.   Well, first off it was November, there were no

19  air conditioners in the windows, and all the cables

20  weren't there.

21     Q.   There were no air conditioners in the windows.

22  That's what your recollection is?

23     A.   I don't remember there was air conditioners

24  being that it was November, and they didn't have all

25  cables on the front of the building.

YVETTE PACHECO  SENIOR COURT REPORTER

ROMERO -CROSS - DEFENSE

1    Q.   So, what did your front security team see?  Do

2    you recall?

3    A.   They told me there was a cable going from the

4    camera up to top of the building and then when rear

5    security also heard that on the radio, he told me the

6    cable was going into the rear apartment.

7    Q.   From looking at that photograph, do you have

8    an idea of where the camera was?

9    A.   No, sir.  I was in the building when it was

10   recovered, but it was facing --

11   Q.   From your information, when you were on the

12   second floor and able to see certain things. Based on

13   what you were able to see, where were the camera?

14   A.   Inside the awning.

15   Q.   The front security team said there was a cable

16   running from the camera up to the fourth floor?

17   A.   Correct.

18   Q.   Look carefully at the picture. Do you see such

19   a cable that could possibly correspond with the

20   description that was given to you by your front

21   security?

22   A.   There is one cable that doesn't lead to any of

23   the front apartments, yes, but I'm not sure that was

24   the cable at the time.

25   Q.   Your testimony is with regard to the other

ROMERO -CROSS - DEFENSE

1   cables in the picture, you do not recall seeing them on

2   November 1, 2007?

3       A.   That's correct, sir.

4       Q.   I believe you also indicated that in that

5   picture you see air conditioning devices around.  They

6   weren't there also on November 1, 2007?

7       A.   I don't remember, no.

8       Q.   Now, Detective Romero, as the arresting

9   officer, you prepared the majority of the paperwork in

10  this case?

11      A.   With assistance from my team, yes.

12      Q.   Do you recall, with regard to Mr. Green, that

13  there was a wallet recovered from him?

14      A.   I'm not sure, sure.  I didn't -- I was down

15  getting a search warrant when he was being processed at

16  the processing facility at the 2-5 Precinct.

17      Q.   Do you recall Mr. Green having a New York

18  State identification card with a Bronx address?

19      A.   I don't remember his exact ID, but he gave me

20  an Ogden Avenue address in the Bronx.

21      Q.   When he gave you that, he told you that?

22      A.   That's the pedigree he gave my team.

23      Q.   What do you mean by "team"?

24      A.   Like I just said, after he was put into

25  custody, he was removed from the apartment, I left the

ROMERO -CROSS - DEFENSE

1    apartment, I left the building at that time and went

2    down to 100 Centre Street to obtain a search warrant.

3    The rest of the search team processed the arrest.  I

4    was down here when he was being processed.

5              THE COURT:  Processing, the police ask

6         date of birth, name, address among other things?

7              THE WITNESS:  That's correct.

8              THE COURT:  One of the team members asked

9         him and he said Ogden Avenue in the Bronx?

10             THE WITNESS:  Correct.

11   Q.   That's what you were told?

12   A.   Yes, sir.

13   Q.   You don't recall the wallet being recovered

14   from him?

15   A.   No, sir.  All I really did was just check him

16   fast for weapons, handcuffed him, and then went, like I

17   said, to come down here.

18   Q.   The $338 recovered from him, you don't recall

19   that being in a wallet?

20   A.   I know he had money on him, and it was

21   vouchered by one of the detectives who processed him.

22   I believe it was recovered from him at the processing

23   center.

24   Q.   But you just don't recall the wallet or the

25   identification?

ROMERO -CROSS - DEFENSE

1      A.   Like I said, sir, I don't.

2      Q.   Just to be clear, with regard to the items

3  that were in open view, is it fair to say that there

4  was a table with the glass top that had on it what

5  appeared to be cocaine residue or white powder?

6      A.   That is correct.

7      Q.   And there was also a digital scale with some

8  white powder on it?

9      A.   Numerous scales, but, yes, right on the table

10  there was a scale with residue.

11      Q.   A scale where?  Where is your recollection of

12  there being a scale that was out in the open?

13      A.   I believe it was on the work table.  I'm not

14  sure.  There was a bunch of scales.

15      Q.   There was a bunch of scales out in the open?

16      A.   No, recovered from the apartment.

17      Q.   I'm saying with regard to what you used to get

18  the search warrant and what your recollection is when

19  you went into the fourth floor apartment, just so the

20  jury will know what was out in the open, there was one

21  digital scale out in the open?

22      A.   I'm not sure exactly.  I would look at the

23  inventory and see where everything was.

24      Q.   Would it refresh your recollection to look at

25  the search warrant affidavit?

ROMERO -CROSS - DEFENSE

1    A.    It would be better to look.

2    Q.    Excuse me?

3    A.    There is an inventory done by Detective

4    Hernandez that lays out everything in the apartment.

5    Q.    Right, that's the other stuff. I'm talking

6    about the stuff that was out in the open. The plain

7    view --

8    A.    Everything recovered in the apartment was

9    listed on that inventory.

10   Q.    Right, I understand that.

11         THE COURT:  Was it listed where it was

12   located, and the conditions under which and

13   circumstances in which it was found?

14         THE WITNESS:  Yes, sir.

15   Q.    On the voucher?

16   A.    No, on the inventory that Detective Hernandez

17   did of the room.

18   Q.    On the handwritten note?

19   A.    Correct.

20   Q.    When was that inventory prepared?

21   A.    After the search warrant was signed and then

22   they conducted the search.

23   Q.    So it was prepared that day?

24   A.    Correct.

25         THE COURT:  Prepared in the apartment or

YVETTE PACHECO  SENIOR COURT REPORTER