ROMERO -CROSS - DEFENSE

1    do you have any idea?

2              THE WITNESS:  It was given to me

3    afterwards, so I guess it was prepared in the

4    apartment after they searched. I was not there

5    when it was done, sir.  I was still down here.

6              MR. KEITH:  Let's mark this Defendant's

7    Exhibit F.

8    Q.   I'd like you to take a look at what's been

9    marked as Defendant's Exhibit F for identification and

10   see if it refreshes your recollection with regard to

11   the items that were in open view in the fourth floor

12   apartment on November 1, 2007.

13   A.   You want me to read the whole thing or tell

14   you what's on the desk.  What was on the desk --

15   Q.   Take a look at it, refresh your recollection,

16   put it down and then tell the jury what you recall.

17   A.   Two scales on the desk, not one scale.

18   Q.   What else?

19   A.   Ziploc bags for packaging on a mantel.

20   Underneath the desk was a large heat sealer which is

21   used to heat seal small bags, and a lot of residue on

22   the table.

23   Q.   Detective Romero, you were involved in the

24   investigation that led to the issuance of the initial

25   warrants, the warrants for the second floor and what

ROMERO -CROSS - DEFENSE

1   you believed to be the third; is that correct?

2       A.   That is correct, sir.

3       Q.   And while involved in that investigation,

4   isn't it true that in investigation with those

5   warrants, there was no information that implicated

6   Edward Green in any way?

7       A.   That's correct.

8       Q.   With regard to the fourth floor, before going

9   into the apartment where you found Mr. Green, did you

10  try the keys on any other doors on to the fourth floor?

11      A.   Like I stated before, I tried them after,

12  before I came down here.

13      Q.   On the fourth floor I'm talking about.

14      A.   I tried them after, before I came down here I

15  knew it would be a question if the keys fit any other

16  door, and that's why I tried them on other doors.

17      Q.   Page 304, starting at line six. Again, these

18  are questions by Justice McLaughlin.

19           "Were there four separately divided rooms

20      on the fourth floor?"

21           You answered:  "Yes, sir."

22           Justice McLaughlin:  Did each of those

23      have a lock?

24           You answered:  "Yes."

25           The Judge:  "And how was it that you went

YVETTE PACHECO   SENIOR COURT REPORTER

ROMERO -CROSS - DEFENSE

1    into the one where Mr. What's-his-name was found,

2    the fellow sitting on the couch, I think, how did

3    you get in there?"

4            You answered:  I opened it with a key,

5    opened the door on the fourth floor that also

6    opened door that the cables were going into.

7            Judge:  "You said the door in which the

8    fellow was ultimately found on the fourth floor

9    was the only door to which keys fit, so I assume

10    that at least one of the other of the three other

11    rooms on the fourth floor landing you tried the

12    keys?"

13            You answered:  "Yes."

14            Do you recall being asked those questions

15    and giving those answers?

16    A.   Yes, I do.

17    Q.   So is it your recollection that you tried the

18    keys on the other doors on the fourth floor or you went

19    straight to the apartment where Mr. Green was?

20    A.   I stated numerous times that after we entered

21    the apartment and placed Mr. Green under arrest, I

22    tried all the doors.  If I was asked did it open any

23    other doors, I would have the answer.

24            MR. KEITH:  May we approach?

25            THE COURT:  Yes.

YVETTE PACHECO  SENIOR COURT REPORTER

ROMERO -CROSS - DEFENSE

1        (Whereupon, a sidebar conference was held

2    on the record out of the hearing of the jury.)

3        MR. KEITH:  Your Honor, I'm going to wrap

4    it up shortly.  With regard to the trying of the

5    keys on the third, can I now ask that question?

6        THE COURT:  I don't think so. The

7    question that he just was asked, I was listening

8    needlessly to say, because it's interesting to hear

9    your own questioning, there was no context as far

10   as time.  So I assume if you are to ask him a

11   question about the third floor, the answer is

12   going to be similar to what he's given. He's going

13   to say whatever he's going to say, but it will be

14   in the context that I knew I was going to be asked

15   if the keys deal with the third floor.  What did

16   he say at the Darden hearing about the third floor

17   that you want to contrast?

18       MR. KEITH:  I wanted to go back to the

19   affidavit and  --

20       THE COURT:  No.

21       MR. BERLAND:  While we're here, as far as

22   the stipulations and publishing the stuff for

23   jury, do you want it done after?

24       THE COURT:  We will do that today. As

25   soon as you guys are finished, I will send them

YVETTE PACHECO  SENIOR COURT REPORTER

ROMERO -CROSS - DEFENSE

1    out and ask the loyal court reporter to find us

2    and read us the disputed part of the keys so that

3    before the jury comes back in I'll have a better

4    idea of what actually was said.  I may not make a

5    ruling.  We'll, all three, hear it at the same

6    time.

7         MR. BERLAND:  I will ask for a bathroom

8    break right before we do that.

9         (Whereupon, the sidebar conference

10   concluded and the proceedings continued in open court

11   as follows:)

12   Q.   Detective Romero, with regard to the execution

13   of the warrants of the second and third floor, what

14   time did that activity start?

15   A.   We had a tact meeting back at our office

16   at 4:30 in the afternoon on the 1st.  Around 5:00, five

17   after five, we headed to vicinity of the location which

18   is only a few blocks from my office, and we executed

19   the first warrant. The entry time was 1720, which

20   is 5:20.

21   Q.   Would you describe that as the afternoon?

22   A.   Five-twenty in the afternoon, yes, late

23   afternoon.

24   Q.   With regard to the third floor, I know it's

25   your testimony that you went to the third floor after

YVETTE PACHECO  SENIOR COURT REPORTER

ROMERO -CROSS - DEFENSE

1   the warrant was obtained and executed on the fourth

2   floor; am I understanding you correctly?

3       A.   As far as what?

4       Q.   You tried the keys to the apartments on the

5   third floor?

6       A.   On my way down, I tried the keys on all the

7   apartments, yes.

8       Q.   Was that after the warrant was executed on the

9   fourth floor?

10      A.   No, sir.

11      Q.   When was that, the sequence?

12      A.   Once Mr. Green was in custody and I was going

13  down to see Mr. Berland, I went down and I tried the

14  keys in all the doors.  This way, if I was asked, does

15  it work in all the doors, and the answer was no.

16      Q.   When you went to those apartments, did you see

17  any residents?

18      A.   Two different people came out.  I knocked

19  before I put a key in the door.

20      Q.   Did you go into any of those apartments?

21      A.   No, sir.

22      Q.   Did you look into any of those apartments?

23      A.   No, sir.

24          THE COURT:  Did he look in any of the

25  apartments or either of the two apartments from

ROMERO -CROSS - DEFENSE

1      which he said people came out.

2                THE WITNESS:  What's the question?

3                THE COURT:  I am asking Mr. Keith.

4                MR. KEITH:  What was the question?

5                THE COURT:  Precisely.  You said did you

6      look into any of those apartments. I didn't know

7      whether you were asking whether he looked into

8      either of the apartments from who he said somebody

9      emerged after he knocked or whether you were

10     asking whether somehow he looked into any of the

11     other five apartments.

12     Q.   Can you answer that, Detective?

13     A.   I said I didn't look.  People answered the

14     door and I told them I was trying the key. I asked if

15     they were okay and they said yes and they closed the

16     door.

17     Q.   Page 39, line 11, again directing your

18     attention to the hearing when you were questioned by

19     Justice McLaughlin.

20                The Judge asked you: "Did you ultimately

21     get into the eight apartments on the third and

22     fourth floor?"

23                You answered:  "No, sir."

24                Judge:  "Did you get into any of them?"

25                You answered:  "We knocked on a few

1    doors."

2                    The Judge:  "Some people opened?"

3                    You said:  "Yes, yes."

4                    The Judge:  "You stuck your head in to

5    make sure there was nobody?"

6                    And you answered:  "Correct."

7                    Is that what happened?

8        A.    They opened the door.  They did the proper

9    thing.  I knocked on the door, said police, they opened

10   the door, I asked if they were okay, I told them I was

11   trying key, and that was it.

12                   THE COURT:  Same instruction.

13       Q.    Detective, is it fair to say that with regard

14   to your recollection of what happened on November 1,

15   2007, that, obviously, it would be clearer back in

16   November of 2007 and in the month thereafter as opposed

17   today?

18       A.    I don't see anything different, no.

19       Q.    Since the time, I would imagine you've been

20   involved in other search warrants?

21       A.    Numerous, yes, sir.

22       Q.    And you made a number of arrests since then?

23       A.    Yes, sir.

24       Q.    So would it be fair to say that your

25   recollection with regards to the activities of

═══════ROMERO -CROSS - DEFENSE═══════

1    November 1st were clearer back then?

2         A.   Would be clearer on that day, yes.  After

3    reviewing my notes, I don't see any --

4              MR. KEITH:  No further questions.

5              THE COURT:  Anything?

6              MR. BERLAND:  No.

7              THE COURT:  You're excused.

8              (The witness was excused.)

9              THE COURT:  I will ask you folks to step

10   out. I want you folks to be available in

11   about 12 minutes, maybe 15. We will have you out

12   of here by ten of five, real time.

13              Keep an open mind. Do not discuss the

14   case. When you come back in, we'll show you the

15   property that I promised you and tell you a little

16   bit more. I need to consult with the lawyers and

17   reporter about what we are going to do tomorrow.

18              (Jurors exit.)

19              (The record was read back by the court

20   reporter as requested.)

21              THE COURT:  We're winding down.  The

22   Court reporter has graciously found and read to us

23   the opening statement by Mr. Keith.  The defendant

24   undoubtedly is with the phrase clearly others had

25   access to the apartment as did the police either

═══════YVETTE PACHECO  SENIOR COURT REPORTER═══════

ROMERO -CROSS - DEFENSE

1    keys or the key they found on the second floor

2    from Mr. Brown, not Mr. Green's apartment, he's

3    not the lessee, it's not his business, apartment,

4    car, et cetera, clearly others had access to the

5    apartment.  I want to hear what you have to say,

6    both sides, about that.

7         Last time I dealt with this, I was

8    willing to say okay, and Court of Appeals wasn't.

9    I believe that you are allowed to say that you're

10   not going to hear any evidence that the defendant

11   had keys to the apartment.  That might be where

12   the Court of Appeals says that's not so good, but

13   I think it's okay. What we have here is clearly

14   others had access to the apartment, that means

15   Mr. Green had no access to the apartment.

16        MR. KEITH:  I don't know if that's an

17   inference.  The People are going to argue just the

18   opposite, Your Honor.

19        THE COURT:  Let me hear him and you will

20   get the last word.

21        MR. BERLAND:  If you'd like, I will pull

22   case law. Same arguments that I made earlier.

23        THE COURT:  Let's leave it at that.  Pull

24   some cases.  We'll come in 20 minutes before the

25   jury.

YVETTE PACHECO  SENIOR COURT REPORTER

───ROMERO -CROSS - DEFENSE───

1    MR. KEITH:  Let me say this real quick.

2    In his opening, he indicated that the experienced

3    detective took the keys to search the fourth

4    floor, they used the key to open up the door, and

5    basically I just repeated that and stated the

6    obvious. Once they got the keys from another

7    location, would appear to me that the obvious

8    natural flow, the inference that can be drawn from

9    that is that other People have access to this

10   apartment.  I think that argument is available to

11   me once it's mentioned that keys were found in a

12   jacket on the second floor were used to gain

13   access to the apartment.

14        THE COURT:  Maybe. But what I pointed out

15   I think was that when literally a litany of the

16   lack of things that the apartment is as to

17   Mr. Green, lessee, owner, tenant, business, not

18   his trunk, not his car and that he is in the wrong

19   place at the wrong time, when you say at the end

20   of the litany what the connection is absent, you

21   don't say anything other than finish the thought I

22   think is the most logical way to say it.  He

23   doesn't have this connection, this doesn't have

24   this connection, this doesn't have this

25   connection, this isn't his place, he doesn't do

ROMERO -CROSS - DEFENSE

1  this.  Your words "clearly others had access to
2  the apartment," clearly he --
3          MR. KEITH:  Unfortunately, that argument
4  is available to me. They found a key in another
5  location. I think it naturally flows that the
6  suggestion is that others have access.
7          THE COURT:  Sure, and that means others
8  have access, he doesn't.
9          MR. KEITH:  I don't know if that's the
10  natural flow. Certainly others have access.
11         THE COURT:  We're finished. Find cases.
12  We'll bring in the jury.  I'll summarize
13  stipulation, we will see the property and cianara
14  for the day.
15         MR. KEITH:  Your Honor, that litany of
16  questions is from the CJI charge from constructive
17  possession.
18         THE COURT:  Sure.  Everybody's got to
19  adopt every CJI charge to the situation.  CJI
20  charge doesn't automatically come in every time
21  evidence is suppressed. That argument is available
22  every time. I'm sure this doesn't come as a major
23  surprise.
24         Bring in the jurors.
25         COURT OFFICER:  Jury entering.

YVETTE PACHECO  SENIOR COURT REPORTER

ROMERO -CROSS - DEFENSE

1      THE COURT:  When I gave you the

2  preliminary instruction, I said there were three

3  ways to get evidence. I said that via stipulation.

4  There are two stipulations here with respect to

5  the material that was seized, supposedly being

6  narcotics, and there are stipulations with respect

7  to two different voucher numbers, the voucher

8  numbers the ones ending in 21910 and 21912.

9      With regard to 21912, a chemist received

10  this intact condition, in an envelope, sealed. He

11  or she opened it, weighed it, analyzed it.  The

12  weight was 17.87 ounces.  The chemist determined

13  that it was cocaine and the chemist resealed it

14  and sent it back and it is what is introduced into

15  the trial here.

16      The other voucher, 2910, is also cocaine.

17  The chemist received it sealed, analyzed it. The

18  weight is .16 ounces or 4.7 grams and then the

19  chemist sealed it, sent it back and the thing

20  admitted in the trial also. You can see the

21  exhibits. I reiterate, you do not have to memorize

22  the details. Please pass the things among each

23  other.

24      There are some legal things that the

25  lawyers and I have to do tomorrow. We'll start

YVETTE PACHECO  SENIOR COURT REPORTER

ROMERO -CROSS - DEFENSE

1    at 9:45. I need you folks here at 10:15, and there

2    will be some more of the trial.

3        Whether we get to the possibility where I

4    put you into a position to decide the case

5    tomorrow or Monday, I don't know.  We will not

6    know until tomorrow. Plan on it being Monday, but

7    I don't know what's going to happen.

8        If you need the stuff in the room during

9    the deliberations, you can ask for it. The

10   stipulations are now in evidence. You are all

11   looking at me which means you probably have seen

12   the exhibits.

13       Tomorrow's schedule, who knows. I suggest

14   that you bring something to read because I know

15   that from 12:30 until 2:30 I will not be

16   available. There is a circumstance under which you

17   may be in the jury room deliberating. Also a

18   circumstance that that will not be happening and

19   you will be asked to come back after 2:30. Or

20   we'll finish and you will a have Friday afternoon

21   off.  I don't know.

22       When I get this, I don't get a crystal

23   ball.  I try to keep you updated on the

24   possibilities. I want you here at 10:10. I would

25   have resolved whatever it is I'm doing and we'll

ROMERO -CROSS - DEFENSE

1  do the next thing.

2  Keep an open mind.  Do not discuss the

3  case. Do not go to the area.  Do not discuss the

4  case or look at anything in media form. If you are

5  reading it, disassociate yourself immediate from

6  it, whether this case or similar case.  Do not let

7  anybody speak or influence your judgment. This

8  doesn't mean I think somebody will try to do it.

9  We're required to mention this to each jury in

10 every case.

11 Be on time. You've been very good. See

12 you tomorrow at 10:10.  Thank you.

13 (Jurors exit.)

14 THE COURT:  We'll also have the charge

15 conference tomorrow. I plan to do CJI on

16 constructive possession and in concert. I asked

17 the assistant to see whether or not, based on the

18 vouchers for the drugs because my recollection of

19 where things were turned out to be faulty.  I

20 asked him because I thought some of the stuff on

21 the fourth floor was actually packaging.  That was

22 not the case. I was worried about what a jury

23 could do if they discount stuff in the safe but

24 agree with stuff in the fourth floor, but there

25 isn't any. It is the safe or nothing on the fourth

YVETTE PACHECO  SENIOR COURT REPORTER

ROMERO -CROSS - DEFENSE

1    floor. He's obviously, accused of the second floor

2    which is the C felony under the weight or B felony

3    under the possession with intent to sell or is it

4    both from your standpoint if the C is based on

5    weight as being a lesser included?

6           MR. BERLAND:  Both.  On the indictment,

7    we have the B possession with intent to sell. From

8    our standpoint that's all it is, the second floor.

9           THE COURT:  I thought that you said that

10   the weight of the packaged drugs on the second

11   floor was in excess of an eighth or half ounce.

12          MR. BERLAND:  Of an eighth. That's not on

13   the indictment.

14          THE COURT:  Understand that.

15          MR. BERLAND:  Correct.

16          THE COURT:  You will have an option, I

17   believe, under the first count which charges in

18   excess of eight ounces, you will have the option

19   of asking for a lesser included of the C felony of

20   the stuff on the second floor when in excess of an

21   eighth of an ounce.  I believe the theory being

22   the jury could decide if your client basically was

23   somehow involved in this, but the People could not

24   prove he had any control over the stuff in the

25   safe, they can decide he was liable in concert

ROMERO -CROSS - DEFENSE

1   with Mr. Brown for what was on the second floor of

2   a C felony in excess of an eighth of an ounce. You

3   can decide whether to charge that or all or

4   nothing with the overall weight charge being in

5   excess of an eight ounces. His not testifying you

6   will tell me at the request to charge, and we'll

7   talk about this key thing at 9:45.

8          MR. KEITH:  With regard to count two, the

9   intent to sell, it is the People's theory that

10   it's not constructive possession, it is the acting

11   in concert.

12          THE COURT:  You have to look at him.

13          MR. BERLAND:  Both.  He possessed all of

14   this with intent to sell it.

15          THE COURT:  If I had to answer the jury's

16   question, the People's contention is that he is

17   responsible for everything and responsible under

18   the second count for intending in concert or alone

19   with Brown to sell some or all, that he is liable

20   for having possessed alone or in concert.

21          MR. KEITH:  Your Honor, I think that

22   count should be dismissed.

23          THE COURT:  I'm sure you do.  What are

24   you talking about?

25          MR. KEITH:  There's no rational theory

ROMERO -CROSS - DEFENSE

1      that fits the second floor apartment. The acting

2      in concert doesn't fly, and certainly no

3      constructive possession.

4              THE COURT:  The stuff on the second floor

5      apartment is the stuff that is actually packaged

6      with the label on it with the stamp, 67 little

7      envelope things.

8              MR. KEITH:  But the detective said it's a

9      stamp that's pretty common, seen them in other

10     cases, other search warrants.

11             THE COURT:  What I know is it's a

12     well-known brand for sale.  It wouldn't be a

13     common brand in whatever region it is if it

14     weren't well sought after.

15             MR. KEITH:  So that's enough to prove

16     beyond a reasonable doubt --

17             THE COURT:  You keep doing this.  It's

18     enough for the jury to make the decision. What

19     they do is up to them. See you tomorrow.

20             MR. BERLAND:  I will have

21     Detective Romero here.

22             THE COURT:  See you tomorrow.

23

24

25

1    SUPREME COURT OF THE STATE OF NEW YORK
     COUNTY OF NEW YORK                PART-93
2

3    THE PEOPLE OF THE STATE OF NEW YORK,

4
                      -against-
5                                     TRIAL

6
     EDWARD GREEN,
7                              Defendant

8                              September 12, 2008

9
     B E F O R E:  HONORABLE E. MCLAUGHLIN, JSC
10

11            (Appearances as previously mentioned.)
     ------------------------------------------------------
12            COURT OFFICER:  Case on trial continued.

13   All parties are present.  Let's continue.

14            MR. BERLAND:  Can I be heard as to the

15   keys, Your Honor?

16            THE COURT:  Yes.  Anybody have anything

17   they want me to read?

18            MR. BERLAND:  I have a few cases.  Let me

19   hand them up.  People V Melendez, People V Massie,

20   and People V Shack.  Court of Appeals cases.  And

21   yesterday I provided People V Rojas.  I'm

22   providing a copy to Counsel as well.

23            THE COURT:  Is there anything you want me

24   to read, Mr. Keith?

25            MR. KEITH:  No, Your Honor.

—————YVETTE PACHECO  SENIOR COURT REPORTER—————

═══ PROCEEDINGS ═══

1          THE COURT:  What else do you want to say?

2          MR. BERLAND:  People V Melendez is the

3     leading "opening the door case" in New York.  It

4     holds when a door has been opened, and as Your

5     Honor is aware there is no bright line rule, and

6     it is within the discretion of the trial court,

7     redirect examination is permissible to a point.

8          This is key words the Court of Appeal

9     uses, "cannot bring out remote and tangible

10    evidence" and "must bear evidence."  And only

11    evidence that must be made necessary by the

12    opponent's action should be allowed.

13         In our case, evidence regarding the keys

14    being found on the Defendant is necessary based on

15    defense counsel's opening statement.  The evidence

16    I propose to offer is neither remote nor tangible.

17    It's paramount to the case.  Allowing testimony

18    would not be anything like in Melendez because I

19    asked one or two questions focused on whether or

20    not keys were found on the defendant and whether

21    they accessed any of the apartments.  That's it.

22         I said People versus Rojas yesterday.  I

23    will not get back into that.  It states a door is

24    opened when a misleading argument is put before

25    the case.

══════ YVETTE PACHECO  SENIOR COURT REPORTER ══════

1       People V Massie, I believe, is the most

2   recent Court of Appeals case to fully discuss the

3   concept in the suppression term, and it holds that

4   a trial court does not abuse the discretion by

5   allowing necessary evidence as long as the

6   evidence is not too remote.

7       The last case I provided is People V

8   Shack.  In that case, defense counsel obtained a

9   pretrial ruling that the defendant's mental

10  illness cannot come into the trial.  The Court of

11  Appeals held that the door was opened by

12  interjecting issue into the opening.

13      We reviewed the opening in this case

14  yesterday.  The only assumption that can be made

15  when defense counsel states clearly forced access

16  to the room, after listing a whole list of reasons

17  that distances the defendant from the room and

18  stated "in the wrong place at the wrong time" is

19  that the defendant did not have access to the

20  room.

21      The defendant doesn't have a burden to

22  open, but chose to interject the issue in the

23  opening and into this case.  They cannot use a

24  suppression issue as a shield and sword.

25  Defendant affirmatively misled, whether things

1      lead to or not evidence, and evidence of keys must

2      come in.  Not saying it was intentional.

3                THE COURT:  Mr. Keith.

4                MR. KEITH:  Your Honor, I totally

5      disagree.  First of all, the opening statement is

6      not evidence.  I made that clear to the jury, and

7      Your Honor made that clear to the jury.

8                Secondly, my statement with regard to the

9      fact that the People opened by indicating that the

10     officers used keys to get into the apartment where

11     Mr. Green was found, I restated in my opening

12     that, yes, the police officers used keys to get

13     into that room.

14               I think it's necessary -- not necessary.

15     It's a logical progression to ask that obviously

16     others had access to the room.  They got the key

17     from another location.

18               There's been some minor question with

19     regard to where that key was actually found.

20     Your Honor, in a pretrial hearing, questioned the

21     detective and made it absolutely clear that the

22     key was recovered from a jacket that was on a

23     chair in the second floor apartment, and near that

24     jacket was the co-defendant, Steven Brown. The

25     People mischaracterized that testimony from day

PROCEEDINGS

1   one to say that the key was recovered from Steven

2   Brown.

3           In any event, that's the way the opening

4   statement, which is not evidence, came out, and

5   that was my reaction to it.

6           Now, during the trial, which is basically

7   at its end, we heard from both detectives.  There

8   hasn't been much said about the key, except that,

9   again, it was erroneously stated that the keys

10  were recovered from Steven Brown.

11          On cross-examination, I brought out that

12  the keys were recovered from a jacket on a chair

13  near Steven Brown.  Nothing else has been said

14  about keys.

15          Melendez, I think, supports my argument.

16  Opening the door analysis necessarily has to be

17  approached on a case-by-case basis.  Under the

18  facts of this case, I don't think the door has

19  been opened to allow in keys that were seized as a

20  result of legal police activity.

21          The Rojas case, in that case, defense

22  attorney made his argue -- made remarks in his

23  opening and followed that up by cross-examination,

24  and that was dealt with at that time on redirect.

25          I think the People's argument here to try

1     to get keys in now are untimely, and it's not

2     supported by the evidence.  It was by a -- he's

3     trying to get keys in by a remark that's not in

4     evidence, by a remark made in the opening.  This

5     issue was dealt with during the trial testimony.

6            I think it would be extremely prejudicial

7     to Mr. Green to allow the keys in at this juncture

8     under these circumstances.  I respectfully ask

9     Your Honor to not allow the People to do it.

10           THE COURT:  The defendant's opening,

11    including his attorneys, stated that the defendant

12    was in the wrong place at the wrong time.  The

13    opening presented a series of statements regarding

14    the defendant's lack of connection with the fourth

15    floor apartment, including it's not his office, he

16    does not lease it, it's not his automobile, among

17    other representations.

18           Additionally, the attorney referred to

19    the answers given to him by two separate

20    prospective jurors who were residential

21    superintendents, that they frequently were alone

22    inside the apartment as part of their

23    responsibilities.

24           Parenthetically, that is in the same voir

25    dire where the attorney stated, on top of being an

PROCEEDINGS

1    accused not testifying during his or her own
2    trial, prefaced that statement with a reference to
3    the "there are two sides to every story."
4              Mr. Keith's opening to the statement then
5    said, clearly others had access to it, such as
6    police who entered with keys they took from down
7    on the second floor.
8              That statement was tantamount to saying
9    the defendant had no more access to the apartment
10   than anyone else without keys, that, as with the
11   police, he had no keys of his own and would have
12   had to have been given access to the one, quote,
13   close quote, to whom the opening referred.
14             While a statement such as "you will not
15   hear evidence that he had access himself," without
16   mentioning the word keys, might have been within
17   legal use of favorable suppression rulings stating
18   that he had no access, others did.  That not even
19   a New York City Police Officer could get in the
20   apartment without somebody else's keys twisted the
21   suppression ruling by arguing that the defendant
22   had no connection to the apartment and had no
23   means of getting into it other than by someone
24   else's keys.
25             Defense misused the suppression ruling

1   intentionally or not to mislead the jury.

2          The issue with this trial is defendant's

3   supposed dominion and control over the drugs found

4   hidden in the two closet safes within the fourth

5   floor apartment.

6          The fact that the defendant had keys to

7   the fourth floor still leaves the jury the issues

8   of whether he knew about the existence or contents

9   of arguably hidden safes and whether he exercised

10  dominion and control of the drugs found about one

11  of them.

12          Consequently, introduction of the

13  suppressed keys, while adverse to the defendant,

14  is not so overwhelmingly admitted.  They're

15  admissible for the reasons just stated.

16          MR. KEITH:  If I may.

17          THE COURT:  I heard you yesterday, I

18  heard you just now.  If he loses, you can appeal.

19          MR. KEITH:  I think we necessarily have

20  to have a mistrial at this point.  This trial has

21  evolved into, I submit, a travesty of justice for

22  a number of reasons.

23          Right at the start of the trial I asked

24  Your Honor for a ruling with regard to the fact

25  that I anticipated the People arguing that

=PROCEEDINGS=

1    Mr. Green did not move, or something to that

2    effect, when the officers came in or didn't open

3    the door for the officers when they were banging

4    on the door.

5         I think that's a basic constitutional

6    right to remain silent.  The Court of Appeals --

7    if you are under arrest, you can remain silent.

8         THE COURT:  We talked about this.  You

9    watched eloquently, and I didn't adopt your

10   position.  If that's one of the contributors to

11   the travesty, that's on the record.  That can be

12   appealed, but you will lose on that one also.

13        MR. KEITH:  Your Honor is aware that the

14   Court of Appeals has held that the failure of the

15   defendant to open an apartment door for the police

16   does not warrant an inference of criminal intent.

17   Your Honor never did rule on that. The People

18   opened on it --

19        THE COURT:  We left it to the charge

20   conference.  I told you, I'm sure, that if you

21   wanted me to tell them that he had no obligation

22   to open the door, I remember telling you that I

23   certainly would do that and deferred to the charge

24   conference, which will be later on this morning;

25   maybe not very much later on.

=YVETTE PACHECO  SENIOR COURT REPORTER=

1      MR. KEITH:  Secondly, Your Honor, your

2  ruling limited my cross-examination of

3  Detective Romero, Your Honor, and the assistant

4  district attorney had the benefit of hearing

5  testimony from this detective ex parte and asked

6  him specific questions, and he gave you answers.

7      THE COURT:  What are you talking about,

8  please?

9      MR. KEITH:  In particular, you may recall

10  that from that hearing, as I previously stated

11  with regard to the keys, you specifically got him

12  to admit that the keys were recovered from a

13  jacket pocket near Mr. Brown and not from

14  Mr. Brown.  But he came in here and still

15  testified that the keys were recovered from

16  Mr. Brown.  The People elicited testimony when

17  they both knew that wasn't factually accurate.

18      THE COURT:  I'm tempted to say, "So

19  what?"  There is a constructive possession,

20  there's in concert possession.  Let's assume that

21  he lied on one of the two items, either in the

22  Darden hearing with me or in front of the jury.

23  The point is, as I made yesterday, the jury, under

24  the rules that bigger, smarter people than I am,

25  Court of Appeal of the United States says a trial

═══ PROCEEDINGS ═══

1    jury doesn't get a second bite, nor does a

2    defendant in front of the jury get a second bite.

3    They get a bite at Huntley and Wade, but not

4    physical evidence suppression hearings, nor Darden

5    hearings.  If this is contribute to the litany of

6    small contributors, I think you're so far 0 for 3.

7         MR. KEITH:  Obviously, Your Honor, that's

8    your opinion.  I feel that Your Honor is limiting

9    my cross-examination of Detective Romero.  Again,

10   we know that he and Assistant District Attorney

11   Berland prepared an Affidavit to get a search

12   warrant, and in the Affidavit, they described

13   certain things.

14        They described how officers went to every

15   door on the third floor and then up to the fourth

16   floor, and then at trial, he testifies as to

17   something different.  The People elicited that

18   testimony.  Again --

19        THE COURT:  That's still on the record

20   for you to do anything you can do with it.

21        MR. KEITH:  You've limited my

22   cross-examination and did not allow me to question

23   him with regard to the officer's activities on the

24   third floor. Your Honor, we have already heard

25   testimony from both detectives.  This ruling

═══ YVETTE PACHECO  SENIOR COURT REPORTER ═══

clearly changes the posture of the case.

When I think back to the motion I made after the People's opening, asking Your Honor to dismiss this case, legally at that time with the People's opening remarks, without any keys on Mr. Green, legally it was impossible for the People to prove their case of constructive possession.

I gave Your Honor a few cites at that time. I want to make the record clear that the Court of Appeals has ruled on this issue on a case that's almost identical, actually more egregious than the situation here, People V Headley 74 New York 2nd at 858.

In Headley, as I tried to explain before, and as I'm going to explain again, the door was not open. It was a search warrant execution. The police officers banged on the door 25 times, according to the decision, three men were found in the living room in that apartment. Weapons, drugs, and money were found concealed in a metal box on a table.

Now, the defendant, Headley, he was found hanging out of the window. And near Headley there was a loaded gun, open jacket pocket with over $2,000. There was a machine gun on the

floor, gun found between the mattress and bedspring in the room, and drug paraphernalia, three scales, grinder, sifter, and a package of pyramid paper. In a bedroom closet, a leather tote bag that contained cocaine and marijuana and two more loaded guns and two holsters.

The Court of Appeals, Your Honor, held that the failure of the defendants to open the door does not amount to an inference of criminal intent, and that the evidence in this case does not establish that the defendant had actual or constructive possession of the drugs or weapons that were found in the closed container.

There are a number of cases that follow immediately, in particular People V Edwards, 206, Appellate Division 2nd 597. In that case, the location was described as a narcotics' factory.

In People V Pedro Encarnacion, the location described as a working apartment. In the cases, the defendant was found in that location similar to Mr. Green.

Here, you suppressed the keys that he had on his person, and there's nothing else that connects Mr. Green to that location or the narcotics that were found. I think Your Honor

=== PROCEEDINGS ===

1   should likely rule that the case is just legally

2   impossible.

3          There's also People V Thomson, 214,

4   Appellate Division 2nd 762.  People V Sally 2001

5   WL 1607761.  Also a Law Journal cite, October 12,

6   2001, Page 20, Column 2.  The Court of Appeals in

7   People V Pierson, 75 New York 2nd, Page 1001.

8   People V Swang 241, Appellate Division 2nd at 695.

9   I do have copies for the People and for Your

10  Honor.

11         Your ruling today creates a slight

12  logistical problem for me.

13         THE COURT:  What's that?

14         MR. KEITH:  I do have witnesses that I

15  would like to bring forth.  One of my witnesses

16  has a child that has Down's Syndrome and will not

17  be available today, but I believe he will be

18  available to testify on Monday morning.  I believe

19  there will be a second witness.  Not sure about

20  that at this point.

21         THE COURT:  So, we'll do the People's

22  witness -- we'll wait until Monday.  I assume the

23  witness will be here on Monday, no issue about

24  that.  The witness can arrange the situation to be

25  available Monday?

1        MR. KEITH:  Yes.

2        THE COURT:  Let me think whether I will

3  be in this room --

4        MR. BERLAND:  You Honor, as to the

5  witness, Mr. Keith did not provide any names of

6  anyone who might testify.  In fact, he indicated

7  that no one would testify.  I ask for an offer of

8  proof or have the information over the weekend so

9  I can do my investigation.

10       THE COURT:  You can be sure they're not

11  character witnesses.

12       MR. KEITH:  He can be pretty sure of

13  that.  Your Honor's ruling specifically precludes

14  Mr. Green from testifying.  Certainly not going to

15  open that door.

16       THE COURT:  You made that jump long ago,

17  and it had to do with the Sandoval ruling rather

18  than the last ruling.

19       MR. KEITH:  Your Honor, I provided him

20  with the name, address, and date of birth of the

21  anticipated witness.

22       THE COURT:  Fine. Bring them in.

23       COURT OFFICER:  Jury entering.

24       THE COURT:  Good morning.  You heard me

25  say some things concern you, some things don't

ROMERO - REDIRECT - PEOPLE

1    concern you.  During a trial, testimony admissible

2    under circumstances, it changes.  You will hear

3    Detective Romero recalled.  Do not speculate about

4    why anything was not done early.  Simply not of

5    your concern.  You will evaluate accuracy and

6    credibility when it's exposed to you.

7            Recall Detective Romero.

8            COURT OFFICER:  Witness entering.

9            THE CLERK:  Detective, you are still

10   under oath.

11           THE COURT:  Go ahead.

12   REDIRECT EXAMINATION BY

13   MR. BERLAND:

14       Q.   Good morning.

15       A.   Good morning.

16       Q.   On November 1, 2007, did you recover any keys

17   from the defendant, Edward Green?

18       A.   Yes, I did.

19       Q.   You've been handed what has been marked for

20   identification as People's Exhibit 28.

21       A.   Yes.  These are the keys recovered from

22   Mr. Green at the time of the arrest.

23       Q.   From where did you recover the keys?

24       A.   They were clipped onto his belt.

25       Q.   Is there a clip on that?

ROMERO - REDIRECT - PEOPLE

1     A.    A Carabiner clip right here (indicating).

2     Q.    Approximately how many keys recovered?

3     A.    Probably in excess of 25 or more.

4     Q.    Are the keys in the same condition or

5   substantially the same condition as they were when you

6   recovered them on November 1, 2007?

7     A.    Yes, they are.

8             MR. BERLAND:  Your Honor, at this time, I

9     ask that the keys be received into evidence.

10            THE COURT:  Anything beyond what has been

11    said already?

12            MR. KEITH:  Actually, I'd like to take a

13    look at them, that's all.

14            THE COURT:  Certainly.

15            (Handing.)

16            THE COURT:  Anything beyond what has been

17    said already?

18            MR. KEITH:  No.

19            THE COURT:  Admitted over objection.  Go

20    ahead.

21            MR. KEITH:  May I ask a couple of voir

22    dire questions?

23            THE COURT:  Sure.

24

25

YVETTE PACHECO  SENIOR COURT REPORTER

ROMERO - VOIR DIRE - DEFENSE

1    VOIR DIRE EXAMINATION BY

2    MR. KEITH:

3         Q.   Detective Romero, who found the keys?

4         A.   I took them off his belt at the time of

5    arrest, sir.

6              MR. KEITH:  I will save the rest for

7         cross-examination.  I believe I object to the

8         entry of the keys.

9              THE COURT:  They're received.

10             MR. BERLAND:  I believe I misspoke.

11        They're People's Exhibit 29, not 28.

12             THE COURT:  All right.  What else?

13   CONTINUED REDIRECT EXAMINATION BY

14   MR. BERLAND:

15        Q.   Did the keys open the room to any of the rooms

16   in 451 Lenox Avenue?

17        A.   They opened the apartment on the fourth floor,

18   Apartment 2 -- Apartment 1 on the second floor, and

19   also the outer door to the building.

20        Q.   Do you know if they opened the laundromat?

21        A.   I believe they worked on the outer locks.

22        Q.   So, the keys that were clipped to the

23   defendant's waist opened the fourth floor stash room?

24        A.   Yes.

25             MR. KEITH:  Objection to the

YVETTE PACHECO  SENIOR COURT REPORTER

ROMERO - RECROSS - DEFENDANT

1    characterization as a stash room.

2            THE COURT:  Yes.  I think it's

3    unnecessary.  The topic is fine, but the question

4    is eradicated from your memory.

5    Q.   Did the keys open the fourth floor door?

6    A.   Yes, they did.

7            MR. KEITH:  I missed it.

8    Q.   Did the keys open the door to the fourth floor

9    apartment?

10   A.   Yes.  To the apartment where Mr. Green was,

11   yes.

12           MR. BERLAND:  Nothing further.

13           THE COURT:  Mr. Keith.

14   RECROSS-EXAMINATION BY

15   MR. KEITH:

16   Q.   Good morning.

17   A.   Good morning, sir.

18   Q.   Please describe to the ladies and gentlemen of

19   the jury the circumstances under which the keys were

20   recovered.

21   A.   At the time of arrest --

22   Q.   "The time of arrest," meaning when he was

23   handcuffed?

24   A.   Yes, sir.

25   Q.   This was in the hallway in front of the

YVETTE PACHECO  SENIOR COURT REPORTER

ROMERO - RECROSS - PEOPLE

1    apartment on the fourth floor?

2         A.   No, sir.  Inside the apartment he was

3    handcuffed.

4         Q.   So, while in the apartment, he was handcuffed.

5    Then what happened?

6         A.   Correct.  The keys were removed.  Because of

7    the size of the keys, they were removed from the belt.

8         Q.   You removed the keys?

9         A.   Yes, and put them on the couch.

10        Q.   You did what with them?

11        A.   Put them on the couch.

12        Q.   Did you have a conversation with Mr. Green

13   after that?

14        A.   Very brief, sir.

15        Q.   Did you ask him why he had so many keys?

16        A.   I believe so.

17        Q.   What did he say?

18             MR. BERLAND:  Objection.

19             THE COURT:  Sustained.

20        Q.   Didn't he tell you that he was --

21             MR. BERLAND:  Objection.

22             THE COURT:  Sustained.

23        Q.   Did he tell you he was the manager of the

24   laundry?

25             MR. BERLAND:  Objection.

YVETTE PACHECO  SENIOR COURT REPORTER

ROMERO - RECROSS - DEFENSE

1        THE COURT:  Sustained.  Disregard it.

2     Q.   Detective Romero, with the keys, isn't it true

3   that you then tried to see where the keys fit?

4     A.   Not at that time.  Later on I did.

5     Q.   Later on you did?

6     A.   Yes.

7     Q.   Did the keys fit some of the apartments?

8     A.   I tried it on the fourth floor, the second

9   floor, and the outer door, yes.

10     Q.   So, it fit some of the other apartments?

11     A.   No -- yes, I checked the second floor

12   apartment.  That was the only other apartment, other

13   than the fourth floor, I checked.

14     Q.   You didn't check the third floor apartments

15   with the keys?

16     A.   No.

17     Q.   On the third floor, was just the keys

18   recovered from the second floor that you used to check

19   those apartments?

20     A.   Because those were the keys I was worried

21   about for getting a search warrant, sir.

22     Q.   So, correct me if I'm wrong.  You get a search

23   warrant for the second floor apartment, you find keys

24   there, and you use those keys to check every apartment

25   in the building; that's basically what you did?

YVETTE PACHECO  SENIOR COURT REPORTER

ROMERO - RECROSS - DEFENSE

1    A.   After we made entry into the fourth floor
2    apartment --
3    Q.   I'm not saying when.  That's what you did
4    ultimately, right?
5    A.   Yes.  Uh-huh.
6    Q.   Now, you go up to the fourth floor, you find a
7    fair amount of drugs, you find Mr. Green with a bunch
8    of keys, and you do not check every apartment to see
9    where the keys fit?
10   A.   The only reason I checked the other keys on
11   the third floor was, when I went down to get the search
12   warrant, I knew I would be asked if it opened any other
13   apartments.  So, I didn't check, no.  It would have
14   taken a long time to check all the keys in every
15   apartment.
16   Q.   The keys worked for the laundromat, to gain
17   entrance into the laundromat?
18   A.   I believe there's keys on there for the outer
19   locks of the metal gates.  That's the only keys I
20   tried.
21   Q.   Now, I believe you also testified that there
22   was a key or keys for the second floor apartment where
23   Mr. Brown was arrested, the other gentleman?
24   A.   Yes, where one of the keys worked at.
25   Q.   Are you sure about that?

ROMERO - RECROSS - DEFENSE

1     A.   Believe so.  That I checked back at the

2   office, because that lock had already been removed.

3     Q.   With the keys you have now, you also have the

4   lock from the second floor?

5     A.   Right.

6     Q.   I'd like you to show me which key fits the

7   second floor.

8     A.   That was back in November.  I don't know which

9   key it is.

10         MR. KEITH:  Your Honor, could we have the

11     evidence open to see if there is a key that fits

12     the second floor lock?

13         THE COURT:  Sure.

14         MR. KEITH:  We need the second floor

15     lock.

16         THE COURT:  It was never seized?

17         THE WITNESS:  No, sir, because the door

18     was opened.

19     Q.   Didn't I just ask whether or not we had the

20   lock for the second floor?

21     A.   That was the lock.  We have the keys from the

22   second floor and the lock from the first floor.  We

23   don't have the second floor lock.  I made a mistake.

24         THE COURT:  What's the first floor lock?

25         THE WITNESS:  The second floor lock that

ROMERO - RECROSS - DEFENSE

1    he's talking about is Apartment 2.  Apartment 1 on

2    the second floor, which Mr. Brown was arrested in,

3    we did not take that lock because that door was

4    open when we made entry.

5        Q.   So, basically, we can't unequivocally show the

6    jury that any of the keys worked for the second floor

7    lock; isn't that fair to say?

8        A.   No.  It worked on the day of the arrest,

9    though.

10       Q.   I'm saying right now.

11       A.   Correct, sir.

12       Q.   Thinking back to what happened inside the

13   apartment on the fourth floor, now, you say that you

14   got these keys from Mr. Green.  Did you also recover

15   money from Mr. Green?

16       A.   No.  As I told you yesterday, he had money on

17   him and I put it in the envelope with all his other

18   property.

19       Q.   Right.  Were you the --

20       A.   No, sir.  No.

21       Q.   Do you know who was?

22       A.   Detective McLaughlin, I believe.

23           THE COURT:  If there is such a person, I

24   don't know him.  If there is a relationship, it's

25   hundreds of years ago in a place far away, and he

ROMERO - RECROSS - DEFENSE

1    might even spell his name incorrectly.  But we're

2    not going to do the Hatfields and the McCoy thing.

3        Q.   Detective Romero, without question, there has

4    been some passage of time, and your memory may have

5    faded.  Are you certain that you are the person that

6    found the keys that were on Mr. Green?

7        A.   Sir, that -- yes.  I took it off his belt

8    because of the size of keys and put them on the couch.

9             THE COURT:  If by "found" you mean "see,"

10   I don't know if anybody can know who saw it first.

11   If "find," you mean "removal" --

12            MR. KEITH:  Removal would be more

13   appropriate, Your Honor.

14       A.   Yes, correct.  Correct.

15       Q.   Now, obviously, based on the questions that

16   you heard in the case and your experience, you know how

17   important it is to be accurate and complete in your

18   paperwork; would you agree?

19       A.   Yes, sir.

20       Q.   And in this case, there are different items

21   found by different detectives, and when you prepare a

22   voucher, it's your responsibility and the other

23   detectives' involved responsibility to be as accurate

24   as possible; would that be fair to say?

25       A.   Yes, sir.

ROMERO  -  RECROSS  - DEFENSE

1     Q.   Generally speaking, with regard to a voucher,

2  there is an indication of who is the finder of the

3  property; wouldn't that be fair to say?

4     A.   Yes, sir.

5     Q.   In this case, with your experience as a

6  detective, you and your fellow experienced detectives

7  were careful to indicate who the finder of the

8  particular item was; would that be correct?

9     A.   Yes, sir.

10     Q.   For example, you indicated that the money was

11  found by Detective McLaughlin.  I assume you refreshed

12  your recollection and looked at the property voucher?

13     A.   No.

14     Q.   You have an independent recollection of that

15  particular thing?

16     A.   The money was on him at the time of the

17  arrest.  I left it in the pocket.  Detective

18  McLaughlin, when he transported it, he vouchered the

19  property, the money.

20     Q.   So, you just happen to remember that, or did

21  you look at the voucher?

22     A.   That's how it happened, sir.

23     Q.   I'm asking you, how is it that you -- it's a

24  relatively insignificant thing.  How do you happen to

25  recall that?  Did you refresh your recollection by

ROMERO - RECROSS - DEFENSE

1    looking --

2         A.   I did look over all the vouchers.

3         Q.   Excuse me?

4         A.   I looked over all my paperwork, but that was

5    the course of events.

6         Q.   With regard to the keys, isn't it correct,

7    sir, that you were not the person that removed these

8    keys from Mr. Green?

9         A.   As I told you before, I took them off his belt

10   because of the size.  It could be used as a weapon.

11   Put them on the couch.  Detective Hernandez then took

12   custody of all the property because I was down in

13   court.  When they recovered -- Detective Hernandez is

14   the recovering officer on the vouchers because he was

15   there right with me.

16        Q.   So, you anticipated where I was going.

17        A.   I know exactly your questions.

18             THE COURT:  It's more comfortable if you

19        wait for the question rather than answer what you

20        expect to be calling for.

21        Q.   You admit again there's documentation that is

22   inconsistent with your testimony?

23             MR. BERLAND:  Objection.

24             THE COURT:  Sustained.  You want to point

25        out a document, that's fine.  Do not do it that

YVETTE PACHECO  SENIOR COURT REPORTER

ROMERO - RECROSS - DEFENSE

1    way, please.  Go ahead.

2                MR. KEITH:  May this be marked

3    Defendant's G for identification.

4                (Defendant's Exhibit G was marked for

5    identification.)

6                THE COURT:  Just read it to yourself.

7    When you are finished, look up.

8    A.    (Complying.)

9    Q.    Look at what has been marked Defendant's G for

10   identification.  What is that?

11   A.    This is a copy of the voucher for the keys.

12   Q.    And it's correct that on the voucher, it

13   indicates that Detective Hernandez is the finder of the

14   property and not yourself?

15   A.    Yes, sir.

16                MR. KEITH:  I offer it as a prior

17   inconsistent statement.

18                THE COURT:  Any objection?

19                MR. BERLAND:  No, Your Honor.

20                THE COURT:  It's in.

21                (Defendant's Exhibit G was received in

22   evidence .)

23                THE COURT:  It's available to you.  Same

24   thing you've heard the testimony being, you can

25   use this for whatever value you wish to use it.

ROMERO - RECROSS - DEFENSE

1    Q.   Detective Romero, in your preparation for this

2    trial, would it be fair to say that you've had a few

3    conversations with Assistant District Attorney Berland?

4    A.   Yes, sir.

5    Q.   Certainly, one of the concerns was how to

6    connect Mr. Green to the drugs that were recovered in

7    the fourth floor apartment; wouldn't that be fair to

8    say?

9    A.   No, sir.

10   Q.   How is that not a concern?

11   A.   He was in the apartment at the time of the

12   arrest.

13   Q.   And you, of course, had conversation with

14   ADA Berland about the People's burden of proof?

15   A.   We just went over the facts of the case, sir.

16   Q.   Detective Romero, isn't it correct that when

17   you were getting pedigree information from Mr. Green,

18   or when you looked at his identification, you

19   recognized that he did not live at that location?

20             MR. BERLAND:  Objection.

21             THE COURT:  Two predicates in the

22        question, neither of which have answers from

23        yesterday's predicate.  Namely, that he looked at

24        both of them, is what you said, the wallet and the

25        identification.  The topic is fine.  Whatever we

YVETTE PACHECO  SENIOR COURT REPORTER

ROMERO - RECROSS - DEFENSE

1    did yesterday is fine.

2              Go ahead.

3              Did you see a wallet?  Did you see an

4    identification?

5              THE WITNESS:  As I said yesterday, no.

6    Q.    The information that you put on your

7    paperwork, the Bronx address that you put down for

8    Mr. Green, where did you get that information from?

9    A.    As I told you yesterday --

10             THE COURT:  He said yesterday, because he

11   was down at the district attorney's office,

12   somebody else did that.  I don't think he said who

13   it was.  Somebody else filled out the on-line

14   booking sheet.

15             We're here because --

16             (Whereupon, a sidebar conference was held

17   on the record out of the hearing of the jury.)

18             MR. KEITH:  I move again for a mistrial.

19   Your Honor, please let the witness answer the

20   question.  You did not have to interject in that

21   manner.

22             THE COURT:  Not if you can remember what

23   happened yesterday.  I will not take any more time

24   than is necessary going over inaccurate, improper

25   predicates to yesterday.  You had two predicates

ROMERO - RECROSS - DEFENSE

1    in the question, both of which you had gone over

2    with this witness significantly.  There's no

3    reason to go forward with that question or that

4    topic.

5           MR. KEITH:  Well, I think the appropriate

6    remedy would have been to sustain the objection

7    and force me to rephrase the question, not in

8    the -- I move from a mistrial.

9           THE COURT:  Nonsense.  Denied.

10          (Whereupon, the sidebar conference

11   concluded and the proceedings continued in open court

12   as follows:)

13   Q.   Detective, I'm sorry, you've been a detective

14   for how long?

15   A.   I've been a detective since 1997; 11 years,

16   sir.  Will be 11 years in November.

17   Q.   You, of course, have been trained in some

18   forensic?

19   A.   Yes, sir, I have.

20   Q.   With regard to any of the items, I guess it

21   would be fair to say that there was no forensic tests

22   done to the extent there was no attempt to find any ID

23   or fingerprints, anything to that extent?

24   A.   No, sir, there was not.

25          MR. KEITH:  No further questions.

YVETTE PACHECO  SENIOR COURT REPORTER

ROMERO - REDIRECT - PEOPLE

1      THE COURT:  Anything else, Mr. Berland?

2      MR. BERLAND:  Yes, Your Honor.

3   REDIRECT EXAMINATION BY

4   MR. BERLAND:

5      Q.  Detective Romero, that's Defendant's

6   Exhibit G.  On the bottom, there is a remarks section.

7   Can you read that?  It's in evidence.

8      A.  "Above removed from defendant at the time of

9   arrest at 5781, has two keys that fits two locks on the

10  fourth floor of 451 Lenox Avenue."

11     Q.  Item No. 1, what does that refer to?

12     A.  The key chain.

13     Q.  These keys?

14     A.  Yes.

15     Q.  Detective Romero, you didn't look for DNA or

16  fingerprints on the keys?

17     A.  No, sir.

18     Q.  Why not?

19     A.  Wasn't necessary.

20     Q.  Why not?

21     A.  We only do fingerprints and DNA when we don't

22  know who possesses the property.

23     Q.  How do you know who possessed this property?

24     A.  It was removed from the defendant.

25     Q.  By the way, were there any clothes or personal

YVETTE PACHECO  SENIOR COURT REPORTER

ROMERO - RECROSS - DEFENSE

1    property inside of the fourth floor room?

2         A.   No, sir.

3              MR. BERLAND:  Nothing further.

4              THE COURT:  Further questions, Mr. Keith?

5              MR. KEITH:  Yes, Your Honor.

6    RECROSS-EXAMINATION BY

7    MR. KEITH:

8         Q.   I wasn't referring to keys.  I'm talking about

9    drugs, the safe, the narcotics, paraphernalia.  Did you

10   do any DNA testing or photocopy testing on the items?

11   The keys were on his waist.

12        A.   Still no, sir.

13        Q.   Isn't it also correct that with regard to the

14   Defendant's G in evidence -- don't mean to restate

15   over -- there's nothing said about any of the keys

16   fitting the lock on the second floor; isn't that

17   correct?

18        A.   That's correct.

19             MR. KEITH:  No further questions.

20             THE COURT:  Anything else?

21             MR. BERLAND:  No.

22             THE COURT:  You're excused.

23             (The witness was excused.)

24             THE COURT:  Any other witnesses today?

25             MR. BERLAND:  No, Your Honor.

YVETTE PACHECO  SENIOR COURT REPORTER

1    THE COURT:  So, we're back to Monday.  Be

2    here at about 9:38 on Monday.  On the day you are

3    asked to decide the case, once you assume certain

4    things happen, we take a lunch order from you.

5    You don't pay for it, so it will not be from the

6    fancy five-star restaurant.

7        If 14 people show up at 9:45, you will

8    not be in here until after 10.  I'm suggesting

9    that you come at about 9:38.  I will have the

10   lunch order taken.  Get yourself ready, and 9:45

11   you will be available in the courtroom to do the

12   last day of the trial.  And defense and the

13   Prosecution arguments will tell me what the law

14   is.  As soon as you get here, the sooner we are in

15   position to discuss the case.

16       Don't discuss the case.  Don't let

17   anybody try to influence your judgment in the case

18   or speak to you about it.  The fact that someone

19   mentions it does not mean somebody will do what

20   it's required to do.  I mention it to each jury in

21   every case.

22       Guess what?  When I started, there

23   were 55 Supreme Court judges.  Now there are 31.

24   So, I will be on the 13th Floor with you and this

25   case in another courtroom on Monday.  It's

PROCEEDINGS

1   Room 1317, this building, 13th floor.  Fellow who

2   will not be there is Carruthers (phonetic).  If

3   you get disoriented, anybody with a uniform can

4   tell you where he is.  Very famous fellow.

5        Please be able to start at 9:45.

6        (Jurors exit.)

7        THE COURT:  Do we need to discuss

8   anything more about the charge conference?  Do you

9   want to consider felony as a lesser on the first

10   count or are you still thinking about that?

11        MR. KEITH:  Your Honor, with regard to

12   the second count, the intent to prove, are you

13   giving that charge to the jury?

14        THE COURT:  Yes.  Yesterday you asked me

15   to dismiss it, and I said that --

16        MR. KEITH:  Even in light of the

17   testimony today, the keys he had clearly were not

18   for the second floor apartment.  And the video

19   connection, or whatever other connection, is

20   somewhat tenuous.  I don't think the People can

21   make out constructive possession theory or acting

22   in concert theory without the keys, without any

23   real connection to the second floor.

24        THE COURT:  I disagree, but there's a

25   factual issue that you just raised about what the

1   witness actually said.  I sure want to clear it up

2   before we leave.  Not with the witness, but

3   between you folks and the jury.  My recollection

4   of what he said were the keys on Mr. Green's belt

5   or key chain opened the second floor door.  What

6   he said is they didn't take the lock, and he

7   cannot prove it, other than what he said.  If I'm

8   wrong, tell me.

9          MR. KEITH:  He did say that.  The voucher

10  was admitted into evidence and doesn't say

11  anything about the second floor.

12          THE COURT:  That is not --

13          MR. KEITH:  I understand that.

14          THE COURT:  Motion to dismiss the second

15  count is still denied.  Anything else we need to

16  do today?

17          MR. KEITH:  What do you anticipate?  Are

18  there going to be any charges I should be aware

19  of?  I know you will charge everything in the

20  indictment.

21          THE COURT:  The answer is I don't believe

22  so.  I've decided.  Most recent trials have been

23  doing acting in concert charge, constructive

24  possession out of the CJI, and the basic charge

25  that I used the last several trials, a trial

====== PROCEEDINGS ======

1    judge -- that Judge Marru in Brooklyn has used

2    that was given at the summer judicial training

3    that I took in June.  I no longer use the Goodman

4    book charge.

5            No, there's nothing that you cannot

6    anticipate.  It's all out of CJI.  The only

7    variant, if there are answers to the questions I

8    have to come up with, but that will not happen

9    during the deliberations.

10           MR. BERLAND:  You mentioned the

11   consciousness of guilt.  We'll ask for that at the

12   conference.

13           THE COURT:  This sounds like this is the

14   conference.  How do you propose that be given to

15   the jury?

16           MR. KEITH:  Conscious of guilt because he

17   sat there?

18           MR. BERLAND:  Because he ran up into the

19   apartment, the door slammed, and then sat there.

20           THE COURT:  Sustained.  I will not give

21   that.  You can argue it.  If nobody identified him

22   and there are, as we discussed, any number of

23   potential people who ran somewhere and slammed

24   something, there is no way, so to speak, to pin

25   that on Mr. Green.

1        MR. KEITH:  With regard to any adverse

2    inference drawn from the testimony that Mr. Green

3    did not open the door or that he sat in the

4    apartment, I don't know what the jury will accept

5    with regard to that.  I would think there is no

6    adverse inference because he didn't do something.

7        THE COURT:  Berland can argue whatever he

8    wants about that as a factual matter.  If you want

9    me to say neither Mr. Green nor anybody would be

10   required under the circumstances to answer their

11   door, I would be glad to.

12       MR. KEITH:  Please, Your Honor. I don't

13   think Mr. Berland should be able to argue.  With

14   regard to ADA Berland, I don't think it would be

15   fair or proper to allow him to argue that there

16   should be some negative inference drawn because

17   Mr. Green exercised his constitutional right to

18   sit there and not do anything.

19       THE COURT:  I wouldn't put in the realm

20   of constitutional rights, because you are

21   analyzing it to the right to remain silent after

22   being arrested and being questioned while you are

23   in custody.  Those two things mandate the giving

24   of the Miranda warnings and then a decision by an

25   accused specifically to speak or not.

PROCEEDINGS

1      While actions can and often are nonverbal

2  communications, Mr. Green was not arrested and

3  certainly was not being questioned at the time of

4  the knocking and his supposed hearing of the

5  knocks and supposed refraining from opening the

6  door, the People can argue to the jury that means

7  something.  I will tell the jury that legally

8  there is no law that says he can't do it, and I'll

9  do that.

10     MR. KEITH:  Well, he doesn't have to

11  respond, and there should be no adverse inference

12  drawn from that.

13     THE COURT:  I disagree.  We are --

14     MR. KEITH:  That's what the Court of

15  Appeals says.

16     THE COURT:  No, it doesn't.  It doesn't.

17  We're, once again, back to the disagreement.

18  There is a way to resolve it, but not between you

19  and me.

20     MR. KEITH:  There could not possibly be

21  an inference of criminal intent by him sitting

22  there.  That's what he wants to argue.  That's

23  part of the problem with this case.  He can argue

24  it because things are --

25     THE COURT:  In the absence of a better

PROCEEDINGS

1  mind than he's got, I'm searching for a similarity

2  or an analogy with respect to -- the closest one

3  is the missing witness situation where one or both

4  sides -- sorry, one side asks that the Court tell

5  the jury that they may draw an adverse inference

6  as a matter of law, that the law supports this if

7  you decide that a party should have called a

8  witness.

9         Oftentimes, however, for the reasons

10  contained in the Gonzalez case, the law would not

11  support, as a matter of law, that the jury must or

12  should draw a certain conclusion, but that never

13  prevents the side who wanted the law to support

14  them, it never prevents that side from arguing as

15  a matter of fact, common sense, et cetera; that

16  the witness not being called by that other side,

17  the jury should realize that there is something

18  strange about that.  And the jury factually can

19  decide something against the person, but not have

20  the law support from that.  That's the closest I

21  can come to where we are here.

22         MR. KEITH:  Your Honor, I --

23         THE COURT:  I might be intransigent, but

24  you will not change my mind.  I'm here for a

25  while.  If you want to talk, go right ahead.  I

1  will stand here and listen.

2      MR. KEITH:  I appreciate your candor,

3  Your Honor.  I'll forge ahead and try to do the

4  impossible.

5      Your Honor, there is a mixture here of

6  law, in fact.  I think we agree on that.  You are

7  allowing the prosecutor to make arguments and ask

8  the jury to reach certain conclusions or draw

9  certain inferences from behavior that the Court

10 has specifically said you should not draw a

11 criminal intent.

12     I think you will invite jury confusion

13 if, when Mr. Berland does his summation, he makes

14 the argument and then you explain to them that

15 they are not to draw such an inference.  I think

16 the better practice is to not let ADA Berland make

17 the argument if Your Honor in turn will instruct

18 them that he cannot draw the inference.

19     THE COURT:  You misunderstood what I said

20 I would do.  It's not that I'm going to tell them

21 they cannot draw an inference.  I will say there

22 is no constitutional prohibition or penalty to be

23 gleaned by a person not opening their door.

24     MR. KEITH:  So, then you conclude to the

25 contrary, if that's a word, or you differ from the

1    Court of Appeals, because they're saying that you

2    cannot draw criminal intent.

3         THE COURT:  I'm pummeled by the Court of

4    of Appeals.  I do not disagree with them.  The

5    answer is, no, I'm not saying that.  What I'm

6    saying I said as best I can, with my limited

7    mental factual and meager experience.  If it turns

8    out your client is convicted of something, I await

9    my fate when there is an appeal, but I'm

10    confident.

11         Please mark his card for Part 81 on

12    Monday.  Please put him on the trial list for that

13    part.

14   ------------------------------------------------------------

15   SUPREME COURT OF THE STATE OF NEW YORK

16   COUNTY OF NEW YORK               PART-93

17   THE PEOPLE OF THE STATE OF NEW YORK

18

19             -against-
                        TRIAL

20

21   EDWARD GREEN,
                    Defendant

22                  September 15, 2008

23

24   B E F O R E:  HONORABLE E. MCLAUGHLIN, JSC

25         (Appearances as previously mentioned.)
   ------------------------------------------------------------

1        THE CLERK:  Case number one on the

2    Part 93 calendar, Edward Green.

3        MR. KEITH:  I want to make sure I'm

4    clear.  With regard to the second, third and

5    fourth counts of the indictment, that covers both

6    the second floor and the fourth floor?

7        THE COURT:  Yes.

8        MR. KEITH:  And you will give a credible

9    charge?

10       THE COURT:  Absolutely.

11       It's just the four charges on the

12   indictment.  Do you want me to tell them about

13   your client not testifying?

14       MR. KEITH:  Absolutely.

15       THE COURT:  Jury entering.

16       THE CLERK:  Case on trial continues.

17   People of the State of New York versus

18   Edward Green.  All parties and jurors are present

19   and properly seated.

20       THE COURT:  Anything else from the

21   People?

22       MR. BERLAND:  The People rest.

23       THE COURT:  Mr. Keith, anything from the

24   defense?

25       MR. KEITH:  No, Your Honor.

PROCEEDINGS

1        THE COURT:  We will now go to the

2    summations.  If you remember the order of the

3    trial, by law, the defense goes first, so we'll

4    hear from Mr. Keith.

5        MR. KEITH:  May we approach?

6        THE COURT:  Yup.

7        (Whereupon, a sidebar conference was held

8    on the record out of the hearing of the jury.)

9        THE COURT:  I thought by the lack of --

10   it's my fault, I don't see the need to hear the

11   motion for the third time.  The evidence is

12   finished.  There's no defense case.  I think if

13   you make a motion at the end of the People's case

14   and at the end of the entire evidence, which is

15   identical, it would be identical to what has been

16   made twice before.  Let's assume you made it and

17   assume I denied it.

18        Is that an adequate record for your

19   purposes?

20        MR. KEITH:  No.  Can I add a little bit?

21        THE COURT:  Why don't we do it later.  Is

22   that accurate for your purposes?

23        MR. KEITH:  Your Honor, I don't know if

24   legally that's the right way to do things.  I want

25   to make sure the record is clear and all his

YVETTE PACHECO   SENIOR COURT REPORTER



1    rights are preserved.  I think I have to make the

2    motion now.

3         THE COURT:  Whatever you feel like doing.

4    It's Monday morning and whatever you want to say.

5         MR. KEITH:  Now that we have heard all of

6    the evidence in the case, I think it would be

7    appropriate for Your Honor to enter a trial order

8    of dismissal.

9         While Your Honor has been privy to

10   information that the jury hasn't heard, I know

11   Your Honor is acutely aware of the fact that

12   there's been three different versions of what

13   happened back on November 1, 2007.  I submit that

14   it's impossible to reconcile the different

15   versions of what supposedly happened back on that

16   date.  I believe I got the phrase "there's only

17   one truth" from Your Honor.  I would think that

18   your conscience has to be somewhat troubled by the

19   testimony of Detective Romero and the differences

20   in the Grand Jury testimony, the affidavit for the

21   search warrant, the testimony that he gave you in

22   that Darden hearing and what he said in the

23   courtroom to this jury.  This case is nothing

24   short of an outrage.  The fact that ADA Berland

25   has had his hands all over the case from the

PROCEEDINGS

1    beginning to the end and brought this forth in

2    this court in this manner.  Your Honor has already

3    ruled that the behavior was illegal and now for

4    them to come in and add more to it, Your Honor

5    should bring this to an end right now.

6              THE COURT:  Do you want to say anything?

7              MR. BERLAND:  I rest on the record, Your

8    Honor.

9              THE COURT:  This situation in the posture

10   in which the legal system in the year 2008 is,

11   really does not permit me to do a thing, since

12   35NYS has been the Brown case which says judges at

13   my level shouldn't be granting trial orders of

14   dismissals because it removes from the prosecution

15   any objection of appeal.  The case would be a dead

16   duck at that point.

17             Perhaps your assessment of my instinct

18   and my reaction is relatively if not largely

19   accurate.  I was afraid after the Darden hearing

20   of saying that the entire thing had to be

21   dismissed since I don't get to act, however, on my

22   own personal feelings now or whenever on whim or

23   caprice, but I'm required to figure out as best I

24   can with my humble mentality what the law is and

25   having been implored and impleaded not to toss the

1    case out of pique perhaps or an assessment of

2    credibility, I didn't think and researched and

3    that's why I had to invoke in my opinion the rule

4    regarding standing that oftentimes causes people

5    to be mystified, namely that there could be a

6    recognized error, perhaps intentional error or

7    misstatement, defraud or deceit, et cetera, et

8    cetera, et cetera, et cetera all of resulting in

9    suppression of evidence, but that the person on

10   trial doesn't get the benefit of it.  It's called

11   the standing rule.  Of course, we're going to

12   review this if there is a conviction, as I assume

13   all three of us, so the motion is denied.

14           MR. KEITH:  Your Honor, briefly, with

15   regard to the Brown decision and the rules

16   enunciated on the 290, I believe Your Honor can

17   reserve decision and the People would still have

18   the right to appeal.

19           THE COURT:  That's absolutely correct,

20   but it's correct as a matter of law, not on facts.

21   If a jury decides that there is a connection, it's

22   again, virtually impossible for me, a trial judge,

23   to say that as a matter of law there is no basis

24   connecting your client to whatever he may be found

25   guilty of.  That really is an Appellate issue

SUMMATION - DEFENSE

1    properly brought by the defendant.  Let's wait

2    until we get there.  If I were to say the word

3    reserved, undoubtedly I'll hear the argument a

4    fourth time and I choose not to do it, so the

5    motion is denied.

6              (Whereupon, the sidebar conference

7    concluded and the proceedings continued in open court

8    as follows:)

9              THE COURT:  In a moment, we're ready for

10   Mr. Keith's summation.

11             MR. KEITH:  Good morning, ladies and

12   gentlemen of the jury.  I want to start by

13   thanking you for your time and attention in this

14   case.

15             I feel like an apology is in order

16   because when we started this last Tuesday, I

17   certainly do not think any of us anticipated that

18   it would take as much of your time and attention

19   as it has, but I also think that even though we

20   have only heard testimony from two witnesses, I

21   would imagine that this has been somewhat of a

22   learning experience for all of us and possibly

23   even a wake-up call.

24             I implore you, I want you to deliberate

25   and discuss this case amongst yourselves.  When

YVETTE PACHECO  SENIOR COURT REPORTER

1    I'm done, of course, ADA Berland will make his

2    arguments and then the judge will instruct you on

3    the law.

4         You all promised that you would

5    deliberate and talk about this case and I

6    certainly want you to do that.  This is an

7    experience I think you should also share with

8    family and friends.  I want you to discuss and

9    talk about how intense, just testimony from two

10   witnesses, how intense the assistant district

11   attorney was and is as the evidence certainly

12   revealed.

13        He has been a part of this case from the

14   very beginning.  This is his case.  This is the

15   way it was presented to you.  He and his very

16   experienced detective, Detective Romero in

17   particular, convinced the judge to sign a search

18   warrant, actually search warrants.

19        I think it's pretty evident that the

20   initial search warrants were based on bad

21   information.  The description of the building was

22   totally wrong.  I want you to talk about that,

23   think about that.  The case started with bad

24   information before November 1st and continued with

25   bad information on that date and since then.  As I



═══ SUMMATION - DEFENSE ═══

1    said, the initial bad information was the wrong

2    description of the layout of the building.

3         Now, what I'm saying now is not evidence

4    and what the prosecutor said in the opening

5    statement is not evidence.  What he's about to say

6    in the summation is not evidence, but you may

7    recall he said something about the building was

8    converted into an SRO.

9         You can take a look at the pictures, and

10   there was no recent conversion.  The building has

11   been the way it is for a long period of time.  The

12   picture makes it very clear that there's no sign

13   of any recent construction, any new construction,

14   anything to that effect.

15        The other bad information that came out

16   on November 1st and it is an important piece of

17   information, is the keys that they got from the

18   second floor.  The assistant district attorney and

19   the officers made it sound as though those keys

20   were gotten from Steven Brown, but a precise

21   statement is the keys were in a jacket next to

22   where Steven Brown was sitting.

23        We heard nothing else about this jacket,

24   whether or not it fit Steven Brown, whether or not

25   it was a man's jacket or woman's jacket, nor any

SUMMATION - DEFENSE

1    identification belonging to Steven Brown.  I think

2    when there was some Q and A about that during the

3    trial, the judge may have interjected and said

4    something about constructive possession or

5    something to that effect, but none of that has

6    been fleshed out.

7            The precise facts are that the detective

8    found some keys in a jacket next to this man

9    Steven Brown, and with those keys, ladies and

10   gentlemen, I think the evidence is clear, they

11   went to every apartment in this building.

12   Detective Romero would like us to believe that

13   they went straight up to the fourth floor

14   apartment and then checked the other apartments.

15           Ladies and gentlemen, I ask you to use

16   your common sense.  These detectives did what they

17   wanted to do on that date.  They went to every

18   apartment.  Let's talk about first grade detective

19   Alfred Hernandez, second grade detective Anthony

20   Romero.  The evidence and lack of evidence that

21   was presented to you.

22           Ladies and gentlemen, I submit to you

23   that the case is a very weak case.  It's built on

24   reasonable doubt.  It certainly appears that what

25   happened on November 1st, these detectives and ADA

=SUMMATION - DEFENSE =

1   Berland made a rush to judgment and made some

2   decision that day and obviously affects my client,

3   Mr. Edward Green.   There was absolutely no

4   investigation done as to who were the apartments

5   were leased to.

6         I don't have the burden of proof here.

7   You can't shift it to me and force me to do

8   things.  Mr. Green has no burden of proof.  The

9   law says they have the burden of proof.  They have

10  to prove the elements of the crimes charged beyond

11  a reasonable doubt.  You can't shift it.

12        Edward Green certainly did not live at

13  451 Lenox Avenue.  Now, I know the district

14  attorney, when he stands up here, he will wave the

15  keys around and try to make his case out and

16  suggest that because Mr. Green had keys to just

17  about everything in that building, that somehow he

18  has the combination to the locks in the safes and

19  therefore the drugs are his or something to that

20  effect.  Speculation, ladies and gentlemen.

21        When I finish, you will see that almost

22  each and every piece of critical information in

23  this case has been rebutted by the detectives' own

24  testimony.  The Polaroid pictures.  Here, in 2008,

25  I am surprised that you can still get film for a

═══════ SUMMATION - DEFENSE ═══════

1    Polaroid camera.  When was the last time somebody

2    used a Polaroid camera?  Are they serious?  What

3    about any forensic work, ladies and gentlemen,

4    DNA, fingerprints?

5         It appeared to me that Detective Romero

6    was almost annoyed because in his mind, oh, the

7    guy is in the room, clearly he's guilty.  In his

8    mind, there's nothing else to be done.  What

9    happened with these very experienced detective?

10   This is 2008.  The technology is here.  There's no

11   excuse.

12        Now, during this trial, there certainly

13   was some laughter and funny moments.  Certainly

14   the laughter is good to counteract the stress, but

15   ladies and gentlemen, the charges are very serious

16   charges.  These are very serious accusations made

17   against Mr. Green.  All the laughing and joking is

18   over.

19        We are in the Supreme Court of New York

20   County, and the first count of the indictment

21   charges him with Criminal Possession of Controlled

22   Substance in the First Degree, the highest and

23   biggest drug charge in New York State.  This is

24   the way the case is handled and presented to you.

25   Please deliberate and talk about this case.  Talk

═══════ YVETTE PACHECO  SENIOR COURT REPORTER ═══════

SUMMATION - DEFENSE

1    about how easy it is to be accused of a very

2    serious crime.

3          I want you to think about the rush to

4    judgment and the conclusions and deliberations

5    that were made back on November 1, 2007.  Think

6    about it, ladies and gentlemen.  You can go to

7    someone's house, someone's apartment or you could

8    be working and there is a heat sealer on the

9    floor, a digital scale.

10         By the way, I cook a little bit, my wife

11   does some cooking.  I don't think I've ever seen a

12   digital scale.  How are we to assume, Mr. Green,

13   even if he were sitting right next to a digital

14   scale, would know what it is?

15         If I understood the testimony correctly,

16   they saw a digital scale on a rack and the other

17   scales were recovered from the inside the closet.

18   On a glass top table, there was testimony that

19   there was cocaine residue.  I think we all agree

20   that the more precise language, if there was some

21   white powder on the table, would have been to say

22   white powder.

23         But, ladies and gentlemen, there's the

24   Polaroid pictures, and I submit, if you look

25   carefully at the pictures, you do not see any

SUMMATION - DEFENSE

1    white powdery substance.  So the arguments or

2    statements that were made to get the search

3    warrant, that were made in the opening statement,

4    that were made throughout the trial about cocaine

5    residue, it really means nothing.  It really means

6    nothing.

7         I mean, I'm asking you not to accept the

8    testimony from these detectives because you don't

9    know what to believe, you do not know what the

10   truth is.  There are too many versions coming from

11   these guys.

12        With respect to those items that were in

13   the room with Mr. Green, the heat sealer on the

14   floor, the digital scale that I believe was on the

15   TV rack, this glass top table with the white

16   powder on it, I also believe there was a box of

17   Ziploc sandwich bags on the counter that looks

18   like a fireplace, a picture of those items are

19   also in evidence, People's Exhibit 21.

20        THE COURT:  What do those items mean?

21   You can look at the picture.  You can see the box

22   with the Ziploc bags.  I don't see any white

23   powder.  You can look at it for yourself.  It's in

24   evidence.  Now, there was testimony that when the

25   police got to this location, before they executed

═══SUMMATION - DEFENSE ═══

1    the search warrant, that they sent -- I believe

2    they described it as a walk-on to the building.

3    According to what the detective said, somebody

4    came out of the building and then they went in,

5    they made their move.

6         Nothing else was said about the person

7    that left the building.  They didn't get any

8    identification from the person.  At least there

9    was no testimony about that.  It appears to me

10   that under the circumstances of this case, with

11   them having a warrant at that time, they should

12   have at least stopped the person and did some sort

13   of investigation.  There was nothing said about

14   that.

15        Ultimately, they get in the building and

16   according to the detective, the first team rushed

17   in and used the battering ram on the door that

18   they thought would lead them to a third floor

19   apartment, but it was the third floor of the

20   building and there were four apartments up there

21   and then they go into the second floor of that

22   building and they say the door was wide open and

23   Steven Brown, their testimony is that they got the

24   keys from Mr. Brown.

25        Now, what about Mr. Green?  Why is he in

SUMMATION - DEFENSE

1    the apartment?  Is he a visitor?  The volume of

2    keys must suggest that he must work in the

3    building, that he had access to the laundromat and

4    the other apartments.  Was he set up?  Did he go

5    into the apartment and did the owner leave him

6    there?  Was the owner of the building the person

7    that left the building?  These are questions that

8    we have no answers to.

9         Ladies and gentlemen, I'm begging you not

10   to shift the burden of proof.  You will get legal

11   instructions from the judge.  I will ask you to

12   follow the law that the Judge gives you and also

13   asking you to use your common sense.

14        The prosecutor will try to argue that

15   Mr. Green and Mr. Brown were working together.

16   The law says it's acting in concert.  I submit to

17   you that there is no evidence that supports that

18   beyond a reasonable doubt.  Start with the

19   misstatements that the keys were recovered from

20   Mr. Brown.

21        When ADA Berland and Detective Romero got

22   a judge to sign the search warrant for the fourth

23   floor, which I submit to you, ladies and

24   gentlemen, based on what we heard from Detective

25   Hernandez.  I submit to you that the apartment was

SUMMATION - DEFENSE

1    searched well before they got the search warrant.

2          I think if you think back to the

3    testimony of Detective Hernandez, you'll remember

4    that he just went on, and, I don't know,

5    describing how they went into the closet, got the

6    safes out, banging away with the sledgehammer.  He

7    forgot that they should have said they stopped to

8    get a search warrant.  I believe that mistake was

9    the way it really happened.

10         I submit to you, ladies and gentlemen,

11   that these detectives, they did what they wanted

12   to do back on November 1, 2007.  The

13   misstatements, the misleading statements that we

14   heard from Detective Hernandez and from Detective

15   Romero are numerous.

16         Now, when I cross-examine the detectives,

17   I mean it's obvious that I shouldn't expect them

18   to go out of their way to, you know, respond

19   appropriately to my questions or to give me the

20   answers that I want to hear, but I certainly did

21   not expect them to make misstatements or have a

22   convenient memory loss when I asked them a

23   question.  I didn't think they would get up there

24   and try to mislead you.

25         There were little things and there were

SUMMATION - DEFENSE

1    big things.  One of the big things, I tried to get

2    this picture of the front of the building into

3    evidence.  You may recall the difficulty that I

4    had when I questioned Detective Hernandez and

5    Detective Romero, and they both claimed that they

6    do not recall the wires.  I think Detective Romero

7    took a step further and he says, Oh, yeah, I don't

8    even remember seeing the air conditioners in the

9    window.

10           And it's true.  These pictures,

11   obviously, were taken after November 1st.  I'm

12   sure the prosecutor will argue about that.  But,

13   ladies and gentlemen, look carefully at the

14   pictures.  You see there are wires going to every

15   apartment.  The video system in that building had

16   been in place for years and those wires went to

17   every apartment.  The building had a locked door.

18   You had to be buzzed in and the tenants could

19   check to see who was buzzing.  It's as simple as

20   that.

21           But these detectives came in here with a

22   whole different story.  And, I don't know, is the

23   ADA going to argue that sometime after the

24   incident, that I or the tenants added these wires

25   to the building?  It doesn't make any sense,

YVETTE PACHECO  SENIOR COURT REPORTER

SUMMATION - DEFENSE

1    ladies and gentlemen.  I mean, you know, what was

2    that all about?

3         The detective came in here and tried to

4    mislead you about a material part of this case.

5    This is the -- this is part of the connection

6    they're trying to make between the second floor

7    and fourth floor, between Steven Brown and

8    Edward Green.  You look at this and it's like,

9    what is he talking about?  How could he forget

10   that?  How could he not remember this?

11        I can't believe that you will accept, I

12   don't know, what the DA will argue, but I can't

13   argue and say I did this or the tenants did this.

14   I think that's too absurd.

15        With regard to the air conditioners,

16   well, the Polaroid pictures, they're bad pictures.

17   The DA conceded that, but if you take a look at

18   People's Exhibit 16, also a picture of the second

19   floor, and if you look carefully at the picture,

20   there clearly appears to be an air conditioner in

21   one of the rear windows.

22        Just sort of destroys that silliness that

23   Detective Romero was talking about, that, you

24   know, he didn't remember the air conditioners.  He

25   just didn't give it to us straight.  Whatever I

YVETTE PACHECO  SENIOR COURT REPORTER

SUMMATION - DEFENSE

1   asked him, it was like it was pulling teeth or

2   something.

3        Another example of that, try when the

4   keys that Mr. Green had on him were introduced

5   into evidence.  Detective Romero testified amongst

6   the keys, there was a key for the second floor.  I

7   challenged him on that.  I was ready to do a

8   demonstration, see which one fit in the lock in

9   the second floor.

10       We got the evidence out and you saw what

11  happened.  We get scissors from the court clerk

12  and I'm about to cut the bag open and then I

13  realize when I take a look at the evidence and the

14  paperwork associated with the evidence, that

15  that's not even the second floor lock.

16       I submit to you, ladies and gentlemen, it

17  was pretty clear that the detective knew that and

18  ADA Berland, too.  They were about to let me open

19  the bag with the fourth floor lock to do a

20  demonstration that would have been impossible to

21  do for what I was trying to do at that time.  The

22  connection between second and fourth floor is very

23  tenuous, very weak.

24       Detective Hernandez testified about

25  recovering stuff from the garbage.  He made it

YVETTE PACHECO  SENIOR COURT REPORTER

SUMMATION - DEFENSE

1   seem as though the bags of garbage were fairly

2   close to the door of the apartment.  If you look

3   if you take a look at the pictures, a small

4   apartment.  They found some stuff in the garbage.

5   The way Detective Hernandez has it, the bags of

6   garbage were I believe he said to the left of the

7   couch, which would put it right by the door.

8        But if you think about the testimony of

9   Detective Romero -- I guess you have to decide

10  which version to accept.  He comes in with the

11  shield, bunker and gun out.  It seems he would

12  have run right into the bags of garbage.

13       Whatever the testimony, it is so

14  convoluted that I don't think there is anything

15  there that you can conclude and make decisions on.

16       Now, another indication that I imagine

17  connects the apartments the assistant will argue

18  when I'm done is that there were bags found on the

19  second floor that had the Big Apple or red apple

20  marking on it and in the closet on the fourth

21  floor, there were similar types of bags found in

22  the closet.

23       Ladies and gentlemen, I ask you to take a

24  look at the bags.  I forget what exhibit they are,

25  but those bags, just from looking at them, they

=== SUMMATION - DEFENSE ===

1    are made that way.  It's not like there was a

2    stamp put on them.  They are rolls of bags and

3    that's the way they're made.

4         If you recall, Detective Hernandez, in

5    one of his rare moments of honesty and clarity,

6    admitted that the bags were relatively common.

7    He's seen them before in other investigations and

8    fairly easy to buy.

9         The video connection between the second

10   floor apartment and the fourth floor apartment, as

11   I stated earlier, I submit that that's bogus.  The

12   detective testified that they never saw a working

13   monitor or TV in the fourth floor apartment.  They

14   tried to explain that away by saying that the

15   camera that was posted downstairs by the door had

16   been removed before they looked at the monitor.

17   Well, it appears that that is certainly something

18   they concocted for the trial.

19        I certainly want you to consider the

20   sworn truth of the testimony that Detective Romero

21   gave to Judge McLaughlin in the pretrial hearing.

22   He told Judge McLaughlin that he was able to see

23   from the monitor and he was able to see the

24   street.  How do you reconcile that?  He told the

25   truth there, telling us the truth in the

1    courtroom.  What is the truth?  There is only one

2    truth.  There is no way to reconcile it, ladies

3    and gentlemen.

4            The Court said:  Inside the room on the

5    fourth floor where the fellow was, he was sitting

6    in the room on a couch?

7            Detective Romero:  Yes, sir.

8            The Judge:  Did you open the lock that

9    got you in there or was it somebody else whom you

10   watched do it?

11           Let's stop for a moment.  Why do you

12   think the judge asked him that question?

13   Obviously, the judge had information that there

14   was either a police report, something that caused

15   the judge to ask him, "was it somebody else you

16   watched do it?"

17           But Detective Romero, in his honest and

18   forthright testimony says:

19           No, I opened the door.  Before we did it,

20   once I noticed the key turn, I banged on the door,

21   announced that it was the police, if anyone was in

22   there, to come out.  There was no response.  I did

23   it again.  I opened the door.  The room was

24   totally dark.  I shined my flashlight in the room.

25   So the gentleman sitting on the floor was

SUMMATION - DEFENSE

1    crouched, just sitting there in the dark.  At that

2    time, we took him into custody, brought him out.

3    Once we turned the lights on in the apartment,

4    that's when we saw all the paraphernalia.

5              The Judge asks him:  Among the

6    paraphernalia was, of course, the TV monitor?

7              The witness goes:  Correct, sir.

8              The Judge:  Was it working?

9              Detective Romero:  No everything was off.

10   The room was totally black at that time.

11             The Judge:  Did you ever figure out how

12   to turn the monitor on?

13             Yes.

14             When you turned it on, could you see the

15   street?

16             He told the Judge yes.  He told us that

17   he couldn't see anything on the monitor and his

18   explanation was that the camera had already been

19   removed.

20             Now, part of your function as jurors is

21   to deliberate and discuss things like this and try

22   to reconcile the differences.  The judge will

23   instruct you, give you some instructions on how to

24   do that.  One of the things he'll tell you is that

25   when you're evaluating the credibility of a

═══ SUMMATION - DEFENSE ═══

1    witness, and, again, his instructions are what

2    control, you can accept some of the testimony or

3    reject other parts of the testimony or if you feel

4    as though the information is to a material fact,

5    you can reject all of their testimony.

6         Ladies and gentlemen, that's what I am

7    asking you to do because this case is so important

8    and these detectives, they came in here, and they

9    weren't straight with us.  They weren't honest

10   with us.  They weren't direct with us, and no one

11   should be convicted on this type of testimony.

12   I'm asking you to reject their testimony.

13        These detectives came in here with a

14   one-track mind, to try and get a conviction

15   instead of being honest and forthright with their

16   testimony.  Their explanation about the picture,

17   about the wires is outrageous.  They do not

18   remember, they do not recall seeing the wires.  So

19   what does that leave us?  I went there and put the

20   wires up?  The tenants put the wires up?  The

21   wires were there, always there, ladies and

22   gentlemen.

23        These guys just lied to you.  Both

24   detectives' credibility leave a lot to be desired.

25   The suggestion that these apartments were recently

═══ YVETTE PACHECO  SENIOR COURT REPORTER ═══

SUMMATION - DEFENSE

1   converted to SROs is laughable.  Look at the

2   pictures.  There is no evidence, no suggestion of

3   any new construction or recent construction.  It's

4   clear that the building has been like it is right

5   now, it's been that way for years.

6          These officers, these detectives tried

7   too hard to get a conviction when they just needed

8   to come in here and be straightforward and honest.

9          In his opening remarks, and again, what

10  I'm saying now is not evidence, the opening

11  remarks are not evidence, the closing remarks are

12  not evidence, but in the opening remarks the

13  assistant district attorney suggested that the

14  detectives used caution.  Ladies and gentlemen, I

15  submit that these men went through that building

16  and did what they wanted to do.

17         They were being cautious to a degree, but

18  they just took over and went door to door in a

19  systematic search of this building, harassing

20  people, terrorizing people, just doing what they

21  do.

22         I submit, they didn't even wait for the

23  search warrant for the apartment on the fourth

24  floor, and Detective Hernandez in his testimony,

25  basically said it.

1    Ladies and gentlemen, you all promised to

2    follow the law.  The burden of proof is on the

3    assistant district attorney, Mr. Berland.  It

4    hasn't shifted.  Mr. Green and I do not have to

5    prove anything.  There is a presumption of

6    innocence.

7    There is no proof.  You should not even

8    think about a conviction when you're not even sure

9    what happened, what version of this incident is

10   the truth for none of the charges.  The first

11   charge is Criminal Possession of a Controlled

12   Substance in the First Degree.  The drugs were in

13   a locked safe.

14   As the prosecutor brought out, there's no

15   evidence, there's nothing to suggest that

16   Edward Green had the combination of the safe or

17   even knew the safes were in the closets.  The

18   Judge will instruct you on constructive

19   possession, not guilty.

20   One of the other charges is Criminal

21   Possession of a Controlled Substance in the Third

22   Degree.  And the paraphernalia charges, with

23   regard to the stuff that was -- going backwards,

24   start with the paraphernalia charges, with the

25   stuff that was in open view when the detective

SUMMATION - DEFENSE

1   entered the room, I submit to you that none of

2   those items so clearly represent a conviction to

3   drug usage that Mr. Green is guilty beyond a

4   reasonable doubt of having knowledge of it.

5        I submit to you that a person involved in

6   drug trafficking may recognize that some of the

7   items can possibly be used.  The heat sealer on

8   the floor or if he even recognized the digital

9   scale that was on the TV stand, the Baggies are

10  regular Ziploc sandwich Baggies sitting on the

11  counter.

12       And the alleged white powder.  Well, I

13  don't know what you are going to conclude about

14  that.  If you believe that there was a white

15  powder --

16       THE COURT:  Give him a tap.  I want to

17  make sure you hear this.  I didn't mean to

18  embarrass you.

19       MR. KEITH:  With regard to the white

20  powder, I don't know what you will conclude about

21  that.  If you believe there was white powder or

22  not, the ADA, in his opening remarks, I imagine he

23  would repeat something about it being sprinkled

24  all over the place.

25       If you look carefully at the Polaroid

═══SUMMATION - DEFENSE ═══

1    pictures, I don't see any white powder.  The

2    detective and the assistant, they refer to the

3    white powder as cocaine residue, but, if there was

4    white powder, it wasn't tested.  There is no

5    evidence of it being tested.  It's like -- I don't

6    know what you do with that.  It's reasonable

7    doubt.

8         I submit that the whole house was wired,

9    all nine apartments.  On another note, when they

10   enter the apartment, I believe the prosecutor will

11   make an argument to the effect that yes, in his

12   mind, Mr. Green was supposed to get up and open

13   the door for them.  I believe you will get an

14   instruction from the judge that he had a right not

15   to do that.

16        Ladies and gentlemen, I ask you to

17   combine the law with your common sense.  If we

18   accept the version, the version that is given to

19   us by, I believe this version is very contrived,

20   but the version given to us by Detective Hernandez

21   and Detective Romero that they grabbed this shield

22   or the bunker thing and rushed into the apartment

23   with his gun out, what would you expect Mr. Green

24   to do under those circumstances?  I certainly

25   wouldn't move, I don't think anybody else in here

═══YVETTE PACHECO  SENIOR COURT REPORTER═══

1    would move under the circumstances, but that's if

2    you accept the version.

3         You recall there is an earlier version

4    when they spoke directly to the judge and it

5    didn't happen that way.  Again, how are you going

6    to decide and make inferences.  He's going to

7    argue that there's some guilt involved in that,

8    but you're not sure what happened.

9         There is only one truth.  Either it

10   happened one way, the other way or somewhere in

11   the middle.  I guess you will have to reconcile

12   that and figure that out.  That's something that

13   you are going to have to discuss when you are

14   deliberating.

15        He told the judge that he had a

16   flashlight and took him into custody and brought

17   him out.  But he told you that he had the shield,

18   the bunker and a gun in his hand.  I don't know,

19   how do you reconcile those two things?

20        There's still the question of him opening

21   the door.  Some of you may be sitting there saying

22   Well, why didn't he just open the door?  I submit

23   to you, ladies and gentlemen, like most of the

24   other people in that building it was probably just

25   simply intimidating.  He didn't want to open the

1  door, he didn't want to be bothered with the

2  police.

3         I think that this issue, that it's a

4  matter of perception, the different environments

5  that we live in.  I submit that some people just

6  don't want to be bothered with the police.

7         I know that's probably contrary to the

8  way many of you were brought up.  If there is a

9  problem, you go to the police, but for some of us,

10  we hesitate to do that, and we have a right not

11  to, and I argue that there should be no negative

12  inference drawn from the fact that Mr. Green

13  didn't get up and open the door for those police

14  officers.

15         Some of us only go to the police when

16  it's absolutely necessary.  It's just the way it

17  is.  Unfortunately for some of us, the

18  relationship with the police department, you know,

19  makes it that way.  Last year in 2007, 19 black

20  men were shot by the police, ten were killed --

21         MR. BERLAND:  Objection, Your Honor.  I

22  don't know what this has to do with the trial.

23         THE COURT:  I hope you're not

24  interjecting an issue into this trial that has no

25  place.

SUMMATION - DEFENSE

1      Sustained.   Disregard it.

2      MR. KEITH:   So, ladies and gentlemen,

3  what's the truth?  How do you evaluate the

4  testimony you heard in this case from the

5  detectives.  I submit their techniques and their

6  testimony should be rejected.  Their lack of

7  investigation, rejected.

8      When you go back to talk about the case,

9  I ask you to take another look at the pictures, in

10  particular Defendant's E in front of the building

11  with the wires.  I ask you to take a look at

12  Defendant's Exhibits B and C, the layout of the

13  apartment on the second floor and fourth floor.

14      I believe Detective Hernandez said

15  something about a black garbage bag covering the

16  window or something to that effect.  Again, the

17  prosecutor will argue and rightfully so that the

18  pictures were taken after the incident.  The black

19  garbage bag, I submit, is something created.  It's

20  just not there.

21      People's Exhibit 22, the detective

22  suggests that this picture came from the fourth

23  floor apartment.  Now, in this picture, in the

24  background, you can clearly see that there are

25  some Venetian blinds.  It's just inconsistent with

SUMMATION - DEFENSE

1    everything we have heard.  If there is the black

2    garbage bag or whatever, it's certainly not

3    reflected in this picture.  I think the detective

4    made a mistake.

5        If you look at the other Polaroid

6    pictures, you will see that in the second floor,

7    that there's some windows with some Venetian

8    blinds on it.  Actually, if you take a look, I

9    referred to it before, at People's Exhibit 16, it

10   appears, and it's hard to tell, but it appears

11   that item might be sitting right here to the left

12   center of the picture.  This item here appears to

13   be the air conditioner. Take a look at the

14   pictures.

15       I think the picture somewhat -- further

16   undermines the information or the misinformation

17   that these gentlemen, these detectives gave you.

18       I submit that it's absolutely clear that

19   Mr. Green did not live at that location.  The

20   evidence, the number of keys suggests that he may

21   have worked there as a superintendent.  I'll

22   concede that I didn't put on a case, but, I ask

23   you to consider my argument and to use common

24   sense.

25       One of the items admitted into the

1   evidence, Defendant's Exhibit G, I used this

2   property voucher to cross-examine Detective Romero

3   with regard to his statement that there were keys

4   for the second floor.  In the bottom part of this,

5   there is a narrative that describes, you know,

6   where they got keys from and what they were for.

7        I submit to you, ladies and gentlemen,

8   that if there were a key or keys for the second

9   floor, you would have included it, and I submit to

10  you that there was no key for the second floor,

11  that the connection between the fourth floor and

12  the second floor just doesn't exist.

13       The other thing in the document that's

14  now in evidence and that you can read, Edward

15  Green lives at 1133 Ogden Avenue in the Bronx.  I

16  know I questioned the detective about that, about

17  whether or not he had a wallet or whether or not

18  he had any identification on him.  Again, the

19  detectives, they both sandbagged me and claimed

20  that they didn't recall, they don't recall.

21       I submit to you, ladies and gentlemen, if

22  it was a situation where he did not have any

23  identification, they would have said something

24  about it.  They had -- on one hand they tried to

25  argue and suggest that Mr. Green didn't cooperate

SUMMATION - DEFENSE

1   with him at all, he just sat there and didn't do

2   anything.  Then, on the other hand, I guess the

3   suggestion is maybe he told them this address.

4           I submit that that is not the case.  They

5   had his identification.  They looked on it.  They

6   got his address, and that's what's included in the

7   police reports.

8           Ladies and gentlemen, I'm about to wrap

9   this up.  If you need to check any of my

10  arguments, and I know the Court Reporter and Judge

11  do not like to me to say this, but you can have

12  testimony read back.  It's only testimony from two

13  people.  Check and verify the arguments that I've

14  made to you.

15          I know in a few moments that the

16  assistant district attorney will make his remarks.

17  I do not get a chance to reply to the remarks.  He

18  gets the first word and last word.  He gets to

19  draw up the search warrants, put these guys on the

20  witness stand.  Now, he will make his arguments.

21          His argument, like my argument, is not

22  evidence.  I'm sure that whatever he says, that

23  there's evidence or lack of evidence in this case

24  to counteract it.  Ladies and gentlemen, I trust

25  in your intelligence and in your common sense to

SUMMATION - DEFENSE

1    see through that.

2          Ladies and gentlemen, you all promised

3    that you would give Edward Green a fair trial.

4    You all said that you would accept the law and

5    follow the law.  Ladies and gentlemen, you cannot

6    hold it against Mr. Green or draw an adverse

7    inference because he did not testify.  You all

8    promised that you would accept the law.  He's

9    presumed innocent.

10         This case is weak.  You are forced to

11   speculate and pick and choose which version is the

12   truth.  What are you going to believe?  What are

13   you going to conclude?  Then you still have to

14   somehow make a connection between Mr. Green and

15   these drugs in this locked safe.  It's just not

16   there.  The judge will instruct you on the law

17   with regard to constructive possession.  Ladies

18   and gentlemen, I submit that based on what you

19   have heard and what you haven't heard, Mr. Green

20   is not guilty of all these charges.

21         Thank you.

22         THE COURT:  People.

23         MR. BERLAND:  Can we approach,

24   Your Honor?

25         THE COURT:  Yes.

YVETTE PACHECO  SENIOR COURT REPORTER

PROCEEDINGS

1          (Whereupon, a sidebar conference was held

2   on the record out of the hearing of the jury.)

3          MR. BERLAND:  I practice not to object

4      during closing.  Mr. Keith, he said at one point

5      the defendant knew nothing about the

6      paraphernalia.

7              THE COURT:  I heard it.

8              MR. BERLAND:  The only people --

9              THE COURT:  I heard it.  I hear it.

10             MR. BERLAND:  I think that's misleading.

11             THE COURT:  Don't look at those folks.

12             MR. BERLAND:  Yes, Your Honor.

13             THE COURT:  What is it that you are

14     asking me to do?

15             MR. BERLAND:  Open my case and put in

16     direct evidence of the witness of the fact that he

17     has sold drugs in the past.

18             THE COURT:  How?  How would you do that?

19             MR. BERLAND:  Through the undercover

20     detective, Your Honor, who he sold to.

21             THE COURT:  The '96 case?

22             MR. BERLAND:  Yes.

23             MR. KEITH:  Your Honor, with regard to

24     that, the conviction was in '96.  The incident was

25     in '94, just to be accurate.

YVETTE PACHECO  SENIOR COURT REPORTER

1          THE COURT:  Do you have that witness in

2     the room?

3          MR. BERLAND:  I do not, Your Honor.  I

4     did not anticipate that happening.

5          THE COURT:  I gather your file doesn't

6     have certificates of convictions for the three

7     felony offenses he's been convicted of?

8          MR. BERLAND:  Correct.  We can get that

9     within an hour, probably.  It's a New York case.

10         THE COURT:  There is no doubt in my mind

11    that people are allowed to counter this statement

12    that was made in the defense's summation.  Why,

13    since we all agree that this is the fact,  why --

14         MR. KEITH:  I don't necessarily agree.

15         THE COURT:  I know you do not agree that

16    you in a way opened the door again.  Let's put

17    that aside.  What I was referring to was we all

18    agree that there were these convictions and since

19    there was an official New York State NYSID history

20    that reflects at least two of the convictions, why

21    don't we just tell the jury that the defendant has

22    felony drug convictions and we do not have to give

23    them an iota more of information on that.

24         MR. KEITH:  Your Honor, again, I think

25    the Court and prosecutor are improperly shifting

PROCEEDINGS

1     the burden of proof.  There is no evidence to

2     suggest that he had any knowledge what these

3     things are used for.  I don't think that this

4     opens the door.  I ask again that Your Honor

5     declare a mistrial because of all of the mistakes.

6              THE COURT:  Your mistakes or mine?

7              MR. KEITH:  Both.

8              THE COURT:  I don't think I made any

9     mistake.

10              MR. KEITH:  I don't think I made any.

11              THE COURT:  I know you made two.

12              MR. KEITH:  I don't think so.

13              THE COURT:  That is your reaction to my

14     saying why don't we simply say the official

15     New York State criminal history of Mr. Green

16     discloses felony drug convictions?

17              MR. KEITH:  I think that deprives him of

18     a fair trial.

19              THE COURT:  Procedurally, as opposed to

20     whether or not the rule is correct and whether or

21     not we adjourn to get a witness who will say

22     Mr. Green sold me the drugs or whether to adjourn

23     to get a certified copy of a New York State NYSID

24     sheet or certified copy of New York State

25     convictions, why don't we move this along to what

YVETTE PACHECO  SENIOR COURT REPORTER

================ PROCEEDINGS ================

1    you perceive to be an unhappy end and just tell

2    them the official New York State history of the

3    defendant is that he has felony drug convictions?

4         MR. KEITH:  Again, Your Honor, I don't

5    think that would be appropriate.  If the People

6    want to -- you know, if you want to proceed down

7    this road, I suggest that the People give the

8    proof.

9         MR. BERLAND:  We're here on Monday rather

10   than Friday because you represented that you had a

11   witness.  As skeptical --

12        MR. KEITH:  I spoke with the witnesses

13   over the weekend and made a decision not to put

14   that on.

15        THE COURT:  I'm sure for perfectly valid

16   reasons.  So you want this posture to be such that

17   there will be an obvious break and when we come

18   back, the thing that would have clearly caused the

19   break is the finding of a document which says he

20   has a drug conviction?

21        MR. KEITH:  Your Honor, that document on

22   that statement is going to effectively deprive

23   Mr. Green of a fair trial.  No, I will not consent

24   to that.

25        THE COURT:  Give me a minute.

================ YVETTE PACHECO  SENIOR COURT REPORTER ================